

SHERRIFF
HEALTHCARE
SEARCH

12120 State Line Rd Box 368
Leawood, KS  66209
913-341-7117
www.SherriffHealthcareSearch.com

In the Case of

United States District Court

Eastern District of Louisiana

CASE No. 19-cv-00137

Eric Greenberg, M.D.

*Plaintiff*

Versus

The Board of Supervisors of Louisiana State University

and Agricultural and Mechanical College

*Defendant*

## Expert Witness Report – August 23, 2019

I, Julie A. Sherriff, have been retained by Rachel Wolfe, Chief Appellate Attorney of Flood Law PLLC, Royal Oak, Michigan to provide an opinion on this case. My opinions are based on a reasonable degree of certainty in my 36 years of experience in the physician recruitment industry, experience working with a wide variety of healthcare organizations, my research and a review of certain documents provided to me.

## Background

I am the founder and President of Sherriff & Associates, Inc., a physician search firm serving the healthcare industry. Our company, founded in 1983, specializes in placing physicians and advanced practitioners in positions with medical groups, hospitals, and other healthcare organizations.

1



EXHIBIT

2

Since 1983, my staff and I have placed hundreds of physicians in medical practices located throughout the United States. Most of our clients have been medical groups, solo practices or partnerships and hospitals, universities and academic centers who have determined there is a local need or shortage, or an urgent need for a specialty physician in their facility, community or service areas or on their medical faculty. When a group practice, hospital or integrated health system retains our firm to conduct a search, we may be searching for a physician who will become an employee of a hospital or related practice, or who will be expected to establish a solo practice, or who will join a single-specialty or multispecialty medical group, or who may join an academic medical center and teaching hospital in the community. We have also searched for physicians to join national clinics providing specialty services to the public.

I am a founding member of the National Association of Physician Recruiters (NAPR) the national trade association for our industry, founded in 1984. I have served the association as President, Vice President, Secretary, and in multiple terms on the board of directors. I have also served as Chair of Ethics, Chair of Arbitration, and as a member of the Strategic Planning, Certification, and Membership Committees, among others. I helped edit, write, and implement the NAPR's Code of Ethics and the industry's Standards of Practice. I remain a member of NAPR in good standing.

I also led NAPR Services, Inc. from 1999 to 2007 as President. This corporation offers NAPR members access to group purchasing programs including candidate sourcing, advertising, business operations discounts, and more.

Since 1989, Sherriff & Associates has also been a shareholder in First Choice, Inc., (FCI). FCI is a corporation comprised of eight highly regarded physician recruitment firms located in Colorado, Florida, Kansas, Missouri, Texas, and Wisconsin. I have served multiple terms on the Board of Directors and currently serve in the Secretary position on the board. The principals of our partner firms are industry leaders and several of us have served on the Board of Directors or as President of the National Association of Physician Recruiters (NAPR) or the National Association of Locum Tenens Organizations (NALTO), the trade associations for our industry. Sherriff &

2

Associates and our First Choice partners abide by NAPR's strict code of ethics and professional standards of practice.

## Previous Expert Witness Testimony

**Deposition: November 7, 2014**

LINDA A. MILLER, M.D., vs HURON REGIONAL MEDICAL CENTER, INC., CY B. HAATVEDT, M.D., as a Member of its Executive Committee and Individually, and MICHAEL N. BECKER, M.D., as a Member of its Executive Committee and Individually; in the United States District Court; District of South Dakota, Southern Division, Case 4:12-cv-04138-KES

**Trial Testimony: May 2017**

LINDA A. MILLER, M.D., vs HURON REGIONAL MEDICAL CENTER, INC., CY B. HAATVEDT, M.D., as a Member of its Executive Committee and Individually, and MICHAEL N. BECKER, M.D., as a Member of its Executive Committee and Individually; in the United States District Court; District of South Dakota, Southern Division, Case 4:12-cv-04138-KES

## Expert Opinion

I have been requested to provide information concerning the career path of an emergency medicine physician, compensation in that physician specialty and in Dr. Greenberg's present Urgent Care specialty, the effect of residency program dismissal on the career of a physician and the present job market in the specialty of Emergency Medicine. Documents provided to me in this case:

