```
 1       A.   Well, executive search, compensation,
 2  studies, for all types of businesses.  Human
 3  resources issues such as mass layoffs and working to
 4  teach employees that were laid off how to find
 5  positions.  Just pretty much anything in the human
 6  resources field where we would be able to advise a
 7  client about what to do about any particular HR
 8  problem.
 9       Q.   Okay.  And did the consulting firm do the
10  type of consulting that you're doing now as far as
11  healthcare and physician placement?
12       A.   Yes.  As I mentioned, that's something that
13  we started in 1983, when I came aboard.
14       Q.   Okay.  All right.  So you went to
15  Mid-America from -- I mean, did you do a four-year
16  degree there?
17       A.   I finished a degree there.  I had earlier
18  been to Central Missouri State University, and then
19  we had our family and I went back and finished my
20  last year at Mid-America Nazarene.
21       Q.   Okay.  And am I correct, you are not a
22  medical doctor?
23       A.   No.
24       Q.   And you have had no education in medicine?
25       A.   Correct.
```

MIdeps@uslegalsupport.com         U.S. LEGAL SUPPORT              Phone: 888.644.8080
Ann Arbor | Detroit | Flint | Jackson   Bingham Farms/Southfield | Grand Rapids   Lansing | Mt. Clemens

EXHIBIT 3

```
 1       Q.   Do you have any experience with resident
 2  selection process?
 3       A.   I think I don't understand exactly what
 4  you're asking.  What do you mean by experience?
 5       Q.   If you're an academic institution, ranking
 6  potential residents as they come to you to interview,
 7  do you have any experience doing that?
 8       A.   I -- we have never been involved in that.
 9  We are knowledgeable -- somewhat knowledgeable of the
10  process, however.
11       Q.   Okay.  And you haven't gone through a
12  residency yourself, correct?
13       A.   No, since I don't have an advanced degree
14  as a medical doctor.
15       Q.   I know.  I know.  It's just questions I
16  need to ask.
17            And do you have any experience in
18  evaluating residents for their ongoing, I guess,
19  activities in a residency program?
20       A.   No.
21       Q.   Okay.  And you don't practice medicine,
22  right?
23       A.   Correct.
24       Q.   Have you ever worked in HR in an academic
25  institution?
```

```
 1      A.    No.
 2      Q.    How about a medical institution?
 3      A.    No.
 4      Q.    And when you did HR, did you draft manuals
 5   about best practices for employment?
 6      A.    What do you mean, when I worked in HR?
 7      Q.    When you worked --
 8      A.    We worked in HR -- I'm sorry.
 9      Q.    When you were with that resources -- HR
10   resources consulting company, did you ever have to
11   draft HR manuals or best practices for the employers
12   that you worked for?
13      A.    No. That wasn't the area of expertise that
14   I worked in.
15      Q.    Okay. So would it be fair to say that you
16   have not managed HR in an employment setting where
17   Title VII is applicable?
18      A.    Correct.
19      Q.    Okay. And is your business applicable to
20   Title VII?
21            MR. SMITH: Objection. That calls for a
22   legal conclusion, and I don't think this witness is
23   qualified to give a legal conclusion.
24   BY MS. ECHOLS:
25      Q.    Okay. If you know the answer, you can
```

```
 1        Q.   Okay.  And word of mouth, things like that?
 2        A.   Yes.
 3        Q.   Okay.  Do you generally place people in
 4   remote locations like South Dakota or like a rural
 5   area in Missouri or Montana, or places like that?
 6        A.   We can.  And actually, when we started out,
 7   we did a lot of that.  But through the years, most of
 8   our work has come from larger cities, metro areas
 9   around the country.  We did just place a family
10   physician in a town of 2,000 in Kansas this year.
11   But that has now become more of the exception than
12   the rule.
13        Q.   Okay.  So today, what percentage of your
14   placement would be in rural areas?
15        A.   We're working on a large project in
16   Illinois that includes some of the major cities, but
17   also some of the rural areas.  So I'm going to say 20
18   percent.
19        Q.   Okay.
20        A.   Or less.
21        Q.   Okay.  Go ahead.
22        A.   20 percent or less, I would say.  Probably
23   more like -- yeah, let's just leave it at 20.  That's
24   a good guess.
25        Q.   Okay.  So for your market, do you recruit
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

