## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ERIC GREENBERG, M.D. | * | CIVIL NO. 19-137 |
| | * | |
| | * | |
| | * | JUDGE: LMA |
| VERSUS | * | |
| | * | MAGISTRATE: JCW, JR |
| BOARD OF SUPERVISORS | * | |
| OF LOUISIANA STATE UNIVERSITY | * | SECTION "I"(2) |
| AND AGRICULTURAL AND | * | |
| MECHANICAL COLLEGE, | * | |
| | * | |
| | * | |

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

<u>**MEMORANDUM IN SUPPORT OF THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AGRICULTURAL AND MECHANICAL COLLEGE'S MOTION TO EXCLUDE OR ALTERNATIVELY TO LIMIT THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS STAN V SMITH**</u>

**NOW INTO COURT**, through undersigned counsel, comes defendant, THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE ("LSU Board"), who submits the following Memorandum In Support of the LSU Board's Motion To Exclude Or Alternatively To Limit the Testimony of Stan V Smith, Ph. D. so as to preclude him from offering expert testimony regarding Plaintiff's alleged wage loss at trial.

Defendant LSU Board, through undersigned counsel, respectfully requests that this Honorable Court grant its motion to exclude the testimony of Dr. Stan V. Smith because his opinions are not the product of reliable methodologies as mandated by *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.* and Rule 702 of the Federal Rules of Evidence ("FRE") 509 U.S. 579 (1993); Fed. R. Evid. 702.

## I.   FACTUAL BACKGROUND

Plaintiff Eric Greenberg began his employment as a resident with LSU Health Sciences Center New Orleans (hereafter "LSUHSC-NO"), a subsidiary of the LSU Board, in July of 2013.[1] In his complaint, plaintiff Eric Greenberg alleges that during his time as a resident with LSUHSC-NO employees of the LSU Board subjected him to "a campaign of harassment and discrimination" on the bases of sexual harassment, anti-Semitic discrimination, and discrimination predicated on the plaintiff's attention deficit hyperactivity disorder (hereafter "ADHD").[2] Plaintiff claims that he reported the allegedly discriminatory conduct to defendant and alleges that the defendant retaliated against the plaintiff and ultimately terminated the plaintiff from the residency program for discriminatory reasons.[3]

Among other things, plaintiff contends that but-for the alleged discrimination he would have been able to complete his residency and would have eventually been able to work as a physician in the specialized field of emergency medicine.[4] Plaintiff himself admitted that he did not intend to work as an emergency medicine physician indefinitely; he planned to get his MBA and work in the administrative side of emergency medicine.[5] Plaintiff currently owns an urgent care facility in Michigan and is working at said facility.[6]

Plaintiff subsequently retained economist Stan V Smith, Ph.D. to render a report.  In his report, Dr. Smith estimates Greenberg's lost wages by comparing his current projected pay in Plaintiff' current line of urgent care work versus his hypothetical pay in the field of emergency medicine.  In doing so, he breaks the wage loss situation down into two scenarios.

---

[1] First Amended Complaint p2.
[2] First Amended Complaint p3.
[3] First Amended Complaint p4.
[4] *See* Greenberg's First Amended Complaint p7-8.
[5] Eric Greenberg Depo. 235:13-17.
[6] Eric Greenberg Depo. 19:22-20:11.

He bases "Scenario 1" on the situation that Plaintiff had gone on to obtain employment as an emergency medicine physician working exclusively with the Metroplex Adventist Hospital ("Metroplex").[7] Smith bases "Scenario 2" on the situation that Plaintiff had gone on to obtain employment as part of a split agreement between Metroplex and St. David South Austin Medical Center ("St. David's").[8] Importantly, in both scenarios Smith derives the base wages from unsigned employment contracts bearing a watermark "SAMPLE" provided to him by Plaintiff's counsel.[9] Smith himself admits that, despite assuming the contracts were representative of what Plaintiff's hypothetical emergency medicine compensation[10,] he made no effort to confirm the authenticity of these contracts.[11] In Scenario 1 he estimates Plaintiff's wage potential through his life expectancy, or age 78.2 years[12], coming up with a total of $20,411,764.[13] Extending his arithmetic for the same period, Dr. Smith compiles a total wage potential under Scenario 2 of $18,343,644.[14]

