Transcript of the Testimony of

# Dr. Eric Greenberg

July 30, 2019

Eric Greenberg, M.D. v. Louisiana State University Health
Sciences Center New Orleans



C O U R T  R E P O R T I N G  &  L I T I G A T I O N  S U P P O R T

P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

EXHIBIT
2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ERIC GREENBERG, M.D.                    )
                                        )
VERSUS                                  )NO. 19-137
                                        )SECTION "I"(2)
LOUISIANA STATE UNIVERSITY              )
HEALTH SCIENCES CENTER                  )
NEW ORLEANS                             )

DEPOSITION OF ERIC GREENBERG, M.D.

TAKEN AT SMITH LAW FIRM

830 NORTH STREET

BATON ROUGE, LA 70802

ON TUESDAY, JULY 30, 2019 AT 10:00 A.M.

Amerson White®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1    APPEARANCES:

 2

 3    REPRESENTING PLAINTIFF:

 4       SMITH LAW FIRM
         BY:  J. ARTHUR SMITH, III, ESQUIRE

 5       BY:  ROBERT SCHMIDT, ESQUIRE
         830 NORTH STREET

 6       BATON ROUGE, LA 70802
         rschmidt@jarthursmith.com

 7

 8

 9

      REPRESENTING DEFENDANTS:

10

         MCCRANIE SISTRUNK ANZELMO HARDY MCDANIEL &

11       WELCH, LLC
         BY:  JULIANNE T. ECHOLS, ESQUIRE

12       195 GREENBRIAR BOULEVARD
         SUITE 200

13       COVINGTON, LA 70433
         jte@mcsalaw.com

14

15

16

17

18

19

20

21

22

23

24

25    REPORTED BY:  ANNA COATES, CCR, RPR
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

E X H I B I T   I N D E X

EXAMINATION BY:                                    PAGE

    MS. ECHOLS...........................5, 256

    MR. SCHMIDT..............................243


REPORTER'S CERTIFICATE.......................259


        E X H I B I T   I N D E X

NO.          DESCRIPTION                      PAGE

EXHIBIT 1   7/1/14-10/1/14 REVIEW........... 58

EXHIBIT 2   TIMELINE......................... 61

EXHIBIT 3   7/1/14-4/30/15 REVIEW........... 85

EXHIBIT 4   SUMMARY OF E-MAILS...............156

EXHIBIT 5   SUMMARY OF TEXT MESSAGES.........156

EXHIBIT 6   REQUEST FOR ADVERSE ACTION.......168

EXHIBIT 7   9/2016 E-MAIL...................172

EXHIBIT 8   4/21/16 E-MAIL..................178

EXHIBIT 9   4/5/16 E-MAIL...................180

EXHIBIT 10  9/1/15 E-MAIL...................182

EXHIBIT 11  3/6/17 LETTER...................186

EXHIBIT 12  9/7/16 LETTER...................192

EXHIBIT 13  APRIL 2014 RESIDENT EVALS........193

EXHIBIT 14  11/10/15 E-MAIL.................197

EXHIBIT 15  9/9/2016 LETTER.................201



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1                   S T I P U L A T I O N

 2

 3        IT IS STIPULATED AND AGREED by and among

 4   counsel for the parties hereto that the deposition

 5   of the aforementioned witness may be taken for all

 6   purposes permitted within the Louisiana Code of

 7   Civil Procedure, in accordance with law, pursuant

 8   to notice;

 9

10        That the formalities of reading, signing,

11   sealing, certification and filing are specifically

12   NOT waived;

13

14        That all objections, save objections as to

15   the form of the question and responsiveness of the

16   answer, are reserved until such time as this

17   deposition, or any part hereof, is used or sought

18   to be used in evidence.

19

20                 *  *  *  *  *  *  *  *  *

21

22        ANNA COKER COATES, RPR, CCR, Certified Court

23   Reporter in and for the State of Louisiana,

24   officiated in administering the oath to the

25   witness.
```



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
1              ERIC GREENBERG, M.D.,
2     626 ACADEMY STREET, FERNDALE, MICHIGAN 48220,
3     AFTER HAVING BEEN FIRST DULY SWORN BY THE
4     ABOVE-MENTIONED COURT REPORTER, DID TESTIFY AS
5     FOLLOWS:
6     EXAMINATION BY MS. ECHOLS:
7          Q.   Dr. Greenberg, I introduced myself
8     before, but I'm Juli Echols.  I represent LSU in
9     this case, Board of Supervisors.
10         Have you ever been deposed before?
11         A.   No.
12         Q.   So let me just set forth a few ground
13    rules:  If you let me ask my questions fully, then
14    I will let you answer, because the court reporter
15    is taking everything down, and she needs to get
16    sequentially and correct.  So we need for that to
17    happen.  And if you don't understand a question
18    that I ask you, ask me to rephrase.
19         You also need to answer out loud.  There's no
20    nodding of the head.  She can't get that down.
21    And I would prefer if you say yes or no to an
22    answer, rather than uh-huh, huh-uh.  It's hard to
23    interpret in a deposition transcript.  And if at
24    any time you need to take a break, just let us
25    know, and we'll go ahead and take a break.  And if
```

Dr. Eric Greenberg 7/30/2019

1   any questions that you don't know the answer to,

2   it's okay to say you don't know.

3        A.   Yes.

4        Q.   Okay.  Have you taken any medication

5   today that might affect your ability to answer

6   truthfully?

7        A.   No.

8        Q.   Okay.  What did you do to prepare for

9   this deposition?

10       A.   Flew to New Orleans, went over my

11  paperwork and consulted with my attorneys.

12       Q.   Okay.  Did you go over your paperwork at

13  home, or did you go over the paperwork with your

14  attorneys?

15       A.   I went over the paperwork both.

16       Q.   Okay.  Would you state your name and

17  address for the record, please, full name?

18       A.   Eric Jacob Greenberg.  My address is 626

19  Academy Street, in Ferndale, Michigan 48220.

20       Q.   Where is Ferndale; what is it close to?

21       A.   Detroit.

22       Q.   Okay.  I grew up in Chicago.

23       Have you ever gone by any nicknames or other

24  names?

25       A.   No.

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        Q.   I'm just going to ask you a bunch of
 2   general questions just to get a feel for
 3   everything.   What is your date of birth?
 4        A.   August 15th of '87.
 5        Q.   And your social security number?
 6        We'll have the court reporter black out the
 7   first --
 8             THE WITNESS:   Give my social security
 9             number?
10   EXAMINATION BY MS. ECHOLS:
11        Q.   Well, the court reporter will block out
12   what you say, and it will only show the last four
13   digits.   But if we want to get your tax records
14   and things like that, we will need your social
15   security number.
16             MR. SMITH:   Why don't we propose a
17             protective order.
18             MS. ECHOLS:   On tax records?
19             MR. SMITH:   No.   Just on the social
20             security number, maybe the tax records,
21             also, because it is confidential under
22             federal law, but I'm happy to give it to
23             you, but I only want it used for
24             purposes of this litigation.
25             MS. ECHOLS:   Right.   I mean, if he's
```

Dr. Eric Greenberg 7/30/2019

Page 8

```
 1              making an economic claim.
 2              MR. SMITH:  Oh, no, I'm going to give it
 3         to you.
 4         MS. ECHOLS:  Okay.
 5         MR. SMITH:  I just want it used for
 6         purposes of this litigation, if we have
 7         an agreement on that.
 8         MS. ECHOLS:  Rachael sent me -- is it
 9         Rachael, the girl in Michigan?
10         MR. SMITH:  Yes.
11         MS. ECHOLS:  Okay.  She sent me a
12         protective order.
13         MR. SMITH:  Okay.
14         MS. ECHOLS:  Which I had passed on to my
15         client.  I didn't have any personal
16         problems with it, but they wanted to
17         know what to do.
18         MR. SMITH:  Can you agree that his
19         social security number will be subject
20         to a protective order?
21         MS. ECHOLS:  No.
22         MR. SMITH:  Okay.
23         MR. SCHMIDT:  Well, everything but the
24         last four has to be redacted before it
25         can be filed anyway.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1            MR. SMITH:  Well, I just don't --
 2            MS. ECHOLS:  I mean, it's in our
 3            records.  I can get it from my records
 4            right now, so...
 5            MR. SMITH:  Well, why don't you do that,
 6            then.  I've never had any problems with
 7            a protective order for tax records or
 8            social security numbers.  If we will
 9            need to get the magistrate on the phone,
10            we can certainly do that.  I'm not
11            trying to be uncooperative.  Just, he
12            has a concern.  I just had a concern
13            with some stuff where it was an issue
14            about, you know, whether somebody had
15            stolen identity.  And hopefully that's
16            been resolved, but I'm sensitive to
17            that, and I know Dr. Greenberg is.
18            MS. ECHOLS:  Well, for purposes of this
19            litigation only.
20            MR. SMITH:  That's all I'm talking
21            about.
22            MS. ECHOLS:  Okay.
23            MR. SMITH:  I'm not talking about in any
24            way impeding your use of it.  I don't
25            want you to go and put on a billboard
```

Dr. Eric Greenberg 7/30/2019

```
 1              that says that Dr. Greenberg --
 2              MS. ECHOLS:  Why would I do that?  I
 3              wouldn't do that.
 4              MR. SMITH:  I'm using it as an extreme
 5              example.  As long as we can agree that
 6              tax information and the social security
 7              number used only for the purposes of
 8              litigation, and then we can confect the
 9              details of a formal protective order.
10              MS. ECHOLS:  Okay.  You can answer.
11              THE WITNESS:  So answer?
12              MR. SMITH:  Is that okay with you?
13              THE WITNESS:  Yes.
14                   XXX-XX-9447.
15    EXAMINATION BY MS. ECHOLS:
16         Q.   And when you were in New Orleans with
17    LSU, did you have a cell phone?
18         A.   Yes, I did.
19         Q.   And who was your provider?
20         A.   AT&T.
21         Q.   What was that number?
22         A.   248-933-4406.
23         Q.   Did you have a Michigan driver's license
24    or a Louisiana driver's license?
25         A.   Michigan driver's license.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        Q.    Okay.
 2        A.    I had a Louisiana identification card,
 3   as well.
 4        Q.    Okay.  Why did you have the Louisiana
 5   identification card?
 6        A.    I owned a house, and I needed it for
 7   property transfer.
 8        Q.    Okay.  Has your license from Michigan
 9   ever been suspended or revoked?
10        A.    No.
11        Q.    Never been arrested for DWI or DUI?
12        A.    Never.
13        Q.    I notice you wear glasses.  Do you have
14   any restrictions on your license?
15        A.    Aside from corrective lenses, no.
16        Q.    Okay.  And you gave your current address
17   that you're living at to the court reporter --
18        A.    Yes.
19        Q.    -- when you first got in here?
20        Is that a house or an apartment?
21        A.    House.
22        Q.    Do you rent or own?
23        A.    I own.
24        Q.    Who resides with you at that current
25   address?
```

Dr. Eric Greenberg 7/30/2019

```
 1        A.   Me, my dog, and my fiancé lives there
 2   part-time.
 3        Q.   How long have you been at that address?
 4        A.   A year and one month approximately.
 5        Q.   It doesn't have to be exact.
 6        A.   Yes.
 7        Q.   Does your fiancé contribute in any way
 8   to the household income?
 9        A.   Yes.
10        Q.   And was that the first place that you
11   lived after you moved from Louisiana?
12        A.   No.
13        Q.   Okay.  Where did you live before that?
14        A.   My parents' house.  The address is 6933
15   Burtonwood Drive, B-U-R-T-O-N-W-O-O-D, that's West
16   Bloomfield, B-L-O-O-M-F-I-E-L-D, Michigan 48322.
17        Q.   And were you born in West Bloomfield?
18        A.   I was born in Southfield, Michigan.
19        Q.   Okay.  Were you raised in Southfield?
20        A.   Raised in West Bloomfield.
21        Q.   Okay.  Same address your whole life, or
22   did you --
23        A.   From the ages of approximately birth to
24   10, I would say, or 9, I lived in a different
25   house with my parents.
```

```
1        Q.   But in the same area?
2        A.   Yes.
3        Q.   Okay.  Are you married?
4        A.   I'm engaged.
5        Q.   Engaged.  Have you been married before?
6        A.   Never.
7        Q.   Okay.  So you're not divorced?
8        A.   No.
9        Q.   Do you have any children?
10       A.   No.
11       Q.   And I notice that you have two sisters
12  and a brother; is that right?
13       A.   Yes.  Correct.
14       Q.   Are they older or younger?
15       A.   Younger.
16       Q.   Okay.  Are they twins?
17       A.   Brother and sister are twins.
18       Q.   They're currently in college, right, or
19  are they out now?
20       A.   One is starting Tulane Med School on
21  Friday, my brother.  One works for Michigan State
22  University, that's the girl, the older girl.  The
23  younger girl is applying to veterinary school.
24       Q.   Okay.  LSU has a good vet school.
25            Your educational background, let's start with
```

Dr. Eric Greenberg 7/30/2019

```
 1    high school.  What year did you graduate high
 2    school?
 3          A.    2005.
 4          Q.    So you went there 2001 through 2005
 5    about?
 6          A.    Approximately.
 7          Q.    Okay.  And then college, where did you
 8    go to college?
 9          A.    Michigan State University.
10          Q.    Okay.  What year did you graduate from
11    there?
12          A.    2008.
13          Q.    And what was your undergraduate course
14    of study?
15          A.    Human biology.
16          Q.    And is that a BS, Bachelor of Science?
17          A.    Yes.
18          Q.    And I notice that you pledged a
19    fraternity.  What fraternity?
20          A.    I was an AE Pi.
21          Q.    Is that the Pi sign or the P, I forget?
22          A.    Pi, like the (INDICATING).
23          Q.    It doesn't matter.  I'm a Chi Omega.
24          Then you were in the academic fraternity?
25          A.    Yes.  I do not recall which one, though.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1      Q.   Okay.

2      A.   I don't recall which one.

3      Q.   And you initiated with AE Pi?

4      A.   Yes.

5      Q.   And it took you 2.5 years to graduate?

6      A.   Yes.

7      Q.   Wow.  Why so fast?

8      A.   When I was in college, I did a lot of

9  research, which gave me a year of credit.  And I

10  stayed around Michigan State and did research for

11  6 months before getting into med school.

12      Q.   Okay.  And your GPA while you were there

13  was a 3.95; is that correct?

14      A.   Yes.

15      Q.   So the 6 months would be, like, you went

16  through December, and then 6 months until you

17  started medical school in August; would that be

18  fair?

19      A.   If I recall correctly, I graduated in,

20  like, August, and then interviewed for med school

21  in October.  Got in, in October.  Worked until,

22  like, February, and then moved to New York and did

23  research in New York before med school, for 6

24  months, and then started med school in August.

25      Q.   Okay.  So August of what year did you

Dr. Eric Greenberg 7/30/2019

```
1    start medical school?
2         A.    '09.
3         Q.    Okay.  You went to Mount Sinai?
4         A.    Yes.
5         Q.    Okay.  Tell me about medical school.
6    What kind of curriculum and studies did you do
7    while you were there?
8         A.    We had a -- everyone had the same
9    curriculum for the first 2 years.  I did research
10   in neurosurgery and neuroscience.
11        Q.    Just let me stop you right there.  Is
12   that what you had done research in before?
13        A.    Yes.
14        Q.    So that was an interest of yours?
15        A.    Yes.
16        Q.    Okay.
17        A.    Around the middle of my third year of
18   med school -- sorry, second year of med school --
19   I take that back.  Around the end of my second
20   year of med school, I injured my arm in a skiing
21   accident.  And I changed my focus from
22   neurosurgery, neuroscience to emergency medicine.
23        Q.    Is that because of the broken arm or
24   broken collarbone or whatever it was?
25        A.    Collarbone.  I separated my AC -- I had
```

1    a grade 4 AC separation.  It made, like, holding

2    your arm up for 9 hours at a time very painful.

3    So I changed my focus.

4         Q.    Okay.  Did you sit out of school at any

5    period of time for that injury?

6         A.    Didn't take a leave.

7         Q.    Did you receive any honors or any kind

8    of accolades while you were at Mount Sinai?

9         A.    I had research accolades.  Did a lot of

10   research in emergency medicine when I was there.

11   I don't think I received any honors, per se.  I

12   did have a lot of research.

13        Q.    Okay.  I'm having trouble reading.  Let

14   me get my glasses out.

15        You've never been in the military, have you?

16        A.    Never.

17        Q.    Okay.  In medical school, I noticed that

18   it said it was pass/fail?

19        A.    Yes.

20        Q.    Is that usual; or is that something that

21   Mount Sinai does?

22        A.    In New York City, it was common for,

23   like, Columbia, Cornell, Sinai to have pass/fail

24   for the first 2 years.

25        Q.    Okay.



Dr. Eric Greenberg 7/30/2019

```
 1        A.    They just had, that was their
 2   curriculum.
 3        Q.    Then the second 2 years, you were
 4   graded; is that right?
 5        A.    Second 2 years, we were graded on pass,
 6   fail, honors.
 7        Q.    Okay.  And what were your second 2
 8   years; pass, fail or honors?
 9        A.    Pass.
10        Q.    Okay.  And you lived in Manhattan when
11   you went there?
12        A.    Yes.
13        Q.    Okay.  Did you rent an apartment, or did
14   you buy something?
15        A.    I rented an apartment from Mount Sinai.
16        Q.    Okay.  Let's talk about your current
17   work right now.
18        A.    Yes.
19        Q.    Where are you currently employed?
20        A.    Currently, I'm medical director at an
21   urgent care, and I also practice wound care in
22   Michigan.
23        Q.    What's the name of that urgent care?
24        A.    Neu, N-E-U, Urgent Care.
25        Q.    N-E-U?
```

Dr. Eric Greenberg 7/30/2019

```
 1        A.    Yes, Neu Urgent Care.

 2        Q.    You said you practiced wound care?

 3        A.    Wound care, yes.

 4        Q.    Do you do that at Neu Urgent now?

 5        A.    That's with Encompass,

 6   E-N-C-O-M-P-A-S-S.

 7        Q.    So your position is medical director

 8   with urgent care.  And with Encompass, what are

 9   you?

10        A.    Just physician working for them.

11        Q.    Okay.  Do they have different offices?

12        A.    They have one office.

13        Q.    How long have you been in the position

14   of medical director?

15        A.    Approximately 7 months.

16        Q.    Before you were medical director, what

17   were you?

18        A.    The entity did not exist.

19        Q.    Oh, is it something you started?

20        A.    Yes.

21        Q.    Okay.

22        A.    And I also started a consulting company.

23   And we have a contract -- or we're signing a

24   contract on Wednesday to establish a methadone

25   clinic and urgent care.
```

1          Q.    A what?

2          A.    A methadone clinic and urgent care in

3     Detroit.

4          Q.    Okay.  Is that a company you formed

5     yourself?

6          A.    With my fiancé, yes.

7          Q.    Okay.  So is the company already up and

8     running?

9          A.    The LLC is formed.  We're billing

10    already.  We're just waiting on the contract to be

11    finalized.

12         Q.    What's the name of that consulting

13    company?

14         A.    Maven, M-A-V-E-N, Healthcare Consulting.

15         Q.    Before the last 7 months, what did you

16    do in between LSU and --

17         A.    In between LSU and working for

18    Encompass?

19         Q.    How long have you worked for Encompass?

20         A.    So I worked for Encompass starting

21    approximately -- I want to say I started with them

22    approximately January of '18.

23         Q.    Okay.  And is that the only other job

24    that you've had?

25         A.    No.  In between LSU and Encompass?


AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        Q.   Let's start, how long were you in New
 2   Orleans?
 3        A.   So I was in New Orleans from --
 4        Q.   2013?
 5        A.   -- 2013 to around October 2017.
 6        Q.   And in October of 2017, you moved where?
 7        A.   To Michigan.
 8        Q.   Okay.  What did you do in Michigan while
 9   you were there, in October of 2017?
10        A.   Just prepared to move.  I was training
11   with Dr. Ruben at Encompass and getting ready to
12   start working for him.
13        Q.   Getting ready to what?
14        A.   Start working for him.
15        Q.   Is Dr. Ruben an ER physician, or what
16   kind of physician is he?
17        A.   Wound care and infectious disease.
18        Q.   Okay.  Is Encompass his company?
19        A.   Yes.
20        Q.   Does he work for himself?
21        A.   Yes.
22        Q.   Are there any other employees?
23        A.   They have office manager, all sorts
24   of --
25        Q.   As far as physicians?
```

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1          A.   He has another physician that covers
 2     shifts, as well.  I don't recall his name.
 3          Q.   So there are two physicians, and then
 4     Dr. Ruben?
 5          A.   Yes.
 6          Q.   Okay.  When you started working, for how
 7     many hours a week would you work?
 8          A.   Approximately 20 to 30 hours a week.
 9          Q.   And how were you paid?
10          A.   I was paid 1099 through him.
11          Q.   Okay.  And what was your rate of pay?
12          A.   It depended.  It was approximately 500
13     to $1,000 a shift, depending on how many patients
14     I saw, how many hours I worked.
15          Q.   Okay.  And when you said you worked 20
16     to 30 hours, about how many shifts would that be?
17          A.   Per month, I would base it off of
18     anywhere between 5 to 12 shifts a month.
19          Q.   Okay.  And so have you worked for
20     anybody else besides the urgent care and
21     Encompass?
22          A.   Yes.
23          Q.   Okay.  Who else?
24          A.   So I worked for Concentra.
25          Q.   And when did you start working for them?
```

Dr. Eric Greenberg 7/30/2019

```
 1        A.    Approximately February of '18.
 2        Q.    And what did you do for Concentra?
 3        A.    Staff physician.
 4        Q.    What kind of outfit is Concentra?
 5        A.    They do occupational medicine.
 6        Q.    How many hours a week did you work
 7   there?
 8        A.    Very variable.  Anywhere from 10 to 30.
 9        Q.    Okay.  How were you paid there?
10        A.    1099 -- actually, sorry.  W-2.
11        Q.    Okay.  And how much were you paid?
12        A.    There are two different tiers; one was
13   hourly at $90 an hour, and the other one was on
14   call.  I would be paid $100 per patient on call on
15   the weekends.
16        Q.    So your typical weekly schedule with
17   Encompass and Concentra, you just kind of juggled
18   them?
19        A.    Yes.
20        Q.    Okay.  How long did you work for
21   Concentra?
22        A.    I still work for Concentra.
23        Q.    So you still work for urgent care,
24   Encompass and Concentra?
25        A.    Yes.
```

Dr. Eric Greenberg 7/30/2019

```
 1        Q.   Anybody else?

 2        A.   Yes.

 3        Q.   Okay.

 4        A.    I worked home medicine.  I work home

 5   medicine for, like, seven different companies.

 6   And that's variable.

 7        Q.    It's where the patient calls, and you

 8   have, like, a video chat?

 9        A.   Or a phone chat, yes.

10        Q.   Okay.  What is the name of that company?

11        A.    Several.

12        Q.   Oh.

13        A.    Like, eight of them.  I can't recall off

14   the top of my head all of them.

15        Q.    Okay.  Is that something -- I mean,

16   that's scheduled time that you spend, like, a

17   non-call kind of time?

18        A.    They're all different.

19        Q.   Okay.

20        A.    Some of them, a text message goes out,

21   and you pick up the case; some of them are

22   scheduled.  It's all different.

23        Q.   Okay.  Do they have various pay scales?

24        A.   Yes.

25        Q.   Of course.  I guess we'll get all of
```

Dr. Eric Greenberg 7/30/2019

1    this in discovery.  And if at any time you need to

2    estimate, that's fine with me, just tell me that

3    you're estimating.

4            How much do you make from the telemedicine?

5        A.    Estimating?

6        Q.    Yes.

7        A.    40,000.

8        Q.    A year?

9        A.    Estimate.  And that was in the year

10   2018.

11       Q.    Okay.  Like, how many hours a week would

12   you work for telemedicine?

13       A.    3 to 10 hours a week, variable.

14       Q.    It's for all eight companies?

15       A.    Yes.

16       Q.    Okay.  How do you keep it all straight,

17   jeezum pete.

18       A.    There's more.

19       Q.    More, okay.  What else -- are you doing

20   it currently or no?

21       A.    Yes.

22       Q.    Okay.

23       A.    I have a real estate company.

24       Q.    Okay.  And what does the real estate

25   company do?

```
 1        A.   We buy up properties and renovate, rent
 2   them out.
 3        Q.   Are you a sole proprietor?
 4        A.   I am 50 percent owner of it.
 5        Q.   And who's the other 50?
 6        A.   Evan Hollander.
 7        Q.   Is that with an H, Hollander?
 8        A.   H-O-L-L-A-N-D-E-R.
 9        Q.   Okay.
10        A.   We have an LLC established with that.
11        Q.   What kind of duties or responsibilities
12   do you have with the real estate company?
13        A.   There's no established duties, you know.
14   There's nothing on paper; that is, like, I'm
15   assigned this, you're assigned that.  But my main
16   role is interfacing with the lenders and tenants.
17        Q.   Okay.  So you don't do any of the
18   rehabbing or finding the property?
19        A.   We subcontract -- well, we find the
20   properties, too.
21        Q.   Okay.
22        A.   We subcontract out the rehabbing.  Not
23   sanding or anything.
24        Q.   What is Evan, what are his jobs in the
25   company?
```

Dr. Eric Greenberg 7/30/2019

Page 27

```
 1       A.    He's more logistics with the renovation
 2   of the houses.
 3       Q.    Okay.  How long have you had that real
 4   estate company?
 5       A.    Since approximately January of '19.
 6       Q.    This year?
 7       A.    December of '18, or in that window.
 8       Q.    So 7, 8 months?
 9       A.    Yes.
10       Q.    Okay.  What's the name of that company?
11       A.    E&E Real Estate Holdings, LLC.
12       Oh, I wanted to back up.  I didn't know --
13       Q.    And that's okay, too.  At any time you
14   remember something or you want to correct
15   something, that's fine.
16       A.    I don't know if that makes a difference,
17   but the Maven is a PLLC.
18       Q.    The -- oh, with your fiancé?
19       A.    Yes.
20       Q.    Okay.  Anything else?
21       A.    Yes.  I do, in the State of Michigan, I
22   do marijuana certifications clinic.
23       Q.    Is marijuana legal in Michigan?
24       A.    Yes.
25       Q.    Is that for patients that you do
```

Dr. Eric Greenberg 7/30/2019

1    certifications?

2         A.    Yes.

3         Q.    Who are you paid by for that?

4         A.    It's a company called Over The Moon,

5    LLC.

6         Q.    And how long have you done that?

7         A.    Approximately from -- I don't know when

8    I started.  If I was to estimate when I started,

9    it would be April of '18, to current.

10        Q.    Okay.  And how much money do you make

11   from that?

12        A.    It's variable.  I would say 10,000, in

13   the year '18.  And I --

14        Q.    Is that before tax or after tax?

15        A.    Before tax.

16        Q.    So you get 1099?

17        A.    Yes, 1099.  I don't know how much I made

18   this year on that.  It's 1099.  At the end of the

19   year, I pay it.

20        Q.    Pay your taxes?

21        A.    Yes.

22        Q.    You don't pay estimated taxes?

23        A.    I do.  I pay estimated taxes, yes.

24        Q.    Okay.  You told me the name of that

25   company.  So what does that process entail?

Dr. Eric Greenberg 7/30/2019

```
 1        A.   You look over patient's records.  They
 2   have established patients.  You see them.  You do
 3   follow-ups.
 4        Q.   So it's like for a medical marijuana
 5   card?
 6        A.   Yes.
 7        Q.   Marijuana is legal?
 8        A.   Yes.
 9        Q.   Okay.  For medical purposes or for all
10   purposes?
11        A.   Legal for both in Michigan.
12        Q.   Legal, okay.  Anything else?
13        A.   Oh, yes.  What dates?  I don't know the
14   start, and I don't know the end date, but I worked
15   for Lakes Urgent Care.
16        Q.   As a physician?
17        A.   Yes.
18        Q.   Okay.
19        A.   I don't know the start and end date.  Do
20   you want an estimation?
21        Q.   Yes, that would be great.
22        See, this is why we need your social security
23   number, because we're going to gather all this
24   information and the dates and all that.
25        A.   A total estimation on the dates would be
```

Amerson White

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1    March of '18 to November of '18.
 2         Q.   Okay.  Is that, like, a -- I hate
 3    this -- doc in the box place, urgent care, where
 4    you walk in?
 5         A.   It's an urgent care and general medicine
 6    practice.
 7         Q.   Okay.  So what was your position there?
 8         A.   Urgent care.
 9         Q.   Okay.  So the internal medicine patients
10    make appointments?
11         A.   Yes.
12         Q.   Okay.  And how much were you paid there?
13         A.   Again, it was variable.  70 to $85 an
14    hour.
15         Q.   And how many hours did you work --
16         A.   You put 75.  It's 7-0.
17         Q.   What?
18         A.   It's 70, 7-0.
19         Q.   70 to 85?
20         A.   Yes.
21         Q.   I mean, why the variable?
22         A.   Weekend shifts make differential.
23         Q.   Okay.  About how many hours a week did
24    you work there?
25         A.   10.
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1              MR. SMITH:  I'm going to excuse myself.
 2              I'll be in the next office if anybody
 3              needs anything.  And, Rob, if you would
 4              help them with any coffee or other needs
 5              like that, but y'all please let me know
 6              if you need anything.  I don't think I
 7              need to be here all day.
 8              MS. ECHOLS:  Well, thank you for
 9              stopping by.
10              MR. SMITH:  I'm not going to be very
11              far.
12              MS. ECHOLS:  That's all right.  We'll
13              call you if we need you.
14      EXAMINATION BY MS. ECHOLS:
15           Q.   Okay.  So at any of these jobs -- well,
16      I know probably the urgent care -- like, Encompass
17      or Concentra or the medical marijuana, have you
18      ever been reprimanded?
19           A.   No.
20           Q.   Okay.  Have you ever been told you
21      weren't doing your job properly?
22           A.   No.
23           Q.   I didn't ask you.  Anything else that
24      you can think of that you did?
25           A.   No.
```

Dr. Eric Greenberg 7/30/2019

```
 1        Q.   Okay.  Have you applied anywhere since
 2   you left LSU in -- when did you leave -- or New
 3   Orleans, that you did not get a job?
 4        October 2017, right, is when you left?
 5        A.   Yes.
 6        Q.   Okay.  While you were at LSU, I noticed
 7   that you did a little bit of moonlighting?
 8        A.   Yes.
 9        Q.   Okay.  So you worked for Lallie Kemp?
10        A.   I had a contract signed with Lallie
11   Kemp.  I did not work for them.
12        Q.   Is that the one in Baton Rouge, or where
13   was that; Independence?
14        A.   Independence.
15        Q.   So you never moonlighted for them, okay.
16   Also, Doctors Urgent Care?
17        A.   Yes.
18        Q.   Where was that?
19        A.   Slidell.
20        Q.   Okay.  And how many hours a week did you
21   work for them?
22        A.   Variable; 8 to 16 hours a week.
23        Q.   Do you remember what years you worked
24   for them?
25        A.   2016 to 2017, approximately.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        Q.   So that's, like, your third and fourth
 2   year?
 3        A.   Correct.
 4        Q.   Okay.  How much were you paid there?
 5        A.   Variable; 90 to 110, based on the
 6   staffing.
 7        Q.   Weekends or nights or...
 8        A.   Depended on if there was a nurse
 9   practitioner there or not.
10        Q.   And then I noticed you also worked for
11   Ochsner?
12        A.   Yes.
13        Q.   Let me back up a second.  What did you
14   do for Doctors Urgent Care; were you a physician
15   in the practice?
16        A.   Yes.
17        Q.   And Ochsner, what did you do for them?
18        A.   I was an emergency medicine physician.
19   They had ER residents moonlight for them.
20        Q.   Where did you work out of?
21        A.   Ochsner on Jefferson.
22        Q.   Okay.  In the main ER?
23        A.   Yes.
24        Q.   Because I know they have satellite ERs
25   now.
```

```
 1        A.    Main ER.
 2        Q.    And how often did you work for them; how
 3   many hours a week?
 4        A.    Let's see.  8 to 12 hours a week.
 5        Q.    So, like, one shift?
 6        A.    Yes.  And it wasn't every week.
 7        Q.    What timeframe did you work for them?
 8        A.    2014 to 2016.
 9        Q.    How much were you paid?
10        A.    It was a sliding scale.
11        Q.    What did you start out at?
12        A.    It was sliding based on volume.  I don't
13   remember their calculation for sliding scale.  It
14   was, like, each procedure was paid for volume.
15   There was a calculation that needed to be made.
16        Q.    So an average of the amount you would
17   make?
18        A.    110 to 130 an hour.
19        Q.    Okay.  Who was your supervisor at
20   Ochsner?
21        A.    David Coffin.
22        Q.    How about at the Doctors Urgent Care,
23   supervisor?
24        A.    Wade Estopinal, E-S-T-O-P-I-N-A-L.
25        Q.    Any other moonlighting or any other
```

Dr. Eric Greenberg 7/30/2019

Page 35

1   medical-type jobs?  Like, you told me about

2   research.

3          A.    Yes.  I worked for In and Out Urgent

4   Care on Claiborne, New Orleans.

5          Q.    Where is that on Claiborne?  Claiborne

6   is a big street.  Where is it?

7          A.    Claiborne and State.

8          Q.    Claiborne and State?

9          A.    Yes, around that area.

10         Q.    Reginelli's?  I know where Claiborne is.

11         A.    It's pizza right there.

12         Q.    Okay.

13         A.    Across from Tulane.

14         Q.    Okay.  Were you a physician there, too?

15         A.    Yes.

16         Q.    And what years did you do that?

17         A.    I did it, from my estimation, 2015 to

18   2016.

19         Q.    How much were you paid?

20         A.    I don't remember.  If I were to go from

21   estimation, 95 an hour.  I would have to get you a

22   real final answer on that.

23         Q.    We'll get it from your social security

24   records.

25         Who was your supervisor there?

