# GREENBERG, M.D. v. BOARD OF SUPERVISORS OF LSU AND AGR. AND MECH. COLLEGE

## ROUGH OF: STAN V. SMITH, PH.D.

October 8, 2019

*Prepared for you by*



U.S. Legal Support

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

**EXHIBIT**
4

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 1

1          REALTIME ROUGH DRAFT AND UNCERTIFIED

2   TRANSCRIPT

3          The following file is not an official

4   Transcript.  It is intended only to aid in

5   case preparation.  The final transcript will

6   be different, both in form and substance,

7   from this rough draft translation.

8          You may see errors and omissions

9   during the realtime translation.  This is

10  not an unusual process, and these errors and

11  omissions will be

12  Corrected on the final transcript.

13          Please do not try to bring these

14  Discrepancies to the attention of the

15  reporter during the course of the

16  deposition.

17          UNOFFICIAL DRAFT TRANSCRIPT

18  THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT!

19          This transcript has not been

20  checked, proofread or corrected.  It is a

21  draft transcript, NOT a certified

22  transcript.

23          As such, it may contain

24  Computer-generated mistranslations of

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 2

1   stenotype code, resulting in inaccurate or

2   nonsensical word combinations or

3   untranslated stenotype symbols which cannot

4   be deciphered by non-stenotypists.

5           Corrections will be made in the

6   preparation of the certified transcript,

7   resulting in differences in page and line

8   numbers, punctuation and formatting.

9           THIS DRAFT TRANSCRIPT IS SUPPLIED TO

10  YOU ON THE CONDITION THAT UPON RECEIPT OF

11  THE CERTIFIED TRANSCRIPT, THIS DRAFT AND ANY

12  COPIES THEREOF (IN CONDENSED FORMAT OR

13  OTHERWISE) WILL BE DESTROYED.

14          THE CERTIFIED TRANSCRIPT IS THE ONLY

15  OFFICIAL TRANSCRIPT WHICH MAY BE RELIED UPON

16  FOR PURPOSES OF VERBATIM CITATION OF

17  TESTIMONY.

18

19

20

21

22

23

24

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 3

```
 1        IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISANA
 2
     ERIC GREENBERG, M.D.,      )
 3                              )
         Plaintiff,             )
 4                              )
            vs.                 ) No. 190137
 5                              )
     BOARD OF SUPERVISORS OF    )
 6   LOUISANA STATE             )
     UNIVERSITY AND             )
 7   AGRICULTURAL AND           )
     MECHANICAL COLLEGE,        )
 8                              )
            Defendants.         )
 9
10   The ROUGH DRAFT telephonic deposition of
11   STAN V. SMITH, Ph.D., called for
12   examination, taken pursuant to notice and
13   pursuant to the Federal Rules of Civil
14   Procedure for the United States District
15   Courts pertaining to the taking of
16   depositions, taken before Angela C. Loisi,
17   Certified Shorthand Reporter, Registered
18   Professional Reporter, Federal Certified
19   Realtime Reporter, at 200 West Jackson
20   Boulevard, Suite 600, Chicago, Illinois,
21   commencing at 9:16 a.m. on October 8, 2019.
22             (Proceedings ended at 11:30 a.m.)
23
24   Reporter:  Angela C. Loisi, CSR, RPR, FCRR
```

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

                                                            Page 4

  1    APPEARANCES:

  2        SMITH LAW FIRM

  3        BY:  MR. J. ARTHUR SMITH, III, via phone.

  4        830 North Street

  5        Baton Rouge, Louisiana  70802

  6        (225) 383-7716

  7        Jasmith@jarthursmith.com

  8            Representing the Plaintiff;

  9

 10        McCRANIE, SISTRUNK, ANZELMO, HARDY,

 11        McDANIEL & WELCH, LLC

 12        BY:  MR. KEITH W. McDANIEL, via phone.

 13        195 Greenbriar Boulevard, Suite 200

 14        Covington, Louisiana 70433

 15        (504) 831-0946

 16        Kwm@mcsalaw.com

 17        Dm@mcsalaw.com

 18            Representing The Board of Supervisors

 19            of Louisiana State University

 20            Agricultural and Mechanical College.

 21

 22

 23

 24

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 5

1                I N D E X

2

    WITNESS:  STAN V. SMITH, Ph.D.      PAGE

3

    Examination by Mr. McDaniels

4   Examination by Mr. Smith

5

6

             E X H I B I T S

7

    STAN V. SMITH, Ph.D.                PAGE

8

9

             (No Exhibits Marked.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

 1            (Witness sworn.)

 2    WHEREUPON:

 3            STAN V. SMITH, Ph.D.,

 4    called as a witness herein, having been

 5    first duly sworn, was examined and testified

 6    as follows:

 7            EXAMINATION

 8    BY MR. McDANIELS:

 9       Q.  Dr. Smith my name is Keith McDaniel I

10    am here representing the defendants we've

11    noticed your deposition you received a notice

12    of deposition?

13       A.  Yes.  Well, let me just say if I was

14    sent it, my staff would have received it.  I

15    don't see one.

16       Q.  Do you happen to have it there with

17    you?

18       A.  The reporter has a copy.

19       Q.  Okay.  Madam Court Reporter would you

20    attach to the deposition as Exhibit Number 1

21    the notice?

22            THE COURT:  I've already written on

23    it.

24            MR. McDANIELS:  Can I supply you one

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    by email.

2         THE COURT:  Sure.

3         MR. McDANIELS:  And Art do you have an

4    objection of attaching the notices as Exhibit

5    Number 1.

6         MR. SMITH:  No.

7    BY MR. McDANIELS:

8         Q.  Dr. Smith I am correct in assuming

9    you've given depositions before?

10        A.  Yes.  And by asking that question

11   you want to knee whether I would be happy if

12   you to would waive the admonitions or recite

13   recitation of the rules, I am perfectly

14   happy if you do so.

15        Q.  Okay.  And as well, having giving

16   depositions before, you recognize that you

17   have a right to read and sign the deposition.

18   What's your pleasure?

19        A.  I typically waive that right unless

20   at the end Art would recommend that I

21   reserve in which case I will follow his

22   recommendation.

23        Q.  Okay.  Then I've made myself a note

24   and between the three of us counting the court

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 8

1    reporter help remember to make an announcement

2    at the end.

3          You provided me with a report

4    dated -- or your office provided Mr. Z with a

5    report dated August the 15th, 2019, that was

6    subsequently supplied to me.

7          Have you generated any other written

8    reports with respect to your opinions in this

9    case?

10     A.  No.

11     Q.  Does that report contain the total of

12   the opinions you plan to give as a forensic

13   economist in this case?

14     A.  Yes.  I -- just to get clear because

15   I want to make sure everybody understands I

16   also, subsequent to my report received an

17   analysis by a pair of CPAs and I have some

18   comments on those.  They're not opinions as

19   to my loss with regard to the claims in this

20   case but they are comments which could be

21   interpreted to be also opinions but

22   it -- not regarding the losses but regarding

23   what the CPAs have written about my report.

24     Q.  You would offer those comments if I

DRAFT COPY


U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 9

1    may as rebuttal to what may be contained in

2    the report you've received; is that fair?

3        A.   Correct and I am prepared to offer

4    those comments today.  It may be that Mr. Z.

5        Q.   Why don't we do that now and then we

6    can move on to your opinions?

7        A.   I was going to say it may be that

8    Mr. Z would ask me to set forth those

9    comments in a short bullet point letter to

10   him and I don't know that he's reached a

11   decision as of yet as to whether he wants me

12   to do that or not.

13       Since they comment on my report,

14   don't you think it might be best to discuss

15   what it is that they are commenting on

16   before we go to their comments?

17       Q.   Well, I -- what I would prefer to do

18   is get from you your thoughts, whether you've

19   identified them in a written form to Mr. Smith

20   or not with respect to the comments in their

21   report that you would be making about their

22   report.

23       So however you want to set it up.  If

24   you want to tell me they said this and I think

DRAFT COPY


U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1   they're wrong because I see it this way, how

2   ever we can, if you will, get those bullet

3   points of items now in this setting because I

4   do not want a letter and some sort of a

5   supplement because that would mean another

6   deposition and I'd rather not go through that.

7          MR. SMITH:  This is Mr. Smith.  I'm

8   fine with however you all want to handle it.

9   He may reduce his thoughts to a brief bullet

10  point supplemental report.  We haven't made

11  that decision yet but we certainly reserve the

12  right to do so and seek leave of court to do

13  so.

14          But subject to that, however you all

15  want to handle it is fine with me.

16          THE WITNESS:  Yeah I'm ready to give

17  you my comments if you do reduce it to writing

18  I would probably introduce it by saying as

19  discussed in my deposition so that you

20  wouldn't necessarily feel the need to inquire

21  further.

22          MR. McDANIELS:  Thank you.

23  BY MR. McDANIELS:

24      Q.  Hit me with your bullet points?



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1       A.  All right.  Well, first of all I

2    would comment that these folks don't have

3    any advanced degrees in economics.  In fact,

4    I think one doesn't have any advanced

5    degrees in anything.  We generally and

6    I -- in the field of economics regard folks

7    as having up to anyone of the four gold

8    standards one being a Ph.D. or the highest

9    trading in the field which is a Ph.D. and

10   both of them like that we regard the next

11   level of qualification to be peer reviewed

12   literature so when you have your Ph.D.

13   you've proven that you've mastered the

14   literature when you published a

15   peer-reviewed journal you've actually added

16   to and increased the store of knowledge in

17   the field of economics.

18       Neither of them have any peer

19   reviewed publications in the field of

20   economics.  I think they don't have any peer

21   reviewed publications in any field.

22       The third level of golden standard

23   of increasing qualifications is having

24   taught a college course in the field of

DRAFT COPY


U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 12

1    economics out of the credited college or

2    university to show that not only have you

3    mastered the field, not only have you

4    contributed to the field but you are trusted

5    to pass on the knowledge and wisdom of the

6    field to another generation of economists

7    who are receiving their degrees and neither

8    of them have that.

9          And then the -- the -- the fourth is

10   when you've written a textbook that is used

11   by other professors at other universities so

12   that not only have you passed on your wisdom

13   but other professors around the nation are

14   passing on your wisdom in the field and

15   neither of them have that.

16         So they -- neither of them have any

17   of the four gold standards in terms of

18   highly desirable credentials in the field.