- United State District Court, Eastern District of Louisiana Eric Greenberg, MD Plaintiff Versus the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College Defendant, Case No, 19-cv-00137, First Amended Complaint.
- Dr. Eric Greenburg's curriculum vitae
- Assignment Report 07-03-2019

3

- Sample EE Agreement & Relo, SignOn (Metroplex) 9-26-16
- Sample EE Agreement & Relo, SignOn (St. Davis SA, Metroplex) 9-26-16

## This report covers the following:

I.  Emergency Medicine Physician Education and Training Requirements

II.  Urgent Care Medicine Physician Education and Training Requirements

III.  Comparison of the Work Performed by Specialists in Emergency Medicine versus Urgent Care Medicine

IV.  Emergency Medicine and Urgent Care Medicine Compensation

V.  Internet Advertised Emergency Medicine Open Positions

VI.  Emergency Medicine Career and Retirement

VII.  Career Effects and the Physician Recruitment Process After Dismissal from a Residency Program

VIII.  Summary Opinion

## I.     Emergency Medicine Physician Education and Training Requirements

Emergency Medicine (EM) physicians specialists are trained to treat patients in the Emergency Department of a hospital, in free-standing Emergency Hospitals, or in Urgent Care Centers. EM physicians treat urgent, emergency or traumatic health conditions as well as a variety of illnesses, accidents, fractures, and more. Emergency Medicine physicians provide diagnosis and immediate treatment as necessary, write hospital admission orders, and provide referrals to primary care or other specialists, and prescribe medication, home care, and more.

### Pathways to an Emergency Medicine Career

The path to becoming an emergency medicine physician is a long one, typically 11 to 12 years, and includes these requirements:

1. A four-year bachelor's degree in biology, chemistry or a related field
2. A four-year, accredited/approved medical school degree
   (A few medical schools in the United States offer a <u>six or seven-year combined</u> undergraduate and medical school degree)
3. A three to four year-accredited residency training period; a first year internship year plus two to three years of emergency medicine clinical training.
4. To add sub-specialization to their credentials, some EM physicians add a year or more of fellowship training in Pediatrics, Critical Care, Emergency Medical Services, and more.
5. The United States has strict regulations for all physicians to meet prior to practicing in this country. Emergency Medicine doctors, like all physicians, must pass the United States Medical Licensing Examination (USMLE), which they take in several parts during their residency training years. Emergency Medicine physicians also pass exams for certification by the American Board of Emergency Medicine in order to practice in most hospitals or urgent care centers.

## II.   Urgent Care Medicine Physician Education and Training Requirements

For comparison to Dr. Greenberg's present practice, Urgent Care Medicine physicians typically treat patients in retail walk-In clinics or urgent care centers, generally outside the hospital. These facilities offer a lower level of immediate medical services, usually without appointments, and provide outpatient care for minor, chronic, and sometimes acute illnesses and injury. Increasingly, Urgent Care Medicine is considered a first line of care and treatment for patients who are without a medical home or a primary care physician or whose physicians are not available. Urgent Care clinics are not appropriate healthcare treatment sites for more serious illnesses, chronic healthcare conditions, more extensive tertiary care or life-threatening conditions or injuries that could result in death or disability. Most clinics and centers limit the conditions they treat, and this is often dependent on state laws, the facility and its diagnostic equipment and services, and the professional credentials, education and training of its medical providers.

5

Physicians who work in Urgent Care Medicine may have completed a three to four year-accredited residency training period in Family Medicine, Urgent Care Medicine, Emergency Medicine, Combined Internal Medicine and Pediatrics, Combined Family Practice and Emergency Medicine, Combined Internal Medicine and Emergency Medicine, or Combined Pediatrics and Emergency Medicine and sometimes other medical specialties.

Other physicians though, can work in Urgent Care even if they have not completed an accredited residency program. They are usually referred to as General Practitioners to distinguish them from specialists with completed residency training. General practitioners can work in Urgent Care Medicine in states that allow them to provide services while having completed just one to two years of residency training. Without additional residency training and completion, General Practitioners cannot currently become certified in Urgent Care Medicine or in any other medical specialty sanctioned by the American Board of Medical Specialties.