```
 1        Q.    Okay.  I was not sure about the company,
 2   you said you started it as a company, or what it is,
 3   but NAPR?
 4        A.    Okay.
 5        Q.    Was that something that you founded,
 6   correct?
 7        A.    I was --
 8        Q.    You were a founding member?
 9        A.    Founding member.  NAPR is our trade
10   association that a group of us started back in the
11   early 80s.  And the reason we set that up was to set
12   standards in the business, standards of practice, and
13   a -- set up a code of ethics for people in the field.
14   It was a brand-new industry.
15        Q.    Right.  So do you know how many members are
16   in the group now?
17        A.    I think -- the membership is by company.
18   And I believe there's like 3- to 400, maybe.  And
19   these are all primarily individually-owned companies.
20   There are some recruiters that joined that work for
21   the larger hospitals and institutions, but it's
22   primarily those of us that own our own external
23   firms.
24        Q.    Okay.  How many founders were there when
25   you started?
```

```
 1        A.    I would say -- this is thinking back.
 2   You've got to remember, this is when Reagan was in
 3   office.
 4        Q.    I know.
 5        A.    I would say maybe a dozen of us.
 6        Q.    And it's a national organization, right?
 7        A.    Correct.
 8        Q.    And are there other groups like this one?
 9        A.    There is another association that is
10   dedicated to the -- what we call the in-house
11   recruiter.  And it is -- I can't tell you -- can't
12   speak for how many members they have, but it's
13   dedicated only to the people that work inside the
14   hospital or large medical group setting.  And they're
15   handling the paperwork that comes in if they use
16   external recruiting or whatever.
17        Q.    Okay.  And then I noticed you are involved
18   in First Choice, Incorporated.  What is that?
19        A.    First Choice is a small group that we put
20   together of like-minded people.  Much as you would
21   see a hospital form a buying group.  One of our keys
22   that we thought we needed was the power of large
23   firms as far as buying capability.  Purchasing.  And
24   what I mean by that is purchasing resources for our
25   businesses to enable us to do our work and compete
```

```
 1   just with a pure -- emergency medicine physicians.
 2        Q.   I understand, like family medicine, and
 3   general practitioners.  But everybody in an ER is
 4   board-certified is what you're telling me.
 5        A.   I would say in probably -- well, let's go
 6   back.  Let's go back.
 7             Case in point is the rural client of 2,000
 8   that I mentioned where we just placed a family
 9   physician.  Those guys will do ER coverage.  But
10   they're family physicians that have extra training in
11   emergency medicine.  And they're board-certified in
12   family medicine.
13        Q.   Okay.  But back to my question:  Are you
14   telling me that everybody who's working in the ER is
15   board-certified in some area?
16        A.   I cannot attest to that.  I'm just telling
17   you that 100 percent of the requests are for
18   board-certified.
19        Q.   But that's requests that are coming to you,
20   right?  That's not other companies?
21        A.   Oh, no.  It's everybody.  I'm sure it's
22   everybody, because I've been a member of the
23   association all these years.  And I talk with my
24   colleagues so regularly about all of this.
25        Q.   Okay.  Is that a request or is that a
```

```
 1   recruiting or the hospital that is recruiting have
 2   medical staff bylaws that always include:  You must
 3   be licensed in our state.
 4       Q.   Okay.  So when Dr. Greenberg made the
 5   statement to me in his deposition that to work in a
 6   Michigan -- any Michigan ER, you had to be
 7   board-certified, where did he get that information
 8   from?  Do you know?
 9       A.   I would not know, huh-uh.
10       Q.   Okay.  So have you checked any of the -- I
11   mean -- so the state has the -- like the primary
12   licensing requirements.  And then it filters down to
13   the hospital or the group or the insurance company
14   bylaws?  Is that how it works?
15       A.   Yes.
16       Q.   Okay.  So do you know of anybody placing
17   physicians without -- ER physicians without board
18   certification?
19       A.   At present, no, I really don't know of
20   anyone.
21       Q.   Okay.
22       A.   And one reason why it might be, Julie, that
23   the emergency medicine field itself, as far as
24   recruitment, has become a staffing field.  And what I
25   mean by staffing is the hospitals typically aren't
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

```
 1   residency and I need to find a job, I would have
 2   grave questions.
 3       Q.   Okay.  So you never reviewed
 4   Dr. Greenberg's evaluations?
 5       A.   No.
 6       Q.   You read in his deposition where he
 7   admitted he was at the bottom 30 percent in his
 8   class.  Is that somebody of the type that you would
 9   place, or does it matter to you?
10       A.   No.  I don't think that we would have been
11   able to find him a position if we knew that.  So, no.
12       Q.   Do you know what type of track he was on in
13   the ER?
14       A.   No.
15       Q.   Okay.  He was on an administration track.
16   I mean, he had told a number of people that he didn't
17   want to actually work in an ER, he wanted to work the
18   business side.  And several of his letters of
19   recommendation were for fellowships in
20   administration.  Does that change your report in any
21   way?
22       A.   I did see that he was looking for a
23   fellowship in administration.
24       Q.   Okay.  But does that change your report?
25   Because all of the data that you gave us was on
```