Then, under both scenarios he offsets Greenberg's hypothetical compensation by Greenberg's projected salary in his current line of urgent care work in order to devise a final wage loss figure.  In doing so, he uses Plaintiff's 2018 income as a base for his projected pay in the line of urgent care work, despite his admission that he has no idea how many hours Plaintiff worked in

---

[7] Report of Stan Smith p5; Sample Employment Agreement Scenario 1 p8.
[8] Report of Stan Smith p4; Sample Employment Agreement Scenario 2 p8,10.
[9] Report of Stan Smith p5.
[10] Rough Draft Stan Smith Depo. 94:12-18.
[11] Rough Draft Stan Smith Depo. 95:9-16; Rough Draft Stan Smith Depo. 57:16 – 58:1; Rough Draft Stan Smith Depo. 60:15-24.
[12] The use of this figure, as Smith admits, it arbitrary. He has no basis for this figure and he uses this figure despite the fact that he believes Plaintiff working until the age of 78 is "**statistically speaking [] not particularly likely**." Rough Draft Stan Smith Depo. 78:24-79:1 (emphasis added).
[13] Report of Stan Smith p5.
[14] Report of Stan Smith p5.

2018,[15] or even if Plaintiff was working full time.[16]

Of note, although Dr. Smith reported that Plaintiff <u>recalled</u> "that he had signed a contract to work as an emergency room doctor at St. David's Hospital" there is no proof that Plaintiff ever actually had concrete job offers from either St. David or Metroplex.  Subpoenas to these hospitals provided no confirming evidence that Plaintiff ever received an employment offer.[17] Also, the 'contracts' make this abundantly clear, as they both conspicuously bear "SAMPLE" watermarks across the front on every page.[18] Additionally, both contracts are clearly not genuine employment contracts, as they both lack signatures from both Plaintiff and alleged hospital staff.[19]

Additionally, in formulating his report, Dr. Smith regularly cites the report of Plaintiff's purported expert in physician recruitment, Julie Sherriff.[20] Dr. Smith cites figures from surveys from Sherriff's report like the annual compensation for emergency medicine physicians and the starting salary for urgent care providers nationwide to inform his calculations.[21] Yet, during his deposition it became clear that Dr. Smith lacked the entire surveys themselves, reading only from "selected results that the Sherriff firm encoded in some spreadsheets."[22] Moreover, he demonstrated no understanding of the surveys, made no effort to investigate the constructs that informed them, or determined that they were applicable to this matter.

## II. LAW & ARGUMENT:

### A.    LEGAL STANDARD

---

[15] Rough Draft Stan Smith Depo. 89:21-22.
[16] Rough Draft Stan Smith Depo. 80:20-81:23.
[17] *See* Advent Health Subpoena Returns p1.
[18] Sample Employment Agreement Scenario 1; Sample Employment Agreement Scenario 2.
[19] Sample Employment Agreement Scenario 1 p6; Sample Employment Agreement Scenario 2 p8,10 (both have slots for "es_signer_signatures", but bear no actual signature).
[20] Report of Stan Smith p2,3,6.
[21] Report of Stan Smith p3,6.
[22] Rough Draft Stan Smith Depo. 78:2-5.

### 1. Federal Rule of Evidence 702

The threshold requirement for the admissibility of expert testimony is set forth in Federal

Rule of Evidence 702, which states:

> A witness qualified as an expert by knowledge, skill, experience, training,
> or education, may testify thereto in the form of an opinion or otherwise if
> (1) the testimony is based upon sufficient facts or data; (2) the testimony is
> the product of reliable principles and methods; and (3) the witness has
> supplied the principles and methods reliably to the facts of the case.

Thus, the first step of the inquiry is a determination of whether the expert is "qualified" to render

opinion testimony, through his "knowledge, skill, experience, training, or education."[23] These

qualifications, of course, must be in the area of expertise the witness intends to broach at trial.[24]

### 2. Expert Opinions Must Meet the *Daubert* Standard

Even if an expert is "qualified" to render expert opinions, and the opinions fall within that

area of expertise, Article 702 states the opinions must be formed through a reliable methodology.

In other words, baseless and unsupported opinions are not helpful to the trier of fact and are

therefore inadmissible. In *Daubert v. Merrill Dow Pharmaceuticals*,[25] the Unites States Supreme

Court determined that proffered expert testimony must be: (1) derived from a reliable

methodology; and (2) "fit" the issues to be decided at trial.

The Court held the inquiry "entails a preliminary assessment of whether the reasoning or

methodology underlying the testimony is scientifically valid and of whether that reasoning or

methodology properly can be applied to the facts in issue."[26] Unsupported opinions are excluded

under federal jurisprudence because "nothing in either *Daubert* or the Federal Rules of Evidence

---

[23] *See Moore v. Ashland Chemical, Inc.* 151 F. 3d 268 (5th Cir. 1998).
[24] *See Hardin v. Ski Venture, Inc.*, 50 F. 3d 1291, 1296 (4th Cir. 1995); *McCullock v. H.B. Fuller Co.*, 981
    F.2d 656, [6]57 (2d Cir. 1992).
[25] 509 U.S. 579 (1993)
[26] *Id*. at 592-93 (footnotes omitted).

requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."[27] The analytical framework outlined in *Daubert* applies to all types of proffered expert testimony and not simply "scientific" testimony.[28]

### 3.  Expert Opinions Must Be Based on Reliable Methodology

The Court in *Daubert* identified factors[29] that it believed would be helpful in making a determination of whether a proffered expert opinion is reliable. However, the *Daubert* Court emphasized that its list of factors was not exhaustive and that no single factor by itself was determinative.  Instead, the Court emphasized that the analysis is a "flexible one,"[30] and that "[m]any factors will bear on the inquiry".[31]  In *Kumho Tire Co. v. Carmichael*, the Court reaffirmed that the analysis under Rule 702 and *Daubert* is a flexible one depending on the nature of the proffered testimony and the issues at hand.[32] The Court explained that "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."[33]  Nevertheless, an expert's testimony still **must always be based on "good grounds."**[34]

### 4.  Expert Opinions Must Be Supported by Sufficient Facts

Applying the above principles, the jurisprudence within the United States Court of Appeals for the Fifth Circuit has recognized that in addition to the factors laid out in *Daubert*, a trial court

---

[27] *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).
[28] *Id.* at 1171.
[29] Regarding the "reliable methodology" prong of the *Daubert* analysis, the U.S. Supreme Court listed several factors that, while not individually dispositive, may help decide whether an expert witness has satisfied this requirement.  These factors include:
> (1)whether the methodology can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology has reached "general acceptance."
> *Id.* at 594.
[30] *Id.* at 594.
[31] *Id.* at 593.
[32] 526 U.S. 137 (1999).
[33] *Id.* at 141-42.
[34] 509 U.S. at 590 (emphasis added).

may consider whether the expert's opinion is based on incomplete or inaccurate data when determining the reliability of an expert's testimony.[35]  The Fifth Circuit has explained that the *Daubert* reliability analysis applies to "the facts underlying the expert's opinion."[36]  In particular, "an opinion based on 'insufficient, erroneous information,' fails the reliability standard."[37] (citing *Paz v. Brush Engineered Materials, Inc.,* 555 F.3d 383, 389 (5th Cir.2009) (affirming exclusion of expert opinion that relied on false assumptions rebutted by undisputed record evidence).  Thus, expert testimony that relies on "completely unsubstantiated factual assertions" is inadmissible.[38] Accordingly, "when an expert's testimony is 'not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's] position,' the trial court should exclude it."[39] "The existence of sufficient facts [therefore] is in all instances mandatory."[40] Throughout this inquiry the party offering expert testimony bears the burden of establishing – by a preponderance of the evidence- the reliability of said testimony.[41]

**B.   DR. STAN SMITH'S OPINIONS REGARDING PLAINTIFF'S LOST WAGES WARRANT EXCLUSION BECAUSE THEY ARE UNRELIABLE AND WOULD NOT ASSIST THE TRIER OF FACT**

To be admissible, an expert's testimony "must be based on a reliable methodology" and it

---

[35] *Moore v. Intl. Paint, L.L.C.*, 547 Fed. Appx. 513, 515 (5th Cir. 2013); *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999) ("Once it considers the *Daubert* factors, the court then can consider whether other factors, not mentioned in *Daubert,* are relevant to the case at hand"); *In re Vioxx Products Liab. Litig.*, 401 F. Supp. 2d 565, 573 (E.D. La. 2005); *Waste Mgt. of Louisiana, L.L.C. v. Par.*, CIV.A. 13-6764, 2015 WL 5798029, at *11 (E.D. La. 2015); *Tripkovich v. Ramirez*, CIV.A. 13-6389, 2015 WL 3849392, at *4 (E.D. La. 2015).

[36] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007); *Moore v. Intl. Paint, L.L.C.*, 547 Fed. Appx. at 515.

[37] *Moore v. Intl. Paint, L.L.C.*, 547 Fed. at 515.

[38] *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007); *Moore v. Intl. Paint, L.L.C.*, 547 Fed. Appx. at 515.

[39] *Moore v. Intl. Paint, L.L.C.*, 547 Fed. Appx. at 515 (quoting *Guillory v. Domtar Indus., Inc.,* 95 F.3d 1320, 1331 (5th Cir.1996)).

[40] *Moore v. Intl. Paint, L.L.C.*, 547 Fed. Appx. at 515 (quoting *Hathaway,* 507 F.3d at 318).

[41] *Johnson v. Arkema, Inc*., 685 F.3d 452, 459 (5th Cir. 2012); *Moore v. Ashland Chemical Inc.*, 151 F.3d at 276.

"must assist the trier of fact in understanding the evidence or determining a fact at issue". *Clark v. Takata Corp.*, 192 F.3d 750, 756–57 (7th Cir. 1999); *see also Chapman vp. Maytag Corp.*, 297 F.3d 682, 686–87 (7th Cir. 2002). Smith opinions on Plaintiff's ultimate wage loss warrant exclusion because they are based on unreliable methodology and thus would not prove helpful to a trier of fact. Furthermore, throughout the course of his calculations Smith makes assumptions and excludes certain pertinent information for the purpose of inflating Plaintiff's projected wage loss.

As a preliminary matter, Dr. Smith is no stranger to offering dubious methodologies in the courtroom. For example, Dr. Smith has been excluded as an expert many times for his controversial methods in quantifying hedonic damages. *See e.g., Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc.*, No. 1:11-CV-430-WTL-DML, 2015 WL 3448947, at *2 (S.D. Ind. May 29, 2015) (holding "Dr. Smith's testimony regarding hedonic damages lacks a factual basis and therefore fails to satisfy Rule 702 and will not be admitted."); *Smith v. Jenkins*, 732 F.3d 51, 66 (1st Cir.2013) (noting "[t]he overwhelming majority of courts have concluded that [Smith's] 'willingness-to-pay' methodology [Smith's means of calculating hedonic damages] is either unreliable or not likely to assist the jury in valuing hedonic damages, or both"); *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992) (finding  it was "irrefutable that the plaintiff could point to no expert consensus supporting Smith's methodology" of valuing a human life and expressing "serious doubts" on the studies cited by Smith). While Dr. Smith, as yet, has given no opinions on hedonic damages in this matter, the case at bar is an example of his willingness to cloak opinions based on unreliable methodologies that lack a proper factual foundation under the guise of expert economic calculations.

At the time of Plaintiff's termination, he was working as a third-year resident in the

Emergency Medicine program at LSUHSC-NO. While at LSUHSC-NO Greenberg performed poorly; he was in the bottom of his class, [42] he had been subject to an academic probation[43], and he had been cited for thirty-one Accreditation Council for Graduate Medical Education ("ACGME") violations while a resident.[44] Nevertheless, despite these professional shortcomings Smith calculated the Plaintiff's future wages based on the prospect that – not only would Greenberg obtain employment as an emergency medicine physician – but that he would obtain employment in Texas, a state which Smith himself admits has one of the highest pay rates for emergency medicine physicians.[45] Smith then cites two employment agreements from which he draws the base wage figures for his computations.  The only basis for this choice was Plaintiff's recollection "that he had signed a contract to work as an emergency room doctor" at one of the facilities.[46] However, these contracts are clearly not bona-fide contracts, as they bear a watermark reading "SAMPLE" conspicuously on every page.[47] Moreover there is no proof a) that Plaintiff was actually given either offer or b) that the sample employments actually originate from the institutions where Plaintiff purports them to originate from.  To the contrary, subpoenas to these instructions revealed no evidence that Plaintiff was ever handed a job offer from either institution.[48] Nevertheless, to overstate Plaintiff's wage potential and thus the loss, after offset, Dr. Smith accepted, without verification-or care, that these two samples were representative of what Plaintiff could have made in the field of emergency medicine.[49]

---

[42] Eric Greenberg Depo. 68:12-16; *see also* Micelle Haydel Depo. 34:13-21(Plaintiff was one of only "one or two" residents in the class requiring enhanced feedback").

[43] Request for adverse action – Termination 001269.

[44] Request for adverse action – Termination 001265-68.

[45] Report of Stan Smith p3-4.

[46] Report of Stan Smith p3.

[47] *See* Sample Employment Agreement Scenario 1; *See* Sample Employment Agreement Scenario 2. .

[48] Advent Health Subpoena Return p1.

[49] Rough Draft Stan Smith Depo. 95:9-16; Rough Draft Stan Smith Depo. 57:16 – 58:1; Rough Draft Stan Smith Depo. 60:15-24.

The United States Court of Appeals for the Fifth Circuit explained that while generally, doubts regarding the bases of an expert's opinion go to the weight rather than the admissibility of the opinion, there remains a requirement for a threshold level of support:

> In some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict. **If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury**. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Fed.R.Evid. 403.

> *Id.* (emphasis added).

Here, Dr. Smith's testimony is fundamentally unsupported and falls short of the threshold reliability requirement for a myriad of reasons. Smith's calculations are speculative and far-reaching because they ask the factfinder to assume a) that Plaintiff would have completed his residency program despite his many professional shortcomings b) that plaintiff had obtained a job in a state like Texas where the pay for emergency medicine physicians is among the highest in the country, and c) that Greenberg would have ultimately obtained the pay rates referenced in the 'contracts' from St. David's and Metroplex. The fact that Smith's opinions are based on multi-layered assumptions that are entirely the self-serving reports of Plaintiff leaves the opinions fatally flawed for lack of a proper factual foundation. *Stokes v. John Deere Seeding Grp*., No. 412CV04054SLDJAG, 2014 WL 675820, at *6 (C.D. Ill. Feb. 21, 2014) (excluding Smith's methodologies as unreliable because "Dr. Smith's method relie[d] on unfalsifiable and unsubstantiated inferences."); *Faries v. Atlas Truck Body Mfg., Co*., 797 F.2d 619, 623-24 (8th Cir. 1986) (an expert' opinion predicated on information provided by an interested witness held to lack sufficient reliability). Dr. Smith's report falls short of the reliability threshold mandated by *Daubert* and Fed. R. Evid 702 as it lacks proper factual foundations and makes multi-layered

assumptions for the purpose of inflating Plaintiff's wage loss.

Without proof of the validity of the contracts and their terms, it is simply wrong, improper and prejudicial to allow the sample employment agreements to form the basis of Dr. Smith's estimation of Plaintiff's earnings loss, particularly here where the purported wages exceed regional and national averages. Nevertheless, even if the sample agreements had been bona fide agreements, Smith's report is unreliable because he fundamentally misunderstood the agreements. Recall that one sample agreement would make Plaintiff split his time between Metroplex and St. David's, while under the other agreement Plaintiff would be working solely at Metroplex.[50] Smith fundamentally misunderstood the split-facility agreement and exclusively applied the St. David's pay, which is higher than the Metroplex pay to the contract.[51] As articulated by Defendant's expert economists Ed Comeaux and Charles Theriot, this act caused an overstatement of Plaintiff's wage loss by "approximately $500,000".[52] Again, Smith's report entails another flawed methodology which – conveniently – overstated Plaintiff's wage loss.

Additionally, Dr. Smith's report is flawed as it presumes that Plaintiff would have worked as an emergency medicine physician for his entire work life, which is not a given. Plaintiff himself admits that he never contemplated working as an emergency medicine physician for long term employment, stating in his deposition "I intended to do ER, **and then eventually MBA and do ER administration.** I was in the final rounds of talks. I got an informal offer to do a fellowship at University of Colorado Denver in ER administration, get an MBA."[53] Despite being aware that Plaintiff sought to eventually work on the administrative side of emergency medicine, Smith chose

---

[50] Sample Employment Agreement Scenario 2 p8,10; Sample Employment Agreement Scenario 1 p8.
[51] The higher compensation of St. David's versus Metroplex is due to higher relative value units (RVU's) rather than a higher base pay.
[52] Charles Theriot & Company Report p7.
[53] Eric Greenberg Depo. 235:13-17.

to omit this information from his consideration.[54]  By relying solely on the sample employment agreements, Smith failed to analyze – or even take into account - Plaintiff's true intent eventually to abandon the physician role for a position as an ER administrator.  Thus, Dr. Smith again ignored critical factual information that would have better informed his assessment for the highest possible end result fashioned for Plaintiff during the pendency of this litigation.

In a similar vein to drive the result, as opposed to offering the jury unbiased, factually based opinion testimony, Dr. Smith calculated the 'offset' to his projection of Plaintiff's earnings to arrive at the ultimate loss.  His 'offset' to the lifetime earnings was driven by his formulation of the amount Plaintiff can earn as an urgent care physician.  Here again, Dr. Smith's calculations uncannily favor Plaintiff.  He starts by predicting his earning base as an urgent care physician based upon one year of earnings, during which Plaintiff was working several jobs and starting his own clinic.[55]  Interestingly, here he looks at no urgent care contracts and ignores surveys by Plaintiff's physician recruiter that show the earnings of urgent care physicians as being higher, both regionally and nationally, than the wage base he uses.  In his continued methodology of avoiding sticky factual based considerations, he completely ignores and fails to project Plaintiff's earnings as a physician-owned business, as opposed to Plaintiff working as an employee of another.[56]  Smith's report fails to account for how Greenberg's ownership of that clinic may eventually amount to an income that rivals –or perhaps even surpasses – the income of a typical emergency medicine physician. While he predicts Plaintiff's purported emergency physician earnings base upward, here he predicts Plaintiff's offset earnings base downward with the result being a continued effort to drive the ultimate earnings loss figure higher and in the manner solely

---

[54] Rough Draft Stan Smith Depo. 63:22-64:10.
[55] Eric Greenberg Depo. 19:22-20:11.
[56] Rough Draft Stan Smith Depo. 87:18-22.

directed by Plaintiff's reporting.  For lack of an unbiased considerations of evidence, Dr. Smith's opinions are unreliable and will not assist the trier of fact.

Furthermore, Smith failed to consider the disproportional effect of geography on wage growth.  In calculating his offset figure, Dr. Smith uses the national wage growth as a benchmark from the Sherriff surveys.  However, the use of the national figure in this context is misleading. Geography has a considerable impact on a physician's salary; with Texas having a comparatively high rate and Michigan having a comparatively low rate.  To demonstrate this point, a survey cited by Plaintiff's expert Julie Sherriff states that, for example, an emergency room physician in Texas receives 24% higher compensation than an emergency room physician in Michigan.[57]  By failing to account for the disparate impacts of geography on wage offset, Smith overstated Plaintiff's lost earnings. *Garay v. Missouri Pac. R. Co*., 60 F. Supp. 2d 1168, 1173 (D. Kan. 1999) (concluding a "projection of future wages that wholly fails to take into account such critical factors [like the plaintiff's immigration status precluding his employment in certain geographical areas] as are shown by the evidence in the case is speculative and unreliable, and must be excluded."). This overstatement undermines the reliability of his opinions and requires exclusion of them.

Finally, Smith's report fails to contemplate the possibility that Plaintiff suffered no loss whatsoever. Recall that Plaintiff's claim is predicated on the notion that he has suffered a loss because he cannot work as an emergency medicine physician. Instead, because of his termination he has chosen to open an urgent care facility, which he alleges has lower compensation that emergency medicine.  This assumption drives Smith's report.  Importantly, in rendering his report, Smith did not consider the possibility that Plaintiff could still work in emergency medicine, or even if Plaintiff's lack of board certification would preclude plaintiff from working at the Texas

---

[57] 2018-2019 Compensation Report for Emergency Physicians; Report of Julie Sherriff p11.

hospitals whose sample contracts serve as Plaintiff's emergency medicine wage base.[58] As he admits, he made no effort to investigate where Plaintiff was qualified to work, stating that such an investigation would be "a waste of time and client money".[59]

Ultimately, Dr. Smith's report is the result of Plaintiff's litigation strategy. Dr. Smith ignores plainly available economic data that would allow him to compare the earnings potential of an emergency room physician, assuming Greenberg could not operate in such a capacity, to an urgent care physician. Further, he considers economic materials without any attempt to validate the worth or bias of the materials and accepts as 'gospel' the word of Plaintiff on his employment choices[60,] prospects[61] and earnings.[62] More is demanded of an expert than 'taking Plaintiff's word for it.' Indeed Smith's testimony calls for exclusion and "we must resist the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it 'the weight it deserves.'"[63] Dr. Smith's methodology is intentionally flawed and lacks reliable factual support. Striking the opinions cures the potential prejudice of allowing the introduction of such opinions cloaked in 'expertise' with the unsophisticated jury being left to sift the wheat from the chaff.

## II.    CONCLUSION:

**WHEREFORE**, for the foregoing reasons, the LSU Board respectfully requests that this Court exercise its gatekeeping functions and prevent Stan V. Smith from testifying at trial regarding Plaintiff's alleged loss of wages.

---

[58] Rough Draft Stan Smith Depo. 70:16-23.
[59] Rough Draft Stan Smith Depo. 91:13-19.
[60] Rough Draft Stan Smith Depo. 63:22-64:10.
[61] Rough Draft Stan Smith Depo. 70:16-23.
[62] Rough Draft Stan Smith Depo. 94:12-18.
[63] *Joy v. Bell Helicopter Textron, Inc*., 999 F.2d 549, 568 (D.C. Cir. 1993).

Respectfully submitted,

**JEFF LANDRY**
ATTORNEY GENERAL

*/s/ Julianne T. Echols*
**KEITH W. MCDANIEL, T.A.** (Bar No. 17992)
**JULIANNE T. ECHOLS** ( Bar No. 22044)
McCRANIE, SISTRUNK, ANZELMO,
HARDY, McDANIEL, & WELCH, LLC
195 Greenbriar Boulevard, Suite 200
Covington, LA   70433
Telephone:     (504) 831-0946
Facsimile:      (800) 977-8810
kwm@mcsalaw.com
jte@mcsalaw.com
***Attorneys for The Board of Supervisors of Louisiana State University Agricultural and Mechanical College***

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on this 8th day of October, 2019 a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice if this file will be sent to all counsel by operation of the court's electronic filing system.

*/s/ Julianne T. Echols*
**JULIANNE T. ECHOLS**