```
 1          A.    I don't remember his name.
 2          Q.    Okay.  But it was a man?
 3          A.    Yes.
 4          Q.    Okay.  Did they only have one location,
 5    or did they have multiple?
 6          A.    They had one location.
 7          Q.    Okay.  Anything else?
 8          A.    No.
 9          Q.    Okay.  Were you ever fired from any of
10    these positions?
11          A.    No.
12          Q.    And I assume you've done your taxes in
13    the last 4 years?
14          A.    Yes.
15          Q.    So the best way, could you estimate your
16    income over -- let's say for 2018, or would the
17    tax returns be the best way that we would get
18    that?
19          A.    For 2019?
20          Q.    No.  2018.
21          A.    2018.  I can give you an estimate.  Tax
22    returns would be a better idea.
23          Q.    Yes.  Can you just give me a ballpark?
24          A.    225.
25          Q.    And I assume you have health insurance.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    Is that through your company?

2         A.    From -- well --

3         Q.    One of your companies?

4         A.    I was on Medicaid after termination from

5    LSU.

6         Q.    Okay.

7         A.    And that lasted until October.  I was

8    uninsured from October '18 to June of '19.  I'm

9    currently on insurance.

10        Q.    So you did COBRA through LSU, or what

11   did you do?

12        A.    If memory serves me correct, I was on

13   COBRA for a month before it got to be

14   unaffordable.  I was uninsured for a time.  Moved

15   to Michigan.  Started on Medicaid, and then I

16   removed myself from Medicaid.  Was uninsured from

17   October, approximately October '18, to June '19.

18   And then through Neu Urgent Care, I have

19   insurance.

20        Q.    Okay.  Have you ever been on social

21   security disability?

22        A.    No.

23        Q.    And you've never applied?

24        A.    No.

25        Q.    Okay.  Have you ever had any personal

Dr. Eric Greenberg 7/30/2019

Page 38

```
 1    injury claim?
 2         A.    No.
 3         Q.    Have you ever filed a suit against
 4    anybody?
 5         A.    No.
 6         Q.    Have you ever been sued?
 7         A.    No.
 8         Q.    No workers' comp claims?
 9         A.    No.
10         Q.    Bankruptcy?
11         A.    No.
12         Q.    And I apologize I have to ask this
13    question:  Have you ever been arrested?
14         A.    No.
15         Q.    Okay.  Prior to the time that you
16    started at LSU, did you have any prior injuries,
17    illnesses, disabilities?
18         A.    I injured my shoulder in med school.
19         Q.    But this is prior -- oh, med school.
20    Okay.  And that was in a skiing accident?
21         A.    Yes.
22         Q.    Okay.  That was your collar bone, right?
23         A.    AC joint.
24         Q.    Okay.  Is that the only injury that
25    you've ever had?
```

Dr. Eric Greenberg 7/30/2019

```
 1          A.    That's the only injury I've ever had.
 2          Q.    How about any significant illnesses?
 3          A.    I have a history of ADHD.
 4          Q.    You consider that an illness or
 5    disability?
 6          A.    Disability.
 7          Q.    Okay.  Disability is -- that's fine.
 8    When were you diagnosed with ADHD?
 9          A.    Approximately 6 or 7 years old, at
10    University of Michigan.
11          Q.    At University of Michigan, you said?
12          A.    Yes.
13          Q.    Did you treat there for the ADHD, or did
14    they refer you out to --
15          A.    I treated at various doctors in the
16    Detroit area.
17          Q.    Do you have one doctor that stands out
18    in your mind that you used the longest, or did you
19    just go from doctor to doctor?
20          A.    There's a Dr. Simonton that I saw from
21    approximately middle school and high school.
22          Q.    Is he the one who switched you from
23    Ritalin to Adderall?
24          A.    Yes.  If the name is correct, yes.
25    Dr. Simonton and Dr. London, they were doctors
```

Dr. Eric Greenberg 7/30/2019

```
 1    that worked together.
 2         Q.   Okay.  Would you just see them for
 3    medication management, or would you --
 4         A.   And therapy.
 5         Q.   What kind of therapy?
 6         A.   Talk therapy.
 7         Q.   About how often would you go in for talk
 8    therapy?
 9         A.   Once a week.
10         Q.   Okay.  And medication management was,
11    like, once a month?
12         A.   Yes.
13         Q.   Okay.  Did you treat consistently from
14    the time you were diagnosed?
15         A.   Yes.
16         Q.   Okay.  So you did talk therapy all the
17    way.  Did you do talk therapy in college?
18         A.   Yes, I did.
19         Q.   Medical school?
20         A.   Yes, I did.
21         Q.   And during your residency?
22         A.   Yes, I did.
23         Q.   Okay.  Perhaps I'm incorrect -- and
24    correct me if I'm wrong -- I read somewhere that
25    you have hearing problems.  Is that something that
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1    is diagnosed, or is that a side effect of one of
 2    the medications?
 3         A.   In med school, I went to an ENT.  I have
 4    some vocal tone hearing loss.  I don't know if
 5    it's ever a medical record.  I went to --
 6         Q.   You went in New York?
 7         A.   In Michigan.
 8         Q.   Michigan.
 9         A.   I don't know if there's any medical
10    record of that, though.
11         Q.   Okay.  Were you tested?
12         A.   I went to a doctor, and he didn't do any
13    formal hearing test.
14         Q.   No audiology testing?
15         A.   No audiology testing.
16         Q.   Okay.  And I noticed, also, that -- is
17    ADHD the only disability that you have, that you
18    know of?
19         A.   Yes.
20         Q.   What about oppositional defiant
21    disorder?
22         A.   Never been diagnosed with that.
23         Q.   Okay.  Were you ever hospitalized for
24    your ADHD?
25         A.   No.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1          Q.    This is all before LSU, right?
 2          A.    (WITNESS NODS HEAD UP AND DOWN.)
 3          Q.    And then -- I don't know how to say it,
 4    Vyvanse?
 5          A.    Vyvanse.
 6          Q.    Vyvanse, who prescribed that?
 7          A.    When I was in medical school, it came on
 8    the market.  I don't remember the psychiatrist's
 9    name that I saw.  I saw a psychiatrist and did
10    talk therapy in New York weekly.  He started me on
11    that.
12          Q.    In addition to the Adderall?
13          A.    Instead of the Adderall.
14          Q.    Okay.  So do you currently have
15    prescriptions for both?
16          A.    I currently have a prescription for
17    Adderall.
18          Q.    Okay.  And I'm going to mispronounce it
19    again; Vyvanse?
20          A.    Vyvanse.
21          Q.    Vyvanse.  When did you stop taking the
22    Vyvanse?
23          A.    I changed to Adderall approximately
24    January or February of '19, for cost issues.
25          Q.    What was the difference in cost between
```

Dr. Eric Greenberg 7/30/2019

```
 1    Vyvanse and --
 2         A.   300 versus $3.
 3         Q.   Okay.  For a month's prescription?
 4         A.   Yes.
 5         Q.   Did the Vyvanse work any better than the
 6    Adderall?
 7         A.   I believe they worked similarly.
 8         Q.   Okay.  Have you been given any kind of
 9    prognosis about your ADHD?
10         A.   No.
11         Q.   I mean, do you continue to do talk
12    therapy today?
13         A.   Yes.
14         Q.   Okay.  When you arrived in New Orleans
15    in July 2013 or June, whenever you got there, did
16    you start seeing a psychiatrist then?
17         A.   Yes.
18         Q.   And who did you see?
19         A.   Richard Roniger.
20         Q.   And did he do your medication
21    management?
22         A.   Yes.
23         Q.   And did he do talk therapy?
24         A.   Yes.
25         Q.   How often would you see him?
```



Dr. Eric Greenberg 7/30/2019

```
 1          A.    Every 2 to 3 months.

 2          Q.    For the talk therapy, as well?

 3          A.    Yes.

 4          Q.    Okay.  Do you have a primary care

 5   physician currently?

 6          A.    Currently, I do, yes.

 7          Q.    And who is that?

 8          A.    His name is Dr. Jay Sandberg, but I'm

 9   going to be switching soon because of insurance.

10          Q.    Okay.  Do you know who you're switching

11   to yet?

12          A.    No.

13          Q.    Did you have a PCP when you were in New

14   Orleans?

15          A.    Yes.

16          Q.    Who was that?

17          A.    Her name was Jenny Kuo, K-U-O.

18          Q.    When you were in New Orleans, what

19   pharmacy would you use?

20          A.    I don't know.

21          Q.    Okay.  I mean, I assume you got your

22   Vyvanse and Adderall filled somewhere.

23          A.    Napoleon and Claiborne, whatever one is

24   there.

25          Q.    By Baptist?
```

Dr. Eric Greenberg 7/30/2019

```
 1         A.    Yes.

 2         Q.    Walgreens.

 3         A.    Okay.

 4         Q.    Have you been to the ER in the last 5

 5   years?

 6         A.    I went in 2017, for pneumonia.

 7         Q.    And where was that?

 8         A.    Ochsner main.

 9         Q.    Did you spend any time in the hospital?

10         A.    I got a breathing treatment in the ER

11   and was discharged.

12         Q.    Okay.  And then I read somewhere that

13   you have asthma, too.  Is that as a child?

14         A.    As a child, yes.

15         Q.    Okay.  And it didn't come back in New

16   Orleans?

17         A.    I have exercise-induced asthma.

18         Q.    I have a daughter that's got that.

19         A.    I have an inhaler on my person.  It's in

20   the car right now.

21         Q.    Okay.  When you applied to LSU, did you

22   apply to any other residency programs?

23         A.    Yes.

24         Q.    And where did you apply?

25         A.    There was a list of 18.  From memory --
```

Dr. Eric Greenberg 7/30/2019

Page 46

```
 1    I applied very broadly.  I believe I had 18
 2    interviews or so.
 3         Q.    All across the country?
 4         A.    Yes.
 5         Q.    Okay.  You didn't know where you wanted
 6    to go?
 7         A.    That's not how the match works.
 8         Q.    Oh, that's right.  So tell me a little
 9    bit about how that works.
10         A.    I applied through a national matching
11    system.  And they send out interviews, interview
12    requests.  I interviewed at approximately, it was
13    either 14 or 18 places all around the country, one
14    of them including LSU.  And then you rank what you
15    like best, and a computer decides where you go.
16         Q.    Was LSU your first choice?
17         A.    It was until an incident with an
18    attending there.  Then it moved on to my, I
19    believe, fifth choice.
20         Q.    Okay.  You had an incident with an
21    attending while you were applying for the matching
22    system?
23         A.    When I came for a second look, Dr. Luke
24    Lebas said some anti-Semitic comments to me.  And
25    I changed my ranking from 1 to 6, or 5 or 6.
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1         Q.   It's Luke?
 2         A.   (WITNESS NODS HEAD UP AND DOWN.)
 3         Q.   What kind of anti-Semitic comments did
 4    he make?
 5         A.   In the presence of TC Crouch and other
 6    residents, he said, "oh, you're a Jew, you come
 7    from Sinai, you should be at jewlane."
 8         Q.   Did you report that to anybody?
 9         A.   I was not at liberty to report that to
10    anyone, as I'm an interviewing med student.
11         Q.   Well, you're --
12         A.   I told my parents.
13         Q.   Well, you're at liberty to report it.
14         A.   I told people at Sinai.  I told my
15    parents.  And when I was at residency, I told
16    Joseph Framin.  And I talked with Lisa
17    Moreno-Walton about it, but didn't give any names
18    directly.  And Joseph Framin was the chief
19    resident at the time.
20         Q.   At LSU?
21         A.   (WITNESS NODS HEAD UP AND DOWN.)
22         Q.   Joseph, what, did you say?
23         A.   Framin.
24         Q.   Framin.  But then you still matched with
25    LSU?
```

Dr. Eric Greenberg 7/30/2019

```
1          A.    They moved down in my ranking.
2     Initially, I put them down to the bottom.  Then I
3     moved them to either 5 or 6, and kind of kept it
4     there.  I thought I was going to go somewhere
5     else, and that didn't work out.  I don't know why
6     it didn't work out, but I ended up at LSU.
7          Q.    Okay.  And you started LSU in July 2013?
8          A.    Yes.
9          Q.    Is that when the year starts for medical
10    school?
11         A.    Residency.
12         Q.    For residency, I'm sorry.
13         And what did you understand that the program
14    entailed?
15         A.    4 years of emergency medicine work.
16         Q.    So when you start out with, like, a
17    class of residents, do they all progress at the
18    same rate?
19         A.    Yes.
20         Q.    Okay.  And what does the ER program
21    involve at LSU, what kinds of things; do you have
22    to go to different departments?
23         A.    The first year, if memory serves me
24    correctly, you have 6 months of ER, and then 6
25    months of different rotations, like, OB/GYN,
```



Dr. Eric Greenberg 7/30/2019

1    pediatrics, ICU.  It's different rotations.

2         Q.   Okay.  Cardiology, critical care,

3    anything?

4         A.   That's hard to remember.  It's ENT, ICU,

5    pediatrics, OB/GYN, community ER, which is, like,

6    Lallie Kemp.

7         Q.   Clinics?

8         A.   Community ER, emergency medicine.

9         Q.   Okay.

10        A.   I would have to see a schedule to give

11   you better information.

12        Q.   Okay.  When you started at LSU, did you

13   report your ADHD to them?

14        A.   I don't remember if I did or did not.

15        Q.   Did you ask for any accommodations when

16   you started in July 2013?

17        A.   Not July 2013.  But in January of 2017,

18   I did.

19        Q.   January 2017, was the first time you

20   reported to LSU that you had ADHD?

21        A.   That's the first time I asked Dr. Suau

22   for accommodations.

23        Q.   Okay.  But did you ever report to LSU

24   that you had ADHD?

25        A.   I do not recall either way.

Dr. Eric Greenberg 7/30/2019

```
 1        Q.    Okay.  And what kind of accommodations
 2    did you ask for -- how do you say his name?
 3        A.    Dr. Suau.
 4        Q.    Suau.  He's been in Europe.  I haven't
 5    talked to him.
 6        So what kind of accommodations did you ask
 7    for?
 8        A.    I asked him for a quiet room for a test
 9    that we were taking.  And he said, if I did not
10    tell anyone, he would give me a quiet room, and
11    then just to keep it between the two of us.
12        Q.    Okay.
13        A.    And when the time came to take the test,
14    he denied ever having this conversation and said I
15    had to take the test.
16        Q.    With the others?
17        A.    Yes.
18        Q.    Okay.  Was this the first time you had
19    ever taken a test like that at LSU?
20        A.    I had taken the test before, not with
21    this accommodation.  I had these accommodations
22    that they gave me in med school and in college.
23    And I had some -- the first year, I struggled on
24    the test.  The second year, I did fine, but not as
25    well as I wanted to do.  And ADHD, I have
```

```
 1    distraction issues.
 2         Q.   Right.
 3         A.   And I wanted to go and use the quiet
 4    room.
 5         Q.   Okay.  So if you used the accommodations
 6    that were recommended, I guess, by your
 7    psychiatrist when you were younger for college and
 8    for medical school, why would you not ask the same
 9    accommodations when you got to LSU?
10         A.   For fear of being treated differently or
11    retaliated against.
12         Q.   Were you treated differently or
13    retaliated against in medical school?
14         A.   No, I was not.
15         Q.   Okay.  So what would make you think that
16    you would be treated differently at LSU?
17         A.   Dr. Suau's overall demeanor and
18    attitude.
19         Q.   Okay.  Are there any other
20    accommodations that you've used in the past that
21    have been successful?
22         A.   I had time and a half in college.  I
23    rarely used that, though.  In medical school, we
24    were allowed to take tests at home.  I didn't see
25    that as an option during residency.
```

Dr. Eric Greenberg 7/30/2019

1      Q.    Did your psychiatrist develop a list of

2   accommodations that would benefit you when you

3   were growing up; you know, in school situations or

4   working or --

5      A.    I believe so.  I don't know where said

6   list would be, but I believe there was a list.

7      Q.    Okay.  Did you ever provide that list to

8   LSU?

9      A.    No, I did not.

10      Q.    Okay.  Can you tell me a little bit

11   about the review process -- I assume there's a

12   review process at LSU as far as evaluating

13   students and how they're performing and things

14   like that.  Tell me, like, your first year, what

15   was the review process?

16      A.    Review process, we'd meet with

17   Dr. Haydel, and she'd go over reviews and

18   performance.

19      Q.    And Dr. Haydel was who?

20      A.    My program director until the middle of

21   my second year -- or the end of my second year.

22      Q.    She was program director for the ER?

23      A.    Yes.

24      Q.    And how often would you do that?

25      A.    Approximately 3 or 6 months.



Dr. Eric Greenberg 7/30/2019

```
 1        Q.   And would you actually sit down with her
 2   individually?
 3        A.   Yes.
 4        Q.   And would there be a form or some sort
 5   of document that you were looking at while you
 6   were going over the review?
 7        A.   She'd give feedback, or feedback that
 8   was collected on shift.  I don't recall --
 9        Q.   There was no -- I mean, I have later
10   reviews.  There was no form in your first year, or
11   was there?
12        A.   I've never seen a form for my first
13   year.
14        Q.   Okay.  So she was your program director
15   for a year and a half?
16        A.   2 and a half years.
17        Q.   2 and a half years.
18             MR. SCHMIDT:  Excuse me, do y'all mind
19             if we take a quick bathroom break.
20             (RECESS 11:05-11:14 A.M.)
21             THE WITNESS:  There were some other
22             financial stuff that I just remembered
23             when I was in the bathroom, to go over.
24   EXAMINATION BY MS. ECHOLS:
25        Q.   Okay, go ahead.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1        A.    So I do some medical survey work,
2   there's about ten companies, for $15,000.  It's
3   all 1099.
4        Q.    And what is medical survey work?
5        A.    You fill out surveys regarding what your
6   thoughts on different treatments are, what this ad
7   looks like, what are your thoughts on how to treat
8   pneumonia in the ER, what are your thoughts on
9   wound care.  There's various things that they
10  could be asking.
11       Q.    And what is the name of the company that
12  you do this for?
13       A.    There's multiple.  One's Sermo.
14       Q.    S-U-R-M-O?
15       A.    S-E-R-M-O.  I would have to look at my
16  financial records to get you the other ones, but
17  there's about 10 to 15, in my approximation.
18       Q.    How much a year do you make from those
19  10 to 15 companies?
20       A.    Approximately $10,000; 10 to 15,000.
21       Q.    How long have you been doing that?
22       A.    Probably for the last -- since I left
23  residency.  And then actually --
24       Q.    Are you still --
25       A.    -- fourth year residency.



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1       In less frequency.  I would say my estimated

2  for this year would be $1,000 or under.

3       Q.   Okay.

4       A.   Then I still have ownership in a

5  healthcare corporation for my family.  I don't

6  know how much money I make off of that.  I know I

7  pay $5,500 taxes a year off of it.

8       Q.   What kind of healthcare corporation is

9  it?

10      A.   It owns and operates in nursing homes.

11      Q.   But you believe you paid $5,500 in

12  taxes?

13      A.   Yes.

14      Q.   So that must mean that you made some

15  money from the company?

16      A.   Yes.

17      Q.   What percentage of ownership do you

18  have?

19      A.   I don't know.

20      Q.   How long has the company been in

21  existence?

22      A.   Since the 60s.

23      Q.   And is that something your parents

24  started?

25      A.   My grandparents started -- or it's a



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1    company my grandfather started and then sold off
 2    to a larger corporation, who now owns that.
 3         Q.   Okay.  And I assume your stock was
 4    transferred to the larger corporation?
 5         A.   Yes.
 6         Q.   Okay.  You said they ran nursing homes
 7    and what?
 8         A.   Nursing homes.
 9         Q.   Just that's it?
10         A.   Yes.
11         Q.   No skilled care?
12         A.   I don't know the extent of their
13    business.
14         Q.   Okay.  We were talking about your
15    reviews.
16         A.   Yes.
17         Q.   The first review that you have listed on
18    your disclosures is 7/1/2014 through 10/1/2014;
19    does that sound right?
20         A.   Sounds about right.
21         Q.   Would that be with Dr. Haydel?
22         A.   Yes.
23         Q.   Okay.  When you started in July of 2014,
24    were there any reviews prior to that time?
25         A.   I don't believe so.  I don't remember.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        Q.   So you worked a full year with having no
 2   review?
 3        A.   Can you go back on the dates, please,
 4   again?
 5        Q.   7/1/2014.  I can actually show you.
 6        A.   Yes, thank you.
 7             MR. SCHMIDT:  Are you attaching this as
 8             an exhibit?
 9             MS. ECHOLS:  My copy machine broke at my
10             house last night, so I don't have
11             copies.
12             MR. SCHMIDT:  We can make copies if you
13             want to.
14             MS. ECHOLS:  Yes.  Actually, I ran out
15             of paper.  And I have some copies, but
16             not all of them.
17             THE WITNESS:  This is for year 2, okay.
18   EXAMINATION BY MS. ECHOLS:
19        Q.   Excuse me?
20        A.   This is for year 2.
21             MR. SCHMIDT:  I'd like to go ahead, if
22             we're going to be talking about this,
23             I'd like to go ahead and make the
24             copies.  Is there anything else?
25             MS. ECHOLS:  Sure.  Yes, there are.
```

Dr. Eric Greenberg 7/30/2019

Page 58

```
 1              There's another one.
 2              MR. SCHMIDT:  Okay.
 3              (OFF-THE-RECORD DISCUSSION)
 4              MS. ECHOLS:  I'm going to mark this as
 5              Exhibit 1, which is the semi-annual
 6              review, 7/1/2014 through 10/1/2014.  Do
 7              you have any objection?
 8              MR. SCHMIDT:  No objection.
 9              (EXHIBIT 1 MARKED FOR IDENTIFICATION)
10   EXAMINATION BY MS. ECHOLS:
11        Q.   Doctor, do you have the right one, first
12   of all?
13        A.   I don't think I have the right one.
14              MR. SCHMIDT:  July 1st.
15   EXAMINATION BY MS. ECHOLS:
16        Q.   Up in that upper left-hand corner.
17        A.   7/1 to what date?
18        Q.   10/1.
19        A.   This is not the right one.
20        Q.   Okay.  Hand me back that one.
21   That's a five-page document, correct?
22        A.   Uh-huh (AFFIRMATIVE RESPONSE).  All
23   right.
24        Q.   So did Dr. Haydel have this document
25   with you when you went over your review?
```

Dr. Eric Greenberg 7/30/2019

Page 59

```
1        A.    I do not recall this document at that
2    review.
3        Q.    Okay.  Do you recall the review at all?
4        A.    I recall the review, yes.
5        Q.    Do you remember what did Dr. Haydel tell
6    you?
7        A.    She said things were going well,
8    progressing well, that I needed some work on some
9    interpersonal issues.  We talked about Dr. LeGros
10   targeting me and retaliation on my complaints
11   about Dr. LeGros.
12       Q.    Wait, let's just stop real quick.  Who
13   had you made -- Dr. LeGros was who to you?
14       A.    Dr. LeGros was a staff physician.
15       Q.    Okay.  In the ER?
16       A.    In the ER.  She's very close friends
17   with Dr. Murphy, who is the head of the CCC.  I
18   complained multiple times to Haydel about Dr.
19   LeGros and also --
20       Q.    We need to slow down.  The court
21   reporter needs to take down what you're saying.
22   It's not fair to her to have her speeding along
23   trying to get what you're saying.
24       So Dr. LeGros was there from July 2013 on,
25   correct?
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1        A.    Yes.
 2        Q.    Okay.  And she was an attending in the
 3   ER?
 4        A.    Yes.
 5        Q.    And the first comment she made to you
 6   was when you came down -- anti-Semitic comment
 7   when you came down to interview?
 8        A.    Different person.
 9        Q.    Okay.  Lebas, I'm sorry.  LeGros, Lebas,
10   different people?
11        A.    Yes.
12        Q.    Okay.  So do you remember what the first
13   comment that Dr. LeGros made to you in the ER was,
14   that you had a problem with?
15        A.    Yes.  Just unfair treatment in the ER,
16   yelling at me.
17        Q.    What do you mean unfair treatment?
18        A.    For example, in approximately -- let me
19   look at this timeline -- July 23rd, 2014 --
20        Q.    What are you referring to?
21        A.    My timeline and several e-mails that I
22   had.
23              MS. ECHOLS:  I would like to attach a
24              copy of that timeline.  That will be
25              Exhibit 2.
```

Dr. Eric Greenberg 7/30/2019

```
 1              (EXHIBIT 2 MARKED FOR IDENTIFICATION)
 2              (OFF-THE-RECORD DISCUSSION)
 3              THE WITNESS:  This document, the whole
 4              record that was submitted to EEOC.
 5              MS. ECHOLS:  Thank you.
 6    EXAMINATION BY MS. ECHOLS:
 7         Q.   You just said that this document was
 8    submitted to the EEOC.  And we're talking about a
 9    timeline that -- did you create this timeline, or
10    did your attorneys create it?
11         A.   I created this timeline.
12         Q.   And question 5 refers to the initial
13    document that you filed with the EEOC?
14         A.   Yes.
15         Q.   Okay.  And when did you create this
16    document?
17         A.   In the year 2017 -- or 2018.  Sorry.  I
18    take that back.  Whenever the EEOC was filed.  I
19    don't remember the year.  I have to go back.
20              THE WITNESS:  Did we get that timeline,
21              too?
22    EXAMINATION BY MS. ECHOLS:
23         Q.   There's another timeline?
24         A.   That one.
25         Q.   No.  That's my work product.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1              MR. SCHMIDT:  Anything that you review,
 2              they're entitled to see it.
 3              THE WITNESS:  Sorry.
 4              MR. SCHMIDT:  Like, she couldn't see my
 5              notes, but if you were referring to my
 6              notes during your deposition, then she
 7              could.
 8    EXAMINATION BY MS. ECHOLS:
 9         Q.   So don't refer to his notes.
10         So whenever it was filed, it was filed, okay.
11    So did you keep a journal or a diary of your time
12    at LSU from July 2013 on?
13         A.   I would send e-mails to myself of things
14    that would happen or discuss them with Dr. Haydel
15    and then confirm via e-mail or other means what
16    conversations we would have.
17         Q.   So your e-mails -- would you send text
18    messages, as well?
19         A.   Yes.
20         Q.   So your e-mails and your text messages
21    are what you recreated this document from?
22         A.   Yes.
23         Q.   Okay.
24         A.   And calendar, as well.
25         Q.   Okay.  What does PGY 2 mean?
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A.    Post graduate year 2.
 2        Q.    Okay.  Let's look back at the review.
 3        A.    Yes.
 4        Q.    So were there any reviews prior to this,
 5   of this similar kind of nature?
 6        A.    Not that I recall.
 7        Q.    Okay.  So for the first year, you didn't
 8   have any kind of reviews?
 9        A.    You mean with Dr. Haydel?  She would
10   show me reviews.  And some of these feedbacks were
11   from my first year, not from my second year.  But
12   she would show me, like, different reviews and
13   say, "you're doing great.  What do you want to
14   work on?  Let's work on that.  Let's have some
15   feedback stuff.  You can get feedback from
16   physicians."  That's whenever I refer to my first
17   year feedback from her, or reviews from her.
18        Q.    So you don't have copies of any of the
19   reviews that you talked about during that first
20   year?
21        A.    Dr. Haydel and I tried to obtain these
22   copies, and we were told that they were
23   unavailable to us.
24        Q.    Okay.  Who did you ask for them?
25        A.    I asked doctor -- or Kathy Whittington
```

Dr. Eric Greenberg 7/30/2019

1    several times for my employee record and was

2    denied every single time.

3         Q.   When you're talking about your employee

4    record, are you talking about your residency file?

5         A.   Yes.

6         Q.   When did you first ask for it?

7         What's that other document right there?

8         A.   This is a copy of my text and e-mails.

9    You can have it, too.

10        Q.   Yes.

11             MR. SCHMIDT:  Is there anything else

12             that you have that we need to go ahead

13             and make copies of?

14             THE WITNESS:  The stuff you were talking

15             about.  This is the copies of text

16             messages, the review of text messages.

17             MR. SCHMIDT:  Like, the summary?

18             THE WITNESS:  Yes.

19             MR. SCHMIDT:  Is this another copy of

20             that, or is this the second half of

21             that?

22             THE WITNESS:  This is e-mails.  This is

23             texts (INDICATING).

24             MR. SCHMIDT:  I'm going to go ahead and

25             go make copies of these, then, make it

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1              easier on everybody.
 2              (OFF-THE-RECORD DISCUSSION)
 3    EXAMINATION BY MS. ECHOLS:
 4         Q.   So let's go back on the record.  I don't
 5    want to belabor all this.  That's a lot of
 6    documents, looking at this review.
 7         So how did you obtain a copy of this review?
 8         A.   I first got this review during my
 9    disciplinary hearings at LSU.
10         Q.   Was that for suspension, termination, ad
11    hoc, what?
12         A.   A termination, or the first -- let me
13    think.  Yes, when they gave me this -- that form.
14    So March 14th, 2017 (INDICATING).
15         Q.   Okay, that's termination.
16         A.   Yes.
17         Q.   Okay.  So how long would it take her to
18    go -- how long would you sit in that office and go
19    over the review?
20         A.   Half an hour to 45 minutes.
21         Q.   Would you do that in the ER in an
22    office?
23         A.   In her office in the academic -- at ILH,
24    at the old hospital.
25         Q.   What was her general procedure during
```

```
 1      the 2 and a half years that you worked with her as
 2      far as going over with you?  Would she go, like,
 3      starting with page 1, or would you just talk?
 4           A.   We'd just talk.  And then she'd have
 5      some action points; like, what are we going to be
 6      doing next.  So for me was, I'm going to get
 7      feedback from attendings and fill out a form with
 8      them to get feedback.
 9           Q.   Was that usual for all of the residents?
10           A.   Yes.
11           Q.   Okay.  So looking at this review, like
12      on page 3 of 5, down towards the bottom --
13           A.   Yes.
14           Q.   -- you see where it says, "below peers,
15      below peers, below peers," did y'all talk about
16      that?
17           A.   No.
18           Q.   So in this review, what did you talk
19      about?
20           A.   We talked about -- we didn't talk
21      specifically about this feedback.  We talked about
22      how I need help with interpersonal interaction,
23      that my knowledge was good, but it's a knowledge
24      at the level that she thought an intern would be.
25           Q.   But you see where it says "below peers"
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    under medical knowledge?

2         A.   I see in this feedback where it says

3    that, yes.  And it says, on page 5, "meets

4    expectations," as well.

5         Q.   Okay.  So when it says, "below peers:

6    See daily evals," what are daily evals?

7         A.   I don't know what that refers to.  I

8    would get evaluations, but there was nothing ever

9    talked about my medical knowledge.

10        Q.   What kind of evaluations would you get;

11   verbal evaluations?

12        A.   Yes, verbal.  Like I said, during my

13   intern year, Dr. Haydel and I came up with a plan

14   to have evaluations, like feedback forms, and I

15   would fill out with attendings.

16        Q.   But I thought you just said that that

17   was usual with all the residents?

18        A.   Yes.  And I had it, too.

19        Q.   You said you came up with a form.

20        A.   Like, individualized for me.

21        Q.   Okay.  And did you have any

22   participation in creating that form?

23        A.   Yes.

24        Q.   Do you have a copy of that form?

25        A.   I do not have copies of that form.  I

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1    requested copies of the forms, but they were never
 2    given to me by Ms. Whittington.
 3         Q.   And Ms. Whittington maintains the
 4    records of all the residents?
 5         A.   Yes.
 6         Q.   Do you know that she had the forms to
 7    give to you and just didn't do it?
 8         A.   I don't know either way.
 9         Q.   Okay.  So after this first review, how
10    did you think you faired; I mean, how did --
11         A.   I wasn't top of the class.
12         Q.   Okay.
13         A.   I wasn't bottom of the class.  I would
14    say in 30 to 40 percentile, I thought.
15         Q.   30, 40 percentile towards the bottom?
16         A.   Yes, a little bit below average.
17         Q.   So what did she tell you in this
18    particular review that you needed to work on?
19         A.   Interpersonal skills.
20         Q.   Which means what?
21         A.   That's all that was told to me.
22         Q.   You didn't ask her to define what she
23    means by interpersonal skills?
24         A.   The whole thing that they -- she was
25    talking about was that I was too New York.  Like,
```

Dr. Eric Greenberg 7/30/2019

1    it was a different culture -- because she trained

2    in the east coast, as well -- that it was hard

3    transition, that all the people from the east

4    coast were having difficulty transitioning.

5         Q.   All the people?

6         A.   So there were two other residents, I

7    believe, from New York med schools were also

8    having difficulties transitioning.  And she said

9    that's a different culture there.  You're going to

10   have to figure out the culture here and try to

11   adapt.  They said -- you know, there's one thing

12   about the feedback I think she gave me was, sit

13   down with patients, sit down when you're talking

14   to patients, and how to better interact with

15   nurses.  Because in New York, nurses didn't

16   interact with residents.  And here is a different

17   culture -- or in Louisiana, it was a different

18   culture.

19        Q.   So in New York, you didn't ask a nurse

20   what she thought should be done or anything like

21   that; you had no communication with them?

22        A.   Limited communication with nurses.

23        Q.   Okay.  What about with patients?

24        A.   She was telling me the expectations of

25   patients in New Orleans was different, that you

Dr. Eric Greenberg 7/30/2019

1   have to sit down with them and talk with them.  I

2   remember the terms, they wanted someone more

3   avuncular when talking with patients.

4        Q.   Okay.  So you say the patients in New

5   York are different than the patients in Louisiana?

6        A.   I think cultural standards are different

7   in New York than Louisiana.

8        Q.   Okay.  So how are the patients

9   different?

10        A.   Like I said, the patients in New

11   Orleans, they said they want someone who is more

12   avuncular, more friendly, that would sit down with

13   them versus someone that was trying to get things

14   done quickly.

15        Q.   Okay.  So the person that you said you

16   had the problems with during this --

17             THE WITNESS:  Could I get the copy of

18             that stuff, too?

19             MR. SCHMIDT:  Yes.  Looks like we ran

20             out of staples in that thing, and we

21             have some paperclips, though.

22             THE WITNESS:  Thanks.

23   EXAMINATION BY MS. ECHOLS:

24        Q.   What order are these in?

25        A.   One is text messages, and one is a



866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1    catalog of e-mails.
 2         Q.   So they start -- which is which?
 3         A.   Let me look at the copy, so I can
 4    explain it to you.
 5              MS. ECHOLS:  Did I get two copies of the
 6              same one?
 7              MR. SCHMIDT:  You got two copies of the
 8              same one.  I'm about to give you two
 9              copies of this one, too.  One is for the
10              court reporter.
11              MS. ECHOLS:  I was, like, they look very
12              similar.
13              MR. SCHMIDT:  Yes.
14              MS. ECHOLS:  I'll attach them later.
15    EXAMINATION BY MS. ECHOLS:
16         Q.   So the one with the extended grid on it,
17    is this e-mails or texts?
18         A.   Summary of e-mails.  E-mails are not
19    attached.
20         Q.   And the other one is summary of text
21    messages?
22         A.   With text messages attached.
23         Q.   Okay.  So we were looking at that
24    initial review that I gave you.
25         A.   Yes.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1       Q.   Which the timeframe is 7/1/2014 to
2  10/1/2014?
3       A.   Yes, which would match with my second
4  year residency.
5       Q.   Okay.
6       A.   And what is interesting is that these
7  are feedbacks from my first year residency.
8       Q.   Okay.
9       A.   So these don't match up with my second
10  year residency feedback.
11       Q.   And apparently, there was an e-mail in
12  February, even before this period started, that
13  the first e-mail in your chain that you wanted --
14  that your supervisor wanted you to go to an
15  emergency board review course boot camp?
16       A.   No, that wasn't to me particular.  This
17  e-mail is sent from Dr. Suau, sending a copy of a
18  copyrighted copy of Emergency Board Review Boot
19  Camp to the whole residency, and then singling me
20  out in the e-mail, accusing me of trying to steal
21  it for other people.
22       Q.   I don't see that, stealing.
23       A.   You have to see the actual e-mail copy.
24       Q.   And you didn't attach those?
25       A.   No.

```
 1          Q.    Okay.
 2          A.    I believe in discovery.
 3          Q.    Okay.  So back to Dr. LeGros.
 4          A.    Yes.
 5          Q.    When did you start having difficulty
 6     with Dr. LeGros?
 7          A.    Probably the middle of my first year,
 8     when I first interacted with her.
 9          Q.    And what was your problem with her in
10     the middle of your first year?
11          A.    She would target me during rotation,
12     make me do stuff that was above and beyond, stuff
13     to throw me off my pace, calling me in on days
14     off.
15          Q.    And nobody else had this happen to them,
16     other residents of this same year?
17          A.    No.  And I complained to Dr. Haydel and
18     Dr. DeBlieux about it.
19          Q.    When did you first complain to
20     Dr. Haydel?
21          A.    The first documentation I have to Dr.
22     DeBlieux was July 25th, 2014, but I --
23          Q.    Wait.  Wait.  Wait.  Is that an e-mail
24     or text?
25          A.    E-mail.
```

AmersonWhite®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554 Hammond LA 70404     Fax 985.419.0799

```
 1          Q.    Okay, I don't have it.
 2          A.    From Eric Greenberg to Peter W. LeGros.
 3          Q.    July 24th?
 4          A.    July 25th.
 5          Q.    Yes.  You said 24th, and it's 25th.
 6          A.    Sorry.
 7          Q.    Okay.
 8          A.    And from memory, I would have to go and
 9    get more e-mails, but I remember --
10          Q.    There are additional e-mails to this?
11          A.    I think there's additional text messages
12    and additional timeline.  From my own memory, I
13    remember complaining to Dr. Haydel during my
14    performance reviews about Dr. LeGros, and Dr.
15    DeBlieux, as well, my adviser.  He said they would
16    take care of it.
17          Q.    What kind of complaints did you make
18    specifically?
19          A.    That she was harassing me.
20          Q.    What type of harassment?
21          A.    So she would pull me out in front of
22    other residents and personally insult me.
23          Q.    Personally insult you how?
24          A.    Saying that, you know, "I want you
25    fired.  I want you gone out of here.  You know
```

Dr. Eric Greenberg 7/30/2019

1    everyone is talking about you."  I'm trying to

2    think of other stuff.

3         Q.   And this is all in 2014?

4         A.   2013/2014, yes.

5         Q.   Okay.  And you said she made you do work

6    that other residents didn't have to do?

7         A.   Yes.  I remember in one particular case,

8    a patient came in with, like, a horrible skin

9    infection, and, you know, to the point where you

10   couldn't breathe without a mask in the room.  And

11   made me stand in the room for, like, an hour and

12   half debriding the wound with her, and would be

13   yelled at if I left the room or insulted --

14        Q.   So no other resident would have to --

15        A.   No.  This would be something that they

16   would have, like, a nurse do or would call a

17   consulting service to do.  But she would single me

18   out and try to intentionally trip me up on

19   questions.  Like, I remember one -- it's in the

20   request for termination, asked me very obscure

21   questions about antibiotics.  And then when I

22   would get it wrong, she would say that I treated a

23   patient wrong, about a hypothetical patient.

24        Q.   And she never asked any other residents

25   any questions?

```
 1        A.    She asked them questions, but not to the
 2   consistency and frequency and singling out that I
 3   was.  It was to the point where other residents
 4   were complaining about it.
 5        Q.    Complaining about what?
 6        A.    Her treatment of me.
 7        Q.    To who?
 8        A.    To Dr. Haydel.  And 7/23/2014, I had a
 9   meeting with Dr. Haydel.
10        Q.    Wait a second.  This is in your
11   timeline?
12        A.    Yes.
13        Q.    Which is Exhibit 2.
14        A.    And I can talk about this experience,
15   also, Dr. LeGros about targeting harassment to
16   Dr. Haydel and Dr. DeBlieux during the meeting.
17   In addition, that a PGY 3 resident also complained
18   about said treatment on me to Dr. -- Dr. LeGros'
19   treatment on me.
20        Q.    Okay.  Who was that physician?
21        A.    I believe it was -- first name was
22   Becca.
23        Q.    She complained to who?
24        A.    Dr. Haydel.
25        Q.    Okay.  Did she complain in writing?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        A.    I believe she complained verbally to
 2   her.
 3        Q.    Okay.
 4        A.    I would have to see about an e-mail, but
 5   I believe it was --
 6        Q.    Well, all your e-mails are listed here,
 7   right?
 8        A.    Not 100 percent of my e-mails.
 9        Q.    Okay.  So did you -- I mean, how did you
10   pick and choose which e-mails you wanted to put in
11   your timeline?
12        A.    I'm saying that because I think there
13   could be a certain percentage of e-mails that I
14   missed during this.
15        Q.    So you didn't intentionally put certain
16   e-mails in and leave out others?
17        A.    No.
18        Q.    Okay.  So this was on 7/23/2014?
19        A.    Yes.  And an e-mail was sent 7/25/2014,
20   asking for me to not be involved in this because
21   of targeting and retaliation from Dr. LeGros.
22        Q.    What's a tox. call thing?
23        A.    So I mentioned that she would call me in
24   on my days off.  In my second year, I was doing a
25   rotation for toxicology, and I was not scheduled
```



Dr. Eric Greenberg 7/30/2019

```
1    that day.  And Dr. LeGros called me in and -- oh,
2    I want to take this back.  This reminds me.  The
3    PGY 3 resident, I believe his name was Joe Framin,
4    not Becca.  I have to confirm, but --
5         Q.   Wait.  Where is --
6         A.   So if you see, you're talking about the
7    PGY 3 resident who confirmed targeting harassment.
8         Q.   Okay.
9         A.   I believe it was either and/or Becca
10   Link and Joseph Framin.
11        Q.   And they were your contemporaries?
12        A.   They were a year ahead of me in
13   residency.
14        Q.   Joseph, what did you say his name was?
15        A.   Framin, F-R-A-M-I-N.
16        Q.   And you believe either or one of them
17   complained to Dr. Haydel about Dr. LeGros'
18   treatment of you?
19        A.   Yes.
20        Q.   Okay.  And this is all in July of 2014?
21        A.   Correct.
22        Q.   Okay.  And you don't know if that was in
23   writing or verbally?
24        A.   I do not.
25        Q.   Okay.  And that was the first time that
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1    Dr. LeGros -- I mean, you said starting the middle
 2    of your first year was when?
 3         A.   Yes.  And this is the beginning of my
 4    second year at this point.
 5         Q.   Okay.  But you said Dr. LeGros had been
 6    harassing you before that point, correct?
 7         A.   Yes.  It was all verbal complaints to
 8    Dr. Haydel about this and Dr. DeBlieux about this.
 9         Q.   Okay.
10         A.   And they said that they would take care
11    of it on a personal basis with her.
12         Q.   Did other residents have problems with
13    Dr. LeGros?
14         A.   Yes, they did, but not to the extent
15    that I had with her.
16         Q.   Okay.  So the first time you ever
17    reported -- or anything was ever reported, was in
18    July of 2014?
19         A.   Yes.  Yes.
20         Q.   And you think it was verbally, you don't
21    know if it was written --
22         A.   Well --
23         Q.   -- other than your documenting?
24         A.   There's a meeting with Dr. DeBlieux and
25    Dr. Haydel, and then e-mails were sent after that,
```

Dr. Eric Greenberg 7/30/2019

1   as well.  Then there's text messages, I believe --
2   I have to look -- with me and Joseph Framin.  I
3   would have --
4        Q.   I've got text messages that start in
5   2015, on the first page.
6        A.   Yes.  If you see the last page, it says
7   "9:30, Joe," that's text messages that refers to
8   that.
9        Q.   Okay.  So that should go at the
10  beginning, correct, if you're doing it in
11  chronological order?
12       A.   Yes.
13       Q.   Okay.  9:30, what day?
14       And you've attached it?
15       A.   Yes.
16       Q.   Okay.
17       A.   It was 9:30 on 7/23.  I would have to go
18  with the exact dates, but that's my estimation of
19  that date.
20       Q.   Where is it in your little --
21       A.   If you look, the last two pages.
22       Q.   Okay.  I've got 9:15.  This one has no
23  date.  It's got 7:15.  I don't see where you're
24  seeing the date.  Show me where the date is.
25       A.   I would have to go and resurrect the

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

 1    date from phone records for you.

 2         Q.    Okay.  And I'm looking at this second to

 3    last page.  What is so offensive about this text

 4    messaging back and forth with Joe?

 5         A.    I was requested by Dr. LeGros to come in

 6    and give recommendations without a supervising

 7    physician.  I expressed my concerns --

 8         Q.    But it says LeGros said she will staff

 9    you.

10         A.    I was told that we couldn't do that.  We

11    needed him to be -- I was on a rotation for a

12    subspecialty, of toxicology.  And I was told that

13    we needed to get recommendations from Dr. Tuckler,

14    being that he's a board certified toxicologist.

15    And Dr. LeGros is not a board certified

16    toxicologist.  And I was on my day off, not

17    scheduled, and I was called in on my day off.  I

18    was accused of -- I received a call from Joseph

19    Framin.  Answered the phone, it was Dr. LeGros

20    accusing me of not wanting to come in, accusing me

21    of not doing my work.  And I told her that I'm not

22    scheduled today, Dr. Tuckler isn't in the country

23    or in town, I'm going to have to talk to my

24    superior about what to do.  And she forced me to

25    come in.  And I haven't heard of a resident having

Dr. Eric Greenberg 7/30/2019

```
 1    that experience before.
 2         Q.   That nobody gets called in on their day
 3    off?
 4         A.   For this rotation, no.
 5         Q.   Okay.  For ER rotation?
 6         A.   This is for toxicology rotation.
 7         Q.   But I thought you said LeGros worked in
 8    the ER?
 9         A.   This is for an ER patient.  I was
10    working in the toxicology service.  The patient
11    was in the ER.
12         Q.   And I don't see any of that written,
13    that you just explained to me in this text
14    message.
15         A.   It was just a text message between me
16    and Joseph Framin.  Then there's a second page to
17    it, as well.
18         Q.   So there would be a record of your -- or
19    their phonecall to your phone?
20         A.   Yes.
21         Q.   And it was Dr. LeGros who actually
22    called you, rather than Joe?
23         A.   Yes.
24         Q.   Okay.  So back to -- you're saying that
25    the fact that you were listed below your peers on
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

Page 83

```
 1   a number of different sections is -- you didn't
 2   know that?
 3        A.   Did not know that.
 4        Q.   Okay.  But --
 5        A.   I was told that I meet expectations.  I
 6   was allowed to moonlight at that point, which
 7   means that I was above average on my testing.
 8        Q.   But you said you were 30 to 40 percent
 9   in your class?
10        A.   In my opinion, I thought I was 30,
11   40 percent.  But I was allowed -- like I said, I
12   knew I wasn't the top resident; I knew I wasn't
13   the bottom resident.
14        Q.   So that's your estimation?
15        A.   Yes.  And I was allowed to moonlight at
16   that time, which not every resident was allowed to
17   moonlight.
18        Q.   And the residents who were not allowed
19   to moonlight were at the bottom?
20        A.   Yes, either for professional issues,
21   knowledge issues or a myriad of other issues.
22        Q.   In 2014, where were you moonlighting?
23        A.   At Ochsner.
24        Q.   Okay.  And I read somewhere that you
25   liked Ochsner and the Doctors Urgent Care better
```

Dr. Eric Greenberg 7/30/2019

Page 84

```
 1   than UMC?
 2        A.   Yes.
 3        Q.   And why is that?
 4        A.   UMC, I felt it was a toxic environment
 5   either by Dr. Suau's actions or other physicians.
 6   I was harassed there constantly.
 7        Q.   It wasn't because it was a school
 8   teaching-type atmosphere versus a nonschool
 9   teaching?
10        A.   Ochsner was a school teaching-type
11   environment, as well.
12        Q.   In the ER?
13        A.   Yes.
14        Q.   So did that count for your --
15        A.   Yes.  And other -- I worked at Slidell.
16   All my other rotations were school teaching type
17   and counted towards it, as well.
18        Q.   Okay.  What was it; that you had more
19   independence there, or did you just get along with
20   the doctors better there?
21        A.   There wasn't a campaign against me from
22   Dr. LeGros and Dr. Suau and other physicians at
23   these other places.
24        Q.   Okay.  So you think you faired in the 30
25   to 40 percent of the class?
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

Page 85

```
 1          A.    During my first year, yes.
 2          Q.    The next review that I've got is --
 3                MS. ECHOLS:  Do you have that?
 4                MR. SCHMIDT:  Yes -- wait, no, I don't.
 5                I do now.
 6                MS. ECHOLS:  Let's mark this as Exhibit
 7                3.
 8                (EXHIBIT 3 MARKED FOR IDENTIFICATION)
 9                THE WITNESS:  Which one was Number 2?
10                MS. ECHOLS:  2 was your timeline.
11    EXAMINATION BY MS. ECHOLS:
12          Q.    You got that review in front of you?
13    Did I give it to you?
14          A.    No.
15          Q.    Here you go.
16          A.    Thank you.
17          Q.    Okay.  If you look --
18          A.    Can I take a second to look at this,
19    please?
20          Q.    Sure.
21          A.    Okay.
22          Q.    If you look in the upper left-hand
23    corner --
24          A.    Yes.
25          Q.    -- do you know why it covers the same
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    period?
 2         A.   I do not know why it covers the same
 3    period.
 4         Q.   I mean, it's an extended period, but I'm
 5    just -- I was curious.
 6         A.   I do not know why it covers the same
 7    period, but --
 8         Q.   But not exactly the same, because the
 9    end date on the first one was 10/1/2014, and this
10    is 4/30/2015.
11         A.   Okay.
12         Q.   Okay.  And do you remember going over
13    this review with Dr. Haydel?
14         A.   I remember certain parts of this, the
15    feedback, but I don't remember ever going through
16    this review in its entirety.
17         Q.   Okay.  So she wouldn't have a copy of
18    the review when she went over things with you; is
19    that what you're saying?
20         A.   I do not know if previously she had a
21    copy, but I do not think that we get a copy of
22    this.  I had a copy of the feedback on page 5 of
23    8, 6 of 8 and 7 of 8.  But as per this specific
24    form, no.
25         Q.   Okay.  If you're looking on page 4 of
```

Dr. Eric Greenberg 7/30/2019

Page 87

```
 1    8 --
 2         A.   Yes.
 3         Q.   -- can you see where you're ranked again
 4    below your peers in a number of sections?
 5         A.   Again, this is the same feedback as the
 6    first year resident feedback.  That was copied
 7    forward, because it refers to things that happened
 8    during my intern year, not during my end of my
 9    second year.  It looks like the start of the
10    second year, feedback is from general, on page 5
11    of 8 downwards.
12         Q.   So they didn't evaluate on your medical
13    knowledge, patient care, practice-based learning?
14         A.   I was told that I had very good medical
15    knowledge from my second year onwards, and it also
16    showed with my test scores from that year on.
17         Q.   Okay.  So what about your patient care?
18         A.   Patient care, I was told, was improving.
19         Q.   Okay.
20         A.   That I meet the expectations.  But as
21    you can see, 4 of 8 is the same stuff from my
22    first year evaluations.  Like I said, on page 4 of
23    8, when they're talking about life-threatening
24    issue, that was during my intern, first month of
25    my intern year.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        Q.    Okay.
 2        A.    Not during the end of my second year.
 3        Q.    Okay.  Just under professionalism, back
 4   to the first one.
 5        A.    Which page are you referring to?
 6        Q.    You can look at page 4 of 8.
 7        A.    Yes.
 8        Q.    Where it talks about you leaving during
 9   your shift.
10        A.    Yes.
11        Q.    For what kind of problem did your --
12        A.    I had a girlfriend who was in the
13   emergency department for -- I think she broke her
14   hand or something happened that she had to go to
15   the ER.  I asked them and got permission to leave
16   at the end of my shift on rotation.
17        Q.    At the end of your shift?
18        A.    It was, like, hour 7 of 8 from a shift
19   at West Jefferson Pediatrics, that I requested if
20   I could leave, because she was in the ER at
21   Ochsner main.  I told them.  They said I can go.
22   And then I had feedback that said I requested to
23   leave.
24        Q.    So it would be your contention that the
25   doctor who kind of wrote this up on you didn't say
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

Page 89

1    it was your choice whether you wanted to leave or

2    not?

3        A.    Correct.

4        Q.    Okay.

5        A.    But from what I remember, from general

6    downwards is my feedback.  The other stuff was

7    copied forward from the intern year.

8        Q.    On your self-evaluation, that was

9    something that happened during your second year,

10   the two things that you wanted to improve on?

11       A.    Every shift, we would do that.  We would

12   go, what are two things you did well, what are two

13   things you want to improve on.  So this would be a

14   copy of a feedback form.

15       Q.    Okay.  But that was from your second

16   year?

17       A.    Yes.

18       Q.    Okay.  From the time in 2014 that you

19   had the bad interactions with Dr. LeGros, did they

20   continue?

21       A.    Yes.  Well, under -- when Dr. Haydel was

22   program director, it got a lot better.  Our

23   relationship was better.

24       Q.    But I thought Dr. Haydel was in the

25   beginning?

```
 1        A.    Dr. Haydel was there until about August
 2   of -- near -- sorry, not August.  Beginning -- she
 3   finished being program director August of my third
 4   year.
 5        Q.    Okay.  But the problems you were talking
 6   about with Dr. LeGros were in 2014, that would be
 7   during that timeframe, correct?
 8        A.    Yes.
 9        Q.    So Dr. Haydel was there?
10        A.    It started in 2014.  They intervened.
11   Dr. Haydel and Dr. DeBlieux intervened and kind of
12   tried to smooth things over with us.  And it got
13   to the point I was going to her Mardi Gras
14   parties, and things were going better between us.
15        When Dr. Suau came in, it evolved to where
16   she was throwing stuff at me.  I would complain to
17   him.  He wouldn't do anything about it.  He would
18   say I was exaggerating my complaints, pushing them
19   off, ignoring me, ignoring other complaints about
20   other physicians.  I was threatened with a knife,
21   and complained to him, by a physician.
22        Q.    Who was that?
23        A.    Dr. Luke Lebas.  And I have written
24   documentations complaining to Dr. Haydel,
25   Dr. Martinez, Dr. DeBlieux and Dr. Suau, in
```

```
 1   writing to Dr. Suau.  And it was pushed off.  I
 2   experienced a lot of stress from that situation.
 3        Q.   When you say he pulled a knife on you,
 4   what --
 5        A.   He physically pulled a knife out of his
 6   pocket and threatened to stab me.
 7        Q.   What kind of a knife?
 8        A.   Like a hunting knife.
 9        Q.   Okay.  And Luke Lebas is an attending in
10   the ER?
11        A.   Yes.  And I also complained -- so that
12   night -- well, let me get my timeline.  One
13   second.  So that night was 7/20/2016.  I worked
14   with Dr. Matthew Carlisle, who was Dr. Suau's
15   program director and friend --
16        Q.   Slow down just a little bit.  Let me
17   find where you're talking about.  2016, what day?
18        A.   7/20.
19        Q.   7/20.  Okay.  So the 7/20 incident, you
20   reported to Dr. Martinez, Dr. DeBlieux --
21        A.   Dr. Haydel, and in writing to Dr. Suau.
22   And Dr. Suau claimed that the e-mail went to spam
23   on August 10th, and he would look into it, but
24   nothing was ever done.
25        Q.   When did you ask him about it again?
```

Dr. Eric Greenberg 7/30/2019

```
 1        A.   Let me see here.  So 7/20.  I sent a
 2   formal complaint to Dr. Suau on 7/23.  And I
 3   talked to him again on 8/5.  I talked to him again
 4   on 8/9.  Talked to him again on 8/10.  I had a
 5   meeting with him on 8/10, with him and Dr.
 6   DeBlieux, about my harassment by Dr. Lebas.  They
 7   said they would look into it and consider banning
 8   weapons from the ER, but nothing was done.  I
 9   additionally talked with Dr. DeBlieux sometime --
10   oh, I talked to Dr. DeBlieux sometime in August,
11   as per follow-up with this, and was told, don't
12   worry about it.  I have to look at the exact date,
13   but I talked with Dr. Martinez.
14        Q.   Who is Dr. Martinez?
15        A.   He is the program director for internal
16   medicine, emergency medicine.
17        Q.   And ER medicine, too?
18        A.   Yes.  There's a combined program.
19        And he recommended that I get an attorney.
20        Q.   Who recommended?
21        A.   Doctor -- they said I should talk to the
22   cops or get an attorney.
23        Q.   Who?
24        A.   Dr. Martinez.
25             MR. SCHMIDT:  Excuse me --
```

Dr. Eric Greenberg 7/30/2019

```
 1    EXAMINATION BY MS. ECHOLS:
 2         Q.   After this knife incident?
 3              MR. SCHMIDT:  Once you finish your line
 4              of questioning, can we take a lunch
 5              break?
 6              MS. ECHOLS:  Sure.
 7    EXAMINATION BY MS. ECHOLS:
 8         Q.   Back to the knife incident.
 9         A.   Yes.
10         Q.   Dr. Martinez, who is an attending -- or
11    what is he again?
12         A.   He's the internal medicine program
13    director and internal medicine and ER program
14    director.
15         Q.   Okay.  And he recommended that you call
16    the police about this?
17         A.   Yes.
18         Q.   And did you do that?
19         A.   I did not.  I was scared for retaliation
20    from Dr. Suau and Dr. Lebas.  They're good
21    friends.  I was told to --
22         Q.   Wait.  Did Dr. Martinez put that in
23    writing to you?
24         A.   He did not.
25         Q.   Did he text you?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        A.   I had an in-person conversation with
 2   him, with Dr. Haydel in the room, as well.
 3        Q.   Okay.
 4        A.   I was told that I could maybe consider
 5   seeing the ombudsman, but the ombudsman was
 6   Matthew Carlisle, who was assistant program
 7   director and friend to Dr. Suau, as well.  I did
 8   not feel there was any confidentiality there.
 9        Q.   Okay.
10        A.   And I even, during the shift, complained
11   to Dr. Carlisle about Dr. Lebas' disruptive
12   behavior, and he said that there's nothing he
13   could do about it.
14        Q.   Okay.
15        A.   And then Dr. Lebas is the physician who
16   said anti-Semitic things to me in the past, too.
17        Q.   Is he the one doing the interview?
18        A.   Yes.  He also said that -- and I don't
19   remember exactly what time it was my first year,
20   but he said the same comment again to me during my
21   first year.  And he said, "oh, don't worry, all my
22   friends are Jewish, I went to Tulane."  And I
23   raised my concerns to Dr. Framin about it.  He is
24   Jewish from New York, and he said it's just
25   different here.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1              MS. ECHOLS:  Okay.  Let's take a lunch
 2         break.
 3              (RECESS 12:17-1:15 P.M.)
 4    EXAMINATION BY MS. ECHOLS:
 5         Q.   In 2014, when you first started having
 6    problems with Dr. LeGros, did you talk to your
 7    friends about it or your girlfriend at the time?
 8         A.   I talked to other residents about it.
 9         Q.   Which other residents?
10         A.   Joe Framin --
11         Q.   This is all in 2014?
12         A.   Yes.
13    Basically everyone in my class about it.
14              MR. SCHMIDT:  Hold on.  Please let him
15         finish his answer before you ask
16         follow-up questions.
17              THE WITNESS:  Joseph Framin.  I'm trying
18         to think who else I was talking about
19         it.  Bruce Hurley.
20    EXAMINATION BY MS. ECHOLS:
21         Q.   H-U-R-L-E-Y?
22         A.   Yes.
23         Q.   Okay.
24         A.   My family members, my mother, my father,
25    Dr. Haydel, Dr. DeBlieux, D-E-B-L-I-E-U-X.
```

1      Q.    My kids went to school with Dr.

2   DeBlieux.  I know him very well, so you don't need

3   to spell it, but I know it's different than it's

4   spelled.

5          How about your girlfriend at the time?

6      A.    I don't remember if I did.  I probably

7   just talked in generalities with her about it.

8      Q.    That's not the same girlfriend that you

9   have now; is that right?

10      A.    No, it's not.  We started dating 2016.

11   I did talk to her about it then, too.

12      Q.    It's the current girlfriend, fiancé?

13      A.    Yes.

14      Q.    And she's an attorney; is that correct?

15      A.    Yes, that's correct.

16      Q.    What area does she practice in?

17      A.    She does government contracting and

18   healthcare compliance.

19      Q.    And all these people that you said you

20   talked to, did you disclose that on your

21   disclosure list to your attorneys; do you know?

22      A.    I don't know if I did.

23      Q.    I'm going to ask you about all these

24   people later, because they're not identified by

25   doctors or who they are.  I don't know who they



Dr. Eric Greenberg 7/30/2019

Page 97

```
 1    are.  Is your girlfriend currently, is she
 2    catholic?
 3         A.    She's converted to Judaism.
 4         Q.    Did that present some problems for you
 5    before she converted?
 6         A.    No, it didn't, because early on into our
 7    relationship, we both talked that she would
 8    convert.  It hasn't been an issue.
 9         Q.    Okay.  I thought I read in Dr. Embley's
10    records that that was a problem, but that's okay.
11         What's synagogue do you belong to in New
12    Orleans, or did you belong to?
13         A.    Touro Synagogue.
14         Q.    Do you keep kosher at home?
15         A.    I keep kosher at home, yes.
16         Q.    You reported to one of the doctors,
17    Dr. Goertz, G-O-E --
18         A.    R-T-Z.
19         Q.    -- R-T-Z, at Ochsner --
20         A.    Yes.
21         Q.    -- that you didn't believe in God; is
22    that true?
23         A.    I might have said it, but I do believe
24    in God.  I don't know when that was said.
25         Q.    Well, when you saw him.  He was at
```



1   Ochsner?
2        A.   No, he wasn't at Ochsner.  He's at
3   Slidell, I believe.
4        Q.   Okay.  Let me just check real quick,
5   because I thought that's who you went and saw
6   your --
7        A.   Oh, sorry.  It was at Ochsner, yes,
8   Dr. Goertz.  That was for the initial evaluation.
9   I believe in spirituality.  I don't believe there
10  is one entity called God.  I believe that
11  there's -- I mean, in that case, I don't believe
12  that there is a physical representation of a God.
13  I believe there's a spiritual force out there.
14  That's my version of Judaism.
15       Q.   Okay.  Do you attend synagogue every
16  week?
17       A.   I don't attend every week, but I attend
18  approximately monthly.
19       Q.   And holidays?
20       A.   Yes, every year.
21       Q.   The initial report that I got from
22  Embley, Scott, is that --
23       A.   Yes.
24       Q.   He's with CAP; is that right?
25       A.   Yes.



1    Q.   Said that you had been there before; I
2  mean, before this whole thing started in --
3    A.   Yes.
4    Q.   -- when was that, 9/9/16?
5    A.   So I went to him on my own accord to
6  talk to him about getting a therapist, getting
7  someone different and just kind of like a plan of
8  action.
9    Q.   Okay.  When you say getting a therapist,
10  you testified earlier that you consistently saw
11  somebody in New Orleans --
12    A.   Yes.
13    Q.   -- for talk therapy?
14    A.   And I was trying to get someone
15  different, someone more like CBT.
16    Q.   What is CBT?
17    A.   Cognitive behavioral therapy.  Just
18  someone different than Dr. Roniger.
19    Q.   Okay.  You self-referred yourself to
20  CAP?
21    A.   Yes.
22    Q.   Did they talk to any of your co-workers,
23  that you know of?
24    A.   Not that I know of.
25    Q.   Did they make any recommendations for

Dr. Eric Greenberg 7/30/2019

1  you --

2       A.   They gave me a list --

3       Q.   -- at that time?

4       If you'd let me finish my questions, I'll let

5  you finish your answers.

6       When you went November 24th, 2015, did they

7  make any recommendations for you at that time?

8       A.   They gave me a list of therapists to

9  see.  I evaluated them.  None of them took my

10  insurance or hard to get ahold of.  And I

11  continued therapy with Dr. Roniger.

12       Q.   It was also recommended that you do a

13  professionalism course.  Did you do that?

14       A.   That was to be scheduled with Dr. Suau.

15  And Dr. Suau put up many barriers.  First it was

16  said that Dr. Suau would pay for it.

17       Q.   Wait.  Him personally?

18       A.   Yes.  Through the program, he would pay

19  for it.  That was the conversation I had with

20  Dr. Suau.  Said they would pay for it, fund it.

21  It would be an elective, and I would schedule it

22  with Dr. Suau.  Dr. Suau -- and I have text

23  messages and e-mails -- put up as many roadblocks

24  as you could to me scheduling completing this

25  course.

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          Q.    Okay.
 2          A.    And in the end, said it was canceled,
 3    that we didn't have to do it.
 4          Q.    So Dr. Suau said it was canceled?
 5          A.    Yes.
 6          (INTERRUPTION)
 7    EXAMINATION BY MS. ECHOLS:
 8          Q.    So you never got another therapist?
 9          A.    I continued on with Dr. Roniger.
10          Q.    And was CAP okay with that?
11          A.    I met with CAP one time and never
12    followed up with them about that.
13          Q.    Okay.
14          A.    But the CAP meeting, under my
15    understanding was, here's some recommendations.
16          Q.    Do it if you want to?
17          A.    Yes.
18          Q.    Okay.  Why did you go in, in November --
19    on November 24th, 2015?
20          A.    So before that, there was an episode
21    with Dr. Suau, which -- and I can go into it in
22    detail if you want.
23          Q.    Well, if it's a reason that you went.
24          A.    So I was on a rotation, toxicology
25    rotation, where I had to ask -- I was told you get
```

Dr. Eric Greenberg  7/30/2019

```
 1    a week of vacation during that, or days off, from
 2    the person running the rotation, and that I have
 3    to give a lecture, also.  So I scheduled my time
 4    off, scheduled my lecture.  I confirmed with
 5    Dr. Suau what day the lecture was.  And he gave
 6    me, for example, it's on -- I'm using approximate
 7    dates -- it's on the 17th of this month.  And so I
 8    booked a trip to go to Michigan for the weekend to
 9    see my grandmother, who had cancer surgery.  The
10    night before my flight, I got a text from Dr. Suau
11    saying that he made a mistake with the scheduling,
12    and that it's actually during the time that I
13    would be away in Michigan.
14         And I want to refresh.  Is it okay if I look
15    at my timeline, to refresh this stuff?
16         Q.   Sure.
17         A.   All right.  So this was in January of
18    2016.
19         Q.   Wait.  No.  We're talking about the time
20    you went to CAP in November of 2015.
21         A.   2015.  I think that was just me
22    complaining about -- I don't remember what exactly
23    sparked that.
24         Q.   How many times did you visit CAP?
25         A.   Once for that and once at the end of my
```

Dr. Eric Greenberg 7/30/2019

1  residency.

2       Q.   Okay.  So you don't remember one of the

3  two times why you went?

4       A.   I don't remember what instigated that

5  time.  This is November 2015?

6       Q.   Yes, 24th.  And I don't see it in your

7  e-mails or text messages.  I'm just curious why it

8  wasn't documented by you.

9       A.   I don't remember why I went to CAP in

10  2015.

11       Q.   Okay.  And you just had one meeting with

12  Scott?

13       A.   Yes.

14       Q.   Was it Scott?

15       A.   Yes.

16       Q.   Okay.  And you don't know what kind of

17  follow-up he did?  I mean, he just gave you the

18  recommendations right there?

19       A.   I think he, like, gave me a handwritten

20  list of people to see, and that was it.

21       Q.   Okay.  Handwritten list of people to see

22  for what?

23       A.   For therapist.  I would have to research

24  the programs on my own.

25       Q.   Okay.  Why did he think you needed

Dr. Eric Greenberg 7/30/2019

```
 1    therapy, if you know?
 2         A.   I don't know.
 3         Q.   And you don't remember why you went in?
 4         A.   No.
 5         Q.   And then, again, you went in to CAP on
 6    9/9/2016?
 7         A.   Yes.
 8         Q.   Was that a self-referral?
 9         A.   They told me it was a self-referral.
10         Q.   Who told you that?
11         A.   Dr. Suau did.  But then they gave me a
12    form to sign, said that I had to sign this or I
13    would be terminated, about being referred to CAP.
14         Q.   Who told you, you had to sign it or you
15    would be terminated?
16         A.   Dr. Suau did.  And Scott said something
17    to that effect, too.
18         Q.   What do you mean, "to that effect?"
19         A.   That if I wanted to continue residency,
20    I would have to sign -- I had to sign the
21    paperwork, and he said it's not acknowledging that
22    everything in this paperwork is true; it's
23    acknowledging that you have received this
24    paperwork.  And you need to sign this to continue
25    residency, or they could terminate you if you do
```

```
 1    not sign this.
 2         Q.   Okay.  And when you -- well, here's your
 3    signature on here.  Do you know what you signed?
 4         A.   At that moment, I did not have full
 5    understanding of what I was signing.  I was told
 6    that this is like a summary of what's going on,
 7    and we're trying to help you out, this isn't going
 8    to be used against you, and you're not -- I
 9    remember Scott said, nothing -- you're not saying
10    everything on this sheet is true; we're just
11    signing that you acknowledge that you were here.
12         Q.   Kind of like when you get a ticket, a
13    speeding ticket?
14         A.   Yes.
15         Q.   Okay.  But Dr. Suau was different, he
16    said you would be terminated if you didn't sign
17    it?
18         A.   Yes.
19         Q.   Okay.  What was your relationship with
20    Dr. DeBlieux?
21         A.   He was my adviser.
22         Q.   The whole time you were there?
23         A.   Yes.
24         Q.   Okay.  And how often did you meet with
25    him?
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg  7/30/2019

```
 1          A.    Every 3 months approximately.

 2          Q.    And from the beginning on?

 3          A.    Yes.

 4          Q.    Okay.  Like 2013 on?

 5          A.    Yes.

 6          Q.    And how long were your meetings?

 7          A.    Approximately 30 to 45 minutes.

 8          Q.    Do you remember Dr. DeBlieux coming up

 9     with any concerns that he might have over any care

10     that you were giving patients or your attitude or

11     anything?

12          A.    Just professionalism stuff; how to get

13     along; differences between my culture from

14     previous to what it was in Louisiana; what the

15     patients expect there; getting along with nurses;

16     kind of like my role with patient care; that LSU

17     was a very nurse-driven ER, and we'd have to

18     respect that; and career help; talked about my own

19     personal life.

20          Q.    Did he make any recommendations -- or

21     were you finished, I'm sorry?

22          A.    Oh, I don't remember.  I remember he

23     made recommendations.  So one thing I brought up

24     concerns with him is Dr. Suau doing a -- history

25     on a lot of stuff that we'd meet with.  We'd talk
```



```
 1    with him, come up with a plan or have some kind of
 2    concrete thing in writing -- or in verbal
 3    conversation with Dr. Suau, but then he would
 4    change it at the last minute.  One of the
 5    recommendations was that you either need to
 6    record, e-mail or write down your conversations.
 7    With Dr. Suau, there's been concerns with other
 8    people, other physicians with Dr. Suau, too.
 9         Q.    What other physicians?
10         A.    So I remember doctor -- when I was a
11    resident, Dr. Haydel complained about Dr. Suau
12    lying about something, about patient care, and
13    Dr. Tuckler, also, and concerns that Dr. Tuckler
14    and I both had about Dr. Suau's handling of a
15    rotation that I had.
16         Q.    What did Dr. Haydel say Dr. Suau lied
17    about?
18         A.    About patient care, that he was doing
19    something or treating a patient in another room
20    when he was nowhere to be found or doing
21    something, and then say, "no, no, I was over
22    there," but something that interfaced with patient
23    care.  And then also he lied about, to me, about
24    funding for rotations and funding for me going to
25    ACEP conference.  And other people had concerns
```

1  about Dr. Suau I don't think were ever formally
2  put down.
3          Q.    Okay.  When you say "other people" --
4          A.    Other residents.
5          Q.    -- who would they be?
6          A.    I'm trying to think.  I remember Tom --
7  I forgot his last name.  He's a year below me.
8  But complained about, like, bait and switch
9  tactics with Dr. Suau.  I remember going in an
10  interview and met a resident from Dr. Suau's
11  previous residency, who said that he was like a
12  used car salesman, that he would bait and switch
13  you on things.
14          Q.    An interview where?
15          A.    An interview in Chicago.
16          Q.    Okay.  Why were you interviewing?
17          A.    For attending physicians, in my fourth
18  year residency.
19          But I do know that Dr. Haydel brought up to
20  Dr. Van Meter an issue about Dr. Suau lying.  And
21  it was pushed off and then said that that is his
22  way of managing.
23          Q.    Okay.  Do you have any documentation of
24  that?
25          A.    I do not.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg  7/30/2019

```
 1        Q.   Okay.  It says on this CAP form that you
 2   were in crisis.  Would you agree that you --
 3        A.   No, I would not agree on crisis.  I
 4   agree that I was burnt out, but I was not in
 5   crisis.
 6        Q.   Okay.  This was on 9/9/16?
 7        A.   Yes.
 8        Q.   Okay.  Do you know why you were referred
 9   to CAP?
10        A.   Well, I was told that it was for
11   burnout, that I was having problem with burnout.
12   The form said something completely different.
13        Q.   What form are you talking about?
14        A.   The CAP referral form.
15        Q.   The initial CAP sheet?
16        A.   Yes.
17        Q.   This is all I have.  Okay.
18        A.   But --
19        Q.   Did you tell anybody you were burned
20   out?
21             MR. SCHMIDT:  Hold on.  Let him finish
22             what he was going to say.
23             THE WITNESS:  It was something
24             completely different than what I talked
25             to Dr. Suau.  I had gone to Dr. Suau
```

Dr. Eric Greenberg 7/30/2019

```
 1              saying, I'm burnt out, I feel like I'm
 2              making more mistakes than I'm making
 3              usually.  And he converted it to, I'm
 4              harming patients, that I'm causing
 5              problems, that I don't trust myself,
 6              which was not the truth.
 7                   And he would take little snippets
 8              of things of what I said and combine
 9              them together and make them look worse.
10              And he did that again in the request for
11              termination, would take little snippets
12              of e-mails and things and mix them
13              together to make them seem worse than
14              they were.
15                   And also, he brought up this --
16              even with CAP, he brought up this e-mail
17              that was never sent to me that should
18              have been sent to my official LSU mail,
19              that I was on probation before, brought
20              up all these things that weren't true
21              and brought up an accusation that I
22              treated this patient horribly, when it
23              was already proven to be my intern and
24              not me.  But he brought up things -- he
25              brought up as much ammunition as he
```

Dr. Eric Greenberg  7/30/2019

```
 1            could against me.
 2    EXAMINATION BY MS. ECHOLS:
 3         Q.   In this encounter, in the 9/9/2016.
 4    We're not talking about the termination.
 5         A.   Yes.
 6         Q.   So let's just answer the questions that
 7    I'm asking you.  I don't want you to expound and
 8    go on to -- I mean, if you feel you need to tell
 9    me, but let's just get through this.  You had --
10    did you tell anybody else you were burned out at
11    that point?
12         A.   I had met with Dr. Suau the week before
13    and told him on a shift that I was burnt out, that
14    I didn't feel up to my normal self, that I just
15    was, like, reaching a limit with work.  I was
16    burnt out.
17         Q.   And were you moonlighting at the time?
18         A.   I was moonlighting at the time.
19         Q.   Did you think that that contributed at
20    all to your burnout?
21         A.   It did contribute to my burnout.  I cut
22    back on moonlighting a lot.  At that point, I had
23    already cut back on moonlighting a lot, too.
24         Q.   From when you list your employment
25    history before, though, it sounded like you were
```

Dr. Eric Greenberg 7/30/2019

1   pretty covered for the full 4 years.

2        A.   Well, that was average over, like, a

3   month, I would say.  But at the end, I was cutting

4   back a lot.  I remember I had cut out Ochsner

5   almost completely.  And I was mainly working at

6   Doctors Urgent Care, which I didn't -- I told them

7   I didn't feel burnt out when I was there.

8        Q.   Okay.

9        A.   And when I went to off sites, I didn't

10  feel burnt out.  And I told him I just felt like

11  it was, like, a hostile environment at LSU

12  whenever I was there.  I told him -- the other

13  thing that I can remember, I had just finished a

14  month and a half of ICU.  Throughout the month, I

15  had complained to him about the performance of an

16  intern, that I was having to do a lot more work

17  and that I was having difficulty.  And Dr. Suau

18  really didn't listen to my concerns about that

19  intern or intervene whatsoever.

20       Q.   So the hierarchy at LSU was, you

21  reported everything with all of your rotations

22  directly to Dr. Suau?

23       A.   Yes.

24       Q.   So nothing would be reported to ICU

25  about an intern in ICU?

Dr. Eric Greenberg 7/30/2019

```
 1        A.   They were my intern -- it was an ER
 2   intern that reported to the ICU people.
 3        Q.   You would report it?
 4        A.   I would not.
 5        Q.   Okay.  So when you went in, in September
 6   of 2016, tell me about the meeting, in your own
 7   words.
 8        A.   He asked me what my past medical
 9   history, asked me what was going.  Told him I was
10   burnt out.  He said, "oh, we're here to help you.
11   It's not punitive.  We're going to get a second
12   evaluation and really go from there."
13        Q.   Okay.  Did you --
14        A.   Try and figure out what's going on.
15        Q.   At this time, were you compliant with
16   your medications?
17        A.   I was working with Dr. Roniger to kind
18   of be on and off my medications.  I was taking
19   them as per our plan with them.  Like, I would
20   take it for a couple of months when I had a lot of
21   rotation.  I would go off the medication and go on
22   it.  It was just what I had talked with him about
23   it.  There was no noncompliance with it.
24        Q.   So Dr. Roniger would have that in his
25   notes; is that correct?
```

```
 1        A.    Yes.  From what I can remember, I would
 2   tell him that I would take drug holidays, is what
 3   they're called.
 4        Q.    You call them that, or does --
 5        A.    Yes.
 6        Q.    Who calls them that?
 7        A.    Just physician, that's what you call
 8   them.
 9        Q.    Okay.  And at that time, you were taking
10   both Adderall and the other one?
11        A.    Only Adderall at that time, if I
12   remember correctly.
13        Q.    Did you have multiple meetings with
14   Scott?
15        A.    Yes.
16        Q.    How many?
17        A.    I don't recall how many.
18        Q.    More than five?
19        A.    I don't remember exactly how many.  I
20   really don't.  If you could tell me how many, that
21   would be great, but I don't.
22        Q.    So what was your takeaway from your
23   first meeting with him on 9/9/16?
24        A.    That they were going to help me with
25   burnout, that we'd kind of create a plan, but this
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

```
1    wouldn't be punitive, that I would go to Ochsner
2    and get an evaluation, and go forward from there.
3         Q.   Okay.  The only thing that he asked you
4    to do at that point was to go to Ochsner and get a
5    psychiatric evaluation, on 9/9/16?
6         A.   I believe so.  I don't remember if he
7    told me anything else.
8         Q.   Okay.  Had you ever been on probation
9    before in the ER?
10        A.   I was told I was not on official
11   probation in 2017 --
12        Q.   No.  This is before, 2016.
13        A.   2016.  So I believe my third year,
14   Dr. Suau met with me and other residents and put
15   us on what he called a secret nonofficial
16   probation, that I wasn't official, that we could
17   not appeal it, that this was, you know, just to
18   help us get better.  I knew another resident,
19   Dr. Aisha Parker, appealed it and was found out
20   that Dr. Suau didn't go through the proper
21   channels of doing this.  But I went with them
22   anyway just to go through this, get better, and be
23   a team player.
24        Q.   And what did he want you to get better
25   at?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        A.   He wanted me to go to this -- what's it
 2   called -- the interpersonal development course.
 3        Q.   And why was that?
 4        A.   Because I had problems with
 5   interpersonal communications, as deemed by them.
 6        Q.   You don't think you had problems with
 7   interpersonal communications?
 8        A.   I think everyone could use improvement.
 9   I don't think I was the best at it.  I was very
10   fast and very quick with patients, and that could
11   come off as gruff.
12        Q.   So would it be fair to say you didn't
13   agree with Dr. Suau's concerns in September of
14   2016?
15        A.   I appreciated Dr. Suau's concerns, and I
16   worked to do everything that he wanted to do to
17   fix any deficiencies that he saw.
18        Q.   Okay.  It also says that you told Scott
19   Embley that you were very depressed; is that true?
20        A.   At that moment, after my -- I was
21   depressed at that moment.
22        Q.   6 on a scale of 10?
23        A.   If I told him 6, then that's what it is.
24        Q.   Had you ever had depression before?
25        A.   No.
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    Q.    Okay.  Did you talk to Dr. Roniger about
2  the depression?
3    A.    I didn't meet with Dr. Roniger at that
4  point.  I think they even told me, don't meet with
5  him.  I asked if I could meet with him.  They
6  said, "don't meet with him, we'll try to get
7  someone better for you."
8    Q.    They don't think Dr. Roniger is good?
9    A.    They wanted -- Scott Embley telling me,
10  we want someone better and more suited for this,
11  because I had an appointment.  Previously, I had
12  scheduled an appointment with his wife to go to
13  talk therapy more frequently.  I said, "can I meet
14  with her and schedule this?"  And he said, "no,
15  we're going to use someone, you know, more -- or
16  better for this situation."
17    Q.    With whose wife?
18    A.    With Dr. Roniger's wife.
19    Q.    Okay.  So have you ever tried any
20  medications for depression?
21    A.    No, never been treated for depression.
22    Q.    Okay.  Anxiety?
23    A.    No -- or I take that back.  In college,
24  I tried Buspirone for anxiety for, like, 2 months.
25  And my anxiety issues resolved at that point.

Dr. Eric Greenberg 7/30/2019

```
 1        Q.   With the Buspirone?
 2        A.   No.  I tried it for 2 months, and then
 3   socially my anxiety -- like, just the stress of
 4   college and getting into med school kind of
 5   subsided.
 6        Q.   As a doctor, you do realize it takes a
 7   while to build up in your system?
 8        A.   Yes.
 9        Q.   So you had no stressors outside of --
10   this is in 2016 again -- outside of your
11   employment at LSU; no girlfriend stressors, no
12   friends?
13        A.   I had just started dating my current
14   fiancé.  And I remember I told them initially
15   there was some little stress involved in it, the
16   first dating.  And then we worked through things
17   with the religion, stuff like that.  And there was
18   stress financially.  I had a house that I was
19   renovating in New Orleans.  My grandmother was
20   sick with cancer back in Michigan.  I'm very close
21   with my grandparents.  Just kind of family stress.
22        Q.   Okay.
23        A.   And also the stress of having to deal
24   with Dr. Suau.  I was new to all that.
25        Q.   Dr. Suau and who else at LSU would
```

Dr. Eric Greenberg 7/30/2019

1    stress you out besides Dr. LeGros and Dr. Lebas,

2    right?

3         A.   Yes.  Dr. Murphy was stressful, also.

4         Q.   What -- she's a woman, right?

5         A.   Yes.

6         Q.   Okay.  What is her position?

7         A.   She's staff physician.

8         Q.   Where?

9         A.   With Van Meter group.  I don't know her

10   exact title, but I know she serves on the clinical

11   competency committee at LSU.

12        Q.   In the ER, though, correct?

13        A.   Yes.

14        Q.   Okay.  Did you ever report feeling

15   overwhelmed and that you couldn't focus?

16        A.   To Dr. Suau, yes.

17        Q.   Okay.  How about to Scott Embley?

18        A.   Yes.

19        Q.   And that your memory was slipping?

20        A.   No.  I mean, I may have said that I'm

21   having -- I don't think the term "memory slipping"

22   directly.

23        Q.   Memory recall, memory issues?

24        A.   Yes.  That was part of my burnout, that

25   I was having trouble with recall.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    Q.   Okay.  And I gathered that you had

2    developed ways of coping with this when you were

3    in college and medical school.  What kind of

4    things would you use to try and cope with

5    situations like this that were not working now?

6         A.   Social; I had strong family in Michigan;

7    the Jewish community was one of my things in

8    Michigan; was my fraternity; I had friends; when I

9    was in New York City, I biked, like, 20 miles a

10   day.  In Louisiana, one time I went biking and

11   came back, and there was a death threat in my car.

12   And honest to God that happened.  Not related to

13   the residency at all whatsoever.

14        Q.   Wait.  You went biking, and you couldn't

15   go biking because there was a death threat on your

16   car?

17        A.   Just didn't feel comfortable -- death

18   threat about bikers on my car.  Someone, like,

19   wrote out, "I'm going to hit a biker next time I

20   see them."  I had a bike rack on top of my car.  I

21   parked where the bikers parked, and someone left

22   that.

23        Q.   And so you didn't bike again?

24        A.   People are just rude to bikers here.  In

25   New York, I lived near Central Park.  I could go,

1    like, in Central Park whenever I wanted to.  It

2    wasn't as safe in New Orleans.

3         Q.    Audubon Park wasn't safe?

4         A.    Yes, but different.  You can't go, like,

5    20 miles per hour in Audubon Park.

6         Q.    So I assume that they wanted -- the

7    psychiatric evaluation that they wanted was a

8    fitness for duty?

9         A.    Yes.

10        Q.    Okay.  And did they give you doctors

11   that you should try and make an appointment with?

12        A.    Yes.  They gave me a name of, I don't

13   know how many, like three to five.  And I

14   scheduled with the ones at Ochsner.  And I think I

15   went either the same day or the next day.

16        Q.    Pretty quick for Ochsner.

17        A.    Yes.

18        Q.    And who did you see?

19        A.    Dr. Goertz.

20        Q.    How long did you spend with him?

21        A.    Approximately an hour to hour and a

22   half.

23        Q.    Okay.  And what type of exam did he give

24   you?

25        A.    Gave me a forensic psychiatric exam.

```
1          Q.   Which is?

2          A.   Talked about my past, current stressors,

3     what's going on with residency, what's going on

4     with my life, generic psychiatric intake.

5          Q.   Generic?

6          A.   Or standard, I would say.

7          Q.   Okay.  And at this time, you were still

8     seeing Dr. Roniger?

9          A.   Yes, or I had not -- I was a current

10    patient of his, but was told to not see him.

11         Q.   When was the last time you saw him

12    before the 9/9/16 CAP?

13         A.   I don't remember.

14         Q.   Estimate?

15         A.   Within the last 2 months of that.

16         Q.   Did you report any of this kind of

17    feeling of burnout or --

18         A.   It was before the ICU rotation.

19         Q.   Did you report any kind of anti-Semitic

20    remarks to Dr. Roniger or that you felt that the

21    workplace was not hospitable for you or anything

22    like that?

23         A.    I don't remember if I did either way.  I

24    didn't talk to him about the anti-Semitic remarks.

25    I was honestly too scared to bring it up, for fear
```

```
 1    of retaliation.
 2         Q.    With Dr. Roniger?
 3         A.    With anyone.
 4         Q.    Okay.  But Dr. Roniger was not
 5    associated with LSU, correct?
 6         A.    No.  But I did not talk to him about the
 7    anti-Semitic remarks.
 8         Q.    How about the harassment at work, or
 9    whatever happened?
10         A.    I don't remember if I did either way.
11         Q.    Okay.  So what would y'all talk about?
12         A.    Current stress, how is life going, how
13    is work going, what to change, how to help myself.
14         Q.    Okay.  Then you saw Judy Barnes?
15         A.    That was after all this LSU stuff.  That
16    was, I think, recommended by CAP.
17         Q.    Okay.  How often did you see her?
18         A.    Weekly.
19         Q.    And for how long each time?
20         A.    An hour each time.  And I saw her until
21    probably October.
22         Q.    Starting when?
23         A.    Probably starting September, around
24    there, around this time.
25         Q.    September 9th, I mean, was the initial
```

Dr. Eric Greenberg 7/30/2019

1   date?

2        A.    Yes.   Either in September or October.

3   Shortly soon after all this, if I remember

4   correctly.  I'd have to look at my records to see

5   exactly when.

6        Q.    Do you have them there?

7        A.    I don't have them.  But I know I

8   finished therapy with her around October.

9        Q.    Okay.  So you only saw her for 2 months?

10       A.    No.  October of 2017.

11       Q.    Okay.  And what kind of things would you

12  talk about with Ms. Barnes?

13       A.    Stress; my harassment with LSU; my

14  treatment by Dr. Suau; I mean, dealing with PTSD

15  from my treatment by Dr. Suau, Dr. Lebas and all

16  of those.

17       Q.    Who diagnosed you with PTSD?

18       A.    I don't think I've ever been -- she said

19  I have PTSD.  I've never been formally diagnosed

20  with PTSD.  She said, I could treat you for PTSD

21  with all this LSU stuff, because it was extremely

22  traumatic and stressful; I had a knife pulled on

23  me, Dr. Suau, all that he did to me, said to me.

24       Q.    So Dr. Suau, was he there when

25  Dr. Haydel was the program director?

Dr. Eric Greenberg 7/30/2019

```
 1        A.    Yes.
 2        Q.    Okay.  What was his position at that
 3   time?
 4        A.    He was just a staff physician.
 5        Q.    Okay.  And then he was promoted,
 6   apparently?
 7        A.    Yes.
 8        Q.    In your third year?  I thought you said
 9   two and a half years.
10        A.    August of my third year, yes.
11        Q.    Okay.  And that's when your problems
12   began with him, or did you have --
13        A.    That's when --
14        Q.    Wait -- or did you have problems with
15   him while Dr. Haydel was the program director?
16        A.    I had problems with him before.  He
17   would single me out, would ask me to do things
18   above and beyond the residents, and only me; for
19   example, he would ask me to get stolen copyrighted
20   books.
21        Q.    Stolen copyrighted books?
22        A.    He'd ask me to download books off the
23   internet for him that were copyrighted.
24        Q.    Books on what?
25        A.    Emergency medicine.  I have text
```

Dr. Eric Greenberg  7/30/2019

1    messages regarding such.

2         He would single me out in e-mails.

3         Q.   And that's listed on your list?

4         A.   Yes.

5         Q.   Okay.

6         A.   But I don't think it got really heated

7    until he became program director in around August.

8    And I remember one --

9         Q.   This is August of what year; did you

10   tell me?

11        A.   '16, I believe.

12        Q.   Okay.

13        A.   August of my third year.  '16, yes.

14        Q.   Okay.

15        A.   I remember one interaction where I met

16   with him.  He was meeting with every resident to

17   kind of go over, he's program director now, and

18   changing of the guard.

19        Q.   Okay.  So this is in August of 2016?

20        A.   Around that time.

21        Q.   Okay.

22        A.   In or abouts August 2016 or

23   September 2016.  But I just remember, I was just

24   joking with him about a pen.  Like, he had a pen,

25   I had the same pen.  I joked with him, "oh, you

Dr. Eric Greenberg 7/30/2019

 1    stole my pen."  And he said, "how could you ever
 2    dare accuse me of stealing a pen?  Get out of this
 3    office right now," screaming at me.  I said, "I
 4    don't know what's going on.  I'm sorry.  I'm just
 5    joking about a pen.  Like, what's going on?"
 6        Q.    This was in your initial meeting with
 7    him?
 8        A.    Yes.  Everything with his interactions
 9    with me was outside the normal behavior of any
10    other resident.
11        Q.    Your medication management after you
12    were referred to CAP on 9/9/16, who did that?
13        A.    I forgot his name.  He was a private
14    doctor.
15        Q.    They didn't trust Dr. Roniger anymore?
16        A.    No.  They wanted me to go to someone
17    that they paneled with, that they were with.  I
18    forgot his name, to be honest.
19        Q.    What do you mean "paneled with?"
20        A.    Like, someone that was -- a physician
21    would panel with CAP or --
22        Q.    They're not LSU physicians or --
23        A.    No, I would not go -- they're not LSU
24    physicians.  George Daul.
25        Q.    Did he put you on any other kind of

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    medications or try anything?

2        A.    I believe I was on Vyvanse.

3        Q.    Is he the one who prescribed Vyvanse for

4    you?

5        A.    Yes.

6        Q.    But currently you're not on Vyvanse?

7        A.    Currently, I'm on Adderall.

8        Q.    Would you take the Vyvanse with the

9    Adderall?

10       A.    No.

11       Q.    They work together?

12       A.    I wouldn't mix the two.

13       Q.    I think they also asked you to schedule

14   with a family physician or PCP or something like

15   that.  Did you ever do that?

16       A.    I don't remember if I did or did not.  I

17   might have seen mine back in Michigan, but I don't

18   remember either way.

19       Q.    Okay.  So you went to see Dr. Goertz at

20   Ochsner.  And what were the results of his exam?

21       A.    They told me that I was stressed out,

22   not to do ICU again, that they would clear me back

23   for work.  At that point --

24       Q.    You said "they."  Who's they?

25       A.    Ochsner psychiatry.

Dr. Eric Greenberg 7/30/2019

     1          Q.    Okay.
     2          A.    I was told that, like, I'm going to give
     3     you a clearance to go back to work, during that
     4     meeting.  At that time, I was told from Dr. Haydel
     5     that Dr. Suau was going around -- Dr. Suau and
     6     Dr. Mackey were going around telling people that
     7     she was trying to protect me, that they were
     8     saying that I never matched the program.
     9          Q.    Wait, I'm confused.
    10          A.    Yes.
    11          Q.    Who's Dr. Mackey?
    12          A.    Dr. Mackey is one of Dr. Suau's
    13     assistant program directors.
    14          Q.    Okay.  It's a female?
    15          A.    Male.  Scott Mackey.
    16          Q.    You said "she."
    17          A.    Haydel.  That they were campaigning
    18     against me.
    19          Q.    Dr. Haydel?
    20          A.    No.  That Dr. Suau and Dr. Mackey were
    21     campaigning against me.
    22          At this point, I was told by Scott that they
    23     weren't able to clear me to go back to work.  And
    24     I asked him why that was.  They wouldn't ever tell
    25     me.  They said, "oh, well, we received other

Dr. Eric Greenberg  7/30/2019

Page 130

```
 1    information."  I was never able to see what the

 2    other information was.  Another couple of days

 3    went by, they were, like, "well, we don't know

 4    what's going on.  We want to refer you to the

 5    PHP."  And I had no idea what the PHP was.  They

 6    said, "if you don't this, they could terminate

 7    you."

 8         Q.   Did you find out what PHP was?

 9         A.   Afterwards, I found out, after going to

10    them.

11         Q.   What is PHP?

12         A.   Physicians Health Program, Louisiana.

13         Q.   So they recommended you go see somebody

14    there?

15         A.   I self-referred to PHP.

16         Q.   But you just said you didn't even know

17    what the PHP was until they said it.

18         A.   They told me if I didn't do this, they

19    would terminate me.  So I didn't see that there's

20    any option other than going there.

21         Q.   Okay.

22         A.   I was in a state of mind to think

23    otherwise; just I want to get back to work, I want

24    to resolve this as soon as I can.

25         Q.   Okay.  So you went to PHP when?
```



Dr. Eric Greenberg 7/30/2019

```
 1        A.   I don't remember the exact date, but it
 2   was in and about September of 2017, or --
 3        Q.   That's a whole year later.
 4        A.   2016, sorry.
 5        Q.   Who did you see there?
 6        A.   I forgot his name.  It was a therapist
 7   and then a nurse.  And I told them, you know, "I'm
 8   burnt out.  My program director is harassing me,
 9   saying some stuff."  I remember telling them all
10   this stuff, that I've been threatened, had a knife
11   pulled on me.  And they're like, "well, we want to
12   go send you somewhere to get evaluated, or they
13   could possibly take away your license or terminate
14   you from the residency program."  At that point, I
15   didn't see that there was any other option other
16   than to follow what they were saying.
17        Q.   Okay.  And the reviews and things that
18   you had gotten in the past that you were below
19   your peers didn't lead you to believe that there
20   might be an issue?
21        A.   Well, that was from the first year
22   residency.
23        Q.   Okay.  So you went to PHP, you saw a
24   therapist and a nurse?
25        A.   Yes.
```

Dr. Eric Greenberg 7/30/2019

1      Q.    Did they render a report?

2      A.    I don't know if they rendered a report

3   or not.

4      Q.    Okay.  What were the results of that?

5      A.    The results were that I would have to go

6   to Chicago to get evaluation.  I went to Chicago,

7   got evaluated.

8      Q.    You went to Elmhurst?

9      A.    Yes.  Got the report back, and I saw the

10  collaborative -- first off, after I got -- when I

11  was at Chicago, I got a call from Dr. Haydel

12  saying that they're trying to dig up all this dirt

13  on you, they're politicking against you, Dr. Suau

14  and Dr. Mackey.

15     Q.    Dr. Mackey?

16     A.    Yes.  That physicians were receiving

17  calls from the PHP with a woman saying, "well,

18  we've known Dr. Greenberg did wrong, so tell us

19  what Dr. Greenberg did."  And people would --

20  these were my positive witnesses.  And they would

21  talk to them, because they didn't know what was

22  going on.

23     Q.    Can you explain that to me again?  Calls

24  were coming in from the PHP?

25     A.    Yes.

```
1        Q.   To where?
2        A.   To attendees, Dr. Baron -- I forgot his
3    first name -- for character witnesses, and Dr. --
4        Q.   Why do you need a character witness at
5    this point?
6        A.   Because they were getting background
7    information on what was going on at LSU.
8        Q.   Okay.
9        A.   So I told them, like, "look, I'm being
10   harassed at LSU, this is burnout.  I'm trying to
11   work through this."  And they were, like, "we want
12   witnesses on this, people who can attest to this."
13   And all the people that they called to attest to
14   it, I was told by these people, there was a woman
15   on the phone saying, "well, we know Dr. Greenberg
16   did wrong, or Dr. Greenberg is a bad doctor," or
17   whatever.  And they didn't feel comfortable
18   talking to that person.
19       Q.   So who were these positive witnesses?
20       A.   Francois Ancelet.
21       Q.   Wait.  Ancelet, A --
22       A.   N-C-E-L-E-T.
23       Q.   Okay.  Woman or man?
24       A.   Man.
25       Q.   Okay.
```

Dr. Eric Greenberg 7/30/2019

1      A.    Micelle Haydel, M-I-C-E-L-L-E,

2  H-A-Y-D-E-L.

3      Q.    Well, that was your --

4      A.    Program director.

5      Q.    Right.

6      A.    And then David Baron.

7      Q.    Each of these people said that somebody

8  from PHP called them and said that you had done

9  something wrong?

10     A.    I know Dr. David Baron told me that

11 that's what the woman called him on.  I know

12 Dr. Ancelet said he got a call, but was never able

13 to contact them, and never was able to contact

14 them again.  I know Dr. Haydel said she talked to

15 them and said that this is all blown out of

16 proportion, that there's a way to resolve this

17 other than this.

18     Q.    Okay.  So for Dr. Haydel and Dr. Baron,

19 the woman told them that you had done something

20 wrong?

21     A.    I know for Dr. Baron, he told me that he

22 got a call from a woman that said that -- or he's

23 a bad doctor, he did wrong, tell us what he did.

24 He said it was like a police calling him.

25     Q.    And this is from PHP?

```
 1          A.    Yes.

 2          Q.    The woman identified herself from PHP?

 3          A.    Yes.

 4          Q.    Do you know what timeframe this was?

 5          A.    In and about September of 2016.

 6          Q.    Okay.

 7          A.    And I remember getting my report from

 8     Elmhurst, and it had information that this was

 9     false.

10          Q.    Okay.

11          A.    Saying that I was, you know, refusing to

12     see psychiatrist and refusing to go to things with

13     Dr. Suau and fighting him.

14          Q.    Okay, let's look at that report.  And

15     I've marked mine up, unfortunately.  Do you have a

16     copy of the Elmhurst report?

17                MR. SCHMIDT:  Let me see.

18                MS. ECHOLS:  26 through 27th of 2016.

19                MR. SCHMIDT:  We might.  It would

20                probably take a little while to find it.

21                MS. ECHOLS:  Okay.

22                MR. SCHMIDT:  I don't remember seeing

23                it, but I've seen a lot of documents.

24                MS. ECHOLS:  There are a lot.

25                MR. SCHMIDT:  If you need to white-out
```

```
 1              or something.
 2              MS. ECHOLS:  No, I highlighted it.
 3    EXAMINATION BY MS. ECHOLS:
 4         Q.   Do you remember where in the report it
 5    said that you were fighting with Dr. Suau, and
 6    what else did you say?
 7         A.   I don't remember where exactly, but it
 8    was stuff like feedback for something that didn't
 9    pertain to me, stuff that had been from years past
10    that was presented as active issues.
11         Q.   Like what?
12         A.   Like, stuff from my intern year, just
13    behavior from intern year, me -- I don't remember
14    exactly.  I would have to see the report.  It's
15    been a while.
16         Q.   Okay.  I apologize.  I should have made
17    a copy of this before I highlighted it.
18         A.   But I remember I refuted the information
19    to Scott and the PHP.
20         Q.   In writing?
21         A.   Verbally over the phone.  I may have
22    done it in writing to someone.  I have to look
23    back at my notes.  But I was told, "well, you can
24    go and do another test, but it would be another
25    $6,000, and we could take away your license or
```



Dr. Eric Greenberg 7/30/2019

1    terminate you from the program if you do that."  I
2    just remember, like -- and I remember getting word
3    of -- I don't remember who I got word of from, but
4    that Dr. Suau had contacted Ochsner to -- like, I
5    was told that I was cleared by Ochsner.  This
6    is --
7         Q.   On one day?
8         A.   On one day.  Cleared by Ochsner and
9    Dr. Suau.  And then later, I got records showing
10   the same thing, that Dr. Suau or someone from LSU
11   had refuted my clearance.  Then they cleared me
12   again, and then Dr. Suau had come up with some
13   paperwork.  And then Ochsner said, well, we don't
14   know what's going on, but we need some other
15   evaluator to look at this.
16        Q.   Okay.  So where is the document that
17   says you were cleared, you said you got?
18        A.   Ochsner medical records.
19        Q.   You said you got it?
20        A.   Yes.  Later on, later in 2017, after all
21   this was going on, I requested my records from
22   Ochsner.
23        Q.   Okay.
24        A.   I don't have them with me now, or we
25   need -- the link had expired, but we can produce



Dr. Eric Greenberg  7/30/2019

1    the records.

2         Q.   Okay.  So on one day they told you, you

3    were cleared, and then they must have got more

4    information?

5         A.   They talked with LSU or someone at LSU,

6    and I was told from Dr. Haydel or someone else in

7    the program that Dr. Suau had protested my

8    clearance.  And they cleared me again, and then

9    they protested again, and said we need to get

10   another evaluator to see what's going on.

11        Q.   Do you remember the timeframe, how long

12   this took?

13        A.   Three days.

14        Q.   Okay.  So when you went to Elmhurst,

15   what was involved with that program?

16        A.   It was a two-day evaluation.  And they

17   just asked me, like, all these different

18   psychiatric testing, talking, a Rorschach test,

19   family history.  I had an evaluation by a

20   physician, drug testing.  It was a two-day,

21   involved evaluation.

22        Q.   Did you ever read the report from

23   Elmhurst?

24        A.   I read it.  I don't remember exactly

25   what the report said.

Dr. Eric Greenberg 7/30/2019

1    Q.    In general, do you remember what it

2  said?

3    A.    It said that I had traits of narcissism.

4    Q.    That's it?

5    A.    That's all that I remember out of it.

6    Q.    Okay.  How about empathy?

7    A.    I don't remember what it said about

8  that.

9    Q.    Okay.

10    A.    I know that, you know, through my

11  therapy, they had talked to me about compassion

12  burnout, that I was experiencing compassion

13  burnout, and working on that.

14    Q.    So you had compassion when you started,

15  and then you stopped having compassion; what does

16  that mean?

17    A.    I was -- part of my burnout was that,

18  after my treatment with LSU and everything, that I

19  was burnt out, and that my empathy was -- had a

20  problem, like, I was having trouble displaying

21  empathy because of it.

22    Q.    This is all in 2016?

23    A.    Yes.

24    Q.    Okay.  So what did Elmhurst recommend to

25  you that you do to help with the situation?

```
 1        A.   That I go to this course.  It was told
 2   to me that this course was -- by Scott and LSU
 3   people, said it would help me, something similar
 4   to the ones they recommended in the past, that it
 5   would be 6 weeks, and that it wouldn't be
 6   punitive, and would be back to work.  And it was
 7   anything but.
 8        Q.   And you went to the course?
 9        A.   Yes.  I thought I'm going to be a team
10   player, going to get myself better.  I wanted to
11   finish this program, finish everything there.  I
12   wanted to be the best that I can be, so I'm going
13   to go through with this.
14        Q.   Where was that program?
15        A.   In Hattiesburg, Mississippi.
16        Q.   Pine?
17        A.   Pinecrest.
18        Q.   Pinecrest.  And how long were you there?
19        A.   I was there for 12 weeks.
20        Q.   Okay.  How long were you originally
21   scheduled to go there?
22        A.   6 weeks.  They told me they extended me
23   because they wanted me to look better for
24   Dr. Suau.
25        Q.   That Pinecrest told you that?
```

Dr. Eric Greenberg 7/30/2019

```
 1        A.    Yes.  They wanted me to appease Dr. Suau
 2   and be there longer and kind of work on my
 3   interactions with him to give me the best chance
 4   of interacting with him and interacting with
 5   myself.
 6        Q.    Okay.
 7        A.    But that he would appreciate that I
 8   would extend my course there.
 9        Q.    And you did?
10        A.    Yes.
11        Q.    Did they also recommend that you go to a
12   program at Vanderbilt?
13        A.    Yes, they did.
14        Q.    And did you do that?
15        A.    Yes, I did.
16        Q.    When did you do that?
17        A.    In about January 2017, or around that
18   time.
19        Q.    11 through 13th, 2017; sound right?
20        A.    Yes.
21        Q.    Okay.
22        A.    At that program, they said they didn't
23   understand why I was referred there, that they
24   would write letters of support for me if I wanted
25   to, but they were confused why I was referred to
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
1   that program.
2        Q.   So did you get any kind of documents
3   from Vanderbilt?
4        A.   They said they would produce the
5   documents anytime I wanted to.  I have not yet
6   requested them.
7        Q.   They didn't produce anything to LSU?
8        A.   That I completed the course, that I've
9   completed successfully, but they kind of kept it
10  to a minimum of information.
11       Q.   Okay.  So what did that course involve?
12       A.   It was just a course about expressing
13  yourself properly, working through systems,
14  dealing with work stress and burnout,
15  communications, too.
16       Q.   Program for distressed physicians?
17       A.   Yes.
18       Q.   The Healthcare Professionals Foundation,
19  did you get any guidelines from them on things
20  they wanted you to do?
21       A.   Monitoring through them.
22       Q.   Monitoring?
23       A.   Yes.
24       Q.   What did that monitoring involve?
25       A.   There are several things; involved no
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554   Hammond LA 70404   Fax 985.419.0799

1    moonlighting, no night shift, that I would receive
2    feedback on shift.  There's a whole 13 or 14
3    separate things.  I don't know exactly what's in
4    the monitoring agreement.
5          Q.    Like, did you read it?
6          A.    I've read it.  At this moment that we're
7    seeing here right now, I don't remember exactly
8    what's on it.
9          Q.    Okay.  Like, you should work during the
10   day for the first 3 months?
11         A.    Yes.
12         Q.    And then did they ask you to follow up
13   with them?
14         A.    Yes.
15         Q.    And did you?
16         A.    Yes.
17         Q.    Okay.  When did you do that?
18         A.    I don't know the dates I followed up
19   with them.
20         Q.    Is that within 4 months; is that fair?
21         A.    Yes.
22         Q.    And they also wanted 360 evaluations.
23   What are 360 evaluations?
24         A.    It's a form that I created with the
25   program about feedback.  I think in my ad hoc, I

Dr. Eric Greenberg 7/30/2019

```
 1    submitted some of them.  But Dr. Suau had gone and
 2    told attendings that, oh, if you fill this out,
 3    you are going to be deposed, so don't fill them
 4    out.  And in a recorded conversation I had with
 5    him, he said he would not fill out any
 6    evaluations, wouldn't report to anyone.
 7         Q.   Okay.
 8         A.   And was actively blocking my monitoring
 9    agreement.
10         Q.   So what are 360 evaluations; are they
11    daily, weekly --
12         A.   Daily.
13         Q.   -- biweekly?
14         A.   Daily.
15         Q.   Is it one person, three people; how many
16    people fill them out?
17         A.   Whatever attending I was working with
18    that day.
19         Q.   So would you ask them to fill them out?
20         A.   Yes.
21         Q.   Okay.  Did you ask Dr. Suau to fill them
22    out?
23         A.   He had not been my attending at that
24    point.  Dr. Suau was supposed to be my work site
25    monitor, but refused to fill out any evaluations.
```

Dr. Eric Greenberg 7/30/2019

1        Q.    Did you ask him, is what I asked?

2        A.    Yes.  Yes.  Or for the 360?

3        Q.    Yes.

4        A.    If he were to work with me on a shift, I

5    would have gotten one from him.  But until the

6    date of my termination, I had not worked with him.

7        Q.    Okay.  So you wouldn't have asked him to

8    fill out any 360 evaluation?

9        A.    But he would have been my overall --

10   there are two levels of evaluations; there's a

11   work site monitor and 360 evaluations, too.

12       Q.    Who recommended the work site monitor?

13       A.    PHP.

14       Q.    What is the work site monitor?

15       A.    They have to fill out a monthly form to

16   submit to PHP.

17       Q.    What is their position at the hospital;

18   I mean, do they work with you?

19       A.    It's a supervisor.  Someone who's in

20   supervisory role.

21       Q.    Okay.  And you asked Dr. Suau, and he

22   wouldn't fill it out?

23       A.    Yes.  There's a recording.  I've shared

24   it during my ad hoc.  I can bring -- I don't have

25   the transcript with me right now, but him refusing

Dr. Eric Greenberg 7/30/2019

1    to fill out any paperwork or submit anything to

2    anyone.

3        Q.    Okay.  Were there other supervisors that

4    you could have asked to fill them out?

5        A.    I asked if Dr. DeBlieux would be my

6    supervisor.  I have an e-mail stating such, and

7    Dr. Suau declining -- or refusing for Dr. DeBlieux

8    to be my work site monitor.

9        Q.    Isn't Dr. DeBlieux above Dr. Suau?

10       A.    Yes, but -- let me see if I can find the

11   e-mail here.  Dr. Suau was my program director.

12   And Dr. DeBlieux --

13       Q.    I thought he was pretty high up over

14   there.

15       A.    With UMC, though, but not with ER

16   residency.

17       Q.    Okay.

18       A.    So 2/23/17, I requested, in e-mail chain

19   with Scott Embley and Dr. Salvador Suau, for Dr.

20   DeBlieux to be my workplace monitor, and Dr. Suau

21   declining my request.

22       Q.    Okay.  Do you know why?

23       A.    I don't know why.

24       Q.    Okay.

25       A.    Dr. Suau had stated before that he

```
 1    didn't want me talking to anyone else about what
 2    was going on or any of my treatment by him; that
 3    if I talked to someone else, I could be fired for
 4    that.
 5         Q.   Okay.  Were there any other
 6    recommendations regarding switching residencies
 7    from ER to anything else?
 8         A.   No.
 9         Q.   Okay.  Did they tell you, you should not
10    treat family, friends and co-workers?
11         A.   Yes.
12         Q.   And why do you think that was?
13         A.   That's a generic provision they have in
14    every single one.
15         Q.   Okay.  Then I guess you signed a
16    contract for continued employment in 2017, in
17    January?
18         A.   Yes.  I was told if I didn't sign that,
19    I would be terminated.
20         Q.   Okay.  Did you read it?
21         A.   Yes, I did read it.
22         Q.   Did you agree with it?
23         A.   I had no choice other than to sign it.
24         Q.   Did you agree with it?
25         A.   Can I see the document before I sign
```



Dr. Eric Greenberg 7/30/2019

1    that and refresh my memory?

2         Q.   Well, I mean, sure.

3         A.   If I remember correctly, it was a copy

4    of my PHP work site monitor.

5              THE WITNESS:  You want to see this, too?

6              MR. SCHMIDT:  I'll take a look at it.

7    EXAMINATION BY MS. ECHOLS:

8         Q.   Now that you've looked at it, did you

9    agree with it?

10        A.   I was not happy to agree with it.  I was

11   told I had no other option to sign it.  I was not

12   happy about some of the provisions with it.

13        Q.   Which provisions were you not happy

14   with?

15        A.   If I remember correctly, Dr. Suau stated

16   that I couldn't go to anyone else.

17        Q.   In that document?

18        A.   There's something in it that I had

19   concerns about, so let me read it.

20        Maybe it was a different document.  I think

21   the thing that I had trouble with Dr. Suau was

22   that I asked him for an expectation of residents

23   and a guideline, accepted behavior, what he wanted

24   me to do.  And Dr. Suau refused to produce such a

25   document.

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1      Q.   But he also, did he not, ask you to come

2   up with a document, and he would go over it with

3   you?

4      A.   And I told him -- I told people on my

5   side that I had concerns about creating such a

6   document, because it may be used against me.

7      Q.   But you wanted him to create a document

8   so you could use it against him?

9      A.   No.  I wanted him to create a document

10   so that I could know how to behave as a resident.

11   There was no guidelines given to me or any

12   expectations of behavior, but was told if I don't

13   meet expected behavior, I could be terminated at

14   any time.

15      Q.   You didn't have a copy of the House

16   Officer Manual?

17      A.   I did have a copy of the House Officer

18   Manual, but he was supposed to create an

19   expectation for me.

20      Q.   Yours was different than everybody

21   else's?

22      A.   For ER residents, I was told.

23      Q.   This does not apply -- this House

24   Officer Manual does not apply to ER residents?

25      A.   It applies to every resident, but I was

AmersonWhite®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    told he would create -- with every probation or

2    any kind of disciplinary matter -- this is my

3    understanding.  The House Officer Manual, there's

4    an individualized program that's created with

5    expectations for every resident.  And he did not

6    do that.

7         Q.   But he asked you to do that, and you

8    refused?

9         A.   I did not refuse to do that.  At the

10   last minute, he asked me to do that, and fired me

11   several days later.

12        Q.   But you just told me you didn't want to

13   create a document.

14        A.   I held off on doing it, because I knew,

15   and I was told by legal counsel I had, my fiancé,

16   other attorneys I knew, that we would have to

17   create in combination; otherwise, he would say,

18   well, you've created all this, you know what's

19   going on, you failed at this, or use it against

20   me.  And it was his behavior to do that, too.

21        Q.   So this statement in here that you were

22   administratively referred to the CAP program on

23   September 9th, due to self-reported feelings of

24   increased depression, anxiety, depersonalization

25   and inability to cope with caring for patients,

Dr. Eric Greenberg 7/30/2019

1    and you understood that it was reported that you

2    have difficulties achieving professionalism

3    standards, demonstrating empathy towards patients,

4    truth telling and difficulties with peer

5    interactions.  So you signed this document, and

6    you agreed with that?

7         A.   I did not.

8              MR. SCHMIDT:  Object to the form.

9    EXAMINATION BY MS. ECHOLS:

10        Q.   You can answer.

11             THE WITNESS:  What did you say?

12             MR. SCHMIDT:  Go ahead and answer.  I

13             was making a form objection.  That's

14             just for the record.  That's for the

15             judge to decide later.  If I don't want

16             you to answer a question, I'll tell you

17             very clearly.

18             THE WITNESS:  So I voiced my concerns

19             over truth telling multiple times, but

20             was told that I had to sign this; that

21             you don't have to agree to everything on

22             this, but you have to sign it

23             acknowledging it.

24   EXAMINATION BY MS. ECHOLS:

25        Q.   Who told you that?

```
 1        A.    Scott Embley told me that.  But I did
 2   not agree with the truth telling,
 3   depersonalization.  I brought that up multiple
 4   times with him and others.
 5        Q.    What was your understanding of what they
 6   meant by depersonalization?
 7        A.    Depersonalization is akin to, like,
 8   dis -- in crisis.
 9        Q.    Okay.  Did they explain that that's what
10   it meant to you --
11        A.    No.
12        Q.    -- or is that your explanation?
13        A.    That's my explanation of it, as a
14   physician.
15        Q.    Okay.  But do other physicians have
16   other explanations?
17        A.    I think you could ask many physicians,
18   and they have many different ideas on this.
19        Q.    Right.  Okay.  And you said you signed
20   it because you were told that if you didn't sign
21   it, you would be terminated?
22        A.    Yes, and lose my license.
23        Q.    Okay.  These are referred to in the
24   request for adverse action termination.  Was there
25   another document created before this, that you
```

Dr. Eric Greenberg 7/30/2019

1    were on suspension by LSU?

2         A.   Dr. Suau had created a short form that

3    says that you're on summary suspension, I believe.

4         Q.   Okay.  Do you know when that was?

5         A.   Approximately several days before that,

6    two days before that, but no reason given for

7    summary suspension.

8         Q.   Two days before?

9         A.   Let me look at my timeline before I

10   answer that.

11             THE WITNESS:  Do you have the timeline

12             from Rachael anywhere?

13             MR. SCHMIDT:  I have been given the

14             timeline by Rachael.  If you refer to

15             that --

16             MS. ECHOLS:  Then I get to see it.

17             MR. SCHMIDT:  -- she will get to see it.

18             THE WITNESS:  3/10/2017, I received a

19             notice of summary suspension at

20             5:25 p.m. to a non-university,

21             unmonitored e-mail that had not been in

22             use.

23   EXAMINATION BY MS. ECHOLS:

24        Q.   Okay.

25        A.   In the handbook, it states that all

1    e-mails should be to a university official e-mail.

2        Q.   Okay.  Was that the first time you were

3    placed on suspension?

4        A.   Yes.

5        Q.   Not that super secret one?

6        A.   That was as probation, super secret

7    probation.

8        Q.   What's the difference between probation

9    and suspension?

10       A.   Suspension, you're not allowed to work.

11       Q.   Probation is?

12       A.   You need to work on things, and there's

13   a plan for you in place.

14       Q.   Okay.  How many times were you placed on

15   probation?

16       A.   I was told I was on unofficial,

17   non-recordable probation once, and was told I was

18   on probation but never filed any paperwork.  And

19   during the ad hoc, they told me I formally was not

20   on probation when I returned after therapy to

21   residency.

22       Q.   Okay.  And this one time that you were

23   on this super secret probation, when was that?

24       A.   The beginning of -- when Dr. Suau became

25   program director.

Dr. Eric Greenberg 7/30/2019

1    Q.   Was that the one where he called in a

2    bunch of residents?

3    A.   Yes.  I know Dr. Aisha Parker complained

4    to the dean about it.

5    Q.   Well, we're just talking about you

6    today.  Not that I don't care about Dr. Parker,

7    but, you know.

8    So I guess you requested this document for

9    the adverse action?

10    A.   Yes.

11    Q.   Okay.  And did you get it before the

12    hearing or after the hearing?

13    A.   I got it before the hearing.

14    Q.   Okay.  There are a list of deficiencies

15    in this document that I would like to go over with

16    you.  And you tell me -- you know, I've got the

17    e-mails from the doctors.  You tell me what you

18    think about each situation.

19    A.   Okay.

20    Q.   The first one is deficiency in patient

21    care.

22    A.   Can I get a copy to look over that, too?

23         MR. SCHMIDT:  It would make the

24         deposition a lot easier if it's

25         attached.

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1              MS. ECHOLS:  I know it's in the records,
 2              but why don't you just make a copy of
 3              this one.
 4              MR. SCHMIDT:  Okay.
 5              MS. ECHOLS:  4 is the e-mails, and 5 is
 6              the texts.
 7              (EXHIBITS 4-5 MARKED FOR IDENTIFICATION)
 8    EXAMINATION BY MS. ECHOLS:
 9         Q.   So you said you've never been placed on
10    academic probation before; is that right?
11         A.   When I was at the ad hoc, I was told
12    that this secret probation thing was academic
13    probation, that it counted, but that when Dr. Suau
14    would tell me that I was on probation, it was not
15    officially probation, in 2017.
16         Q.   Okay.  I have a letter from March 30th,
17    2016, placing you on academic probation from
18    Dr. Suau.
19         A.   Can I see that?
20         Q.   Sure.
21         A.   So this is an e-mail --
22         Q.   No.  This is a letter.  And it's signed
23    by Dr. DeBlieux, as well.  It's only a two-page
24    letter, but I'm not going to attach it.
25         A.   Yes.  So this was the secret probation I
```

Dr. Eric Greenberg 7/30/2019

1    was talking about.

2         Q.    And so Dr. DeBlieux signed off on that?

3         A.    Yes.  I was told it was unofficial

4    probation, that this is to help me out, that this

5    isn't going to go on any record, that I was to

6    sign it, but it would be a secret probation.

7         Q.    I guess I'm confused by secret

8    probation, when they send you a letter.  You told

9    me it wasn't documented.

10        A.    Yes.

11        Q.    It is documented.

12        A.    It is documented, but he said it would

13   be unofficial.

14        Q.    It's on LSU stationery.  Is that your

15   e-mail address right there?

16        A.    That is my gmail address, correct.  But

17   this is -- when I referred to a secret, unofficial

18   probation, that's what this is.  So other

19   residents received this, also.

20        Q.    So all the residents in the program

21   received this?

22        A.    No.  Around five residents.  I don't

23   know exactly which five it was, but I know that

24   one was Aisha Parker.  And we weren't given any

25   opportunity to appeal the probation.  We were told



Dr. Eric Greenberg  7/30/2019

```
 1   it's unofficial.
 2        Q.   Okay.  Did you read the letter?
 3        A.   Yes, I read the letter.
 4        Q.   And did you understand what the
 5   requirements were for you to get off this secret
 6   probation?
 7        A.   Yes.  Can I see the letter again?  Can I
 8   get a copy of the letter, just so it would be
 9   easier?  I know it's copies, but -- yes, okay.
10        Q.   I mean, you signed it.  Again, did you
11   agree with the letter or not agree with the
12   letter?  Were you told you were going to be fired
13   because you wouldn't sign it?
14        A.   I agreed that I needed help, that I
15   needed to progress myself as a resident, that I
16   had some deficiencies, that I was seen as
17   quote/unquote an asshole, and I needed some help
18   with it.  And I was in agreement with Dr. Suau and
19   Dr. DeBlieux to do stuff to make myself better.
20        Q.   Okay.  And did they give you any
21   incidents that you might have done that
22   contributed to this academic probation?
23        A.   They did not give me any specific
24   incidents.  They just said professionalism or
25   interpersonal, but Dr. Suau was unable to give me
```

Dr. Eric Greenberg 7/30/2019

1    any specific; here's what happened.

2         Q.   Okay.  It seems like that they thought

3    your professionalism and your interpersonal

4    communication skills were unacceptable; would you

5    agree with that?

6         A.   I agree that they said that to me, and

7    that it's something I meet expectations overall

8    for that and I needed improvement on those.

9         Q.   So they asked you to complete a

10   sensitivity training course.  Did you do that?

11        A.   I intended to do such.  Dr. Suau put up

12   several barriers of doing that.  In the end, said

13   I didn't need to do it, that it was canceled, that

14   it wasn't required anymore.

15        Q.   I thought that was the one, okay.

16        A.   Which date was that again?

17        Q.   This is in 2016.

18        A.   And e-mails.  I had several e-mails

19   trying to schedule that with him and every time

20   him pushing me off.  This is the one where he said

21   he would pay for it.

22        Q.   The program would pay for it, not him

23   personally?

24        A.   Not him personally.  The program would

25   pay for it.

Dr. Eric Greenberg 7/30/2019

```
 1          Q.   Okay.  Let's see where it gives me --
 2          A.   Okay.  This is on page 5 and 6, starting
 3    4/17 -- or 4/15, I e-mailed Dr. DeBlieux,
 4    expressing concern I had with Dr. Suau.  And
 5    also -- where's the text message?  This is text
 6    message.  Can you give me one minute to get this
 7    organized?
 8          Q.   Sure.
 9          A.   Can I write on these?
10          Q.   Yes.
11          A.   So several times April of 2016, I texted
12    and e-mailed Dr. Suau and Dr. DeBlieux about
13    concerns I had with scheduling the course.
14    Dr. Suau, every time, would push me off or said he
15    had more important things to do than helping me
16    schedule this.  It got to the point where I was
17    unable to -- there was, like, a deadline to
18    schedule this course, and it was coming up the
19    next week.  And I e-mailed Dr. Suau about this and
20    was pushed off.  It got to the point where --
21          Q.   What date are you talking about?
22          A.   Okay.  On 4/17/16, on page 5, I e-mailed
23    Dr. DeBlieux.  It states that Dr. Suau told him
24    about his elective time, was worried about the
25    deadline for elective was getting close.
```

Dr. Eric Greenberg  7/30/2019

```
 1        Q.   Wait.  Mine is out of order.  I'm
 2   missing a bunch of pages.
 3        A.   You're on the page right now.  Can I
 4   reach over and show you?
 5        Q.   It goes from 4 to 6.  I don't have a
 6   page 5.
 7        A.   Page 5 is at the top.
 8        Q.   Oh, okay.  I see.  All right, go ahead.
 9        A.   You're on page 3 and 4.  So one more
10   page, so 4/17 -- sorry, 4/15/16.  Like I said, we
11   can give you these e-mails, too, in discovery.
12   4/15/16, I sent an e-mail to Dr. DeBlieux
13   expressing concern about getting the elective in
14   time.
15        Q.   The elective is what you're referring to
16   as --
17        A.   This course, yes.
18        Q.   Why would you refer to it as an
19   elective?
20        A.   It was during my elective time.  Dr.
21   Suau wanted me to schedule this course during my
22   elective time.  As a third year resident, you were
23   given, I'd say, a month of elective time or
24   however many weeks, and the goal was to schedule
25   this sensitivity course during that time.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          Q.    Okay.

 2          A.    That would have been paid for by the

 3    program.

 4          Q.    Okay.

 5          A.    So I e-mailed Dr. DeBlieux concerns with

 6    Dr. Suau, with the elective, on 4/15.  4/17, I

 7    e-mailed him again saying concerns that I had not

 8    been -- with Dr. Suau, what to do during this

 9    time, that the deadline is coming up, and if

10    Dr. Suau doesn't make any action on it, I won't be

11    able to arrange it.  On 4/4, I texted Dr. Suau

12    information about the assessments.  4/8, I tried

13    to arrange --

14          Q.    What assessments?

15          A.    These courses, the elective.

16          Q.    Elective, assessments and --

17          A.    How about, going forward, we call it

18    elective?

19          Q.    Sensitivity training.

20          A.    Elective.  The elective was 8,000 to

21    $16,000.  I tried to make an appointment with him

22    on 4/18, tried to make an appointment with him on

23    4/11, tried to make an appointment with him on

24    4/15, and was pushed off every single time.  At

25    that point, I was told I could do a different
```

Dr. Eric Greenberg 7/30/2019

```
 1    elective, that he wasn't requiring me to do
 2    probation, and that the probation, secret
 3    probation, was called off.
 4         Q.   Okay.  Do you have an e-mail on that?
 5         A.   I do not have an e-mail.  This was all
 6    verbal.  And I was at the point where I could
 7    trust Dr. Suau on what he said, but it was proven
 8    otherwise.
 9         Q.   And Dr. DeBlieux didn't ask you if you
10    had ever done the sensitivity training course,
11    which you're calling an elective?
12         A.   Elective, yes.
13         Q.   Did he ask you if you had done it?
14         A.   I don't know if I asked if I did it.
15         Q.   No.  Did he ask you if you had completed
16    it, Dr. DeBlieux?
17         A.   I don't recall if he did.  But talking
18    with Dr. Suau, I remember the conversation went,
19    and this was -- give me one second.  4/11, sent
20    e-mail to him, no response.  4/12, sent e-mail, no
21    response.  4/15, texted him, said that I need to
22    be patient.  4/15, e-mail to Dr. DeBlieux
23    expressing concern about Dr. Suau.  Second
24    e-mail -- okay.  5/6/2016, I met with Dr. Suau.
25         Q.   Is that on the e-mail or a text?
```

Dr. Eric Greenberg 7/30/2019

```
 1          A.    This is --
 2          Q.    On your timeline?
 3          A.    On my timeline, yes.
 4          Q.    Okay.  So now I've got all these papers
 5     here.
 6          A.    So if we go to 5/6/16, I met with
 7     Dr. Suau, and states that the unofficial -- there
 8     was an interaction with my intern involved with a
 9     patient that they thought was me, but then was
10     later cleared up that it wasn't me.  So I met with
11     Dr. Suau and said that the unofficial probation
12     would not be made official, that still trying to
13     figure out what's going on with the elective.  But
14     on 5/19, I recapped my e-mail to Dr. DeBlieux
15     stating that the --
16          Q.    I don't have 5/19 on the timeline.
17          A.    I'm sorry, 5/9/2016.
18          Q.    You said 19.
19          A.    Sorry.  On 5/9/2016, I sent an e-mail to
20     Dr. DeBlieux recapping my conversation with
21     Dr. Suau stating the probation will stay
22     unofficial per our discussion.
23          Q.    And did he e-mail you back accepting
24     that?
25          A.    I don't know if he e-mailed me back or
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1   not.  I'd have to look at the e-mail.
 2        And then later on 6/29/2016, I met with
 3   Dr. Suau.  And he stated that I was off the fake
 4   probation, stated that I could moonlight again.
 5   He states that he's not going to make me go to the
 6   sensitivity course, because he, or the program
 7   being he, cannot --
 8        Q.   The insipid course; is that what you
 9   just said?
10        A.   The sensitivity course.
11        Q.   I think you said something different,
12   but okay.
13        A.   Sensitivity course would not be
14   required, because he cannot afford it.  And he did
15   not provide me with any paperwork or anything to
16   sign at that moment.
17        Q.   When was that?
18        A.   6/29/2016.
19        Q.   Okay.  So let's go to --
20             MS. ECHOLS:  Did you get one of these?
21             I think it's right there.
22             MR. SCHMIDT:  Yes.
23   EXAMINATION BY MS. ECHOLS:
24        Q.   The deficiencies in patient care.  It's
25   at the bottom of the first page.
```

Dr. Eric Greenberg 7/30/2019

1     A.    Yes.

2     Q.    He had -- complaint by Dr. Suau.  He

3  advised resident to request UPT before ordering

4  whatever medication.  And the lab was placed after

5  the medication had been ordered and administered.

6     A.    So this is blatantly false.  The lab had

7  been ordered before.  I submitted evidence of this

8  as such, and Dr. Suau never ordered me to get a

9  UPT before.  In fact, Dr. Suau had not been in the

10  ER.  I was treating this patient for approximately

11  an hour before Dr. Suau came back to the ER.  I

12  was trying to find him to talk to him about this

13  case.  But to my initial ad hoc, I submitted

14  the -- I can get it to you.  I think I have it

15  with you guys -- I have the actual patient chart

16  that's blacked out with the statements of orders.

17     Q.    Who's Sandra Irons?

18     A.    She's the nurse.

19     Q.    She sent an e-mail to Dr. Suau?

20     A.    So during that day, Dr. Suau told her,

21  he lied on you, I want you to e-mail me and say

22  that he lied to you.  So she was forced by

23  Dr. Suau to send that e-mail.  But I have

24  witnesses that can attest to the fact that he

25  screamed to the nurse to say that -- it's in my

Dr. Eric Greenberg 7/30/2019

1    witness list.  I forgot the name exactly -- Vin

2    Tonthat.

3          Q.   Okay.  So that one is false.

4          Complaint Number 2, on 3/5/2017, performs

5    extremely limited physical exams.  And I have had

6    multiple discussions with him about this.  This is

7    Dr. Elder?

8          A.   Yes.  So this e-mail was produced the

9    same -- after Dr. Suau had requested to terminate

10   me.  If you go look at the e-mail, I think it's

11   dated 3/10, and after.  Like I said, this could be

12   concerns that this physician had, but he never

13   voiced them to me.  He may have discussed them

14   with me in the past, but there was no discussion

15   at that time when I worked with him on 3/5, that

16   there were extremely limited physical exams or

17   documentation or discussions thereof.

18         Q.   So you're saying that one is false, too?

19         A.   I don't think it's false.  I think

20   Dr. Elder was requested by Dr. Suau to write

21   negative feedback after my termination.

22         Q.   He says that he's had multiple

23   discussions about this limited exam with you over

24   time.  Do you not think --

25         A.   In the past, he has, in past years.  But

Dr. Eric Greenberg 7/30/2019

1    in the past months, he has not had this

2    conversation with me.

3         Q.   He doesn't give a timeframe, so that's

4    what I was asking.

5         3 is a complaint on 1/24/2017.  Resident left

6    room to see if other trauma needed help.  Full

7    head-to-toe assessment for trauma not performed.

8    RN's main concern is about change in patient's

9    mental status.  Complaints not evaluated by

10   resident.  This is by Freitag, the nurse?

11        A.   Yes.

12             MR. SCHMIDT:  Has this been marked, this

13             exhibit?

14             MS. ECHOLS:  All these are marked in --

15             oh, as --

16             MR. SCHMIDT:  For the deposition.

17             MS. ECHOLS:  Oh, yes, sure.  We'll do

18             that right now, 6.

19                  Off the record real quick.

20             (EXHIBIT 6 MARKED FOR IDENTIFICATION)

21             (OFF-THE-RECORD DISCUSSION)

22             THE WITNESS:  If I remember correctly,

23             Dr. Freitag was actively recruited to

24             give feedback by Dr. Suau and

25             Dr. Mackey, that she wouldn't have given

Dr. Eric Greenberg 7/30/2019

```
 1                    this feedback otherwise.  She attests
 2                    this information to Dr. Haydel, that
 3                    they pressured her to write bad feedback
 4                    of a really non-concerning interaction.
 5        EXAMINATION BY MS. ECHOLS:
 6             Q.   It's not a concern that the patient's
 7        mental status changed?
 8             A.   So I did I assess the patient's mental
 9        status.  We did get a head CT on there.
10             Q.   It said, repeat head CT not ordered by
11        resident, which showed an intracranial hemorrhage.
12             A.   Yes.  And what happens is, the nurse can
13        put -- I can allow the nurse to put an order
14        during the trauma.  So I didn't physically put the
15        order in.  A nurse put the order in when I was in
16        there, which is commonplace.
17             Q.   It says it's not ordered.
18             A.   It was ordered, though.  Not ordered by
19        resident.
20             Q.   Okay.  Did you sign off on the order?
21        Don't you have to sign off on your orders?
22             A.   I don't know exactly how that works,
23        but --
24             Q.   Well, you worked in the ER.
25             A.   A CT was ordered on the patient and done
```

Dr. Eric Greenberg 7/30/2019

1    emergently.

2         Q.    Okay.  So do you sign off on the orders

3    that you give to nurses while you're working in

4    the ER; isn't that common?

5         A.    Either the attending or me, I do it.  I

6    don't know in this specific case who signed off on

7    this order.  But regardless, the patient was

8    assessed head to toe.  I did address the concerns.

9         Q.    Did you leave the room?

10        A.    Everyone leaves the room for x-rays.  So

11   the patient was getting x-ray, and I left the room

12   for x-ray.

13        Q.    CTs are performed in the trauma rooms?

14        A.    So the order of operations -- well, in

15   this particular case, it was a patient that was a

16   transfer from another hospital.  The patient was

17   already worked up, already had a head CT.  So they

18   came in.  In these cases, we sit them up, run

19   their back, evaluate them.  That's our head-to-toe

20   assessment.  Sit them back down, get a chest

21   x-ray.  During the chest x-ray, you leave the

22   room, and you come back.  At this point, she was,

23   if I remember correctly, told me the patient had a

24   mental status change, and that she was going to

25   put a CT in.  I said, okay, you can do that.

Dr. Eric Greenberg 7/30/2019

1    Afterwards, I talked to her about it, broke it

2    down.  She said, oh, I'm not going to make an

3    issue of this, but it's just something to address

4    and change in the future.

5         Q.   So the nurse actually was the one who

6    suggested the CT?

7         A.    The nurse is the one that suggested the

8    CT.  And that's also commonplace, too, in the ER.

9    And I said, yes, we can do that.

10        Q.   Okay.  But not in New York, nurses don't

11   suggest in New York, right?

12        A.    I mean, it's --

13             MR. SCHMIDT:  Object to the form.

14   EXAMINATION BY MS. ECHOLS:

15        Q.   All right.  So this write-up that is on

16   page 3 --

17        A.    So she -- Dr. Haydel had the

18   conversation, and it was told to me -- and I hope

19   Dr. Haydel can attest the same -- but Ms. Freitag

20   felt pressured by Scott Mackey and Dr. Suau to

21   write this negative feedback, that she wouldn't

22   have otherwise written this, that it was, say,

23   like, squeezed out of her.  And Dr. Haydel advised

24   her to talk to Dr. Elder about this.

25        Q.   Do you know if she did?

Dr. Eric Greenberg 7/30/2019

```
 1            A.    I do not know if she did.
 2            Q.    The next one is a complaint by a fourth
 3    year medical student and a nurse, that the medical
 4    student felt it was inappropriate, and the patient
 5    had a safety issue.  I'm going to hand you the
 6    e-mail.
 7                   MS. ECHOLS:  I've marked it as Exhibit
 8                   7.
 9                   (EXHIBIT 7 MARKED FOR IDENTIFICATION)
10                   MS. ECHOLS:  I don't have one for you,
11                   but it's on page 4 of that.
12                   THE WITNESS:  Again, Dr. Suau elicited
13                   this feedback from this resident, too.
14                   This isn't feedback that she would have
15                   normally written.  I was told after this
16                   incident not to talk to the intern, that
17                   he would get a story out of her.
18                      I had a patient that was dieing in
19                   front of me that needed a crash line.
20                   The kit that I opened up was faulty.  It
21                   didn't have Lidocaine in it.  I touched
22                   him one time with the needle, the
23                   patient jumped.  I got Lidocaine, tried
24                   to inject the Lidocaine, tried the
25                   central line again, because the patient
```

Dr. Eric Greenberg  7/30/2019

```
 1                      was, like I said, dieing in front of me.
 2                      We call it a crash line.  So you get a
 3                      line in as soon as you can.
 4      EXAMINATION BY MS. ECHOLS:
 5           Q.    But usually under local anesthetic,
 6      correct?
 7           A.    If a patient is dieing in front of you
 8      with no IV access, you get IV access however you
 9      need to get it.
10           Q.    How long does Lidocaine take to work?
11           A.    Variable, from seconds to minutes.
12           Q.    Seconds, okay.
13           A.    Could act immediately; could act 30
14      seconds to a minute.  I'm not --
15           Q.    I've had Lidocaine before, and it's not
16      3 seconds, believe me, but okay.  Go ahead.
17           A.    30 seconds, I said.  But regardless, the
18      patient was dieing in front of me.
19           Q.    Okay.  What was the patient dieing of?
20           A.    The patient had renal failure, had a
21      blood pressure of 80 over 40, mental status
22      changes, no IV access, with hyperpnea and renal
23      failure.
24           Q.    You don't agree with what's written in
25      the third paragraph:  "We both looked to see if it
```

```
 1    had been part of the outside of the kit and didn't
 2    see any.  I then asked if we could ask a nurse for
 3    Lidocaine; however, Dr. Greenberg declined."
 4         A.   I object to that part, because we did
 5    get Lidocaine at that point.  Lidocaine was
 6    brought to me.  I believe, and I was told that
 7    Dr. Suau had prepped this resident to write this
 8    letter.  She was instructed to do such.
 9         Q.   Okay.  This was 9/7/2016?
10         A.   Uh-huh (AFFIRMATIVE RESPONSE).
11         Q.   So again, pressure from Dr. Suau.
12         A.   And also a medical student with no
13    knowledge of patients would be an inappropriate
14    judgment on clinical skills.
15         Q.   Fourth year medical student?
16         A.   Uh-huh (AFFIRMATIVE RESPONSE).
17         Q.   Okay.  Is a specific fourth year medical
18    student that you don't think has that knowledge?
19         A.   I think medical students in the fourth
20    year don't have the nuance of a senior resident.
21         Q.   Okay.  I'm not going to argue, but even
22    I know you need anesthesia.  Okay.
23              MR. SCHMIDT:  I'm sure it goes without
24              saying, but I'm going to object to your
25              testifying in between the questions.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg  7/30/2019

```
 1              MS. ECHOLS:  I know.  I know.  It's just
 2         hard to contain myself.
 3   EXAMINATION BY MS. ECHOLS:
 4         Q.   Okay.  4/28/2016?
 5         A.   Yes.
 6         Q.   There was a patient who was treated as
 7   though she was drug seeking, delays in IV access,
 8   which led to a delay in pain medication.  This was
 9   by -- what did you say his first name was?
10         A.   Bruce Hurley.
11         Q.   Bruce Hurley.
12         A.   Again, at this point, I thought this
13   issue had been cleared up in its entirety.  This
14   is involving an intern that I had.  And it was --
15   I had e-mails and texts that show that this was
16   cleared up, that it wasn't me, but Dr. Suau would
17   not give up that it was me.  It was an intern that
18   I had.  It was stated that the white man in a vest
19   that did this to her.
20         Q.   Did you wear a vest?
21         A.    I frequently wore a vest.  Didn't wear
22   the vest at that time.  It was stated by Dr. Van
23   Meter that it wasn't me.  I have texts from
24   Dr. Haydel from me that said that she talked to
25   Van Meter, and that he cleared it up, that it
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg  7/30/2019

1   wasn't me.  But in the end, it was assigned to me

2   anyway.

3        Q.   Where are those text messages?

4        A.   All right.  5/5/2016, I had a

5   conversation with Dr. Haydel.  And she said that

6   Dr. Van Meter wants to talk to you about this.  I

7   met with Dr. Van Meter, and he said that I was not

8   at fault.  She sent me a text message on 5/5, that

9   he wants to talk to you.  He said he already said

10  that you are not at fault.  I had met with

11  doctor --

12       Q.   Wait.  Where are you reading this at

13  fault thing?  Is it in the text messages?

14       A.   5/5/16.

15       Q.   I didn't see anything from 5/5/16.

16       A.   I don't think it's in this -- it may

17  have been left out, but we can provide it.

18       Q.   Okay.

19       A.   I can provide it to you.

20            MS. ECHOLS:  We asked for all e-mails.

21            So I assume you'll provide it, Rob?

22            MR. SCHMIDT:  Can we go off the record

23            real quick.

24            (OFF-THE-RECORD DISCUSSION)

25            THE WITNESS:  Regardless, I met with

Dr. Eric Greenberg 7/30/2019

```
 1                    Dr. Suau on 5/6/2016, regarding the same
 2                    incident and explained him my side.
 3                    Told him that it wasn't me; it was my
 4                    intern.  I had a good interaction with
 5                    this patient.  I ordered narcotics on
 6                    her.  I worked through getting her the
 7                    IV access delay.
 8    EXAMINATION BY MS. ECHOLS:
 9         Q.   What do you mean you worked through it?
10         A.   So this happened at shift change.  So
11    shift change, you spend probably 45 minutes before
12    shift change changing over.  And then the new team
13    comes on and helps you out with any kind of
14    procedural stuff.  Like, as you're wrapping up,
15    they're starting up.
16         So a resident -- first I went to a nurse and
17    asked her for help with IV in this patient,
18    actually Ms. Sandra Irons.  And she had attempted,
19    was unable to get IV access in this patient.  I
20    then had a resident, who was coming on -- her name
21    escapes me right now, but I could come up with the
22    name -- but she agreed to help me -- she would do
23    IV access for this patient, and had difficulty
24    with IV access of this patient, as well.  It
25    wasn't until the next shift that they were able to
```

1    get IV access for this patient.

2         Q.   Did you ever try to get IV access?

3         A.   At this point, I don't remember if I

4    tried once or if the nurse -- I don't remember.  I

5    don't remember if I tried to get IV access.  But

6    at that point, we were focusing on signing out.

7    It was already told to me that it was being

8    handled.

9         Q.   Who told you it was being handled?

10        A.   The nurses, the oncoming resident.  They

11   told me they were taking care of it, that it was

12   off my plate.

13        Q.   So it wasn't an emergent situation?

14        A.   To get IV Dilaudid at that moment, by

15   the nature of being in the emergency department, I

16   didn't think it was an emergent situation.  But

17   the priority of operations, it was lower on the

18   priority, and it was being handled by other

19   residents.

20        Q.   Okay.  The next one is Number 6,

21   4/21/2016, which is on page 8.

22        A.   Yes, I see it.

23             MS. ECHOLS:  Mark this 8.

24             (EXHIBIT 8 MARKED FOR IDENTIFICATION)

25             THE WITNESS:  Talking about the Ketamine

```
 1              pain control?
 2     EXAMINATION BY MS. ECHOLS:
 3         Q.    Yes.
 4         A.    So in this regards, Dr. Mackey asked me
 5     to give -- I'm not using exact numbers --
 6     45 milligrams of Ketamine.  And I was trained that
 7     when you give Ketamine, you push 15 milligrams at
 8     a time, and you wait for clinical response.  I
 9     pushed 15, then another 15, and the patient had
10     clinical response to it.  I then went and talked
11     with Dr. Mackey, said, I gave 30 instead of 45.
12     Patient had clinical response, I didn't see the
13     need to give anything more than that, for patient
14     safety.  And he accused me of giving different
15     doses than he ordered.  If it would have happened
16     to any other resident, it would have been nothing.
17     It would have been standard operating procedure.
18         Q.    That a resident would give a different
19     dose than an attending ordered?
20         A.    A lower dose, giving a dose toward
21     clinical response, yes.
22         Q.    Okay.
23         A.    You wouldn't give a dose of a life --
24     more of a life-threatening medication than you
25     would have to.
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    Q.   You thought that Dr. Mackey ordered
2  something that was life-threatening to the
3  patient?
4    A.   I don't think it was life-threatening.
5  I think the medication in itself has a potential
6  to be life-threatening in higher doses.  If a
7  patient has a response at a lower dose, then
8  that's clinically just.
9    Q.   Okay.  4/5/2016, page 9.
10   A.   Yes.  So this is feedback, not a
11 complaint, bundled in a complaint.  He has fair
12 cases on this, and I've taken the feedback and
13 worked with it.
14        (EXHIBIT 9 MARKED FOR IDENTIFICATION)
15 EXAMINATION BY MS. ECHOLS:
16   Q.   So did you have a tendency to opt for
17 shortcuts?
18   A.   Yes.  I had templates.  I was actually
19 one of the residents that worked in developing
20 templates for notes in the chart for the
21 residencies.  I used -- was one of the ones that
22 helped everyone get used to dictation.  I did have
23 a tendency to use shortcuts to help clinically.
24 And Dr. Kanter's feedback was that this was
25 residency, you should be doing the slow version,

1    you know, the slow method of it, not using

2    shortcuts.  You can use shortcuts when you're out,

3    but more is better when documenting.  And I took

4    that to heart.

5         Q.   Okay.  So you agree with the bullet

6    points that he's got in the middle here, one, two,

7    three, four --

8         A.   Can I see the e-mail?

9         Q.   Yes, sure.  I thought you had a copy.

10   And that's 9.

11        A.   Yes.  This is feedback, not a complaint.

12   I believe that these are things that me or any

13   physician could improve on.

14        Q.   They're valid concerns?

15        A.   What?

16        Q.   Valid concerns?

17        A.   They're valid concerns for anyone, yes.

18        Q.   Okay.  But they're directed to you at

19   this point?

20        A.   They are directed to me at this point.

21   Again, it's feedback.  This is at a time that he

22   was giving feedback.  And you can see the e-mail,

23   it's titled "feedback," not complaint or...

24        Q.   Well, we don't know why he entitled it

25   "feedback."

Dr. Eric Greenberg 7/30/2019

```
 1        A.   Well, this is a moment when Dr. Suau is
 2   asking attendings to give feedback e-mailed to
 3   him.  I don't think it matches up to the level of
 4   a complaint.  I think this physician was trying
 5   to -- I asked the physician for feedback, and he
 6   gave his feedback to me.  I still think about this
 7   feedback today.
 8             (EXHIBIT 10 MARKED FOR IDENTIFICATION)
 9   EXAMINATION BY MS. ECHOLS:
10        Q.   Good.  And then the last one is --
11        A.   Do you want this back, or is this mine?
12        Q.   Yours.
13        By LeGros, wanted to give wrong antibiotic to
14   an infected, febrile ortho patient.
15        A.   Again, this is Dr. Suau kind of -- the
16   LSU packaging an innocuous thing to a complaint.
17   This was a, as you call them, PIMP questions.
18        Q.   I don't know what a PIMP question is.
19        A.   Stands for put in my place.  It's kind
20   of questions that an attending would ask; oh, if
21   you were to treat X, Y or Z, how would you treat
22   it.  There was never any patient involved with
23   this.  This was an academic discussion.  I think
24   she asked, if you were to treat a patient with
25   infected hardware, what would you use?  And I
```

Dr. Eric Greenberg 7/30/2019

Page 183

1    answered her a suboptimal thing.  She said, no,

2    it's this instead.  So it's really an academic

3    conversation, not a, I gave the patient the wrong

4    medication, which is presented in this case.

5         Q.   This e-mail that I just handed you

6    doesn't correspond with that about the wrong

7    antibiotic.  This is about dressing out in a gown.

8         A.   But they used this anyway for that.

9         Q.   In this e-mail, they're talking about

10   getting somebody stabilized, who was perhaps not

11   the most attractive patient?

12        A.   I'm confused about what you're saying.

13        Q.   Read the e-mail, or the text, whatever

14   it is.  He was vomiting, smelling of feces and

15   altered --

16        A.   Are we going to talk about this during

17   this specific complaint?

18        Q.   We're going to talk about this right

19   now.

20        A.   So this was -- she was not my attending

21   that night.  We had a patient that came in

22   vomiting blood that I treated, the intern was

23   taking care of.  I was supervising resident.  I

24   de-gowned, walked out of the room to do something

25   else and come back.  And she is not my

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1   attending -- I even have e-mails complaining about

2   this to other attendings and Dr. DeBlieux.  But

3   not my attending.  Saw me walk in the hallway and

4   said, get your gown back on, or get your mask back

5   on.  And I went in the room, got my mask back on,

6   did what I needed to do.  Went out and was still

7   yelled at and told that I was actively

8   disregarding her -- or disobeying her by not

9   wearing a mask.  It had nothing to do with the

10  patient.  He was stabilized, being taken care of

11  by the intern.  I'm the supervising resident.  I

12  have 50 emergent things to take care of at one

13  time.  This thing was taken care of.

14        Q.   So does the supervising resident have to

15  only -- I mean, do you only obey the attending

16  that is working with you on a specific night?

17        A.   That's my main concern, my main thing.

18  She wasn't even working in our area, or she was

19  just walking through.  This is the harassment that

20  she would do.  She would come from -- she was

21  working in the psych pod, if I remember right.

22  Would come into our pod to harass us and get us to

23  do extra work, like, throw us off our game.

24        Q.   And you just said --

25             MR. SCHMIDT:  Let him finish.

Dr. Eric Greenberg 7/30/2019

```
 1              THE WITNESS:  I even had e-mails and
 2              texts to Dr. DeBlieux about this, about
 3              complaining about her harassment.  If I
 4              could -- yes.  So September 1st, 2015 --
 5              or August 31st, 2015, sorry, I sent an
 6              e-mail to Dr. DeBlieux complaining and
 7              stating that Dr. Tuckler, who was my
 8              attending, thought that the whole case
 9              was ridiculous that she came in there
10              just to harass us.  And I apologized to
11              her, that I was being cordial during it,
12              but she was trying to start a fight with
13              me about it.  But her not as the
14              supervising attending, not involved with
15              the patient care, was just unrelated to
16              this case, just came in to yell at me
17              for not wearing a mask.
18    EXAMINATION BY MS. ECHOLS:
19         Q.   Are you finished?
20         A.   Yes.
21         Q.   Okay.  You said that, way back when you
22    were testifying, that "she came in to harass us."
23         A.   Me and the intern.  I don't remember who
24    the intern was.
25         Q.   Okay.  I thought you told me that they
```



Dr. Eric Greenberg 7/30/2019

```
 1    singled you out.
 2         A.   Well, whoever I was working with, too,
 3    also got flak with it.
 4              (EXHIBIT 11 MARKED FOR IDENTIFICATION)
 5    EXAMINATION BY MS. ECHOLS:
 6         Q.   Okay.  What's the deal with the VA?
 7         A.   VA?
 8         Q.   Yes.  Complaint Number 10, under
 9    deficiencies and professionalism and system base
10    practice.
11         A.   So when she -- I had a meeting with
12    Kathy Whittington and said that -- this is all
13    from recollection.  She said that I needed to fill
14    out a course for the VA, or some kind of training
15    for the VA.  I said, I'll do it, but part of my
16    agreement with CAP was that I wouldn't go off from
17    LSU.  So I was confused on what's going on,
18    because, with my license, they say I can't go away
19    from LSU, but you're requesting that I not stay at
20    LSU.
21         Q.   So you said that you are not going to
22    the VA, is what it sounds like.  "He would get
23    them to me eventually, but he was not going to the
24    VA.  I stated that everyone was going to the VA.
25    And again, he said he wasn't."
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1      A.   Again, I told her that it's because my

2  agreement with my license said that I couldn't

3  leave -- I can only rotate at LSU.

4      Q.   At UMC?

5      A.   Yes.

6      Q.   And so -- okay.

7      A.   It's confusing why this is even a

8  complaint.  And it was written on the request by

9  Dr. Suau.  And I'm not objecting to anyone doing

10 it; I was trying to clarify, am I staying here.

11 Like, I'm getting mixed messages.

12     Q.   Okay.

13     A.   I had --

14     Q.   Seems like Dr. Suau has a lot of pull

15 with the people that he works with, that he can

16 get them to do, write things --

17     A.   As any program director and director

18 would.

19     Q.   I will not argue.  Okay.

20     A.   There's a real kind of, like,

21 environment of fear around this program.  Every

22 year, we had to fill out an ACGME.  You had to

23 come in and intervene about fear of retaliation

24 with our program.  There were multiple complaints

25 to the ACGME about that.

Dr. Eric Greenberg 7/30/2019

```
 1          Q.    Who made those complaints?
 2          A.    I don't know who actually made.  I made
 3    one complaint.  Another resident made a complaint.
 4    There was an anonymous complaint made.
 5          Q.    You said this was a complaint to who?
 6          A.    ACGME.  I know that the ACGME intervened
 7    in this, as well.  But every year, we would
 8    have --
 9          Q.    Intervened in this, as well, what do you
10    mean?
11          A.    Intervened in the fear of retaliation
12    and the environment at LSU.
13          Q.    Okay.
14          A.    Or at the ER residency.  I remember
15    every year we had to fill out -- every year, we
16    had to fill out surveys for the ACGME, saying I
17    didn't feel retaliated.  Dr. Suau, one year -- I
18    think this is documented somewhere, someone
19    complained about it, that Dr. Suau tried to
20    persuade us to fill out these reviews incorrectly;
21    like, say that we're better than we are, because
22    ACGME could come in and shut down the program at
23    any time.  I know someone submitted an anonymous
24    complaint to the ACGME about it.  Dr. Suau accused
25    me of submitting that complaint.  And that was the
```

Dr. Eric Greenberg 7/30/2019

1   complaint was submitted a day before he terminated

2   me.

3       Q.   So he asked you-all to inflate your

4   abilities on these forms to the ACGME?

5       A.   He said --

6       Q.   And --

7       A.   Sorry.

8            MR. SCHMIDT:  Everybody let everybody

9            finish.

10           THE WITNESS:  I'm sorry.  I'm sorry.

11           MS. ECHOLS:  And I'm jumping in on you,

12           too.  That's the way we talk in normal

13           conversation.

14           MR. SCHMIDT:  It is, but it makes it a

15           lot more difficult in reviewing the

16           deposition.

17           MS. ECHOLS:  Yes, it does.

18           THE WITNESS:  Very sorry.

19   EXAMINATION BY MS. ECHOLS:

20       Q.   That's okay.  So I don't even remember

21   my question now.

22       You said an anonymous complaint, and Dr. Suau

23   wanted you to fill out these evaluations and kind

24   of inflate your knowledge?

25       A.   No.  Inflate that -- he said that if we

1    have a concern about retaliation, come to him

2    about it, don't complain to the ACGME about it,

3    because nothing good is going to happen with the

4    ACGME; they're going to put us on probation.

5    We're already in trouble with the ACGME about a

6    retaliation and concerns about retaliation.  I

7    think I even have an e-mail somewhere with Siavash

8    Sarlati from 4/18, about grievances should be

9    brought to members and not the ACGME, but they

10   were concerned about these ACGME reviews, because

11   there were, every year, concerns about retaliation

12   and fear of getting feedback.

13       Q.   Okay.  So had -- while you were there,

14   or did you hear about while you were there,

15   residents being terminated from the program for

16   retaliating?

17       A.   I know doctor -- or Joseph Framin almost

18   was terminated for complaining about retaliation

19   and complaining about treatment.  I was terminated

20   in retaliation for complaining.  Dr. Suau accused

21   me of filing this anonymous ACGME complaint.  And

22   I was terminated the day after the complaint was

23   turned in.  And I know other people have

24   complained to the ACGME about Dr. Suau, it was

25   told to me, tried to terminate another resident

```
 1    after me for complaining about retaliation.  But
 2    this is a problem that I -- I felt this personally
 3    in this program.  Other people have felt it.  I
 4    have witnesses that can attest to this, too, they
 5    have felt retaliation.
 6         Q.   Is the retaliation more of a personality
 7    difference, or is it because of your ADHD?
 8         A.   It's both.
 9         Q.   Can you explain to me?
10         A.   I asked for accommodations.  I was
11    punished because I had these accommodations, was
12    insulted, called retarded by Dr. Suau, texted to
13    me that I'm retarded, insulting text messages.
14    And when I complained about my treatment by
15    Dr. Suau and harassment, I was terminated.  And I
16    think you guys have those text messages, too.
17         Q.   I don't know.  I mean, we asked for
18    them.  I'm not sure if we have them all.  I only
19    got, like, five.  I don't know if you provided
20    them to LSU or not.
21         A.   But I was actively insulted and targeted
22    and punished because of my ADHD, like, Judaism,
23    many different factors.
24         Q.   Okay.  This is a letter or --
25         A.   This is the same VA, we were talking
```

1    about before.

2         Q.    But she doesn't say anything about you

3    telling her that it was a conflict between your

4    LSU and license and all that.  She just -- is she

5    a friend of Dr. Suau's?

6         A.    She's Dr. Suau's secretary.

7         Q.    Okay.

8         A.    And paid for by the program.

9         Q.    Okay.

10        A.    This is just a Word document.  When was

11   it e-mailed or created, too?  It's just a Word

12   document that says March 6, 2017.

13              (EXHIBIT 12 MARKED FOR IDENTIFICATION)

14   EXAMINATION BY MS. ECHOLS:

15        Q.    Okay.  Again, I'm looking at page Number

16   13, which is under Number 12.  And this says that

17   the medical record was falsified, and it was by

18   Dr. Mackey.  So again --

19        A.    Dr. Mackey never took any testimony from

20   me or talked to me about this whatsoever.

21        Q.    Okay.

22        A.    I documented very minimally my course of

23   what happened.  I don't know if there's any

24   falsifications in this.  Dr. Mackey -- thank

25   you -- like I said --



Dr. Eric Greenberg  7/30/2019

```
 1          Q.    Did I give you 13?
 2          A.    -- I said that patient was getting up,
 3    patient was jumping.  I told you I touched the
 4    needle to the patient's neck, patient jumped.  Got
 5    Lidocaine, patient jumped again.  I put in as
 6    minimal as I could.  And it's also Dr. Mackey's
 7    opinion on this, as well.  Dr. Mackey is one of
 8    Dr. Suau's people.
 9              MR. SCHMIDT:  There are exhibit numbers,
10              there are numbers on here, and then
11              there are page numbers.  They're all
12              kind of in the same range, right?
13              MS. ECHOLS:  Right.
14              (OFF-THE-RECORD DISCUSSION)
15              (EXHIBIT 13 MARKED FOR IDENTIFICATION)
16    EXAMINATION BY MS. ECHOLS:
17          Q.    This is Number 23.  And I don't
18    understand.  LeGros, is he called Slick?
19          A.    Slick is another physician.
20          Q.    So this must be somebody else
21    complaining.
22          A.    Can I see it?
23          Q.    Sure.
24          A.    No.  The Slick underneath is someone
25    giving feedback about another resident or someone
```

```
 1   else.  It could be about me, I don't know, because
 2   it's blacked out.
 3            MS. ECHOLS:  This is page 27, 28.
 4            MR. SCHMIDT:  Oh.
 5            THE WITNESS:  Again, this was never
 6            given to me, ever.  Never presented to
 7            me before this termination.  And it's by
 8            Dr. LeGros, and after I complained --
 9            retaliation about -- complained about
10            harassment, to where -- and having
11            constantly -- I don't think I make
12            authoritative statements that are
13            patently false.  Doesn't have any
14            productive feedback, either.  These are
15            just the rantings of someone.
16   EXAMINATION BY MS. ECHOLS:
17        Q.   Did you ever talk about literature and
18   things that you had read in the ER?
19        A.   Which one are you looking at?
20        Q.   At the very bottom, the last paragraph:
21   "I am concerned that these falsehoods he
22   continually spreads about the literature will be
23   believed by lower levels and off-service interns."
24        A.   We've never talked about that, between
25   the two of us.  She told me to --
```

Dr. Eric Greenberg  7/30/2019

```
 1        Q.    My question was:  Did you ever talk in
 2   the ER about literature and things that you had
 3   read or researched?
 4        A.    Everyone talks about stuff that they
 5   have read or researched.
 6        Q.    Okay, so you did?
 7        A.    I think the answer to that is, everyone
 8   does that.
 9        Q.    But I asked you specifically about you.
10   I'm just concerned with you today, so.  And the
11   paragraph up from there, it says, "he is the
12   poorest performing of all the interns I have
13   worked with in many years.  He needs serious
14   intervention."
15        A.    I think these show a personal issue
16   between Dr. LeGros and I.  I mean, I guess as an
17   intern, it's -- an intern is not expected to
18   have -- intern didn't know everything.  I didn't
19   know the up-to-date literature.  I was going off
20   information from med school.  I was given that
21   feedback, too.  I wouldn't expect anyone to expect
22   an intern to know everything.
23        Also, I mean, I don't think I ever said there
24   are really no good studies regarding broad
25   spectrum antibiotics in sepsis within the United
```

Dr. Eric Greenberg 7/30/2019

1    States.  I don't think I ever -- those words ever
2    came out of my mouth like that.
3        Q.   Okay.  One more question.  You said you
4    never actually worked at Lallie Kemp?
5        A.   I worked as a resident.  I never worked
6    independently as a moonlighter at Lallie Kemp.
7        Q.   Okay.
8        A.   And I never ever said -- going back
9    reading this, this reminds me, this was one of the
10   things that I complained about with Dr. LeGros, as
11   an intern.  She had come up in her mind that I
12   told people that I was the best resident, that I
13   was the top of the class.  And she pulled me aside
14   one day saying you're not -- "I heard you're
15   telling people this, and you're not even close to
16   the top of the class.  I want to kick you out."
17   And it's not something I would ever say that I'm
18   top of the class.  I know I'm not top of the
19   class.  It's something that's ridiculous.  She's
20   very extreme in the way she presents things.
21       I will agree with eating at the doctor's
22   desk.
23       Q.   Because Dr. DeBlieux doesn't work at
24   night?
25       A.   I said that.  I'll agree to saying that.

Dr. Eric Greenberg 7/30/2019

```
 1          Q.    Okay.

 2          A.    I probably --

 3          Q.    And I know everybody does that, too,

 4   because we all are guilty of that, your boss is

 5   not around.

 6          A.    I don't know if I ate four to five

 7   different types of snacks and large drinks with

 8   him at all times.  This stuff is ridiculous, when

 9   read.

10                (EXHIBIT 14 MARKED FOR IDENTIFICATION)

11   EXAMINATION BY MS. ECHOLS:

12          Q.    Okay.  The next one is on page 28, which

13   corresponds with --

14          A.    Talking about Avegno?

15          Q.    No.  It's actually from Murphy-Lavoie.

16          A.    I'm seeing Number 28 as --

17          Q.    No.  I meant page 28.  I'm sorry, page

18   28, which I'm trying to find out where it is.

19                MR. SCHMIDT:  Isn't page 28 the one we

20                were just looking at?

21                MS. ECHOLS:  No.  We were just

22                looking --

23                THE WITNESS:  Yes.  He says pages 27,

24                28.  So this was interesting, because --

25                MS. ECHOLS:  Maybe this was 29.  I can't
```

Dr. Eric Greenberg 7/30/2019

```
 1              read his numbers.
 2              MR. SCHMIDT:  Hold on.  This is 28, the
 3              one with Slick down here.
 4              MS. ECHOLS:  Okay.  So this must be 29.
 5              I was confused, because --
 6              MR. SCHMIDT:  It does look like an 8.
 7              Actually, there are two 28s.  There are
 8              two 28s.
 9              MS. ECHOLS:  Okay.  Well, two pages, I
10              guess.
11              MR. SCHMIDT:  Yes, two pages labeled 28.
12              MS. ECHOLS:  Okay.
13  EXAMINATION BY MS. ECHOLS:
14       Q.   So the one I am looking at now is the
15  gmail, the one with the clinical -- CCC.
16       A.   Okay.
17       Q.   And I just had a question about that
18  conference attendance.
19       A.   Yes.  I remember I brought up concerns
20  about this, because it was calculated wrong.  The
21  conference attendance wasn't calculated over the
22  whole year.  She was calculating it -- when she
23  did the calculations, she calculated it, like, for
24  the month.  The calculation was wrong.  I remember
25  having verbal conversations with Dr. DeBlieux
```

Dr. Eric Greenberg 7/30/2019

1   about this.  And regardless, I said I'd make it

2   better, I would change it.  I didn't have any

3   objections to the conference -- oh, I remember

4   what it was.  So there are two separate things

5   that were recorded.  It was conference attendance

6   and asynchronous wording.

7        Q.   And what?

8        A.   Asynchronous wording.  It's like studies

9   you do, research, how many hours towards that.

10  You need to plug in so many hours.  I had not

11  logged my hours for that quarter yet.  I told them

12  I haven't logged it.  When you calculate it, it

13  says, with your attendance plus a zero for the

14  asynchronous, you're below 50.  So I remember --

15  this is a verbal conversation with Dr. DeBlieux --

16       Q.   I just need to --

17       A.   -- I'll log my hours.  I'm not

18  deficient.  It's just a logging issue.

19       Q.   Okay.

20       A.   But it was brought up like it was a

21  serious concern.

22       Q.   There's also other concerns in there

23  about you have several documented episodes of

24  being disparaging or disrespectful with respect to

25  your patients.

```
 1        A.    I could see those concerns and stuff
 2   that I worked on throughout residency.
 3        Q.    And they recommended you go to
 4   sensitivity training, but that was thwarted by Dr.
 5   Suau?
 6        A.    Yes, which is interesting because at
 7   this point when they were sending these e-mails,
 8   which were documented November, they were
 9   constantly sending two years of feedback to a dead
10   e-mail from my med school that I wasn't receiving.
11   There's no opportunity for me to respond to these
12   e-mails.  Even if you look, it says, "Cc:
13   Eric.greenberg@mssm.edu."  So they were sending
14   all these recommended changes to a dead e-mail.
15        Q.    But they put also egreenberg87@gmail?
16        A.    Yes, but these were weeks and months of
17   these feedbacks being sent to a dead e-mail.
18        Q.    But they also copied you on your current
19   e-mail.
20        A.    Later in November.
21        Q.    Okay.  I guess it doesn't identify.  I'm
22   not IT literate.  But this was in 2015, and
23   Dr. Suau was not the program director at that
24   time, correct?
25        A.    He was not.
```

Dr. Eric Greenberg 7/30/2019

```
 1              (EXHIBIT 15 MARKED FOR IDENTIFICATION)
 2    EXAMINATION BY MS. ECHOLS:
 3         Q.   The last one I have is a letter
 4    regarding a discussion you had in 2016, on
 5    September 9th, with Avegno, DeBlieux, you and
 6    Dr. Suau?
 7         A.   Yes.
 8         Q.   What was the deal with your interview in
 9    Austin in 2016?  It's in the second paragraph.
10         A.   So, yes.  When I -- again, the bait and
11    switch by Dr. Suau.  I was never told I couldn't
12    go to Austin for an interview.  Never told to
13    cancel it.  And then when I get back, they tell
14    me, oh, no, we talked to you about that, we
15    discussed this.
16         Q.   Was there an administration fellowship
17    in Denver that you were also applying for?
18         A.   Yes.
19         Q.   And you said -- did you say that you
20    would be fired within a year because of your
21    personality?  It's in quotes.
22         A.   I don't think I said that as to that.
23         Q.   Okay.
24         A.   I maybe said I don't know if I'd last.
25    Currently, I don't know exactly what I said, but I
```



Dr. Eric Greenberg 7/30/2019

```
 1    don't think I said you'd be fired within a year
 2    with my personality.
 3         Q.   And then they talk about that central
 4    line again?
 5         A.   Yes.
 6         Q.   And did you report that you had
 7    performed that sort of behavior on multiple other
 8    procedures without appropriate medications?
 9         A.   I told Dr. Suau that I had performed
10    crash lines before, when it needed to happen.
11         Q.   Okay.
12         A.   There are situations that a crash line
13    is --
14         Q.   I understand.
15         A.   -- patient is dieing, what are you going
16    to do.
17         Q.   Okay.
18         A.   It's brought that I -- it was repackaged
19    by Dr. Suau that I had behaviors of harming
20    patients in the past, when that's not what I said.
21         Q.   Okay.  So when we talk to Dr. Avegno and
22    Dr. DeBlieux, that you discussed that you reported
23    not feeling anything for the patients; is that not
24    true?
25         A.   I don't think that's true.
```



 1        Q.    Okay.

 2        A.    They were trying to summarize, did you,

 3   you know -- they were summarizing stuff.  They

 4   said, "oh, did you talk with Dr. Suau yesterday

 5   about this stuff?"  I must have said, yes, to it.

 6   They go in, "well, you talked about these things,

 7   you assented to all this."  I didn't say about not

 8   feeling anything for patients, nothing to the

 9   like.

10        Q.    It said you continued describing that

11   you're worried about how you are feeling

12   emotionally dead and feel nothing; is that not

13   true?

14        A.    I could say that, yes, I felt like I was

15   depressed at that point.  I don't think I

16   said nothing.  I felt like I was having emotional

17   trouble with depression and burnout.

18        Q.    And did you say that, to the program

19   director, you shouldn't trust you caring for

20   patients?

21        A.    No.  I remember what I said is that I

22   feel that my quality is decreased because of my

23   burnout.  Like, I feel my quality is down.

24        Q.    And it said -- did you talk to Dr.

25   DeBlieux before you went into this meeting?

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        A.    Yes.
 2        Q.    And did you tell him you felt out of
 3   control?
 4        A.    I remember telling him that I felt this
 5   situation is getting out of control, that with
 6   Dr. Suau and everything, it's out of control at
 7   this moment.
 8        Q.    Okay.  And did you cry with Dr.
 9   DeBlieux?
10        A.    Yes, I did.  I was scared, because I
11   knew Dr. Suau would take this, like, way out of
12   control.
13        Q.    The previous day, did you make a
14   statement about not feeling safe working with
15   patients, and that you hated working in a hospital
16   setting?
17        A.    No.  I remember I told him I hated
18   working at UMC and felt it was a bad environment,
19   and I felt like I was burnt out.
20        Q.    And what about that they had been
21   progressively getting worse since you had been in
22   the ICU in June; is that fair?
23        A.    Yes.  I remember telling him that my
24   burnout was getting worse after the ICU.  And I
25   also disagree that I had not been compliant with
```

Dr. Eric Greenberg 7/30/2019

1   my medications.

2        Q.   Okay.  But that will show up in

3   Dr. Roniger's records?

4        A.   Sure.  Yes.

5        Q.   Yes.  And I don't know exactly where I

6   read this --

7        A.   And all this was predated on Dr. Suau's

8   harassment of me and just not helping me or doing

9   what he needed to do for a program director to not

10  create a hostile environment.

11       Q.   Okay.  So after this point is when you

12  went inpatient, correct?

13       A.   No.

14       Q.   No?

15       A.   Not inpatient.

16       Q.   Tell me about that.

17       A.   What?

18       Q.   Tell me about what happened after this

19  September meeting.

20       A.   I agreed to go to an outpatient

21  residential treatment program.  I was there for 6

22  weeks initially.  I agreed to extend to 12 weeks.

23       Q.   So you didn't stay in the hospital; it

24  wasn't inpatient?

25       A.   No.

Dr. Eric Greenberg 7/30/2019

```
 1        Q.    Okay.
 2        A.    And I was told multiple times by
 3   Dr. Suau inpatient, inpatient, trying to denigrate
 4   me further.  There was never any inpatient stay to
 5   anything.  It was I went there during the week,
 6   went home on the weekends.
 7        Q.    You stayed overnight there, though?
 8        A.    In an apartment.  I rented an apartment
 9   there.  You went to therapy during the day.
10   There's no inpatient to anything.
11        Q.    Okay.
12        A.    You know, during the time, again, they
13   were concerned that there were a lot of issues at
14   LSU, and they were concerned with, you know, if I
15   go back, no matter what happens, Dr. Suau is going
16   to try to fire me no matter what.  They voiced
17   that concern, that he was going to try to find
18   something or do something.
19        Q.    I'm sure that will show up in the
20   records, right?
21        A.    Yes.
22        Q.    Okay.
23        A.    Or depends on what they wanted to
24   document.
25        Q.    Well, who told you that?
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        A.   A therapist there.
 2        Q.   What therapist?
 3        A.   I forgot her name.  That there's
 4   problems with the environment there.  It's stuff
 5   with me, but they had concerns about me going back
 6   and working with Dr. Suau.  And when I went back
 7   for re-evaluation, they said, "we are really
 8   concerned.  We are worried that no matter what
 9   happened with you and Dr. Suau, his personality is
10   such that he's going to try to find any way to
11   retaliate or do anything to you."
12        Q.   Okay.  Did you ever consider, when you
13   were in LSU's residency program, leaving the
14   program and going to find another residency
15   program?
16        A.   There was a point, yes, that I
17   considered transferring because of treatment with
18   Dr. Suau and Dr. LeGros, but I looked into the --
19        Q.   I don't even know if that's something
20   you can do.  Can you do that?
21        A.   It's a possibility -- it's extremely,
22   extremely hard, near impossible.
23        Q.   Okay.  Because I thought I read
24   something about radiology or ophthalmology.
25        A.   No.
```

AmersonWhite®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        Q.    No.
 2        A.    That was something after I got
 3   terminated.  I had a conversation with Dr. Van
 4   Meter where he suggested, "well, you should go to
 5   a program somewhere in New York where there's a
 6   lot of Jews" -- my mother was on this
 7   conversation, as well, and can attest to this --
 8   "where there's a Jewish program director, a lot of
 9   Jews that would be more sympathetic to this,
10   unlike here at LSU."
11        Q.    Who said that to you?
12        A.    Dr. Keith Van Meter.  And my mom can
13   attest to this.  It was in August of 2017.
14        Q.    And your mom was in New Orleans for it?
15        A.    Yes.  It was on the phone, me, my mom
16   and Keith Van Meter.
17        Q.    I know Keith's wife.  I don't know him.
18        A.    And he said, "well, why don't you look
19   to transfer to radiology or something else."  But
20   there was never a recommendation to transfer to
21   radiology or ophthalmology ever.
22        Q.    Okay.  And he said it was because you
23   were Jewish?
24        A.    He said that I should look into programs
25   in cities like New York, Philadelphia, because
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    there's more Jews there, or they would have a
2    Jewish program director that would be more
3    sympathetic to this.
4         Q.   Did they suggest Tulane?
5         A.   Well, Tulane doesn't have an ER program.
6         Q.   But as far as changing to accommodate
7    your religious --
8         A.   They never did.
9         Q.   I went to Tulane, so.
10        There was also something in the records about
11   you seeing Paul Applebaum at Columbia?
12        A.   Yes.  I went to go get a neutral
13   evaluation by Paul Applebaum, who was the former
14   chairman of the American Psychiatry Board.  And he
15   refuted a lot of the diagnoses that -- provide
16   that to you, it's discovery -- that was done by
17   CAP and over at LSU.
18        Q.   The witnesses you had when you made your
19   EEOC complaint --
20        A.   Yes.
21        Q.   -- I don't think we talked about Lisa
22   Moreno, have we?
23        A.   We have not.
24        Q.   What did she testify to?
25        A.   She was testifying, I believe, that

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1    Dr. Suau did not go through the proper channels of
 2    probation and remediation with the resident.
 3         Q.   What is her position at LSU?
 4         A.   I don't know currently, no.  She's
 5    professor.  She's within the emergency medicine
 6    department.  I don't know her --
 7         Q.   But she was your witness?
 8         A.   Yes.
 9         Q.   Okay.
10         A.   Talking about during ad hoc or EEOC.
11         Q.   EEOC.  I could be wrong.
12         A.   Well, during the ad hoc.  I think this
13    is during ad hoc.
14         Q.   And also Jorge Martinez?
15         A.   Yes.
16         Q.   And Dr. Haydel?
17         A.   Yes.
18         Q.   Okay.
19         A.   And they testified that these are
20    behaviors normal for any resident, that Dr. Suau
21    was going above and beyond his treatment of me,
22    and that he's targeting behavior on me and created
23    a hostile environment.
24         Q.   Okay.  Will all these three doctors
25    testify to the same?
```

```
 1        A.    Dr. Martinez and Dr. Haydel do, I
 2   believe so.
 3        Q.    And Dr. Moreno was regarding the
 4   process?
 5        A.    Yes.
 6        Q.    Okay.
 7        A.    You'd have to get the records to get
 8   exactly what they said, from the ad hoc.
 9        Q.    Okay.  So -- and I apologize.  These are
10   just some notes that I just jotted down last night
11   late.  When you made your EEOC claim, you didn't
12   make a claim of sexual harassment like you did in
13   your complaint here.  What is your complaint of
14   sexual harassment?
15        A.    That Dr. Suau had multiple lewd sexual
16   comments in front of me and others in the ER.
17        Q.    What kind of lewd comments?
18        A.    He would report about residents needing
19   to, quote, I believe was, "you should go fuck that
20   nurse, why aren't you doing it."
21        Q.    That was not to you; is that right?
22        A.    Just in my -- to another resident when I
23   was sitting there.  I mean, I thought that was
24   extremely disrespectful, to me, saying about this
25   nurse, "oh, I wish I could fuck her."
```



Dr. Eric Greenberg  7/30/2019

1      Q.   Did you tell him it was inappropriate at

2   the time?

3      A.   Yes, I did tell him that was

4   inappropriate at the time.  I told Dr. Haydel

5   about this, as well.

6      Q.   So the nurse is the only lewd comment

7   that he made?

8      A.   Two separate times.

9      Q.   On the same nurse?

10     A.   Yes, same nurse.

11     Q.   Okay.  Must like that nurse.

12   That's the extent of the sexual harassment?

13     A.   Yes.  Oh, he commented about my weight,

14   but that's more --

15     Q.   That's -- I don't think weight is

16   sexual, but, you know, who knows.

17   Also, in your EEOC claim, you made a claim

18   about denial of accommodations.

19     A.   Yes.

20     Q.   Is that the one time you were talking

21   about with the testing?

22     A.   Yes.

23     Q.   So it was only one denial of an

24   accommodation you requested?

25     A.   Yes.  That was the only test that we

```
 1    would take -- we take one test a year.  It's very
 2    important.  It's like the test.
 3         Q.    Boards or whatever?
 4         A.    Preboards, yes.
 5         Q.    Yes.  And then there's so many
 6    documents, but there was something about you
 7    tapping too loud on your computer?
 8         A.    Yes.
 9         Q.    When was that?
10         A.    That was after treatment, after getting
11    back to LSU, he singled me out in a roomful of
12    taking people, that I'm too loud at writing on a
13    paper or too loud at erasing stuff, that you're
14    being disruptive, and we could -- insinuating that
15    he could fire me because of that.
16         Q.    Because you were too loud writing on
17    paper --
18         A.    Yes.
19         Q.    -- or the clicking or both?
20         A.    Both.  You had a computer to put it in,
21    and you had a paper with notes.  That I'm too loud
22    at clicking things on a keyboard.  And that's just
23    only me of the 2 -- 60 residents, he goes to just
24    me with clicking too loudly.
25         Q.    Okay.  When you went down to interview
```

Dr. Eric Greenberg 7/30/2019

Page 214

1    at LSU, Lebas -- was that the guy who made the
2    anti-Semitic comment?
3          A.    Yes.
4          Q.    Why did you wait until April 4, 2017, to
5    file a discrimination claim?
6          A.    Because I thought I would be retaliated
7    against.  I was already being retaliated.  I was
8    totally afraid.  Dr. Lebas has significant
9    political standing power.  His father is a state
10   senator, and they're on the hospital finance
11   board.  He has considerable power within the
12   program.  I was fearful about retaliation.
13         Q.    There was a mention of you having an
14   offer of employment in 2016.  What was that offer
15   of employment?
16         A.    I got offered -- in 2016?
17         Q.    Yes.
18         A.    I don't know.  I don't remember any
19   offer of employment in 2016, to be honest.
20         Q.    Okay.
21         A.    If you could bring it back to me or tell
22   me about that.
23         Q.    I apologize, I can't do that.
24         The other medications that you're on, who
25   prescribed those medications, like Zofran and

1    Propranolol.

2         A.    Either my father, who is my primary care

3    physician, or my psychiatrist or Dr. Sandberg.

4         Q.    Okay.  It's a beta blocker.  Do you have

5    heart problems?

6         A.    It's used for social anxiety.

7         Q.    Okay.  Is it allowed for a family member

8    to prescribe for another family member?

9         A.    I think you're allowed to prescribe, but

10   not to bill.

11        Q.    While you were at LSU, you had the save

12   of the month three times.  What is that?

13        A.    I don't remember exactly what it was,

14   but it's a resident that would do something

15   spectacular or save a patient or do something that

16   was above and beyond your duty.

17        Q.    So you had one in August of 2014.  Do

18   you remember?

19        A.    I forgot what they were.  I mean, I

20   could come up with them later.

21        Q.    September and November 2015.

22        A.    I don't remember what they were.

23        Q.    Okay.  You also said you were on the

24   UMCNO medical records committee?

25        A.    Yes.



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        Q.    Representing the ER.  How long were you
 2   on that committee?
 3        A.    Approximately 3 months, 4 months.
 4        Q.    What were your duties and
 5   responsibilities?
 6        A.    I would go to the meetings and listen.
 7   It was more of an observership.
 8        Q.    Is that something that all the
 9   residents --
10        A.    No.
11        Q.    -- participated?
12        A.    Someone from the department nominated me
13   for it, because I wanted to do administrative and
14   business medicine.
15        Q.    Okay.
16        A.    And I have an interest in documentation
17   and IT with healthcare.
18        Q.    Okay.  So LSU is not on Epic, right?
19        A.    Yes.
20        Q.    Do you like Epic?
21        A.    I wish I could afford Epic in my own
22   private practice.
23        Q.    But you only sat on that committee for 3
24   months; is that right?
25        A.    And then all the stuff happened.
```

Dr. Eric Greenberg 7/30/2019

```
 1          Q.   So when was that?
 2          A.   I think at the beginning of my fourth
 3     year, I went to two meetings with it.  They met
 4     monthly.  And honestly, I just sat there and
 5     listened to the actual executives talking and do
 6     stuff.
 7          Q.   Absorbed?
 8          A.   Yes.
 9          Q.   It also said you were resident director
10     of the LSU ER department clinical quality review
11     panel.
12          A.   Yes.
13          Q.   And what is that?
14          A.   So I think that lasted, like, a year or
15     so.  We would have and evaluate quality measures
16     in the ER; like, is this patient being treated for
17     lumbar fracture, pain medication, is pneumonia
18     being seen and treated.  My thing was ER
19     follow-ups; so how are we addressing patients that
20     are coming frequently to the ER, and what could we
21     do to treat them better, get better resources
22     around them, social worker, document better.
23     Because the way the healthcare works, if you have
24     a revisit within a certain amount of days, they
25     don't pay.  The state won't pay for that.  It's
```

1  non-reimbursable visit.  Plus, the patient is
2  getting more healthcare.
3       Again, I wanted to try to identify what's
4  going on in our ER that's caused this.  We would
5  get cases every month, discuss it.  I had four or
6  five residents underneath me that would do it with
7  me.  We'd meet monthly and go over these cases and
8  kind of create an action plan.
9       Q.   Okay.  When you say the state wouldn't
10 pay for it, what do you mean?
11      A.   So I think Medicaid -- there's Medicaid
12 laws that -- this isn't anything particular to
13 Louisiana -- but if you have, like -- and this is
14 all based off my 2017 knowledge of the healthcare
15 act.  This is kind of weird that we're getting
16 into this.  But if you have, say, like pneumonia,
17 heart failure, and there's a third one -- I forgot
18 which one -- and you're discharged from the
19 hospital, and you go back to the same hospital ER
20 with the same complaint within 30 days, it's not
21 reimbursable.  Like, the insurance Medicare or
22 Medicaid will not pay for it.  So it's a
23 financial --
24      Q.   They wouldn't pay, the state, because I
25 mean, the patients -- as far as you know, are the

Dr. Eric Greenberg 7/30/2019

```
 1    patients paying?
 2         A.    No.
 3         Q.    At UMC, isn't it a sliding scale,
 4    according to their economic?
 5         A.    This is with Medicare and Medicaid
 6    patients.
 7         Q.    I understand.
 8         A.    UMC takes all patients.
 9         Q.    I know.  Well, what's the majority of
10    UMC's patients?
11         A.    Honestly, I don't know, but Medicaid,
12    Medicare.
13         Q.    Okay.
14         A.    But these are standard nationwide rules.
15         Q.    I do medical malpractice for LSU, too,
16    so we always get those waived.
17         Also neonatal resuscitation program training,
18    was that special to you?
19         A.    Everyone did that.  The whole residency
20    did that.
21         Q.    AHLS radiological incidents and
22    terrorism training?
23         A.    That was something I was nominated for,
24    I think by Dr. Moreno and Dr. Tuckler.  Had to
25    take a special course and do that.  At one point,
```

Dr. Eric Greenberg 7/30/2019

```
 1    I thought I was going to do toxicology.  I was
 2    interested in that.
 3         Q.   Okay.  Is that, like, what is
 4    radiological --
 5         A.   If someone let off a dirty bomb in New
 6    Orleans, they would call me and --
 7         Q.   Okay, I just want to make sure.  And
 8    then NOHDEMS medical control?
 9         A.   That's something everyone did.
10         Q.   Okay.  While you were at LSU, did you
11    have any particular friends that you hung out with
12    that were other residents that maybe you didn't
13    work with, but --
14         A.   Well, there are no other -- I hung out
15    with Aisha Parker.  And then I mainly kept to
16    hanging out with Tulane residents and other Jewish
17    residents and Jewish people in the city.  I was on
18    a board with Touro Hospital, like a young Jewish
19    professional board.  And that was my social life.
20         Q.   Okay.  When I read over your Elmhurst, I
21    guess I just got the comprehensive report.  I
22    didn't get all the testing, data and all that kind
23    of stuff.  You didn't mention the discrimination
24    as far as --
25         A.   I did.  I did to them.  And they
```

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1   recommended -- they said, "this is off the record,
 2   you should get a lawyer now for this."
 3         Q.   And who recommended that to you?
 4         A.   Her name was Robin, but the woman there.
 5   She said, "this is all off the record, but get a
 6   lawyer right now.  Right now, get a lawyer."
 7         Q.   Okay.
 8         A.   And I told pat -- CAP about it.  I told
 9   Scott Embley, who didn't record it.
10         Q.   Who is pat cap?
11         A.   I'm sorry, CAP.  I told CAP, PHP about
12   it.
13         Q.   I thought you said pat cap.  I was,
14   like, it's a new doctor.  Okay.
15         A.   I made everyone aware of it.  They
16   didn't record it.  But I know I made Elmhurst, I
17   made Pinecrest.  I made everyone aware that
18   there's anti-Semitic remarks, behavior.  One woman
19   even, at Elmhurst -- or Pinecrest told me, "well,
20   it's the south, get used to it," one of the
21   therapists.
22         Q.   Anti-Semitic --
23         A.   Yes.
24         Q.   -- is indigenous to the south?  Okay.
25   Are you currently seeing any doctors now?
```



Dr. Eric Greenberg 7/30/2019

```
 1         A.    Yes.

 2         Q.    Any psychiatrists?

 3         A.    Yes.

 4         Q.    Who is that?

 5         A.    His name is Samy, S-A-M-Y, Wassef,

 6    W-A-S-S-E-F.

 7         Q.    He's in Michigan?

 8         A.    Yes.

 9         Q.    Is he a psychiatrist or psychologist?

10         A.    Psychiatrist.  I see him every 3 months.

11         Q.    For medication management?

12         A.    Yes.  And I see Cathy, C-A-T-H-Y,

13    Pietrofesa, P-I-E-T-R-O-F-E-S-A.

14         Q.    And is that for talk therapy?

15         A.    Yes.

16         Q.    Okay.  How often do you see her?

17         A.    Monthly.

18         Q.    And that's also in Michigan?

19         A.    Yes.

20         Q.    Okay.

21               MR. SCHMIDT:  Real quick restroom break.

22               (RECESS 4:00-4:05 P.M.)

23    EXAMINATION BY MS. ECHOLS:

24         Q.    I'm just going to go down your list of

25    current and former employers, independent
```

Dr. Eric Greenberg 7/30/2019

```
 1    contractors.
 2         A.    Which list is this?
 3         Q.    This is on your disclosures that your
 4    attorneys made to me.
 5         A.    Okay.
 6         Q.    I just wanted to know if you know who
 7    they are.  I assume you gave them these names.
 8         A.    Sure.
 9               MR. SCHMIDT:  Are you talking about Rule
10               26?
11               MS. ECHOLS:  Yes.
12    EXAMINATION BY MS. ECHOLS:
13         Q.    LeGros, we talked about her?
14         A.    Yes.
15         Q.    Lui?
16         A.    Lui.
17         Q.    Cal --
18         A.    Caleon.
19         Q.    Is he a doctor?
20         A.    He is a resident who was recently
21    terminated.
22         Q.    Do you know why?
23         A.    I was never told why.  He had multiple
24    attempts at remediation, multiple fitness for duty
25    exams, above and beyond what I was able to get,
```

Dr. Eric Greenberg 7/30/2019

1    and then they terminated him.  I have not had

2    contact with him.

3         Q.   Is he an ER resident?

4         A.   Yes.

5         Q.   You don't know what his problem was?

6         A.   I refrained from contacting him.

7         Q.   But he's on your list.

8         A.   Yes.

9         Q.   Okay.  Micelle Haydel, we talked about

10   her.

11        Jorge Martinez.  I have Jorge as J-O-R-G-E.

12        A.   Oh, it is J-O-R-G-E.  It is spelled

13   wrong there.

14        Q.   Micelle is a doctor, and Jorge Martinez

15   is a doctor.

16        A.   Dr. Geuringer.

17        Q.   And who is Dr. Geuringer?

18        A.   He's a physician that expressed concern

19   about -- he's a physician at Slidell expressing

20   concern about how Dr. Suau was treating me at LSU,

21   as well.

22        Q.   Did he -- is that because you talked to

23   him about it?

24        A.   Yes.

25        Q.   He's at that urgent care place?

Dr. Eric Greenberg 7/30/2019

```
 1        A.    No.   He's at Slidell, it's a rotation
 2   that we do.
 3        Q.    What's in Slidell?
 4        A.    ER in Slidell, Slidell Memorial
 5   Hospital.
 6        Q.    Okay.  Is it Dr. Robert Mercadel?
 7        A.    Yes, also at Slidell.
 8        Q.    In the ER, right?
 9        A.    Yes.
10        Q.    And I know Keith Van Meter.
11        And Jim Aiken?
12        A.    Physician, as well.
13        Q.    Where?
14        A.    At LSU.
15        Q.    UMC?
16        A.    Yes.
17        Q.    Okay.  And Tuckler was a resident with
18   you?
19        A.    Physician -- or supervising physician at
20   LSU.
21        Q.    In the ER, right?
22        A.    Yes.
23        Q.    Lisa, we talked about Lisa Moreno.
24        A.    Yes.  Francois also was a physician at
25   LSU.
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
1         Q.    In the ER?

2         A.    Yes.

3         Q.    Okay.  Are any of these -- just tell me

4    if any of these people are residents or they're

5    attendings:  David Beran?

6         A.    Attending.

7         Q.    LSU?

8         A.    Yes.

9         Q.    Roy Ary?

10        A.    Attending, LSU.

11        Q.    And --

12        A.    Nurse, UMCNO.

13        Q.    Meredith Hall?

14        A.    Attending, LSU.

15        Q.    Mary Varner?

16        A.    My fiancé.

17        Q.    And we talked about her?

18        A.    Yes.

19        Graduated resident, current attending.  I

20   don't know where he's at.

21        Q.    Jude?

22        A.    Yes.

23        Q.    Okay.  He was ahead of you?

24        A.    Below me.

25        Q.    Okay.  Andrew Johnston?
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    A.   Current resident, LSU.

2    Q.   Vin?

3    A.   Graduated resident.

4    Q.   Lauren Harrell?

5    A.   Graduated resident.

6    Q.   And Desharus?

7    A.   Desharus, yes.  I don't know if he's

8    current or graduated.

9    Q.   But a resident?

10   A.   Yes.

11   Q.   Peter --

12   A.   Assistant program director.

13   Q.   Okay.  I know Charles Hilton.

14   Charles Sanders, he was on the --

15   A.   Charles Sanders is -- the way that LSU

16   ER is sectioned out, is that it's a section of

17   internal medicine.  So he's the head of internal

18   medicine.

19   Q.   Rosalynn Martin?

20   A.   LSU HR.

21   Q.   Cunningham?

22   A.   LSU HR.

23   Q.   Delacroix?

24   A.   He was part of the LSU HR, as well.

25   Q.   Lebas, we know.

Dr. Eric Greenberg 7/30/2019

```
 1          A.    Uh-huh (AFFIRMATIVE RESPONSE).
 2          Q.    Gillespe?
 3          A.    Nurse at LSU.
 4          Q.    Male nurse?
 5          A.    Yes.  UMCNO, I meant.  Sorry.
 6          Q.    Carlisle, I know.
 7          A.    He's current program director.
 8          Q.    Avegno?
 9          A.    Jennifer Avegno, I put the name down
10    wrong.
11          Q.    Okay.  Peter, is that his first name,
12    Peter?
13          A.    Yes.
14          Q.    Okay.  Lewis Hunt-Irving?
15          A.    Resident, LSU -- or graduated resident.
16          Q.    We talked about her, her, him.
17          A.    Jude I put twice.
18          Q.    Okay.
19          A.    Graduated resident.
20          Lauren Harrell I put twice.
21          Becky Odinet Frey is the LSU -- or at the
22    time, was the LSU ombudsman.
23          Q.    She's not a doctor, though, is she?
24          A.    I think she's a Ph.D.  I don't know.
25          Q.    I know her sister.  Okay.
```

Dr. Eric Greenberg 7/30/2019

```
 1        So do you know if you've hired an economic
 2   damages expert yet?
 3            THE WITNESS:  Have we?
 4            MR. SCHMIDT:  I can't answer your
 5            questions.
 6            THE WITNESS:  I believe we are either
 7            currently recruiting or waiting to sign
 8            the retainer for one.
 9   EXAMINATION BY MS. ECHOLS:
10        Q.   Did you have any relationship with
11   Katherine Muslow?  She's general counsel.
12        A.   My attorneys did.
13        Q.   She's not there anymore.
14        And then quickly, the evaluations.  Said you
15   requested your residency by 4/4/17.  Is that the
16   only time you requested it?
17        A.   No.  I requested it multiple times.  If
18   you would give me a second.
19        Q.   I sure would.
20        A.   I requested them 4/4/17 --
21        Q.   Yes.
22        A.   -- 4/21/17, 4/26/17.  And I believe that
23   a certified letter was sent out on 4/26/17, as
24   well.
25        Q.   Is that by your attorney or by you?
```

Dr. Eric Greenberg 7/30/2019

1      A.   I don't know which one it was.

2      Q.   Okay.  To the office of Kathy

3  Whittington?

4      A.   Yes.  They were filled out with the

5  proper paperwork and signed forms, as well.

6      Q.   Okay.  I don't know if I have your

7  complaint to the Accreditation Council for

8  Graduate Medical Education, but I assumed I asked

9  for that in discovery.

10      The five recordings that you have, what

11  are -- tell me about what they all are.

12      A.   So if I could summarize it, I don't have

13  them in front of me.

14      Q.   But you have five separate ones?

15      A.   Yes.  One is me talking with Dr. Suau

16  and him saying -- so one of them is, I believe, in

17  regards to Dr. Suau coming up to me and saying

18  that I am going around telling Dr. DeBlieux that

19  I'm feeling intimidated, and that he says, "I'm

20  not going to play that game with you.  If you're

21  going to play this game with me, we're going to

22  take it down to that level.  We'll get a third

23  person."

24      Q.   What date was that?

25      A.   3/1/17.

Dr. Eric Greenberg 7/30/2019

 1          Q.    Okay.   And did you have his permission
 2     to record that?
 3          A.    Louisiana is a one-party consent.
 4          Q.    But he didn't know you were recording?
 5          A.    Louisiana is one-party consent.
 6          Q.    Did he know you were recording?
 7          A.    He did not have knowledge I was
 8     recording at that time.
 9          Q.    Then the second one?
10          A.    I'd have to go over -- I don't have the
11     transcripts with me.
12          Q.    Okay.   Can you tell me generally -- were
13     they all with Dr. Suau?
14          A.    Yes.   One saying that he would refuse to
15     fill out any paperwork for me.
16          Q.    Okay.
17          A.    I'd have to look at them to see.   I
18     don't know.
19          Q.    Okay.   I asked for those, as well, so.
20     And then the text messages between you and David
21     and you and Dr. Suau, you provided?
22          A.    Yes.   And if not --
23          Q.    And you'll provide the rest, should you
24     find them?
25          A.    Yes.

Dr. Eric Greenberg 7/30/2019

1    Q.   Okay.  And the complete EEOC file that
2    you submitted, because I don't have all of these
3    documents that were contained within that.
4         I think that is all I have, other than
5    talking about your damages.
6         A.   Yes.
7         Q.   How has it affected your livelihood as a
8    doctor?
9         A.   So it is essentially -- first off, I was
10   unemployed for a whole year.  I was on Medicaid.
11   I went from having the prospect of making
12   430,000 --
13        Q.   430?
14        A.   Signed contract.
15        Q.   With who?
16        A.   With Team Health in Austin.
17        -- to making $9,000 a year, and that was from
18   LSU.  I was on Medicaid.  I am unable to -- I
19   applied to residency multiple times and have been
20   rejected every single time.
21        Q.   When did you apply to residency, after
22   this whole situation?
23        A.   Yes.  2017, 2018, and currently am
24   applying right now.  But I had been told that,
25   because my funding has already expired, that I

1  will not be getting a spot.

2       Q.   What does that mean, your funding?

3       A.   So the way that the funding goes is that

4  every ER has 3 years of funding.  I'm a 4-year

5  program.  I finished 3 years and 6 months and

6  change of 4-year program.  The fourth year is

7  usually funded by the hospital.  That means the

8  hospital would have to pay money to not fund it

9  from the government for me.  First off, there's

10  extremely limited spots for fourth year.  Hospital

11  would have to pay for me.  I can't go back and do

12  an internal medicine residency or family medicine,

13  because I'm not funded.  The hospital would have

14  to pay for me.  They're not going to take a

15  resident who's unfunded.  No one will.  I've

16  talked to multiple places, exhausted all my

17  options with that.

18       Q.   Okay.

19       A.   My earning potential has halved, more

20  than halved.  I went from the prospect of 40 hours

21  a week making $400,000, to maybe 60 to 70 hours a

22  week making $225,000, by multiple venues.  Over

23  the course of career, I mean, it's halved for my

24  50-year career.  It's very hard to find work being

25  an un-board certified physician, noncertified --

Dr. Eric Greenberg 7/30/2019

```
 1          Q.   Right.  I mean, there are certain
 2     physicians who are not board certified who are --
 3          A.    In the state of Michigan, it's very hard
 4     to find employment for that.
 5          Q.   Okay.  So you're saying in Michigan, you
 6     have to be board certified in a specialty?
 7          A.    In Michigan, if you wanted to work at an
 8     ER, you have to be board certified to work in an
 9     ER.
10          Q.   Okay.
11          A.    And it's caused extreme stress on my
12     relationship.  My fiancé is an attorney working
13     for major government contractor here.  She's
14     unable to move up immediately.  She's been down
15     here for the past year and a half.  We've been
16     separated.  It's caused a lot of stress in our
17     relationship.
18          I've been treated for depression by Dr.
19     Pietrofesa because of this.  I've gained 30 pounds
20     because of this.  My mom had to leave her work and
21     help me out for 3 months.  My brother quit his job
22     and stayed down here to help me for 8 months with
23     my depression after being terminated.  I feel like
24     I have PTSD after this.  Even going through this
25     has been extremely stressful.
```

Dr. Eric Greenberg 7/30/2019

1     Q.    Okay.

2     A.    And every day, like, my partners

3  question me about it.  Every day, I'm looked at as

4  less than by the physicians because of this.  I've

5  had to reinvent myself completely because of this.

6     Q.    Okay.

7     A.    Right now, I do a lot of -- I'm moving

8  myself towards addiction medicine.  I find it very

9  rewarding, and I'm happy in it, but the pay is

10 half of what it was with the ER.

11    Q.    Okay.  So you intended to always go

12 through and be an ER doctor?

13    A.    Yes.  I intended to do ER, and then

14 eventually MBA and do ER administration.  I was in

15 the final rounds of talks.  I got an informal

16 offer to do a fellowship at University of Colorado

17 Denver in ER administration, get an MBA.  So they

18 were going to give me a free $200,000 MBA from

19 University of Colorado and pay me as an attending.

20 Also, I had the job offer at Austin, with also the

21 promises of getting a free MBA out of it and doing

22 administration.  I would be in administrative

23 healthcare at this moment.

24    Q.    So you wouldn't be working -- in

25 addition to the ER?

Dr. Eric Greenberg 7/30/2019

1       A.    Yes.

2       Q.    Okay.  And I mean, you mentioned

3  depression a number of times.  Have you ever taken

4  any medications for it?

5       A.    No.

6       Q.    Why not?

7       A.    I've never been recommended to be on

8  depression medications.  Everyone told me it was

9  situational depression involving LSU.  And when I

10 left LSU, my depression got a lot better.  Like, I

11 don't feel like I have depression right now.

12      Q.    Okay.  When did your brother move down

13 here to help you?  I thought you said it was

14 after --

15      A.    So my mom moved down immediately and

16 stayed for, like, 4 months, 3 months.  And my

17 brother moved down around July 2017, around there.

18 And he stayed until med school.

19      Q.    Your mom was there when?

20      A.    Probably from March until June -- no,

21 March until August.

22      Q.    Okay.  Of 2000 --

23      A.    '17.

24      Q.    So your brother and your mom overlapped

25 a little bit?

Dr. Eric Greenberg 7/30/2019

```
 1          A.    Yes.

 2          Q.    And that wasn't stressful for you?

 3          A.    It was very helpful, yes.

 4          Q.    I was just teasing.  If my mom moved in

 5     with me, it would be.

 6          A.    The in-laws are another story.

 7          Q.    Oh.

 8                MS. ECHOLS:  I think that's pretty much

 9                all I have, but let me look over my

10                notes for a second.

11                (OFF-THE-RECORD DISCUSSION)

12                THE WITNESS:  I was going to say the

13                damages, also, I had to pay an

14                exorbitant amount of money in treatment

15                that was required by LSU.  Probably in

16                excess of $150,000.

17     EXAMINATION BY MS. ECHOLS:

18          Q.    What kind of treatment?

19          A.    For Elmhurst, Pinecrest, going to

20     therapists.

21          Q.    I thought you said you were already

22     going to a therapist?

23          A.    During LSU, after -- or they made me go

24     to someone different.

25          Q.    Okay.  And you didn't have insurance at
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    that time?

2         A.    With the Pinecrest and Elmhurst, it was

3    not covered by insurance.

4         Q.    Okay.

5         A.    And Vanderbilt was also not covered.

6    Vanderbilt, I told them my story, they waived my

7    fee.  But travel to Vanderbilt multiple times was

8    not covered.  I told them my story, they said,

9    we'll waive this for you.

10        Q.    Okay.  So you say you were never

11   diagnosed with oppositional defiance disorder?

12        A.    Never.

13        Q.    You never told Scott Embley that you had

14   that?

15        A.    I told Scott that, when I was a kid,

16   they were thinking maybe at that moment, the

17   psychiatrist thought it was linked to ADHD.  It

18   was the same thing.  I was never diagnosed with

19   it.  I told him they thought maybe, but they said,

20   no, I don't have it.

21        Q.    Okay.  So why tell him about it?

22        A.    Because at that moment, Dr. Suau said

23   you need to tell everyone everything.  Constantly

24   being accused of lying by Dr. Suau nonstop.  I had

25   to tell them every detail of everything.  I was



```
1    never diagnosed with that ever, nor social
2    disorder.  I even went to the president of the
3    Board of Psychiatry, Dr. Applebaum, and he said I
4    didn't have it.
5         Q.   Did you ever go see anybody over at
6    Tulane?
7         A.   For psychiatry?
8         Q.   Yes.
9         A.   No.
10        Q.   And why is that, if you felt so
11   comfortable with hanging out with Tulane people?
12        A.   For a physician?
13        Q.   Yes.  Didn't you say you hung out with
14   Tulane residents and physicians?
15        A.   I hung out with other Tulane residents.
16   And with Touro, I was on the board and hung out
17   with other people who were Jewish that were on
18   this board, as well, but I was comfortable with
19   Dr. Roniger and comfortable with Dr. Kuo.  Didn't
20   ever see a need to go to a Tulane physician.
21        Q.   I was just curious.
22        In Hattiesburg, at Pinecrest, was your
23   attending Dr. Peter Kemp?
24        A.   He was the psychiatrist there, correct.
25        Q.   One more thing.  So when you stated that
```

Dr. Eric Greenberg 7/30/2019

```
1    your -- the complaints that were made about you
2    about your behavior were due to you not taking
3    your stimulants or your Adderall, that was not
4    true?
5         A.   Show me the complaint.
6         Q.   It's in the CAP stuff.
7         A.   I know what you're talking about.
8    Again, like I said, I would have drug holidays.
9    And I told them I'm having a drug holiday right
10   now.
11        Q.   I kind of got the feeling that it was
12   based upon the number of hours you were working
13   and the shifts.
14        A.   I had just come off of ICU rotation and
15   was on a lighter rotation.
16        Q.   Was what?
17        A.   A lighter rotation, and was on drug
18   holiday at the moment.  This is something that I
19   had scheduled.  I had been doing my whole life,
20   these drug holidays.  My current psychiatrist even
21   said I need to be taking more drug holidays.
22        Q.   Is that because of the level of
23   tolerance or what?
24        A.   That's just how -- I don't want to get
25   into, like, medical terms, but I think it's a
```

Dr. Eric Greenberg  7/30/2019

```
 1   chemoprophylaxis.  Like, the more you take
 2   medication, the less it works.  So you take a drug
 3   holiday, reset your receptors, and it works
 4   better.
 5        Q.   Okay.
 6        A.   I do remember times Dr. Suau loudly
 7   discussing my medical problems in the ER.  It was
 8   very, extremely embarrassing in front of other
 9   people.
10        Q.   So you completed both of the Elmhurst
11   program and the Pinecrest program?
12        A.   Yes.
13        Q.   Okay.  And did you sign some sort of
14   professional monitoring agreement; was that the
15   workplace monitor?
16        A.   Yes.
17        Q.   And who was that with again?
18        A.   Supposed to be with Dr. Suau.
19        Q.   No.  Who was the organization that
20   recommended that, the --
21        A.   Pinecrest recommended it.  It was
22   brought forward by PHP.
23        Q.   That's what I thought.
24        A.   Dr. Suau refused to follow that request.
25             MS. ECHOLS:  That's all I have.  Thank
```

Dr. Eric Greenberg  7/30/2019

```
 1            you so much for your time.
 2            MR. SCHMIDT:  I'm going to have just a
 3            handful of questions.  Do you mind if we
 4            take a quick recess?
 5            MS. ECHOLS:  Okay.  Also, I have an
 6            authorization for the psychiatric
 7            records, because the one that you sent
 8            didn't allow us to get them.
 9            MR. SCHMIDT:  Did you ask for these in
10            discovery?
11            MS. ECHOLS:  I asked for all medical,
12            mental health, yes.
13            MR. SCHMIDT:  In general, we have no
14            problem signing forms to have the
15            records --
16            MS. ECHOLS:  Released.
17            MR. SCHMIDT:  -- released to opposing
18            counsel, but I do need to look over it
19            and make sure, because we want to make
20            sure it does not allow verbal
21            communication.
22            MS. ECHOLS:  No.  I mean -- off the
23            record.
24            (RECESS 4:30-4:36 P.M.)
25    EXAMINATION BY MR. SCHMIDT:
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

```
 1        Q.    Dr. Greenberg, I only have a few quick
 2   questions about some things that came up while
 3   Ms. Echols was questioning you.  But first, I'd
 4   like to go back and look at Exhibit 3.  That is
 5   the semi-annual review for the review period of
 6   July 1st, 2014 through April 30th, 2015.
 7        A.    All right.
 8        Q.    If you turn to page 4.
 9              MS. ECHOLS:  This is five-page one or
10              eight-page one?
11              MR. SCHMIDT:  I'm sorry?
12              MS. ECHOLS:  What dates were they again?
13              MR. SCHMIDT:  7/1/14 to 4/30/15.
14              MS. ECHOLS:  So first one?
15              MR. SCHMIDT:  Yes.
16   EXAMINATION BY MR. SCHMIDT:
17        Q.    So under evaluation comments, "all."
18        A.    Yes.
19        Q.    Okay.  If you look at the second
20   category on there, where it says "patient care."
21        A.    Uh-huh (AFFIRMATIVE RESPONSE).
22        Q.    Okay.
23              MR. SCHMIDT:  Oh, we're on page 4.  You
24              there?  Okay.
25
```

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

EXAMINATION BY MR. SCHMIDT:

1

2      Q.   So the second line, under "patient

3 care," where it says "below peers, see daily

4 evals."  Did I read that correctly?

5      A.   Yes.

6      Q.   Okay.  Right above that, it says,

7 "diagnostic tests are ordered and interpreted

8 appropriately.  Consultations are timely and

9 coordinated with plan of care."  Did I read that

10 correctly?

11      A.   Yes.

12      Q.   Okay.  Then under "below peers," where

13 it says, "H&P and differential diagnosis," I'm not

14 going to read that whole paragraph.  But then if

15 you notice under that, there's not a line that

16 says "below peers;" is that correct?

17      A.   Yes.

18      Q.   So the third little arrow here, where it

19 says "procedural skills are acceptable for level

20 of training.  The resident uses proper technique,

21 organizes equipment and puts the patient at ease."

22 Then below that, it says -- I'm still on the same

23 page, still under patient care.

24      A.   I'm looking at a different one.

25           MS. ECHOLS:  Yes, below peers and daily

Dr. Eric Greenberg 7/30/2019

```
 1              eval.
 2              THE WITNESS:  You're looking at 7/1
 3              and --
 4    EXAMINATION BY MR. SCHMIDT:
 5         Q.   I'm looking at 7/1/14 to 4/30/15.
 6         A.   These are copies --
 7         Q.   Page 4 of 8.
 8              MS. ECHOLS:  See, mine says --
 9              THE WITNESS:  Mine is different.
10              MS. ECHOLS:  Mine is different, too.
11              THE WITNESS:  It's different.
12              MR. SCHMIDT:  Okay.
13              MS. ECHOLS:  After the H&P little arrow,
14              it says "below peers."
15              MR. SCHMIDT:  Okay.
16              THE WITNESS:  Someone just clicked the
17              button for -- it says I'm meeting all
18              requirements and then I'm doing well,
19              then also clicked the button on that.
20              So which one is it?
21    EXAMINATION BY MR. SCHMIDT:
22         Q.   What is your understanding of below
23    peers; what do you think that means?
24         A.   That you are below 50 percent,
25    50 percentile, and needing some kind of help with
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

Dr. Eric Greenberg  7/30/2019

1    that.  But with this one, it seems like everything

2    is just clicked no matter what.

3        Q.   Do you interpret that as meaning you are

4    not meeting expectations?

5        A.   You could see that as not meeting

6    expectations.

7        Q.   I'm sorry, what's that?

8        A.   Yes, it could be seen as not meeting

9    expectations.  Then it says I meet expectations.

10   I feel like I meet expectations.

11       Q.   Under "practice-based learning and

12   improvement," the second area there, where it

13   says, "the resident demonstrates self-education

14   and applies principles of evidence based medicine

15   in the clinical setting.  The resident supplements

16   patient care with current literature, up-to-date

17   textbooks and online readings.  Applies knowledge

18   of study design and methodology when appraising

19   the literature."

20       Does that sound like the description of a

21   resident who's not meeting expectations?

22       A.   No, it doesn't.  It sounds like a

23   resident that is meeting expectations.

24       Q.   But below that, it says, "below peers,

25   see daily evals," correct?

```
 1        A.    Yes.
 2              MS. ECHOLS:  I think you're reading it
 3              wrong, but okay.
 4              MR. SCHMIDT:  If you have any follow-up
 5              questions, you're welcome to --
 6              MS. ECHOLS:  Sure.
 7   EXAMINATION BY MR. SCHMIDT:
 8        Q.    When you were on this unofficial
 9   probation, and you asked Dr. Suau for a written
10   description of your expectations, is it fair to
11   say that a resident on probation has different
12   expectations from a resident not on probation, or
13   are they the same expectations?
14        A.    I believe that all residents have the
15   same expectations, but there's different, like,
16   categories that I would need to meet on probation.
17   I guess it would be different expectations of
18   that.
19        Q.    Are there additional activities that
20   someone on probation has to perform?
21        A.    Yes.
22        Q.    Is that what you were asking him for,
23   was an explanation of those things?
24        A.    Yes.
25        Q.    Another incident I'd like to talk to you
```

Dr. Eric Greenberg 7/30/2019

```
 1    about briefly is the mentally ill patient with the
 2    Lidocaine, I believe you referred to as a crash
 3    line.
 4         A.    Yes.
 5         Q.    Okay.  I believe your testimony was that
 6    there was no Lidocaine in the kit that you opened
 7    to perform the procedure.
 8         A.    Yes.
 9         Q.    And at that point in time, you made the
10    decision not to have the nurse go get Lidocaine,
11    but to go ahead and start the procedure; is that
12    correct?
13         A.    Yes.
14         Q.    Okay.  Would you explain what the word
15    "crash line" means?
16         A.    So crash line means that someone is
17    dieing in front of you, has no IV access, and they
18    need some sort of hydration or medication or
19    something.  They need something this moment, life
20    or death kind of thing.
21         Q.    Okay.
22         A.    This patient was altered mental status,
23    which means he's not getting enough blood to his
24    brain.  His blood pressure was 80 over 40.  He is
25    hyperpneic, which means he could have V-fib at any
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1   time.  Like, this is a patient that's going to die

2   this moment if we don't do something about it.

3        Q.   Okay.  So does crash line simply mean

4   that it's an emergency, or does crash line mean

5   that you perform the procedure without analgesic?

6        A.   You can perform without analgesic,

7   doesn't matter.  You just got to get the line in

8   as quickly as you can.  In traumas, we do I/Os.

9   We do central lines in the legs, in the neck,

10  without anesthesia.  And in critical cases, get it

11  done as soon as you can, because it's life or

12  death at that moment.

13       Q.   Okay.  If you hadn't been of the opinion

14  that it was life or death, would you have acted

15  differently in that situation?

16       A.   Yes, I would.

17       Q.   What would you have done differently?

18       A.   I would have gotten another kit, got the

19  nurse to get the Lidocaine, or gotten some

20  sedation on the patient.  This is a patient that

21  could have used Ketamine sedation, anything else

22  to calm the patient down.  But this is a life or

23  death situation right now.

24       Q.   Okay.

25       A.   Lidocaine, anything.  Done an I/O,

Dr. Eric Greenberg 7/30/2019

```
 1    something that's more -- something other than a
 2    central line on him to get IV access.
 3         Q.   All right.  I'd like to ask you about
 4    the complaint that was discussed earlier by
 5    Dr. Mackey regarding giving the patient a
 6    different dose of Ketamine than what he specified.
 7         A.   Yes.
 8              MS. ECHOLS:  Which exhibit was that?
 9              MR. SCHMIDT:  This is Exhibit 6, page 2
10              of 5.
11              MS. ECHOLS:  Okay.
12              MR. SCHMIDT:  Number 6 on the list.
13              MS. ECHOLS:  Okay.
14    EXAMINATION BY MR. SCHMIDT:
15         Q.   So my understanding of your testimony
16    was that Dr. Mackey had instructed you to give a
17    particular dose of Ketamine to a patient, correct?
18         A.   Yes.
19         Q.   And that the dose that you gave the
20    patient was lower than that number --
21         A.   Yes.
22         Q.   -- whatever it was, correct?
23         A.   Yes.
24         Q.   Okay.  Could you explain again why that
25    was?
```

Dr. Eric Greenberg 7/30/2019

Page 251

```
 1         A.   So when you give Ketamine or any kind of
 2    sedation like this, you titrate to physical
 3    response.  So you can give up to 45.  If you give
 4    30, and the patient responds, you wouldn't give
 5    any more medication, which could possibly suppress
 6    their breathing drive or circulatory collapse,
 7    because it could cause them to have an adverse
 8    outcome.  So the patient, say, only needs 30, and
 9    you give them 30, they have response, you don't
10    need to go any further.  This is how I was trained
11    in the ER during residency and trained at off
12    sites to do this.  Like, if you pull up 45, 15,
13    give it, see if the patient responds, give another
14    15, the patient is out, you can do the procedure.
15    There's no need to give an additional 15, where it
16    can cause circulatory or respiratory collapse.
17         Q.   So that's how you were trained to do it?
18         A.   Yes.
19         Q.   So when Dr. Mackey told you to
20    administer a particular dose of Ketamine, let's
21    say it was 45 milligrams -- I just made that
22    number up.  I'm not saying that's what it was --
23    did you interpret that to mean titrate up to that
24    dose?
25         A.   Yes.
```

Dr. Eric Greenberg 7/30/2019

```
 1        Q.    Did you explain that to Dr. Mackey?
 2        A.    Afterwards, I came back and told him I
 3   titrated up.  I gave him 30, patient had clinical
 4   response, and we did the procedure.  I did -- or
 5   explained to him afterwards that's what we did.
 6        Q.    Did you explain to him the reason for
 7   it, that that was how you were trained to do it?
 8        A.    Yes.
 9        Q.    What was his response?
10        A.    I don't remember him giving me a
11   response, other than you should have given him 45.
12   Dr. Mackey wasn't even there for this titration to
13   happen.
14        Q.    Okay.
15        A.    But he's, like, you disobeyed me or gave
16   something to that matter.  This is at a point
17   where they were already told by Dr. Suau to find
18   anything wrong with me, you know.  Like, target
19   was on me.
20        Q.    I believe you mentioned a couple of
21   different complaints to the ACGME?
22        A.    Yes.
23        Q.    I believe you said that there was one
24   made the day before your termination, correct?
25        A.    Correct.
```



Dr. Eric Greenberg 7/30/2019

```
 1        Q.    And that that one was not made by you?
 2        A.    It was an anonymous complaint to the
 3   ACGME.  Might have heard from Dr. Haydel and
 4   Dr. Parker, another resident.
 5        Q.    But it wasn't yours?
 6        A.    It wasn't me.
 7        Q.    But you had submitted a separate
 8   complaint to the ACGME?
 9        A.    Separate complaint.
10        Q.    What was that complaint based on, if you
11   remember?
12        A.    Anti-Semitism, harassment, statement
13   Dr. Suau made to me, lack of protection, in
14   following rules with them protecting me when he
15   pulled a knife on me, ad hoc violations.  During
16   the ad hoc, no side is allowed to communicate to
17   the ad hoc judges.  And during that, Dr. Suau sent
18   them an e-mail questioning the veracity of my
19   evidence and basically trying to denigrate me
20   prior to the hearing.  I even submitted a request
21   for appeal to the ad hoc, and it was never -- I
22   think to doctor -- I e-mailed it to you today --
23   whoever is above -- and it was never responded to.
24        Q.    Okay.  When was it that you made that
25   complaint?
```

Dr. Eric Greenberg 7/30/2019

```
 1       A.   I believe on or about August 17th.  I'd
 2  have to go look at the e-mail.
 3       Q.   Of what year?
 4       A.   2017.
 5       Q.   2017, okay.
 6       A.   Oh, the ACGME complaint, you're saying?
 7       Q.   I'm talking about ACGME, yes.
 8       A.   I believe we sent in the complaint 6/29.
 9       Q.   Of '17?
10       A.   Yes.
11       Q.   A minute ago, when you were saying the
12  complaint included the allegation of anti-Semitism
13  and those things --
14       A.   Yes.
15       Q.   -- were you talking about the ACGME
16  complaint, or were you talking about a different
17  complaint you thought I was asking you about?
18       A.   Both of them.  ACGME complaint and the
19  complaint to -- well, okay.  The ad hoc violation,
20  I sent to the chancellor.  The ACGME complaint had
21  the anti-Semitism and harassing workplace and
22  unsafe workplace environment.
23       Q.   Was Dr. Suau aware of the complaint?
24       A.   I don't know if he's aware of the
25  compliant.  Dr. Suau did accuse me of filing the
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    anonymous complaint, in the presence of

2    Dr. Matthew Carlisle and Kathy Whittington.

3        Q.   Okay.  That anonymous complaint was the

4    day before your termination, or was it the day

5    before the recommendation of your termination?

6        A.   Day before the recommendation of my

7    termination -- wait, hold on.  I was told it was

8    the day before.  So on 3/17, I e-mailed Becky

9    Frey.  E-mail to Becky Frey 3/8.  I e-mailed on

10   3/10, I e-mailed and had a conversation with Becky

11   Frey.  I believe it was 3/9, I was told.  Because

12   on 3/10, Dr. Suau had ordered me to not use any

13   electronic devices in the emergency department,

14   because he thought I was out to get him, and that

15   there was this complaint.

16       Q.   Do you know what that anonymous

17   complaint alleged?

18       A.   I was told that it was with Dr. Suau

19   trying to influence the ACGME review and the

20   hostile or -- like, an air of hostile environment,

21   like a fear of retaliation for complaining, that

22   they were trying to alter the ACGME reviews, and

23   that the ACGME -- I got an e-mail from Hilton that

24   was sent to the whole department that he had to

25   talk to everyone about an ACGME issue.

Dr. Eric Greenberg 7/30/2019

```
 1              MR. SCHMIDT:  That is all the questions
 2         I have.
 3              MS. ECHOLS:  I have a couple.
 4    EXAMINATION BY MS. ECHOLS:
 5         Q.   When a kit doesn't have Lidocaine, is
 6    there a report that you fill out?
 7         A.   Not that I know of.
 8         Q.   So if you don't have the proper
 9    supplies, there's nothing that you report to LSU
10    saying that I don't have the proper supplies to do
11    a particular procedure?
12         A.   No.
13         Q.   Okay.  The ACGME complaint that you said
14    was made the day before your recommend of
15    termination -- recommendation of termination, how
16    do you make a complaint to the ACGME?
17         A.   E-mail them.
18         Q.   Okay.  So do they contact the doctors
19    immediately?
20         A.   I don't know.
21         Q.   Okay.  And then you said something about
22    the ad hoc committee.  I thought there was a
23    letter that Dr. Hilton sent you saying what the ad
24    hoc committee's decision was?
25         A.   I received a single page.  All it says
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Dr. Eric Greenberg 7/30/2019

1    is, we agree with all this.  And then later on,

2    through EEOC discovery, found that there was a

3    much larger document that was produced.

4         Q.   And you said that it didn't go above

5    Dr. Hilton.  Isn't Dr. Hilton the dean of the

6    medical school?

7         A.   After the ad hoc, there's an additional

8    appeal that I have to the chancellor.  And I sent

9    him an e-mail, and we had a letter sent out, but I

10   haven't received any response as to the appeal to

11   this date.

12             MS. ECHOLS:  And I have asked for

13             production of that document.

14             THE WITNESS:  I have the e-mail.  I sent

15             it to you today.

16             MR. SCHMIDT:  Yes.

17   EXAMINATION BY MS. ECHOLS:

18        Q.   So it's chancellor of LSU, the whole

19   school?

20        A.   Chancellor of LSU Medical School, yes.

21        Q.   I don't know how the hierarchy works.

22             MS. ECHOLS:  Okay, that's all I have.

23             (DEPOSITION CONCLUDED AT 4:54 P.M.)

24

25

1                      WITNESS' CERTIFICATE

2

3

4         I, ERIC GREENBERG, M.D., read or have had the

5    foregoing testimony read to me and hereby certify

6    that it is a true and correct transcription of my

7    testimony, with the exception of any attached

8    corrections or changes.

9

10

11

12

13

14       _____              _____

15       DATE SIGNED               ERIC GREENBERG, M.D.

16

17

18

19       INITIAL ONE:

20

21       _____ Read with no corrections.

22

23       _____ Read and correction sheet attached.

24

25       DATE TAKEN:  July 30, 2019


Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1                 REPORTER'S CERTIFICATE
 2          This certification is valid only for a
 3     transcript accompanied by my original signature
 4     and original seal on this page.
 5          I, ANNA C. COATES, CCR, RPR, do hereby
 6     certify that ERIC GREENBERG, M.D., to whom the
 7     oath was administered, after having been duly
 8     sworn by me upon authority of R.S. 37:2554, did
 9     testify as herein above set forth in the foregoing
10     259 pages; that this testimony was reported by me
11     in the stenotype reporting method, was prepared
12     and transcribed by me and is a true and correct
13     transcript to the best of my ability; that the
14     transcript has been prepared in compliance with
15     transcript format guidelines required by rules of
16     the board; that I have acted in compliance with
17     the prohibition on contractual relationships, as
18     defined by Louisiana Code of Civil Procedure
19     Article 1434 and in rules and advisory opinions of
20     the board; that I am not related to counsel or the
21     parties hereto, nor am I otherwise interested in
22     the outcome of this matter.
23     _____          _____
24     DATE                ANNA COATES, CCR, RPR
25                         LOUISIANA CCR NO. 97018
```


AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799