19   Q.  You repeatedly referred to the gold

20   standards.  Who's standard is that when you

21   cite that standard is that a particular

22   standard that is applied in courts that you've

23   testified in or does it come from some

24   arrhythmic economic manual?

DRAFT COPY

 U.S. Legal Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 13

```
 1              What is the criteria for the gold

 2      standard?

 3          A.  I would say that any Ph.D. in any

 4      field of study would agree that those are

 5      increasingly -- desirable qualifying

 6      standards.  It's an informal standard.  And

 7      certainly you don't have to have those four

 8      gold standards to be admitted as an expert

 9      I'm talking about what we in the field of

10      economics frequently discuss as increasingly

11      desirable standards that because I belong to

12      the national association of forensic

13      economics and we're an educational

14      institution and we seek to support other

15      people developing themselves as experts and

16      we hold out that if a person wants to

17      develop themselves as an expert that they

18      seek to have the highest qualifying

19      standards possible and so those are

20      the -- those are the four that I advocate

21      but it's --

22          Q.  In?

23              (Simultaneous colloquy.)

24              THE WITNESS:  It's nothing formal.
```

DRAFT COPY

U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1            MR. McDANIELS:  Thank you, Madam Court

2    Reporter.

3            In terms of name NLB that you

4    referenced, is that an organization that

5    requires one to hold a Ph.D. before joining?

6            THE WITNESS:  No, it's an educational

7    organization seeking to develop people and

8    education in economics and of course we

9    encourage people to get a Ph.D. and get

10   increasingly greater credentials.

11   BY MR. McDANIELS:

12       Q.  Does it require one to have an

13   undergraduate degree in economics?

14       A.  No, it's an educational institution

15   and if you have a 14-year-old daughter she

16   can pay $100 and join of course she wouldn't

17   be leading seminars or leading committees in

18   the organization but she could certainly

19   qualify to be a member and get a copy of the

20   journal on I think twice or three times a

21   year basis.

22       Q.  Your answer as clarified a question I

23   was about ask but let me make sure that I

24   understand.

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1           When you say they as an educational

2    organization you don't mean it is an

3    organization that is an academic setting.  You

4    mean it is an organization that seeks to

5    educate others in this particular instance in

6    the field of forensic economics?

7        A.  That is correct.

8        Q.  Thank you.

9           And membership in the organization is

10   as you mentioned as simple as applying and

11   paying whatever the yearly fee is?

12       A.  Correct and sometimes librarians

13   become members for the university so 24

14   university can receive the journals.

15       Q.  Returning to your bullet point

16   consideration of the report of the defense you

17   first of all mentioned the credentials if you

18   will of the authors of the report.  Let's

19   return to that discussion.

20          What other bullet points would you

21   share with me based upon a your review of the

22   economic report from the defense?

23       A.  The -- I'm just going refer to them

24   as the authors because there's two of them.

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    Indicate that physicians in southwest aren't

2    a bit more than physicians in Michigan and

3    that is a -- I just note that that's a

4    3.18 percent difference and Dr. Greenberg

5    had offers to work in the southwest region,

6    actually.

7          And I understand he intended to do

8    so at the completion of his residency.

9    Number two, they use -- so in statistics

10   there's a few terms of art people have heard

11   of the word average and they heard median

12   and mode and mean.

13         The -- the defense authors use

14   median which is a bias.  It understates the

15   likely expected earnings of someone in the

16   field, and he generally learned that in the

17   first week or two of statistics, the

18   difference between the mean and the median.

19         These doctors, of course, not

20   trained with any advanced education in

21   economics, and I think in one instance no

22   undergraduate education in economics don't

23   understand those who are trained in forensic

24   economics is the difference between bias

DRAFT COPY


U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 17

```
 1    using the median and the correct use and

 2    forensic economic of the mean regarding

 3    wages.

 4         So they --

 5    BY MR. McDANIELS:

 6         Q.  Does?

 7         A.  Let me just finish.

 8         So that produces a bias in the wage

 9    loss if they were -- their advocacy of the

10    median, which is incorrect.

11         Q.  With respect to use of the mean, would

12    you agree that name captures out liars in both

13    the upper and lower end of the range of

14    numbers that are being looked at?

15         A.  It captures the entire population.

16    Anybody could become an outlier.  When Bill

17    gates was in 7th grade no one would predict

18    that he could becoming an outlier.

19         So given that our client our I

20    should say the plaintiff in this case, I

21    don't know of any limitation on his future

22    unless you do, then your defense

23    folks -- unless they can state that thigh

24    would be limited for some reason by virtue
```



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    of lacking sufficient neurons or some other

2    defect in his capacity, there's no reason to

3    think that he doesn't have the same

4    ultimately potential as anybody and

5    so -- and secondly, outlier is purely a

6    judgment and it's a judgment often used by

7    defense folks to create a fudge factor based

8    purely on ad hoc bias.

9           So the means --

10      Q.  Would you a- --

11      A.  I'm sorry, sir.  The reporter

12   admonished us for both speaking at the same

13   time.

14          So the use of the mean captures all

15   the possibilities by using a fudge factor

16   such as the concept of an out liar which is

17   purely ad hoc and without any statistical

18   precise definition of any sort.

19          The defense folks often bias

20   estimates down wards by using the median.

21      Q.  Would you agree with the mean can bias

22   the outcome upwards?

23      A.  No.  In fact, it does give the

24   neutral unbiased estimate, and what we call

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 19

 1    that as a best, B-E-S-T.  It's the term of

 2    art.  The best estimate.

 3        Q.  With respect to use of median --

 4        A.  Can I -- er.

 5        Q.  Or mean?

 6        A.  Yeah.

 7        Q.  With respect to use of median or mean

 8    can you cite me to any cases that require the

 9    use of one over the other in terms of

10    methodology and forensic economic analysis?

11        A.  I know of no judge that has

12    disallowed biased testimony.

13            What judges do allow us for the jury

14    to become educated on how sometimes defense

15    folks will chisel and create bias downward

16    but there is no prescription.

17            The field of economics does not

18    prohibit the introduction of bias what it

19    does is educate people as to how bias exists

20    arises in though exists and it's my job to

21    educate the jury about the bias approach in

22    this instance of the defense office.

23        Q.  And you would agree the defense office

24    may have the same job of offering opinions



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    that may show bias in the sense of your

2    approach?

3        A.  They have whatever job you assign

4    them.  I cannot speculate to what their job

5    is.  I can only tell you that from a

6    statistical point of view the use of the

7    word -- the use of the median bias downward

8    the expected earnings.

9        Q.  In terms of other bullet points...

10       A.  They have -- I -- I will comment on

11   their wage growth but without any objection

12   they use is a 1.9 percent based solely on

13   inflation.  They don't attribute any real

14   wage growth.  It's not a major problem but

15   it is another way of chiseling these figures

16   downward.

17       The discount rate they use includes

18   long term bonds, long term bonds introduce

19   risk into the process.

20   They -- the -- the -- the risk of long term

21   bonds is that inflation may eat away at the

22   value of any award.

23       And the south purpose of introducing

24   the long term bond versus the safe or short

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 21

 1    term bond is so that the defendant will get

 2    a discount or a sale price on the measure of

 3    damages at the expense of the plaintiff

 4    having to take risk.

 5          And if you institute that process

 6    whereby the defendants get a reduced price

 7    on the damages, a sale price or a discount

 8    on the damages the plaintiff is forced to

 9    take a risk.

10          And if that risk goes against the

11    plaintiff, there's no way for the plaintiff

12    to come back into court in five or ten years

13    and ask the defendant to makeup the

14    difference.

15          The sole advantage is to the

16    defendant and the sole exposure in risk is

17    observed by the plaintiff and nowhere in any

18    financial newspaper do you open up and see

19    an add by Merrill lunch and other investment

20    firms that say let us invest your money and

21    if the risk goes in the favor of the

22    investment, we will capture all the reward

23    and take it as our own and not share one

24    penny with you.

DRAFT COPY

 U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1           If on the other hand the risk goes

2    against the investment and you're investment

3    loses value, you will suffer in shoulder

4    100 percent of the loss and we will not

5    suffer one penny.

6           And that's effectively the

7    proposition that the defense authors are

8    requesting the jury to impose on the

9    plaintiff, the heads we win as defendants

10   and the tales you use as plaintiff

11   investment strategy.

12       Q.   What's the discount rate that used?

13       A.   I use a short term real rate of

14   1.25 percent.

15       Q.   And they use what rate?

16       A.   They use a long term nominal rate of

17   6.54 percent.  Shall I go on?

18       Q.   Are there -- in just a minute.

19           Are there presently low risk or risk

20   free investments that have an interest rate

21   higher than discount rate that you use -- that

22   you would consider safe?

23       A.   I use what the term of -- what the

24   field of finance terms to be the risk free

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 23

1    rate.  It's by definition the risk free

2    rate.  They use a riskier rate and the

3    government has to raise the rate on long

4    term bonds in order to induce investors away

5    from the low risk and into the higher risk

6    after all the government doesn't just

7    stupidly pay people more money for nothing

8    it has to pay them in order to sell those

9    bounds because they are less desirable due

10   to the risk.

11       Q.  My question was:  Are there safe

12   investments available at a higher interest

13   rate than what you have identified --

14       A.  Milton Freeman --

15       Q.  -- right?

16       A.  -- famously said there is no free

17   lunch and so the answer is no you don't get

18   something for nothing in the field of

19   finance unless you're listening to Bernie

20   Madoff.

21       Q.  You said that they had a wage group of

22   1.9 person.  What percent did yeah use?

23       A.  I used 1 percent above inflation

24   with an assumption of approximate 2 percent

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 24

1    inflation.  So an estimate of a 3 percent

2    wage growth.  There's -- they attribute no

3    real wage growth at all which is, I think,

4    an ultra conservative assumption.  It's

5    just -- it doesn't bear with reality.

6          The average wage nationwide grows at

7    the rate I use, which is one percent above

8    inflation.  They don't give the plaintiff

9    credit for getting an average wage growth

10   that a carpenter would get.

11       Q.  Other bullet points with respect to

12   your criticisms?

13       A.  They use what is called a work life

14   which doesn't take into account that people

15   in the medical field are unlikely to be

16   unemployed for economic reasons.  In fact, I

17   think we I understand that there's a

18   shortage of doctors and if you haven't

19   notice I had certainly have that these days

20   it's taking a lot longer to get an

21   appointment with a doctor than it used to,

22   which indicates more shortage.

23          And he -- I believe will testify

24   that he intends to work as long as he is

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    physically able to and so the work life

2    tables that the defense uses is another way

3    of chiseling down the losses by assuming

4    that he will be laid off due to economic

5    reasons and other reasons why he wouldn't be

6    working.

7            I produce a table that shows that

8    plaintiffs capacity to earn year by year I

9    leave it to the trier of fact to determine

10   when those losses would end.

11           So that's a contrast in our --

12       Q.  In terms of -- of your production of

13   the table you've relied on, the state of

14   Dr. Greenberg as to his intent with respect to

15   continuing to work?

16       A.  May I complete the last sentence of

17   my last answer, sir?

18       Q.  I thought you had, Dr. Smith, I'm

19   sorry?

20       A.  Well, mire last words were so that

21   is -- and then you began your next question.

22           So my last answer ends that so that

23   is and I now continue, the difference

24   between their approach and my approach and

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    may I hear your question again, sir?

2         Q.   You've relied on the statement of

3    Dr. Greenberg with respect to his intent to

4    work to the end of his life expectancy in

5    terms of the upper limit if you will to your

6    projection?

7         A.   No, I don't.  I leave it to the jury

8    to determine that.  I simply note that I

9    believe that's what the testimony and

10   intention is of Dr. Greenberg.

11        Q.   In terms of the numbers that you

12   provided, does it not end with his life

13   expectancy?

14        A.   It goes to each and every future

15   year for the jury to select and then it does

16   end at the life expectancy so that they have

17   every single possible option.

18             Something that the defense economist

19   don't give the jury the option, they don't

20   treat the jury like they are, intelligent

21   enough to figure this out on their own by

22   listening to Dr. Greenberg they impose a

23   table that does not apply to him so that

24   they either have to file -- follow a hook,

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 27

1    line and sinker or it is useless entirely.

2            And they give the jury no choice.  I

3    treat the jury as if they have intelligence

4    and that they will quant to see what their

5    options are and I give them all the choices

6    of all the possible retirement years into

7    the future.

8        Q.  Do you agree with the following

9    statement:  To determine a statistically

10   average work life for people in the labor

11   force economist use work life tables published

12   by the U.S. government that show the total

13   number of future years of participation in the

14   labor force adjusted for age, race, gender and

15   education?

16       A.  It applies to the -- to a

17   statistically average person or a large

18   group of people.  It doesn't apply to a

19   specific individual where we have known

20   factors such as that he is a professional

21   who intends to work through to his physical

22   capacity to do so.

23           It is perfectly fine if someone says

24   let's make an average shoe for the





ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    statistically average person but you can't

2    try and put the statistically average show

3    sees of ten and a half C and expect that

4    Shaq O'Neal will be pleased if you give it

5    to him as a present.

6        Q.   Have you made a decision that

7    Dr. Greenberg is the Shaq O'Neal of the

8    medical profession?

9        A.   Well, I think the jury will here

10   that he -- first of all is a profession that

11   worked longer than statistically average

12   work life folks and a doctor in -- a

13   profession that we all know is experiencing

14   shortages.

15        And he himself will I believe

16   testify that he intends to work long into

17   his career as long as he is capable of doing

18   so which is common for many doctors and none

19   of that is taken into account by the work

20   life table that the defense uses and the

21   jury should hear that so that they can make

22   their own decision.

23        But I have not said he's Shaq

24   O'Neal.

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1              (Simultaneous colloquy.)

2         MR. McDANIELS:  Excuse me I have not

3   said he's the Shaq O'Neal I said there's many

4   manner a factors that I think the jury can

5   conclude that average shoe does not fit

6   Dr. Greenberg.

7   BY MR. McDANIELS:

8      Q.  Is it your testimony that the U.S.

9   government's work life tables does not include

10  professionals and in particular, those in the

11  medical career?

12     A.  It is not limited to that.  So if

13  you take the average -- if you want to

14  measure the average height of someone and

15  you include the entire national basketball

16  association, it's unlikely that that will

17  statistically apply to folks who work for

18  example at an Amazon warehouse because they

19  typically don't hire basketball players so

20  it's a bias.

21         So if you include the work life of

22  the entire population you have an

23  extraordinary bias if you try and apply it

24  to a physician.

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 30

1      Q.  Do you agree with the following

2   statement:  These tables, referring to the

3   work life tables, do not take into account

4   unemployment but incredibly most economist

5   failed to reduce the work life for this

6   factor, there by producing a five foreign

7   7 percent upward bias of white males and even

8   more for other categories of people in the

9   workforce?

10     A.  Well you're citing a report I wrote

11  so that defense attorneys would have

12  something to depose me with because I know

13  that they're so busy I wrote an article that

14  they could use against me and it's published

15  in many different areas.

16        And so I'm happy that you found it

17  so that you didn't have to do your own work

18  to prepare for today's deposition you can

19  merely read for my article helping defense

20  attorneys oh, understand how to attack a

21  plaintiff.

22        So congratulations for that

23  discovery.

24        But the work life tables in the

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1   article I wrote are not the Skoog, Ciecka

2   and Krueger tables that your defense CPAs

3   use.

4           So I agree with the statement as it

5   applies to government work life tables but

6   actually as in your last question I should

7   have noted that your defense CPAs are not

8   using the government work life tables?

9       Q.  Did you use the government work life

10  tables?

11      A.  I told you what I did.  And so no, I

12  didn't use the government work life tables

13  nor did I use the Ethiopian phone book I

14  used the wage loss year by year that I

15  expect this plaintiff will sustain for as

16  many years as the trier of fact may believe

17  he will have the ability to work, period.

18      Q.  Does the Ethiopian phone book have

19  information that you would consider reliable

20  in this case?

21      A.  I'm going wait for the next

22  intelligent question if that was.

23          If that was intended as a joke, I'm

24  ready and willing to laugh.

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 32

1       Q.  Well, I'm wondering while you included

2   it in your answer?

3       A.  It was a metaphor, sir, but I'm

4   wondering why you included it in your

5   question.  I didn't expect you to take it

6   literally I hoped it would be educative, but

7   I think I failed.

8       Q.  In terms of other bullet points of

9   disagreement are there any?

10      A.  Yes.  Just say points of comment.

11  Some of my comments contain elements of

12  disagreement some of my comments are

13  observations.

14          So well the net overall bottom line

15  is that the misapplication of standard

16  forensic principals by folks who are not

17  trained in any -- in forensic economics or

18  any advanced field of economics, the defense

19  comes up with a very bias downward net loss

20  figure.  That's the net overall result of

21  the biases and misapplications of

22  methodologies that I've listed above.

23          With regard to the next area, with

24  regard to offset, they use median earnings

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 33

1    again of urgent care physicians and for

2    example they state that Dr. Greenberg should

3    have earned $285,000 in 2018.  Well, my wife

4    says I should have made $20 million in 2018.

5    But the fact is, I didn't earn $20 million

6    in 2018 as much as my wife would have hoped

7    I might have.

8            And as much as the Theriot Comeaux

9    hoped that Dr. Greenberg would have earned

10   $285 in 2018 and while they assumed he would

11   so that the defense would get credit for

12   $285,000 in 2018, they are wrong.  They've

13   overestimated his income due to their

14   defective methodology.

15           And in fact, Dr. Greenberg earned

16   $200,000 in 2018 again proving the

17   misapplication and bias of the defense

18   report.

19       Q.  Did you use any statistics with

20   respect to projecting Dr. Greenberg's

21   potential earnings in the urgent care arena,

22   and if so what mean did you use out of those

23   ams?

24       A.  Well, when I get to my report we can

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1   discuss that.  The reporter had a question

2   for me.  If you could just pause for one

3   moment.

4        So that was my last comment.  In you

5   would like to discuss my report and you want

6   to start with the offset or did you want to

7   start with the projections?

8      Q.  I want you to answer the question that

9   I asked, the court reporter corrode it back

10  too you?

11     A.  No need.  Well, I often claim to

12  have bad memory it's not quite that bad.

13     Q.  Is there an answer?

14     A.  I am shuffling the papers we don't

15  have the advantage of a video if you will be

16  a little patient switching to my report and

17  the work that I did.

18        I used average earnings of urgent

19  care folks in urgent care medicine so yes, I

20  use statistics?

21     Q.  And you use the mean of those

22  statistics?

23     A.  Yes.

24     Q.  And specifically, are those the

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    statistics that were provided you from

2    Ms. Julie Sheriff?

3            I may have misspoke my assumption is

4    the materials were provided to you by

5    plaintiff's counsel.  But were the materials

6    supplied to plaintiff's counsel by

7    Ms. Sheriff?

8        A.  Well, I -- I used -- I will tell you

9    what I used.  I used the 2018 wages and

10   projected those to grow to the average

11   earnings of urgent care and urgent care

12   medicine by 2028.

13       Q.  And in terms of the number to which

14   they were to grow by 2018, were those

15   materials that you researched and found or are

16   those materials that were supplied to you from

17   Ms. Sheriff?

18       A.  It's from to a survey available to

19   anybody.  MHA survey while we've obtained

20   that survey a number of times, I can't tell

21   you in this instance who's copy we used.

22           I believe it is the -- let me just

23   take a look.  It's the Sheriff healthcare.

24       Q.  Thank you Dr. Smith are there other





ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1   criticisms or comments with respect to the

2   defense economic analysis?

3        A.   No.   That's the end of my

4   observations.

5        Q.   Thank you.

6             I've been provided your CV.   In terms

7   of your BS degree that was received in 1968?

8        A.   Yes.

9        Q.   If I were to look at your diploma or

10  your certification what would it identify your

11  area of study as?

12       A.   The certificate was issued by the

13  Cornell university school of engineering and

14  I think it would list it as the -- I know it

15  says operations research, I think they refer

16  to it as the department of operations

17  research or in the field of operations

18  research.   It's exactly as my resume says.

19       Q.   And it is from the engineering school

20  at Cornell?

21       A.   Cornell university college of

22  engineering, yes.

23       Q.   And your MS was in 1986 and again what

24  would your degree say with respect to the



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 37

1    degree given?

2        A.  Well, I believe it was 736789 I'm

3    not sure do you have the resume there?

4        Q.  I made notes from it.  I wrote 76, but

5    there are times when I'm dyslexic.  I may have

6    missed it by --

7        A.  No matter, it doesn't matter, I

8    believe it was 73 or maybe even 72, because

9    I haven't memorized that date.

10            But it's from the University of

11   Chicago graduate school of business master's

12   degree.

13       Q.  So it just says, college of business

14   master's degree?

15       A.  It says the graduate school

16   University of Chicago graduate school of

17   business master's degree.

18       Q.  And it doesn't give a particular

19   curriculum or size in which the master's

20   degree was given?

21       A.  Correct, you can go to my school

22   records and you will find out that my field

23   was general economics as posed to marketing

24   or statistics or other specialized fields

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 38

1    that you can take after gradual school of

2    business.

3        Q.  And then your Ph.D. was 1997 in

4    economics?

5        A.  Yes.

6        Q.  Your report is on the letterhead of an

7    entity entitled Smith economics group limited.

8    How long has that business been in formation?

9        A.  Since the middle 80s.

10       Q.  That's partnership?

11       A.  It's an Illinois corporation.

12       Q.  How many employees?

13       A.  A staff of 18 employees.  A

14   couple -- I think two are part-time.

15       Q.  And what's the scope of this work, the

16   organization's work?

17       A.  Hawaii to main Alaska to Florida,

18   U.S. virgin islands even further southeast

19   and if you want to go further west than

20   Hawaii I have done work in sigh pan and

21   Guam.  So pretty mum the entire United

22   States and perhaps all of its territories I

23   haven't memorized the list of the

24   territories but...

DRAFT COPY


U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1      Q.   Beyond geographic area, what's the

2    scope of this work in terms of services that

3    it renders?

4      A.   Economic and financial consulting,

5    some of it the a minority to closely held

6    private businesses sometimes we do business

7    valuations for a company looking to either

8    cell a company or buy company sometimes we

9    do business valuations for litigation so

10   much of our private business consulting can

11   also apply to litigation and sometimes

12   doesn't apply in litigation.

13          And the -- besides we do loss of

14   other business analyses for litigation and

15   we do a fair amount of personal injury,

16   perhaps half or so of our overall work is

17   related to and I really should say wage loss

18   wage loss can arise in a claim such as being

19   made by Dr. Greenberg in today's case wage

20   loss can arise for defamation, it can arise

21   from somebody dying in a plain crash, as I

22   interviewed folks from the Indonesian line

23   air 747 max crash yesterday so we do wage

24   losses of all sorts for all sorts of

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 40

1    reasons.

2        Q.  In terms of the letterhead, it has

3    across the top under the name

4    economics/finance/litigation support, of the

5    work of Smith economics group, how much is

6    litigation support?

7        A.  It's about 75 to sometimes 80,

8    85 percent depending upon how much

9    nonlitigation work there is.

10       Q.  And of that 75 to 80 percent would you

11   say that half of that is in the area of wage

12   loss determinations?

13       A.  Yes.  Perhaps a bit more.

14       Q.  Of the 18 employees how many other

15   forensic economists do you employ that write

16   opinions and testify?

17       A.  0.

18       Q.  How much of your time do you spend in

19   the context of litigation related matters?

20       A.  The percentages I gave you relate to

21   my time.

22       Q.  I looked at your list of publications

23   without going through those.  Would you agree

24   with me that the majority of those address

DRAFT COPY

U.S. Legal Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    nondamages and various methodologies in terms

2    of predicting those damages?

3        A.   I think if you count instances of

4    publications that's true but what you'll

5    find is that there's really one core article

6    which was republished in maybe 20, 30 states

7    that is essentially the same article but

8    differentiated by case law applying to that

9    particular state regarding testimony and the

10   claim for loss of quality of life.

11          So I don't mean to say I've written

12   30 articles or 40 articles on hedonic

13   damages, I wrote one article that has a

14   paragraph or two variation on the case law.

15   But, yes, it has been a significant

16   component of my publications but it's only

17   one chapter for example in the textbook that

18   I wrote in forensic economics.  It's -- it's

19   one of 12 or 13 chapters.

20       Q.   Whom were you retained in this case?

21       A.   The flood law firm.

22       Q.   And have you worked in the past for

23   the Flood Law firm?

24       A.   I believe there was a prior



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 42

1    instance.

2        Q.  Prior to your retention in this case

3    did you know Dr. Eric Greenberg?

4        A.  No.

5        Q.  As part of your work in this case have

6    you had any personal meetings with Dr. Eric

7    Greenberg?

8        A.  No, but I -- let me clarify because

9    I don't want to play hide the ball.  I

10   recognize you've got a job to do and

11   I -- and I want the answers to appear as if

12   I'm fully forthright and forthcoming.

13          I have not had a personal meeting

14   with Dr. Greenberg but there was what I will

15   call a personal telephone call and it was

16   not by me but by a member of my staff who is

17   trained -- one of my staff economic research

18   analyst is assigned to any given case and in

19   this instance one of those analysts by the

20   name of -- let me just check my file.

21   Michael Lindbloom, L-I-N-D-B-L-O-O-M, was

22   assigned together information for my review

23   to include, for example, the life expectancy

24   of Dr. Greenberg and to include information

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1      about Dr. Greenberg's career.  He's trained

2      to make phone calls to find out information

3      I need in this instance I directed him to

4      make the phone call to Dr. Green burg to get

5      information about Dr. Greenberg's career and

6      there are a page of notes regarding that

7      phone call in my file.  The call was at my

8      direction at my request on August 5, 2019,

9      and it was conducted under my personal

10     supervision, although I was not on the line

11     or in the room.

12         Q.  Is there -- because I don't have in

13     front of me that page of notes -- is there an

14     outline, if you will, that your staff members

15     utilized for the making of such phone calls or

16     the conduction of such interviews?

17         A.  No, that would be too much

18     micromanage:  My staff are trained to ask

19     open ended questions what's your career what

20     has been the impact on the allegations in

21     this case on your career and how has that

22     shaped and changed your career prospects.

23             And those are very open ended

24     questions candidly if you told me you have



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    an intelligent paralegal and two weeks I

2    could train her to conduct the type of phone

3    call that was needed in this case,

4    Dr. Lindbloom is highly sophisticatedly

5    trained in many areas this required -- this

6    phone call required the very least of his

7    many skills.

8        Q.  And there are notes reflecting the

9    conversation that Dr. Lindbloom had with

10   Dr. Green burke?

11       A.  Typewritten, yes.

12       Q.  And the notes were taken on what day

13   did you say?

14       A.  Five August 2019.

15       Q.  From the contents of the notes how

16   long do you think the conversation lasted or

17   does the notes have a start and stop time?

18       A.  I can only give you an estimate.  I

19   would say something probably more than half

20   an hour perhaps but likely less than one

21   hour.

22       Q.  Dr. Smith could you provide a copy of

23   that document to the court reporter to attach

24   as Exhibit Number 2?

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1      A.   Certainly.

2           MR. SMITH:   I'd ask that Dr. Smith

3   provide it to us first because we haven't seen

4   it and then I will review it for any privilege

5   concerns and then we'll assuming that no

6   privilege concerns, we'll provide it to the

7   court reporter for inclusion.

8           THE WITNESS:   Mr. Smith, I can PDF a

9   copy of it to you by email.

10          MR. SMITH:   That would be great.

11  Thank you.

12  BY MR. McDANIELS:

13     Q.   And it is that document, Dr. Smith, up

14  on which you relied for the earlier statements

15  you made in terms of Dr. Greenberg's

16  representation in terms of his work life

17  expectancy?

18     A.   It is the document to which I cite

19  for his statements, yes.

20     Q.   You've testified in state and federal

21  courts throughout the country?

22     A.   Yes.

23     Q.   The area in which you have been

24  qualified to testify is the area of economics

DRAFT COPY

U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 46

1    or forensic economics?

2        A.  Mostly, yes.

3        Q.  Have you ever divided your caseload in

4    cases where you've retained by the plaintiff

5    versus cases where you're retained by the

6    defense?

7        A.  Informally because I know no formal

8    tracking method.

9        Q.  What's the informal split?

10       A.  Where we are looking at business

11   related litigation and by that I'll include

12   many types of class actions.  For example, a

13   company makes up growing machine and there's

14   a faulty device on it and there could be a

15   class action claim, I would recall that a

16   business type of litigation.

17           It's about 50/50.  And in claims for

18   wage loss it's more for plaintiff about

19   three quarters or so.

20       Q.  Have there been instances where your

21   opinions have been struck?

22       A.  There are many reasons why the

23   testimony I am proposed to give may be

24   limited in some form or another, yes.

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 47

1     Q.  Have your meths ever been described as

2   poor science for the courtroom?

3     A.  I don't specifically recall.

4     Q.  Has your methodology ever been

5   criticized as failing to meet the Daubert

6   standard?

7     A.  I have mel the Daubert standard many

8   times but there have been instances where

9   applying the exact same standard a judge in

10  one courtroom may admit it, and the judge in

11  the adjacent courtroom may disallow it, and

12  that has happened.

13    Q.  In the same way that you've tracked

14  your testimonial experience, have you tracked

15  the number of instances where your opinions

16  have been excluded?

17    A.  I don't keep track of where I

18  haven't gone, no.

19    Q.  When were you retained in this case?

20    A.  I opened up a file at the end of

21  this year.

22    Q.  I have a case information form that

23  was supplied to us with a days -- with a date

24  of 7/29/2019.  Is that what you would

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 48

1    reference to determine when you were retained?

2        A.  My staff is trained put on a file

3    tab for each file and the tab says July 30,

4    201.  It's the file is created when we

5    actually have an object to put into the

6    file.

7        Q.  And so I know that I'm looking perhaps

8    at what you're looking at since we're not in

9    the same room I have a two-page -- well

10   actually it's front and back.  It would be a

11   total of three pages.  And with the letterhead

12   across the top and then it has case

13   information form and it has today's date being

14   7/29/2019.

15          Do you have that paper in front of

16   you?

17       A.  Of course.

18       Q.  And is that what would be your

19   company's if you will, opening document?

20       A.  Well, there's many things we might

21   receive that cause us to open a file.  This

22   is frequently one of them.

23       Q.  Is this what would be memorialized at

24   the company when you open a file?

DRAFT COPY

U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1      A.  I don't understand what you mean,

2   memorialized if we receive it we put it into

3   the file.

4      Q.  Does your company create this type of

5   form when a file is opened?

6      A.  This form is available on our

7   website and of course I created the form but

8   in terms of the form content we don't create

9   the content we rate the -- I create --

10     Q.  The form is a -- excuse me, I'm sorry

11  go ahead?

12     A.  Yeah, to clarify I create the

13  questions not the answers.

14     Q.  In terms of the handwriting that is on

15  this form, do you recognize that handwriting?

16     A.  It is no one at my firm and I do

17  not.  We do not fill out the form ourselves.

18     Q.  When you say the form is available on

19  the website if I wish to retain you could I

20  download this form, fill in this information

21  and then send it to your form is that how some

22  of the retentions are made?

23     A.  No that just will get our attention

24  to place a phone call to discuss a

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    retention.

2        Q.  Okay.  So in terms of the information

3    contained in this report, you don't -- I'm

4    sorry -- in terms of the information contained

5    on this form you do not recognize the

6    handwriting?

7        A.  I so stated that I do not but I will

8    tell you.

9        Q.  And it?

10       A.  It is of no one with whom I have had

11   contact with personal, physical contact --

12       Q.  And?

13       A.  -- it would be no one at my firm.

14       Q.  With respect to the information

15   contained there in, did you under take to

16   verify any of the information?

17       A.  Our assignment is to incorporate

18   what we understand will be the plaintiff's

19   claims at trial and this form contains some

20   of those claims so we are not assigned to

21   conduct surreptitious video surveillance nor

22   to can conduct lie detector tests and so it

23   would be waist of my client's money to seek

24   to do something that we were not assigned.

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1        So I didn't verify for example

2    Dr. Greenberg's date of birth.  I simply

3    assumed that it is correct on this form.

4        Q.  After you were retained did yeah

5    request materials to review to formulate your

6    opinions?

7        A.  This form does request information

8    itself, including depositions and earnings

9    information so.

10       Q.  Given the form of whatever would have

11   been part of your retention, what did you

12   understand the scope of your work to do when

13   retained?

14       A.  The assignment is itemized in the

15   first paragraph of my report which is to

16   calculate the lost wages as a result of the

17   alleged wrongful termination of

18   Dr. Greenberg.

19       Q.  And in order to fulfill that

20   state -- that scope did you request any

21   materials?

22       A.  I indicated the intake form itself

23   has a request and the information we were

24   sent is itemized.

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 52

1        Q.  And what --

2        A.  In the --

3        Q.  And what material --

4        A.  The information that I was sent is

5   itemized on page 2 of my report under the

6   background section a set of eight documents.

7        Q.  And those are the materials that you

8   received and reviewed by the time that you

9   generated the report dated August 15, 2019?

10       A.  Yes, which of course as we discussed

11   does not include the defense accountant

12   perspective.

13       Q.  What is the expert witness agreement

14   referenced in number two on page 2?

15       A.  The complete statement of

16   number -- Item Number 2 is the expert

17   witness agreement and report by Julie

18   Sheriff S-H-E-R-R-I-F-F.  And that is

19   a -- just a moment.  That's a 5-page

20   document.

21            If you haven't seen it before I can

22   describe it to you but I would have thought

23   that the defense accountants had it

24   available to them maybe not.

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 53

1        Q.  I had seen sheriff's report and

2   perhaps I missed it if she titled her report

3   expert witness agreement.  I'm curious if

4   there's any portion of whatever agreement she

5   had with plaintiff that has any barren on your

6   opinions of this case.

7        A.  The first two pages which appear to

8   be her agreement are merely a listing of her

9   fees.

10       Q.  You would agree with me that with

11  respect to that document it has no bearing on

12  your economic calculation?

13       A.  The first two pages of what I have

14  paper clipped as a 5-page document do not

15  contain any of her opinions and, therefore,

16  they were not used by me.

17       Q.  In terms of your report you sought to

18  establish the earnings base for Dr. Greenberg?

19       A.  Yes.

20       Q.  And in order to establish that

21  earnings space what materials did you utilize?

22       A.  The two contracts.

23       Q.  Did you look at Dr. Greenberg's

24  historical earnings in the ER setting?

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1      A.  They would not be applicable and I

2   did not.

3      Q.  So you did not grow them out to a

4   national average because you did not believe

5   them to be applicable at the outset?

6      A.  I assume that he was going to be

7   working under the contracts that he was

8   offered.

9      Q.  So it's fair to say that with

10   represent to your selection of earnings base

11   it is completely reliant on the contracts that

12   are listed on page 2 of your report and were

13   represented to you or to your office by

14   Dr. Greenberg had they been given to him?

15      A.  It incorporates the financial terms

16   of those two contracts.

17      Q.  Did you do any survey with respect

18   to -- strike that.

19         Did you do any analysis in the

20   projection of his potential earnings using

21   statistics that would show a national average

22   for what ER physicians make?

23      A.  I did no survey but the Sheriff

24   report I believe contained some information

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    in that regard consistent with --

2        Q.   Did you use any of that in your

3    projections of his potential earnings base?

4        A.   I used those two contracts for the

5    purposes of determining his future earnings

6    and I believe although I will let -- just

7    one moment, please.  Mr. Z testified on his

8    own behalf I believe that Mr. Sheriff has

9    produced information showing that Dr. Green

10   burg could have easily expected earnings at

11   the level and even higher than level of the

12   two contracts that he was offered.

13       Q.   Did you review the two contracts?

14       A.   I have them with me and I reviewed

15   everything in my file, yes.

16       Q.   On page 3 of your report you indicate

17   that Dr. Greenberg recalls that he had signed

18   a contract to work at an emergency room doctor

19   at St. David's hospital.

20            Do you see that on page 3?

21       A.   Yes.

22       Q.   Do you have a contract signed by

23   Dr. Greenberg showing his agreement to work in

24   the terms of such agreement at St. David's

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    hospital?

2        A.   The copy of the contract I have

3    indicates that it had been signed by

4    Dr. Greenberg but I am not a document

5    examiner and I would leave it up to others

6    to make a determination of which copies of

7    the contract were executed and legally

8    binding and which copies of the contract

9    merely reflect the terms under which

10   Dr. Greenberg believes he was offered and

11   expected to work.

12          I'm not here to testify as to

13   whether someone was signed and legally

14   binding or not.

15       Q.   Per your statement at page 3,

16   Dr. Greenberg's recollection is he signed a

17   contract for St. David, also provided a

18   contract for metro flex.

19          Did Dr. Greenberg represent to you

20   that he had signed a contract from metro flex?

21       A.   If it's not in my work notes then he

22   didn't represent it.   The only two contracts

23   that I candidly care about are the two that

24   I reference in my report that I base my

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 57

1    opinion on.  There's a --

2        Q.  Would you refer to Exhibit Number 2

3    and see if it references its specific

4    recollection of Dr. Greenberg with respect to

5    signing contracts and if it does read me the

6    statement on Exhibit Number 2 since I don't

7    have that?

8        A.  Sure, but it wouldn't matter to me

9    whether he represented he signed the

10   contract or not.  I will tell you that the

11   copy --

12       Q.  Why is that?

13       A.  I gave an answer to that earlier

14   about why it doesn't matter whether he

15   signed it or not.

16           What I have assumed is that he would

17   work under these two contracts whether they

18   were legally executed whether they were

19   notarized whether they were stamped whether

20   they were recorded with the national

21   registry in Washington, D.C. I have no idea

22   nor do I care.

23           I only assumed and I will inform the

24   jury that my work is based on him working

DRAFT COPY

U.S. Legal Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 58

1    under these two contracts.

2         If someone things that he wouldn't

3    work under those two contracts that's fine.

4    But I don't care whether they were signed or

5    not.  It's irrelevant to me.

6    Q.  So your assumption you've taken his

7    word that that is a contract that he would

8    have worked under you've done nothing to

9    verify whether in fact those offered of

10   employment were in fact made?

11   A.  Well, you've asked a multiple part

12   question so let me try and remember all the

13   parts.

14        No I didn't take his word.  My

15   assignment as I said earlier in this

16   deposition was to understand what will be

17   the plaintiff's claim and assertion at trial

18   and what evidence relative to my area they

19   are providing at trial and so I understand

20   that plaintiffs will be asserting that

21   Dr. Greenberg was going to be working under

22   these contracts.

23        If you wish to know whether he

24   signed it and where the executed copies and

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 59

1    whether they were notarized, I'm sure

2    plaintiff counsel can discuss that

3    information with you.

4         As to whether we bothered to note

5    whether Dr. Greenberg said he signed it or

6    not which is irrelevant to me I can take

7    some time and review these notes for that

8    irrelevant statement if you wish.

9         Q.  I would like you to do that.

10        A.  Although his notes appear -- notes

11   indicate that he recalls signing the

12   St. David ER agreement, I will note that the

13   copy of the metro flex agreement I have also

14   indicates that it was electrically signed by

15   Dr. Greenberg so it appears that

16   Dr. Greenberg signed both contracts,

17   although I will leave it up to other

18   professional document examiners to determine

19   that.

20        Q.  Do you agree with me that both of the

21   contracts you are looking at contain a

22   watermark that said sample?

23        A.  Yes.

24        Q.  Do you agree with me that neither

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 60

1    there, the signature of the agency making the

2    alleged offer?

3        A.  It says E signer signature so that

4    to me indicates an electrical signature but,

5    sir, I do not care whether these have been

6    signed or not.  I have use said them.  If

7    you knowing I have been absolutely stupid

8    fooling and misguided you may inform the

9    jury.

10            But let's not argue now over

11   something I am telling you repeatedly as

12   irrelevant we've agreed that this deposition

13   will hopefully will end early so everyone

14   can go on with their way.

15            Whether this document was signed or

16   not I will tell you from not quite but maybe

17   close to the 10th time I do not care.

18       Q.  Do you care if the offer was made?

19       A.  I've told you what I've assumed.  I

20   only -- only thing I care about is that I

21   have been asked to assume that these two

22   contracts are representative of what the

23   client will present at trial in terms of the

24   earnings that he expected to make, period.

DRAFT COPY

U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 61

1    I care about nothing more than what

2    plaintiff's assertion will be.

3            Could we take a 10-minute break.

4                    (Whereupon, a recess was

5                    had.)

6    BY MR. McDANIELS:

7        Q.  Dr. Smith, as part of your work in the

8    case you indicated you rely on the sample

9    contracts that were provided to you.

10           Did Dr. Greenberg provide those to you

11   or did they come from counsel?

12       A.  Everything in my file that I did not

13   generate came from counsel.

14           I typically do not receive

15   information directly from claimants unless

16   it's a business litigation where I'm

17   retained by the party themselves as opposed

18   to their counsel.

19       Q.  So as far as the conversation, if one

20   of your staff or you are having a conversation

21   with a plaintiff in the case and materials are

22   mentioned, you wouldn't ask the plaintiff to

23   forward those to you?

24       A.  It is my standard practice to

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 62

1    specifically ask that all information come

2    through the counsel that is engaged us and

3    we actually decline to receive things

4    directly unless the counsel happens to be on

5    the phone line and they agree that we should

6    get something directly.

7            In this case we got everything

8    through plaintiff counsel, period.

9        Q.  Is it your practice for counsel to be

10   on the phone for the interview of the type

11   that occurred with Dr. Greenberg?

12       A.  It's my practice where it's useful

13   to do so and it's my practice not to when

14   it's not useful to do so.  In every case

15   it's specific but in general how often does

16   that happen?

17           It's very rare.

18       Q.  Do the notes that are attached as

19   Exhibit 2 indicate whether that happened?

20       A.  Plaintiff counsel was not on the

21   call.

22       Q.  In terms of your work in the case

23   would I be correct that you chose the

24   geographic area of Texas for the area where

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    Dr. Greenberg would have his earnings

2    based -- again based upon a the two sample

3    contracts?

4         A.   I didn't chose any area I used those

5    two contracts.

6         Q.   In terms of your work in this case,

7    did you have any conversations or did you

8    collect any information from Dr. Greenberg

9    that would represent other places that he had

10   professed an interest in working?

11        A.   There is nothing in the notes that

12   indicated any interest beyond the two

13   contracts that I understood he signed.

14             THE WITNESS:  Off the record.

15                  (Whereupon, a recess was

16                  had.)

17   BY MR. McDANIELS:

18        Q.   Your investigation into his potential

19   earnings ability include any information from

20   him with respect to other career paths that he

21   was thinking of pursuing?

22        A.   Yes.  He stated that eventually in

23   his career he had hoped to work in a -- he

24   used the term medical director ship.

DRAFT COPY

 U.S. Legal Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 64

1     Q.   In terms of having learned that

2   information, do your calculations take into

3   account that change?

4     A.   No, I believe that that would

5   increase his prospective earnings over time

6   but I made note further inquiry into that

7   prospect since he said it was so early in

8   his career to think about it that it was

9   only something that he had, quote, hoped one

10   day, unquote.

11     Q.   What's the basis of your opinion that

12   you believe that would increase his earnings

13   over time?

14     A.   I have studied earnings of folks in

15   the medical profession for many, many years

16   and while I did no research in this

17   instance, it is my belief that due

18   to -- from past research that such a

19   position could have a very, very significant

20   increase in pay over that of a -- of a -- of

21   the career that -- for which the contracts

22   represent his earnings.

23     Q.   And is the basis for that belief that

24   a physician owner/administrator makes more

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 65

1    than a physician employee?

2        A.  I'm un -- I see nowhere in my file

3    the term for the career you mentioned.

4        Q.  Well I'm trying to understand what's

5    the career that you described as medical

6    administration that would result in a greater

7    earnings capacity?

8        A.  Well, that --

9        Q.  Is it ownership of a --

10       A.  That --

11       Q.  What does it mean?

12       A.  Well, that term is your term.  It's

13   not my term. And Dr. Greenberg said medical

14   director ship if you wish to know more,

15   perhaps plaintiff counsel will give you

16   leave to depose him.

17       Q.  What I would like to know is what are

18   the career options that you've studied how

19   would you define them a medical director ship

20   that allows you to say he would have earned

21   more in that capacity?

22       A.  I have no opinion about what he

23   would earn in that capacity.  Though, I will

24   express at trial other than I believe such

DRAFT COPY


U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    people not Dr. Greenberg, can earn more than

2    doctors but since I'm not give an opinion

3    about that with regard to Dr. Greenberg's

4    future, I will decline to give you a 10-hour

5    lecture on everything I know about what

6    people earn in medical can rears.

7         Q.  Did you have any investigation into

8    residency programs that he applied for?

9         A.  I'll answer that question in a

10   minute.

11             But I actually thing and I don't

12   mean this to be a criticism, if you would

13   take the time now to go through my report in

14   terms of what I did and how I did it you

15   will then learn the 40 billion things I did

16   not do one of which you just mentioned.

17             So rather than asking me about 40

18   billion things you think I might have done

19   or you're interested as to whether I did or

20   not you will learn if we go through my

21   report the -- the specific not too many

22   things I actually did and then you don't

23   have to speculate about the 39,999,998,000

24   other things that you think I possibly did

DRAFT COPY

1   but actually didn't do.

2          And so the answer to your question

3   is.

4     Q.  Dr. Smith?

5     A.  The answer to it question -- I'm

6   finishing it, is no, it was not necessary.

7          I am happy it tell you what I did do

8   which may save you time into finding out the

9   40 billion things that I did not do.

10    Q.  I would be correct that you have no

11  opinion on Dr. Greenberg's ability to enter

12  and complete a medical residency program.

13    A.  Correct.  I will tell you that my

14  opinion is I see no reason why he would not

15  have been qualified but I will...

16    Q.  You have no opinion on Dr. Greenberg's

17  suitability or capability to practice as an

18  emergency room medicine doctor?

19    A.  I see no reason why he would not

20  have been able to practice under either of

21  those and in fact both of these contracts.

22  That's correct.

23    Q.  Have you evaluated employees for that

24  setting before?

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1      A.   I have evaluated often the skill set

2   of people in the medical profession, yes.

3      Q.   And you've evaluated Dr. Greenberg's

4   skill set so as to have an opinion that he

5   could be suitable and capable of practicing as

6   an ER physician?

7      A.   Are you under the impression that I

8   gave that opinion today?

9      Q.   Well, I ask you if you had the -- if

10   you had an opinion on that and I understood

11   that you said you did, that he was capable of

12   doing that?

13      A.   That would be a complete

14   misstatement and mischaracterization of my

15   testimony.

16      Q.   Okay.  Then I missed it and I

17   apologize?

18      A.   I said very carefully --

19      Q.   You will have no --

20      A.   I have said very carefully that I

21   see -- my opinion is that I see no reason

22   why he would not be qualified that's very

23   different from how you characterized what I

24   said.

DRAFT COPY

U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1      Q.   Are you going to testify at trial as a

2   forensic economist that Dr. Greenberg has a

3   skill set necessarily to perform in an

4   emergency room setting?

5      A.   What I will testify in regard to

6   that subject at trial if asked is that I see

7   no reason why he would not be qualified.

8   And nothing beyond that statement.

9      Q.   What have you reviewed that would

10  allow you to say you see no reason that he's

11  not qualified?

12     A.   The entire job file we discussed --

13     Q.   Did you review his --

14     A.   The entire job file.

15     Q.   Did you review?

16     A.   The entire job file discussed

17  earlier and nothing more.  You know exactly

18  what I reviewed because we reviewed the

19  eight Celts of documents that are listed in

20  my report and there are no other documents

21  that you may care to mention or speculate

22  whether I reviewed or not if they are not in

23  that set of eight it's a complete waste of

24  time to ask me if I reviewed because the

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    answer is no.

2         Q.  You will give mow opinions on the

3    requirements to practice medicine in any

4    statement or any facility.

5         A.  I will give mow opinions that you

6    have not read in my report and what you just

7    mentioned is one of 40 billion opinions that

8    I will not offer.

9         Q.  You will offer no opinion as to the

10   actions of the LSU burn with respect to the

11   Dr. Greenberg's termination?

12        A.  The only opinions I will contain in

13   my report that we discussed and none of the

14   over 40 billion opinions including the one

15   you just mentioned I will not offer.

16        Q.  Do the contracts that you reviewed,

17   the sample contracts state any terms requiring

18   board eligibility or certification in the area

19   of emergency medicine?

20        A.  I haven't memorized them.  They may

21   or may not.  I don't know.  I cared about

22   the earnings, I didn't care about the other

23   terms.

24        Q.  Do you have an opinion as to whether





ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    Dr. Greenberg could practice in the area of

2    emergency room medicine without being board

3    eligible or board certified?

4        A.  The only opinions I will be giving

5    at trial are those contained within my

6    August 15, 2019, report and there are

7    perhaps 40 billion other opinions that you

8    may inquire as to whether I'm prepared to

9    give or not and the answer including the one

10   you just mentioned is no.

11       Q.  So because it's not expressed in your

12   report I'm correct in understanding that you

13   do not have an opinion that Dr. Greenberg

14   cannot earn the very earnings space that you

15   showed as an emergency room physician

16   somewhere?

17       A.  I apologize.  I lost track of the

18   logic of the question if -- if you wouldn't

19   mind the reporter could read it again.

20       Q.  Sure?

21               (Whereupon, the requested

22                testimony was read back.)

23           THE WITNESS:  I do not intend to

24   express any opinions in my report that are not

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 72

1      in my report, including that one.

2      BY MR. McDANIELS:

3          Q.  You mentioned earlier some surveys

4      that were provided by Ms. Sheriff and you

5      mentioned one in particular, I think it was

6      the MGMA and I may have lost the initials on

7      that and I apologize.  I'm sure you will

8      correct me if I missed it.

9              But with respect to those surveys do

10     you have any information in terms of the

11     constructs that were used.

12             In other words information that would

13     allow you to tell me the type of entity,

14     survey, the types of practices surveyed that

15     sort of information?

16         A.  I have reviewed that MDMA survey in

17     the past.  I do not specifically recall.

18     There's also the AMGA survey that I have

19     reviewed and MHA survey.

20             The Sheriff report contains data

21     from the survey but nothing beyond that.

22             May I just ask a question?

23             This agreement with the Sheriff firm

24     refers to an expert but I thought the

DRAFT COPY

U.S. Legal Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    expert's name was William Sheriff.

2         My understanding that there is

3    another Sheriff who is a female that you've

4    referred to.

5    Q.  I mean we can do this off the record

6    or you can include it on the record.

7         My understanding is Julie Sheriff?

8    A.  Oh.

9    Q.  Is the wife of William Sheriff.  It is

10   a business owned by the two of them and she is

11   the physician recruiter and will be the -- in

12   fact she generated the report that I believe

13   is in your file?

14   A.  Okay.  I just don't see her name on

15   the report, but that's -- that's fine.

16   Thank you for the clarification.

17   Q.  The one that I have has her picture,

18   which clearly to me appears to be a female at

19   the top of it.

20   A.  And mine is simply a black and white

21   typewritten document with letterhead

22   and -- and no picture.

23   Q.  Maybe for purposes of making sure I

24   have what you have why don't we attach as

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 74

1    Exhibit Number 3 the materials that you have

2    been referencing as the items reviewed in your

3    report from the Sheriff and I'm just going to

4    call it Sheriff outfit?

5        A.  Yeah, do you have a three-page

6    document that starts with the headline

7    survey MGMA.

8        Q.  You're asking me?

9        A.  Yes.  I'm just -- you want to know

10   if we are looking at the same document, of

11   course, we'll attach it, but for the

12   purposes of today, do you actually have the

13   document that I have that starts with the

14   term survey MGMA.

15       Q.  I have a document that starts with

16   Julie Sheriff:  Physician recruitment expert

17   which although it's in black and white it's

18   plainly a photo of a female.

19           And then I have that is a one, two,

20   three, four, page document and a peers I would

21   call it a CV?

22       A.  Yes.

23       Q.  That is followed by an expert witness

24   report dated August 23, 2019, and it has got

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    the case caption?

2        A.  All right.

3        Q.  And its heading?

4        A.  I understand.  You.

5        Q.  No foo?

6        A.  I understand I don't need further

7    description.  The -- the -- just so I don't

8    know, I have three pages of data from the

9    Sheriff firm with their letterhead at the

10   top and it says survey MGMA.  It's three

11   pages long.  I should say two and a quarter

12   pages.  And just didn't know if you had that

13   or not.

14       Q.  I -- I do not have what you are

15   identifying?

16       A.  All right.  It has about six -- it

17   has about six, seven boxes of data, you

18   know, little -- little tiny spreadsheets of

19   data.

20       Q.  I do not have that so I would ask you

21   attach that?

22       A.  That's fine, okay.

23       Q.  As?

24       A.  I am not saying that that

DRAFT COPY


U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 76

1    information is not embedded in her report

2    but I don't have it as you are describing

3    it.

4        Q.  Understood thank you?

5            MR. SMITH:  Why don't we do shat the

6    same way why don't you send it to me Mrs. and

7    then I will review it and send it can the

8    court and give you a copy.

9            THE WITNESS:  I should PDF it

10   definitely.

11           MR. SMITH:  That would be great.

12           MR. McDANIELS:  And -- and Art, while

13   I am not objecting to your request, I am

14   noting that the materials that you have asked

15   about, the interview sheet as well as what is

16   now identified as Exhibit 3 are materials the

17   expert has plainly indicated are materials up

18   on which he relied and certainly those are

19   materials that are discoverable but I

20   certainly am not objecting to the process

21   that -- that you call out and I ultimately am

22   calling for production of those items.

23           MR. SMITH:  I understand and I have no

24   intention of withholding those documents

DRAFT COPY

U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    unless I pick up on any clearly not

2    discoverable, I count that but I just -- since

3    I haven't seen them and know exactly what you

4    all are talking about I prefer to see it go

5    through the record.

6             MR. McDANIELS:  I understand.  And as

7    I said I am not objecting to the process.

8             MR. SMITH:  Okay.

9             MR. McDANIELS:  I would like a quick

10   turnaround on those because they are attached

11   as Exhibit to the deposition.

12            MR. SMITH:  Yeah I want to get the

13   Court's information after we finish the

14   deposition.  We'll do that off the record.  We

15   don't need to put that on the record.

16   BY MR. McDANIELS:

17       Q.  Dr. Smith, running to the deposition

18   you had some materials in your file that are

19   surveys.  My question to you is:  Did you

20   under take any study of the construction and

21   that's my term, the foundation if you will of

22   those surveys that would allow you to tell me

23   the type of questions asked, the respondents,

24   the geographic locations anything of that

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    nature?

2        A.  I am sure the complete surveys

3    themselves explain the nature and extent.  I

4    only have a selected results that the

5    Sheriff firm encoded in some spreadsheets.

6        Q.  You told me earlier in terms of

7    forecasting the period of economic loss for

8    Dr. Greenberg that you had taken him at his

9    word with respect to what he told your

10   interviewer with return -- with respect to how

11   long he planned to work and that was one of

12   the reasons you showed on your projection is

13   working until roughly 78 some odd years old?

14       A.  Let me rephrase I said I

15   incorporated his statements.  That's a

16   different phrase from taking him at his

17   word.

18       Q.  It was his words up on which you base

19   the opinion that he is going work to 78?

20       A.  I do not have an opinion that he

21   will work to 78.  I will not be expressing

22   that opinion at trial.  He may but I will

23   not be offering the opinion that he would.

24   I will be stating statistically speaking

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    that's not particularly likely.

2        Q.  In terms of the Sheriff materials were

3    the only materials that you were -- the ones

4    that you indicated as Exhibit Number 3 that

5    would be the survey materials?

6        A.  Referenced to the survey materials,

7    yes.

8        Q.  Okay.  Now, after projecting

9    Dr. Greenberg's potential earnings as an ER

10   physician you then south to offset those

11   earnings based upon a his work as an urgent

12   care provider; is that correct?

13       A.  Yes.  And again, there I did use the

14   mean which is higher than median and that

15   would, of course, be for the at least

16   theoretical benefit of the defendant for me

17   to use the neutral and statistically

18   accurate methodology that I used rather than

19   the biased use of the median by --

20       Q.  And which --

21       A.  By the defense -- by the defense

22   CPAs.

23       Q.  In terms of making that calculation

24   you first had to start with a wage base.

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 80

```
 1              How did you derive its wage base as an

 2    urgent care provider?

 3        A.  I didn't derive it.  He actually has

 4    a wage in 2018 so we don't have to

 5    speculate.  We know what he was making in

 6    2018.  And I assume that he would migrate

 7    eventually over the course of time to the

 8    mean earnings that are stated in the Sheriff

 9    report of 275,000 over the course of -- to

10    the year 2018 that -- that after a decade he

11    would be at that mean earning level,

12    although he is not at that level at present.

13    He is at the --

14        Q.  Did Dr. Greenberg --

15        A.  Sir, sir, sir, sir, excuse me.

16              He is at present less significantly

17    less than the mean but I give him credit

18    that he will be capable of getting to the

19    mean.

20        Q.  Did Dr. Greenberg work full-time the

21    year that you used his waging to calculate his

22    earning base?

23        A.  I don't have punch clock records and

24    I don't know exactly how many seconds or
```

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 81

1    minutes he worked in 2018.

2        Q.  Would you agree with me that if he can

3    did not work full-time that the wage base you

4    used is not representative of a full-time

5    urgent care provider?

6        A.  Well, it's representative of his

7    earnings and I don't know who else earns

8    that or even there is no legal definition of

9    full-time some -- in some professionals

10   working --

11       Q.  You did?

12       A.  In some professions working 40 hours

13   a week would get you fired for working so

14   little and in other professions work

15   40 hours a week is above average.

16           There is no legal or economic

17   definition of full-time and what other

18   people in this profession how many hours

19   they work I don't know but to stress again,

20   I don't know how many hours he worked to

21   generate the 100 -- let's see.  Let me just

22   get the number on the record -- to get the

23   $200,000 that he earned.

24       Q.  Why didn't you use the statistical



DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 82

1    database and materials provided by Ms. Sheriff

2    with represent to urgent care providers?

3         A.  I did do that.  I assumed he would

4    be earning the mean by 2028.

5         Q.  What's the basis of a tenure speed for

6    him to go where he is now to 2028 to get to

7    the mean that she has?

8         A.  Well, people start out at the bottom

9    of the letter and they migrate to the top I

10   assume that it was true at your law firm and

11   that's true in the great majority of

12   professionals unless you're a union

13   carpenter where the 22 year old novice after

14   his four year apprenticeship gets the exact

15   same hourly rate as the 62 year master

16   carpenter.

17        But I assumed for better or for

18   worse that it would take him some time in to

19   his late 30s to earn the mean.

20        Q.  And that's what I'm trying to

21   understand.  What is the reason for the ten

22   year spread?

23        A.  That --

24        Q.  If it had been a 43 year spread a five





ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 83

1    year spread a seven year spread?

2        A.  Well, it could have been a seven

3    second spread thee retially but I assume it

4    take him ten years to get to the average of

5    his profession and frankly by age 37 he is

6    still probably younger than average

7    physician, although -- because physicians

8    tend to work long into their life contrary

9    to the incorrect work life tables that were

10   used by defense CPAs.

11          So I think actually that's a

12   favorable assumption for the purposes of the

13   defendants because he wouldn't be average

14   age probably until early 40s in the medical

15   profession but in any event I used a ten

16   year term.  I think that is a -- based on my

17   background training experience a reasonable

18   time period if someone believes that they

19   would like to accelerate him a bit more and

20   a bit more quickly, they could go to my

21   table nine because my report says that it's

22   a tool an aid and a guide and I intend to

23   educate the jury in terms of how to use the

24   table.

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1          If someone would like to believe

2    that the 300,000 $ wage I have him earning

3    in 2028 would actually start as early as

4    five years earlier when he's only five years

5    into this profession, then they may increase

6    those five years of numbers I think it would

7    add a total of a little over $100,000 to my

8    offset which is about 1 percent of the total

9    offset.

10         So if the trier of fact thought that

11   you are correct, he'd be so darn good he

12   could out pace his peers and -- and shoot up

13   like a rocket in only five years to the

14   average of his profession.

15         That would impact the offset to

16   age 67 by 1 percent by about one hundred

17   thousand dollars.

18         It is, of course a trivial -- it is,

19   of course, a trivial impact in percentage

20   terms.

21      Q.  In terms of your statement that it

22   would shoot off in comparison to his peers can

23   you cite me to anything that shows that peers

24   being urgent care physicians take ten years to

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 85

1    grow from where he is to where you have him in

2    2018?

3        A.  I can tell you that in my 30 years

4    of back on training and experience people

5    don't rocket -- don't shot like a rocket up

6    to the average of their profession in the

7    first five years.  It would be unheard of.

8    I have never seen it in any of the

9    10,000 cases I've worked on.

10            That doesn't mean that you won't get

11   some rocket -- some star shooting is like a

12   rocket if you believe Dr. Greenberg is that

13   rocket star, you may persuade the jury of

14   that.  I don't hold that opinion but I don't

15   say you are incorrect and if you would like

16   to accelerate him and shoot him up like a

17   rock tot be equal to the average of his

18   profession consisting of people who work in

19   it for 40 years that he would rocket to that

20   average after only five years, the

21   jury -- you can invite the jury to use my

22   table nine and add 1 percent to the total

23   offset.

24       Q.  You reference cases I would be correct





ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    that you're not referencing 10,000 cases of

2    wage earning calculations as related to the

3    medical profession?

4        A.  As related to medical profession and

5    others.  I have never seen it in any

6    profession accept of course union carpenters

7    where you start earning the same wage at

8    age 22 as the master carpenter at age 62.

9        Q.  Do you recall how many times you've

10   evaluated the earnings for an urgent care

11   physicians?

12       A.  I evaluated physicians dozens and

13   dozens of times and a good number of those

14   are urgent care but physicians practices

15   don't tend -- in terms of their earnings

16   profession don't ten to vary all that much

17   some specialties may but in any vent without

18   you and me wasting this court reporter's

19   time on whether he would shoot up like a

20   rocket in five years or ten years I have

21   told you though suggest to the jury though

22   modify my table nine and you and I can agree

23   to disagree without wasting the reporter's

24   further time.

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 87

1    Q.  Did you consider the fact that his

2    earnings that you used to project the offset

3    were earnings partially based upon a his

4    ownership of the practice?

5    A.  Which earnings, his pro injury his

6    but for earnings or these -- of his offset

7    earnings?

8    Q.  The offset earnings?

9    A.  The offset earnings are taken

10   strictly -- I'll say it again:  You asked me

11   before about the offset.  It's based on two

12   things and not 40 billion other things only

13   two things.

14       What he actually earned in 2018 and

15   the ten year profession to the earnings in

16   the Sheriff report.

17       Absolutely nothing else, period.

18   Q.  Did you know that he owned the urgent

19   care business?

20   A.  It may be in the notes and it

21   wouldn't be relevant to me.  I've used the

22   earnings of Sheriff.  That's it.

23       If you think there's a better

24   approach, have your CPAs do it.  I would

DRAFT COPY

U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1    like to get to what I did so that you can

2    understand it and then you will see what's

3    relevant in what I know.

4        Q.  With respect to your experience with

5    other medical care providers, would you agree

6    with me that physician owners is higher than

7    physician employees?

8        A.  I have seen medical practices go out

9    of business for improper or I should say

10   effective management, doctors are doctors

11   not necessarily managers.

12          And I haven't seen a study of

13   physicians who have partial ownership over

14   practice versus employees.  I'm not offering

15   an opinion in my report.

16          If you would like to go over the

17   report then you could see what my opinions

18   are and what I took into account.

19       Q.  Would you agree with my that

20   nationally based statistics are a reliable

21   source of projecting earnings when there is no

22   adequate historical base?

23       A.  I don't understand your question.

24       Q.  You have had cases before where a



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 89

1    party has been injured early in their work

2    career and you've been asked to project their

3    future earnings based as you use national

4    statistics with respect to what earnings would

5    be had they gotten to their career choice?

6        A.  It depends on the case.  There may

7    have been instances where that was

8    appropriate and I can think of many

9    instances where that would not be

10   appropriate but the statist I cans used here

11   are based on what Sheriff did and if you

12   knowing that she should have used something

13   else the argument would be with her, not

14   with me.  I haven't asked him to incorporate

15   her report and nothing else.

16       Q.  The initial earnings base was

17   established on Dr. Greenberg's tax records for

18   one year of earnings and you don't know if

19   that was full-time or part-time; is that

20   correct?

21       A.  It's his most recent year and I

22   can't tell you how many hours he worked.

23       Q.  Because I don't have the materials

24   that you have as Exhibit 3, were you provided

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 90

1    anything from Ms. Sheriff with respect to the

2    statistic as related to ER physician or did it

3    only address urgent care physician?

4        A.  It has both.

5        Q.  And you did not use the ER statistical

6    references in any of your calculations?

7        A.  It's my understanding that

8    plaintiffs will assert that is offset

9    earnings are with respect to urgent care.  I

10   don't have an opinion about that.  It was

11   simply the assignment.

12       Q.  And you used the statistical numbers

13   for urgent care but you did not use in any of

14   your opinions the statistical numbers for ER

15   earning; is that correct?

16       A.  I used nothing other than what I

17   said I did.  Urgent care.  But it is based

18   on Dr. Sheriff's statement of 1632 clinical

19   hours.

20       Q.  I'm going to go back over my notes you

21   all want to take a break.  I think I am at the

22   end?

23           MR. SMITH:  Good.

24               (Whereupon, a recess was

DRAFT COPY

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 91

1                    had.)

2    BY MR. McDANIELS:

3       Q.   Doctor Smith in your report under

4    earnings offset at page 5 you have the

5    statement, Dr. Greenberg reports that because

6    he did not finish his residency is not

7    authorized to work in most physician positions

8    including primary care doctor emergency doctor

9    or other specialist physician have you

10   undertaken any investigation that would allow

11   you as a forensic economist to verify or to

12   state whether that statement is accurate?

13      A.   I will not be offering any opinion

14   about where he's qualified to work and

15   therefore, it would be a waste of time and

16   client money for me to start investigating

17   whether he could be a greeter at Walmart or

18   an assistant to the president of Ethiopia.

19           I do not know.

20      Q.   With no opinions as to that I will not

21   waist your time or mine.  I have no other

22   questions?

23           MR. McDANIELS:  Art?

24           MR. SMITH:  Okay just -- just a little

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 92

1    bit.

2         MR. SMITH:  You referenced Exhibit

3    Number 2, Mr. McDaniel.  For clarity, what is

4    Exhibit Number 2?

5         THE WITNESS:  That would be my work

6    notes the one page of work notes that we

7    referenced earlier.

8         MR. McDANIELS:  We need to clear that

9    up.  I -- Exhibit 2 to be the notes from the

10   telephone call from the gentleman the doctor

11   in Dr. Smith's office with respect to his

12   interview of Dr. Greenberg I understand

13   Exhibit Number 3 to be the materials that were

14   supplied to Dr. Smith from Julie Sheriff or

15   from the Sheriff recruiting firm, Exhibit

16   Number 1 is the notice of deposition and

17   I -- I guess Dr. Smith since we're going off

18   what your file contains, have we identified

19   everything in it with the exception of the

20   information sheet that you and I -- sheets

21   that you and I talked about earlier as well as

22   the sample contracts that are identified in

23   your report and the tax returns that are

24   identified in your report and the first

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

Page 93

1   amended complaint that's identified in your

2   report.

3           THE WITNESS:  Did you mention

4   Dr. Greenberg's CV?

5           MR. McDANIELS:  I missed that one.  So

6   for sake of completeness again since I'm not

7   there, if you could attach it we'll do it flow

8   bow as Exhibit Number 4 the tax returns, the

9   two contracts and the CV of Dr. Greenberg and

10  Madam Court Reporter that will be Exhibit

11  Number 4 in grow bow.

12          Are there other file materials that

13  you have, Dr. S.

14          THE WITNESS:  No.

15          MR. McDANIELS:  Thank you.

16          Art I interare theed you did you have

17  anything else.

18          MR. SMITH:  Yeah let's go ahead and

19  attach Dr. Smith's curriculum vitae as Number

20  five and his report of August 15, 2019 as

21  number six.

22          MR. McDANIELS:  No objection.

23  BY MR. SMITH:

24      Q.  I just have couple of questions?

DRAFT COPY

U.S.Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1                    EXAMINATION

2    BY MR. SMITH:

3       Q.  Dr. Smith you said that in reference

4    to the contracts that Dr. Greenberg provided

5    with respect to St. David's hospital and the

6    metro flex advents hospital facility you said

7    it didn't -- it didn't -- it wasn't relevant

8    to you from an economic standpoint whether

9    these two contracts were signed.

10          Would you explain to us why that does

11   not matter to you?

12      A.  I assume that Dr. Greenberg would be

13   working and earning according to what these

14   contracts apparently offer in terms of

15   earnings.  And so the legalities of the

16   offer are not relevant to me.  I have just

17   assumed that he was capable of earning what

18   these contracts offer him.

19      Q.  And when you say they're not relevant

20   to you withdrew mean not resival to you as a

21   forensic economist; is that correct?

22      A.  That's correct, I mean I have -- I

23   have -- there's plenty of people who work

24   under a hand is shake and some people work

DRAFT COPY


U.S. Legal
Support

ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1   under a formal agreement.  All I care about

2   is what they expect to earn and not how the

3   contract -- whether the contract is executed

4   or not.

5       Q.  So as a frenzic economist you don't

6   evaluate the formalities of whether contract

7   has been completed or signed or notarized or

8   anything like that?

9       A.  Yes, I am not a document examiner.

10  I'm not a -- there are people who are

11  handwriting experts that can evaluate

12  fraudulent signatures.  I do none of that.

13  Your -- you folks, the plaintiff counsel

14  have asked me to present to the trier of

15  fact what Dr. Greenberg's earnings would be

16  had he earned under these two contracts and

17  that's it.

18      Q.  Okay.  And your report in this case is

19  dated August 15, 2019?

20      A.  Yes.

21      Q.  Is that correct, sir?

22      A.  Yes.

23      Q.  And you -- you received the report

24  from the defense CPAs and that is dated

DRAFT COPY



ROUGH OF: STAN V. SMITH, PH.D.
October 8, 2019

1   September 23, 2019; is that correct?

2       A.  Yes.

3       Q.  At the time that you finalized your

4   report of August 15, 2019, it's obvious, is it

5   not, that you didn't have the benefit of your

6   review of the defense report dated

7   September 23, 2019?

8       A.  It's my understanding that's correct

9   I did not have it in -- it was.

10      Q.  Okay.  And so the?

11          THE COURT:  I'm sorry.

12          THE WITNESS:  I'm sorry go ahead.

13          THE WITNESS:  That was it.

14  BY MR. SMITH:

15      Q.  And so the comments on the defense

16  report that you offered this morning are

17  observations and observations and opinions you

18  formed after the review of the defense report;

19  is that correct?

20      A.  Correct and the last week.

21          MR. SMITH:  I don't have any other

22  questions thank you, sir.

23          MR. McDANIELS:  Thank you all.  Madam

24  Court Reporter.

DRAFT COPY