**Pathways to an Urgent Care Medicine Career**

The path to an Urgent Care career includes these requirements:

1. A four-year bachelor's degree in biology, chemistry or a related field and a four-year, accredited/approved medical school degree. However, a few medical schools in the United States offer a six or seven-year combined undergraduate and medical school degree.

2. Residency training requirements vary by healthcare entity and state. Some employers require completion of a primary care residency such as family medicine, while others may require completion of an emergency medicine residency. Some healthcare entities, including those in rural, low-volume locales, will also hire or contract with physicians who have just one to two years of residency training (based on their state's requirements for licensure) and who are not eligible for board certification, but only if their facility's medical staff privilege rules and their insurance contracts allow it.

6

3. As in all medical specialties, Urgent Care physicians must pass the United States Medical Licensing Examination (USMLE).

4. For those seeking an Urgent Care career and advanced professional credentials, there are several routes to certification provided by the American Board of Urgent Care Medicine. They include completion of an accredited residency in several specific medical specialties, previous board certification in another specialty or a combination of residency or urgent care fellowship completion, or board certification and work experience in acute care medicine.

## III.    Comparison of the Work Performed by Specialists in Emergency Medicine versus Urgent Care Medicine

The Urgent Care Association of America reports that 20% of urgent care centers use a "physician-based" staffing model that only includes physicians and 80% use a combination of physicians and advanced practice providers - nurse practitioners and physician assistants.

**There are unique differences practicing in urgent care medicine vs emergency medicine:**

- Urgent Care physicians may work in Walk-In Clinics or Urgent Care Centers. A Walk-In Clinic allows ambulatory patients to visit with minor illnesses. They may need diagnosis and minor treatment for non-emergent conditions such as flu, colds, sinus infections, urinary tract infections, minor injuries, etc. Most walk-in clinics offer simple lab screens but no x-ray services or more sophisticated on-site lab services.

- Urgent Care Centers typically treat a higher acuity of medical issues and minor injuries, offer EKG's, suturing, diagnostic testing, x-rays, and treat other conditions that are not as severe or life-threatening. Some Urgent Care Centers also provide pre-packaged prescriptions for patients.

- In both Walk-In Clinics and Urgent Care Centers, if a patient presents with a life-threatening condition, they are referred or transferred to a tertiary care hospital's Emergency Room for expert, higher level emergency care.

- Urgent Care physicians report that in general they are less stressed working in an urgent care setting than in an emergency department due to the lower acuity of patient conditions seen, steady and less stressful work shifts, and the ability to build relationships with repeat patients.

- Emergency Medicine physicians employ a much wider skill set and more sophisticated treatment options than Urgent Care physicians, learned through years of residency training and practical experience. Their longer work shifts can be demanding, as they typically treat a higher volume and acuity of patients. Patients visit emergency rooms with a wide array of emergency or life-threatening conditions and traumas. Emergency Medicine physicians must constantly and quickly employ the knowledge and procedural skills gained from their training and experience and fast, crucial decisions are necessary, often to save a patient's life.

- Emergency Medicine physicians are not limited in treatment options like Urgent Care physicians. They are hands-on, procedural specialists. Among many others, procedures they perform include resuscitation, intravenous access, chest compressions, central or arterial line placement, gastric tube placement, spinal taps, and removal of all types of foreign bodies that may result from construction, industrial, home, and other accidents. They also diagnose and provide cardiac care and treat pneumonia, meningitis and a variety of bacterial, viral, and skin infections. They treat trauma – shooting victims, auto accidents, and a wide variety of serious injuries.  Due to the variety of casework, Emergency Medicine physicians are traditionally more stimulated by their work, however Emergency Medicine doctors also have reported higher stress in their jobs due to the fast pace, demand for immediate critical thinking and crucial decision making, and longer, rotating work schedules.

## IV.    Emergency Medicine and Urgent Care Medicine Compensation

1.    <u>Medical School and Residency Compensation.</u>

While students attend medical school, they are not employed and do not receive compensation, even though they can start working in clinical patient care as early as their 2nd year of school. For 2019, according to the Association of American Medical Colleges (AAMC), the average student tuition loan debt of graduating doctors is $183,000. This debt is incurred before physicians start their specialty training via a residency program.

Resident physicians are employed during residency training by a healthcare institution-hospital or medical center, typically with ties to a medical university, and receive a salary and benefits. According to The Medscape Residents Salary & Debt Report 2019, the average emergency medicine resident salary is $57,800. With such high student debts, most residents also continue to take loans to support themselves and their families during the residency training years.

2.      In-Practice Compensation

Our in-practice compensation survey research considered the specialties of emergency medicine and urgent care medicine.

**SURVEYS**

**Medical Group Management Association (MGMA)**

MGMA's Compensation and Production Survey is regarded by health professionals as one of the major industry leaders in physician and medical provider compensation, with some of the most comprehensive data available. MGMA is a 90+-year old trade association of over 50,000 members engaged in the administration and management of medical practices in the United States. Members oversee practices for individual to large multispecialty groups in every specialty, academic practices which are affiliated with medical schools, and healthcare system-owned or affiliated group practices. Since 1987, MGMA has surveyed its membership and published annual Physician and Provider Compensation and Production Surveys.

9

SURVEY: **MGMA Physician *Starting* Salary** 2018 based on 2017 results

| Guaranteed Compensation – Provider Placement Starting Salary | | | | |
|---|---|---|---|---|
| Specialty | 25th Percentile | Median | 75th Percentile | 90th Percentile |
| Emergency Medicine | $140,400 | $207,360 | $260,000 | $331,480 |
| Urgent Care Medicine | $153,717 | $201,500 | $228,752 | $247,320 |

| Amount of Signing Bonus | | | | |
|---|---|---|---|---|
| Specialty | 25th Percentile | Median | 75th Percentile | 90th Percentile |
| Emergency Medicine | $15,000 | $20,000 | $30,000 | $48,000 |
| Urgent Care Medicine | $10,000 | $20,000 | $30,000 | $30,500 |

SURVEY: **2018 MGMA *Provider Compensation*** based on 2017 results

| Total Physician Compensation | | | | | |
|---|---|---|---|---|---|
| Specialty | 25th Percentile | Median | 75th Percentile | 90th Percentile | Mean |
| Emergency Medicine | $300,022 | $354,350 | $420,680 | $499,850 | $365,685 |
| Urgent Care Medicine | $219,037 | $254,711 | $311,593 | $395,925 | $275,173 |

SURVEY: **2018 MGMA Provider Compensation Total Compensation *Trending*** based on 2017 results

| 50th Percentile Total Physician Compensation Trending: | | | | |
|---|---|---|---|---|
| Specialty | 2015 | 2016 | 2017 | Overall |
| Emergency Medicine | $300,022 | $354,350 | $420,680 | $499,850 |
| Difference | | + 7.12% | + 6.07% | + 13.63% |
| Urgent Care Medicine | $219,037 | $254,711 | $311,593 | $395,925 |
| Difference | | + 0.16% | + 6.17% | + 6.34% |

**American Medical Group Association (AMGA)**

The AMGA trade association includes 440 multispecialty medical groups and health systems that represent 175,000 physicians in practice in America.  Most member medical groups have more than 25 physicians -- the average group size is over 300 physicians. This compensation survey is in its 32nd year and is highly regarded as a benchmark for large, multispecialty groups as well as other patient-centered systems.

SURVEY: **AMGA 2018 Medical *Group Compensation and Productivity*** based on 2017 results

| Specialty | 20th Percentile | Median | 80th Percentile | 90th Percentile | Mean |
|---|---|---|---|---|---|
| Emergency Medicine | $292,031 | $351,728 | $421,712 | $479,411 | $361,270 |
| Urgent Care Medicine | $214,476 | $306,000 | $526,936 | $603,786 | $353,618 |

## American College of Emergency Physicians

**2018-2019 Compensation Report for Emergency Physicians**

Article Published on www.acepnow.com by Barb Katz, president of The Katz Company EMC, a member of ACEP's Workforce and Career sections

Regional Compensation numbers based on 1,632 clinical hours per year plus incentive bonuses and RVU incentive compensation where applicable. Package numbers include benefits valued at $30,000.

| Region | Average Per Hour | Average Annually |
|---|---|---|
| Southeast (MS, SC, GA, TN, AL, NC, AR, LA, FL) | $236 | $416,000 |
| Southwest/West (NM, NV, TX, CA, AZ, OK, HI, CO, UT) | $220 | $389,000 |
| Midwest (ND, IL, OH, KY, IN, WI, MO, MN, MI, IA, KS, NE, SD) | $212 | $377,000 |
| Pacific Northwest (WY, ID, MT, OR, WA, AK) | $200 | $357,000 |
| Mid-Atlantic (VA, PA, NJ, WV, MD, DC, DE) | $198 | $353,000 |
| Northeast (NY, MA, VT, ME, CT, NH, RI | $186 | $333,000 |

Trends and developments in this report included **contract sign-on bonuses,** which continue to grow, with $50,000 a norm and a high between $120,000 and $150,000 in geographically challenged areas.

## Merritt Hawkins & Associates (MHA)

Merritt Hawkins (MHA), is a national healthcare search and consulting firm that specializes in recruitment of physicians and advanced practice clinicians. The firm has been in business 31 years and is a company of AMN Healthcare, the largest healthcare staffing organization in the nation.

SURVEY: **MHA *2018 Review of Physician and Advanced Practitioner Recruiting Incentives***

***Starting Salaries or Guaranteed Income* Only; Bonuses or Benefits Not Included**

| 2017/2018 | Low | Average | High |
|---|---|---|---|
| Emergency Medicine (ABEM Trained Only) | $250,000 | $358,000 | $568,000 |
| Urgent Care Medicine | $155,000 | $234,000 | $290,000 |

***Amount of Signing Bonus* (this is not specialty specific)**

| 2017/2018 | Low | Average | High |
|---|---|---|---|
| All Specialties | $2,500 | $33,707 | $180,000 |

***Amount of Education Loan Forgiveness* (this is not specialty specific)**

| 2017/2018 | Low | Average | High |
|---|---|---|---|
| All Specialties | $10,000 | $82,833 | $300,000 |

## V.    Internet Advertised Emergency Medicine Open Positions

Our Internet research conducted during August 2019 included a review of thousands of published jobs and candidate requirements. These are current, open positions. It is not possible to look retrospectively to the job market in 2017, when Dr. Greenberg would have been completing his residency program and seeking employment, but similar results would have been available in the job market then. The demand in Emergency Medicine has continued to flourish and has been growing for many years due to increased use of emergency room care by patients.

We found nearly 18,000 Emergency Medicine job advertisements on a variety of physician and career job boards including LinkedIn.com, Indeed.com, Physicianjobboard.com, PracticeMatch.com, PracticeLink.com, HospitalRecruiting.com, Physemp.com, and more. It should be noted that the same job opening may be listed on more than one jobsite, which would result in an additional "count" of some jobs. The demand for Emergency Medicine physicians continues to climb annually and for years, abundant positions have been available nationwide for EM physicians to consider.

12

It should be noted as well that presently there are nearly 500 advertisements for positions in Emergency Medicine in the state of Michigan where Dr. Greenberg is from, and where he practices at present. There is no reason to think there would not have been an equally abundant number of practices to consider there in 2017 when he would have completed his residency training, again due to the increased demand for emergency medicine services.

Although we were unable to thoroughly read every ad, in our research and review, some salary figures and other recruitment incentives stood out. For salary, we found ads offering a low of $275,000 and a high of $450,000 annually. Several ads also posted the current compensation physicians in the practice were earning:

- The highest income noted was $600,000, in North Dakota.
- Advertised contract signing bonuses ranged from a low of $20,000 to a high of $200,000.
- Advertised education loan repayment benefits ranged from $50,000 to $200,000.

Although not all ads include full job requirements, when stated, the typical requirements are:
- Graduate from an accredited School of Medicine or School of Osteopathic Medicine
- Completion of Emergency Medicine Residency
- Board Certified or Board Eligible in Emergency Medicine or board certification in another medical specialty, coupled with a significant amount of clinical emergency medicine experience.
- BLS and ACLS
- Current DEA # and unrestricted license to practice medicine in the state where the job is located

As to job opportunities requiring either board eligibility or board certification, because Dr. Greenberg was dismissed from his residency program, he is neither board eligible nor can he become board certified in emergency medicine nor in any other medical specialty without completing an approved American College of Graduate Medical Education (ACGME) medical residency.

13

## VI. Emergency Medicine Career and Retirement

There is no mandatory retirement age for physicians. In our experience, it is common for emergency medicine physicians to practice beyond the age of 60. Our company continues to receive job inquiries regarding fulltime, part-time, and locum tenens positions from emergency medicine physicians who are in their 60's. In 2018, the Association of American Medical Colleges, which tracks physician activity in most specialties, reported that in 2017, 65.4% of practicing Emergency Medicine Physicians were under age 55, and 34.6 % were over 55, and the median age of retirement for all physicians in all specialties is 65.

## VII. Career Effects and the Physician Recruitment Process After Dismissal from a Residency Program

**The Physician Recruitment Process**

Background information regarding the typical physician recruitment process and hiring/contracting is important when considering how the dismissal from a residency program can affect the job prospects of a physician. Hospitals are increasingly conducting direct hiring of physicians and they, medical groups, emergency medicine department staffing companies, search firms, in-house recruitment departments, and other healthcare organizations who evaluate prospective physician candidates for open job opportunities, all use the following process. While there may be some slight variation in the steps, this process is universally utilized and is considered the industry standard.

1. Announce to physicians (by medical specialty) there is a job opening, using several selected mediums of the organization's choice:
    - Ads on appropriate physician-specific Internet job boards
    - Ads placed on the medical specialty's association Internet career center
    - Print advertisements in professional medical journals
    - Broadcast e-mails to prospective candidates

- Telephone communication with prospective candidates in the specialty recruited
- Direct mail pieces to prospective candidates in the specialty recruited
- Direct mail, email or telephone calls to residency or fellowship programs
- Research other job boards where physicians may post their curriculum vitae
- Network with other physicians, hospital staff or others
- Attend physician academy or association conventions to meet prospective candidates in person
- Attend physician job fairs offered by outside organizations, specialty societies, or at specialty educational meetings and conventions

2. When physician candidates respond to a job opening, recruitment staff typically respond to the candidate by phone call, text, or email. At that point or immediately after the first contact with the recruiting organization or outside recruiter, the physician provides a copy of their curriculum vitae (CV) for consideration.

3. Healthcare organizations and search firms (on behalf of the recruiting organization) then carefully review and evaluate the physician candidate's CV for the following information:

- Full name and complete contact information
- Specialty and Sub-specialty, if any
- Medical school name, location, dates of attendance and graduation date
- Residency training program name, locations, exact dates, and completion date
- Board certification eligibility or certification in their medical specialty

*One measure of a candidate's CV is if he/she has trained in more than one residency program. If so, this is considered in our industry as a potential "red flag" that requires additional investigation and due diligence by the recruiter and healthcare organization. This situation requires that additional information be obtained and reviewed about the circumstances involved. Scenarios can include the program having <u>closed</u>, the physician <u>transferred</u> to another program or specialty, or the physician voluntarily <u>withdrew</u> from or was <u>dismissed</u> from the program.*

*If verification exists that the residency program has <u>closed</u>, consideration of the candidate can continue.* **We have had this occur with some candidates.**

*If the candidate <u>transferred</u> programs in the same specialty, transferred to another specialty, or voluntarily <u>withdrew</u> from a program, there is more exchange of information including additional background research conducted by the recruiter or healthcare organization. If after more research (which would include references from all residencies), the recruiter or hiring authority is comfortable with the reason for transfer, they may continue with the interview process. If not, the candidate is rejected.* **We have had candidates rejected by clients at this point while others were further considered and hired.**

*If the candidate was <u>dismissed</u> from a residency, this is regarded as a very serious event. The recruiter or healthcare organization may cease the candidate's processing at this point and go no further. If they continue consideration, the candidate may still not advance, based on additional fact-finding, reference reports or a complete report on the circumstances involved.* **In my 36 years in this industry, I cannot recall successfully recruiting/hiring any candidate who had been dismissed from a residency program.**

- Fellowship training program names, locations, and completion date.

*A review and ensuing action as described above under Residency, would be accomplished, although not completing a fellowship or being dismissed from a fellowship might not be as restrictive to a physician's career depending on the circumstances.*

16

- Certifications, including the date of board certification or board eligibility window (physicians must pass their board oral and written specialty exams in a prescribed number of years).

*This is another point at which a physician candidate may be eliminated from consideration by the healthcare employer or physician recruiter conducting the search. Most healthcare organizations require board certification or board eligibility with express intent to become board certified within a specific amount of time. This is in order to comply with hospital and/or medical group medical staff bylaws, the organization's policy, the organization's commitment to quality standards and patient health outcomes, and/or the ability for that physician to treat insurance company empaneled patients.* ***We have had candidates rejected at this point while others have been considered and hired.***

- Current and past practices; organizations names, locations, and dates of practice.

*This is another critical point that employers and search firms use to determine if a physician candidate is qualified for the job opportunity. Specifically, this important step will reveal if the physician held one or more jobs for one year or less, or the number of jobs the physician held during a specific period. Requesting additional information regarding short work stints or gaps in employment helps to ensure the doctor is not a "job hopper", since this may be a sign of issues that need further vetting.* ***We have had candidates rejected at this point while others have been considered and hired.***

- During the organization's or recruiter's first or second telephone interview with the physician candidate, they will ask the physician to outline any negative or detracting elements regarding their professional background, e.g., state license suspensions; terminations, sanctions or disciplinary actions, medical staff

17

privileges suspensions, terminations or actions; or any other disciplinary issues; and medical malpractice claims history.

*This is another critical point where healthcare organizations and search firms may eliminate a physician's candidacy. In our experience, if problems or issues exist regarding state medical licenses, medical staff privileges, or other disciplinary or medical malpractice issues, and these cannot be satisfactorily reconciled, a decision is made whether to proceed further with the candidate. **We have had candidates rejected at this point while others have been considered and hired.***

The foregoing recruitment process is important to consider as concerns Dr. Greenberg's emergency medicine career, in my opinion and experience. His dismissal from the LSU residency program was career ending in terms of him becoming an emergency medicine physician in most hospitals, due to his lack of residency training completion and his ineligibility to sit for his board exams.

I have worked with thousands of physicians since 1983 in my physician recruitment business, and I have never worked with a physician who was dismissed from a residency program for cause, and subsequently went on to enter, and successfully complete, residency training in the same or even a different medical specialty. That said, there is nothing that would prohibit Dr. Greenberg from applying anew to pursue completion of his Emergency Medicine residency. However, competition is historically keenly fierce for program year one (PGY-1) residency positions if he must start his residency over. In my experience, and as revealed in my research, there are historically not enough first year residency openings for the number of registrants available, and there are a very limited number of slots available at the second to fourth year level, as those openings occur only if the a slot has been vacated by another resident. .

The Association of American Medical Colleges 2019 Match Summary report of April 2019 indicates that although there were an all-time high of 44,608 registrants for all medical residency specialties, just 32,194 available residency positions were offered to applicants. Only

18

2,458 were filled in the specialty of Emergency Medicine. With this strong competition and having been previously dismissed from his LSU residency, in my experience, it would be unlikely that Dr. Greenberg would be seen as a top contender and able obtain another Emergency Medicine residency if he chose to apply. And, for the same reasons, he would unlikely be successful applying to other specialty residency programs.

## VIII.   Summary Opinion

This report is based on my 36 years of professional physician recruitment activities, experience and expertise in the physician recruiting industry and on research conducted in this case. In my expert opinion, Dr. Greenberg will be unable to transfer to another emergency medicine residency program or achieve his goal to become board certified in and practice in his chosen vocation - full-time emergency medicine. His chances were seriously impacted and effectively ended due to his dismissal from the emergency medicine residency at LSU. This concludes my report and opinion.  I reserve the option to supplement this report should additional information become available that may impact my opinion.

Sincerely,

Julie A. Sherriff