MIdeps@uslegalsupport.com  
Ann Arbor | Detroit | Flint | Jackson  
U. S. LEGAL SUPPORT  
Bingham Farms/Southfield | Grand Rapids  
Phone: 888.644.8080  
Lansing | Mt. Clemens | Saginaw | Troy

```
 1        Q.    Okay.
 2        A.    It just doesn't happen.
 3        Q.    Okay.  Did you read any of the findings
 4   regarding his termination?
 5        A.    What do you mean by "findings"?
 6        Q.    Well, there was a letter that was issued
 7   with ACGME, core competencies, that were the
 8   rationales behind his termination.  Did you read that
 9   report?
10        A.    I was not provided that information.
11        Q.    Okay.  Were you made aware that
12   Dr. Greenberg made statements that he was burnt out
13   and he shouldn't be trusted with patients?
14        A.    I did see that in the deposition.
15        Q.    Does that concern you?
16        A.    Does it concern me?
17        Q.    Yes.
18        A.    Well, certainly it would, as a patient.  I
19   don't -- again --
20        Q.    I guess so.
21        A.    Again, I just don't think I would ever know
22   it.
23        Q.    Hopefully.
24        A.    The way our -- yeah, the way our process
25   works, I don't think I would ever know it.
```

1  to comment on that, per se.  But it looks like he did
2  go out and give it a college try.
3         In my experience, there have been
4  physicians who have been terminated and what they
5  considered to be a bona fide search for another
6  program may be that they made a call or two.
7         So this was a much better effort -- if this
8  list of assignments is correct, this is a much more
9  massive effort toward finding another residency than
10 I've seen before.
11    Q.   Okay.  And that's assuming that he applied
12 timely to all of these programs; is that correct?
13    A.   Correct.
14    Q.   And then they're all in Michigan.  Is that
15 indicative -- I mean, does that indicate to you that
16 he -- I mean, he wasn't searching rural areas or
17 places who might have other programs?  Is that fair?
18    A.   That's fair, but there's hardly any --
19 there would not -- as far as I know, there are no
20 emergency medicine training programs in rural areas.
21 They don't get enough experience with the variety of
22 patients in a rural area.
23    Q.   So, I mean, stuff like Montana, or, you
24 know, South Dakota, do they have emergency residency
25 programs?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

```
 1    professional manager or administrator.  And the
 2    professional administrator or manager can be a
 3    physician, but it's typically an administrative
 4    person only.  And that's who the primary membership
 5    is.  It's the people who run the practices.
 6         Q.   And so do they represent larger
 7    metropolitan areas?
 8         A.   Oh, yes, the entire nation.
 9         Q.   Okay.  Do they include any not
10    board-certified doctors in their survey?
11         A.   They don't include doctors themselves in
12    the survey.  They survey the practices and get the
13    financial information from the practices.
14         Q.   Okay.  Okay.  So do you use this survey in
15    your practice?
16         A.   Please repeat?
17         Q.   Do you use this survey regularly in your
18    practice?
19         A.   Yes, we do.
20         Q.   Okay.  And so these practices that are
21    getting the answers, the responses to these surveys,
22    do you know if the doctors that they're responding on
23    behalf of are board-certified or board-eligible or
24    ABEM eligible?
25         A.   No.  No way of knowing.
```

```
 1   internet two years ago.  That's just the problem with
 2   it.  It's really hard.  I mean, nobody has an answer
 3   for it.
 4        Q.   So you're not familiar with like
 5   archive.org or the Wayback Machine on the internet?
 6        A.   I have no idea what --
 7        Q.   Which allows you to go back and look?
 8        A.   Never heard of it.
 9        Q.   Okay.
10        A.   You called it Wayback?
11        Q.   Yep.  Wayback Machine or archive.org.
12        A.   Well, thank you.
13        Q.   You're welcome.
14             On a related note, you state that in your
15   report you found like 18,000 EM job placings.  And
16   you also gave us the caveat that you were unable to
17   review every ad, which I understand.  So how many of
18   the ads did you actually read?
19        A.   This would be an estimate.  Between myself
20   and my assistant, I want to say between -- I would
21   say 3- to 500, at the most.
22        Q.   Okay.  And you said a lot of these ads
23   didn't have full job requirements, and like lacked
24   full job descriptions?  Is that right?
25        A.   Most of them don't.
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy