UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ERIC GREENBERG, M D.            CASE NO. 19-cv-00137

VERSUS                         JUDGE LANCE M. AFRICK

LOUISIANA STATE UNIVERSITY     MAGISTRATE JUDGE
HEALTH SCIENCES CENTER         JOSEPH C. WILKINSON, JR.
NEW ORLEANS

        Deposition of DR. MICELLE HAYDEL, taken on
September 19, 2019, commencing at 9:28, a.m. in the
office of McCraine, Sistrunk, Anzelmo, Hardy,
McDaniel, & Welch, LLC, 909 Poydras Street, Suite
1000, New Orleans, Louisiana 70112.

EXHIBIT

8

**DR. MICELLE HAYDEL**                              **September 19, 2019**

Page 2

1    APPEARANCES:

2    SMITH LAW FIRM
     830 North Street
3    Baton Rouge, Louisiana 70802
     Telephone:  225-383-7716
4    Email:  rschmidt@jarthursmith.com

5    BY:   ROBERT M. SCHMIDT, ESQUIRE
     Attorney for:  Eric Greenberg, M.D.

6

7

8
     McCRAINE, SISTRUNK, ANZELMO
9    HARDY, McDANIEL & WELCH, LLC
     909 Poydras Street, Suite 1000
10   New Orleans, Louisiana 70112
     Telephone: 504-831-0946
11   Email:  kwm@mcsalaw.com

12   BY:   JULIANNA T. ECHOLS, ESQUIRE
     Attorney for:  Louisiana State University Health
13                  Sciences Center New Orleans

14

15

16

17   Also present:

18   Denman Mims, Esquire

19

20

21

22   REPORTED BY:

23   Belinda D. Vigueira
     Certified Court Reporter

24

25

**DR. MICELLE HAYDEL**                    **September 19, 2019**

Page 3

```
1                    I N D E X

2                                        PAGE

3    Title                               1

4    Appearances                         2

5    Stipulation                         4

6    Examination by Mr. Schmidt          5

7    Examination by Ms. Echols         117

8    Reporter's certificate            126

9

10                  EXHIBIT INDEX

11   Exhibit 1    Evaluation                   23

12   Exhibit 2    Deposition of Dr. Greenberg  38

13   Exhibit 3    Evaluation                   39

14   Exhibit 4    Evaluation

15   Exhibit 5    Emails                       48

16   Exhibit 6    EEOC Intake                  62

17   Exhibit 7    Request for termination      72

18   Exhibit 8    Request for termination      72

19   Exhibit 9    Greenberg Responses

20   Exhibit 10   Email Re: Mackey             42

21   Exhibit 11   Karen Jubanyik, M.D. document 108

22

23

24

25
```

Page 4

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4     counsel that the deposition of Micelle Haydel, M.D.

5     is hereby being taken under Federal Rules of Civil

6     Procedure for all purposes in accordance with law;

7              That the formalities of filing, reading and

8     signing, and certification are hereby waived;

9              That all objections, except those as to the

10    form of the question and/or responsiveness of the

11    answer, are hereby reserved until such time as this

12    deposition or any part thereof may be used in

13    evidence.

14              *   *   *   *   *   *   *   *

15          BELINDA D. VIGUEIRA, Certified Court

16    Reporter, in and for the State of Louisiana,

17    officiated in administering the oath to the witness.

18

19

20

21

22

23

24

25

Page 5

1                          *        *        *

2              MICELLE HAYDEL, M.D. 1328 2ND STREET, NEW

3       ORLEANS, LOUISIANA 70130-11463, AFTER FIRST BEING

4       DULY SWORN IN THE ABOVE-ENTITLED MATTER, DID TESTIFY

5       ON HER OATH AS FOLLOWS:

6                          *        *        *

7                          EXAMINATION

8       BY MR. SCHMIDT:

9          Q    Good morning, Dr. Haydel.  We met a moment

10      ago.  My name is Rob Schmidt and I represent Dr.

11      Eric Greenberg in a lawsuit against LSU.  So, I'm

12      here today to take your deposition.  Before we get

13      into my questions I have prepared binders of

14      exhibits I plan to introduce.

15              Would you like to go off the record for

16      just a moment?

17         A    Sure.  Sure.

18                      (OFF THE RECORD)

19              MR. SCHMIDT:

20                  Okay.  Can we go back on the record?

21      BY MR. SCHMIDT:

22         Q    All right.  So, I just passed out a binder

23      to everybody with a series of exhibits marked one

24      through ten and I'd like to go ahead and attach

25      these to the deposition.

**DR. MICELLE HAYDEL**                    **September 19, 2019**

```
1        MR. SCHMIDT:
2            Do you have any objection?
3        MS. ECHOLS:
4            No.  Other than, you know, if there
5    is something you haven't produced in
6    discovery, you know, like emails.  I don't
7    have time to go through it right now.
8        MR. SCHMIDT:
9            Of course.  Everything that's in here
10   came from the EEOC file, from the exhibits
11   to Dr. Greenberg's deposition, and from
12   that stack of emails that we all passed
13   around during Dr. Greenberg's deposition.
14       MS. ECHOLS:
15           The ones that I attached.
16       MR. SCHMIDT:
17           Right.
18       MS. ECHOLS:
19           Okay.
20       MR. SCHMIDT:
21           So, there should not be anything in
22   there you haven't seen.  If there is let
23   me know and we'll --
24       MS. ECHOLS:
25           Just reserving my objection.
```

DR. MICELLE HAYDEL                          September 19, 2019

Page 7

```
 1          MR. SCHMIDT:
 2              Of course.  Of course.  We'll deal
 3          with it if there is.
 4          MS. ECHOLS:
 5              Okay.
 6   BY MR. SCHMIDT:
 7      Q    All right.  So, Dr. Haydel have you ever
 8   given a deposition before?
 9      A    Yes.
10      Q    Okay.  Um --
11      A    Medical.
12          MS. ECHOLS:
13              You heard that?
14      A    Medical.
15   BY MR. SCHMIDT:
16      Q    Medical?  Okay.  So, was it a medical
17   malpractice case?  What type?  What was it?
18      A    Yeah.  Something that the hospital was -- I
19   was like a witness, I guess.  I wasn't named but I
20   was just a -- I had to give a deposition about
21   patient care.
22      Q    Okay.  And it was just one time?
23      A    Yeah, I think.  I mean I've talked to
24   attorneys before about other things but I think a
25   true deposition I think it was only one time, and
```

1    that was like before the storm.

2        Q    Okay.

3        A    A long time ago.

4        Q    Um, well, you -- you probably heard a lot

5    of this before but there are a few things I just

6    like to cover at the very beginning of any

7    deposition.  One is, it's important that we don't

8    talk over each other.  I'm going to do my very best

9    to let you finish your answer before I ask another

10   question.  I would ask that you do your very best to

11   let me finish my question before you start

12   answering.  The main reason for that is so that we

13   don't interrupt each other's trains of thought.

14   But, also, it makes the court reporter's job a whole

15   lot easier if two people are not talking at the same

16   time.  The other thing I would ask that you

17   verbalize your responses.

18       A    Yes.

19       Q    Exactly.  Yes and no, not head nods, head

20   shakes or uh-uh or uh-huh?

21       A    I may need a reminder now and then.

22       Q    That's fine.  And I'll remind you, you

23   know, if that comes up.

24            Another thing, if you need to take a break,

25   let me know.  I can take breaks.  I'll be reasonable

DR. MICELLE HAYDEL                          September 19, 2019

Page 9

 1   about that.  The only thing is if there's a question

 2   on the table and you ask for a break I would ask

 3   that you answer the question --

 4        A    Sure.

 5        Q    -- before I take a break.

 6             Another thing, Ms. Echols might have

 7   objections to some of the questions that I'm asking.

 8   If Ms. Echols asks questions I might have objections

 9   to some of the questions she's asking.  And the

10   purpose of those objections in a deposition are for

11   the judge to decide later.

12        A    Okay.

13        Q    So, it doesn't mean don't answer the

14   question.

15        A    Okay.

16        Q    I think Ms. Echols will probably tell you

17   very clearly --

18             MS. ECHOLS:

19                  I'll tap ya.  Just hang on a second.

20             Let me make my objection and then --

21   BY MR. SCHMIDT:

22        Q    Right.  And she'll instruct you not to

23   answer if she's going to instruct you not to answer.

24   Other than that --

25             MS. ECHOLS:

```
 1                 I rarely do that.
 2          MR. SCHMIDT:
 3                 I've never done that but it happens
 4          sometimes, you know?
 5          THE WITNESS:
 6                 Yes.
 7   BY MR. SCHMIDT:
 8        Q    Okay.  Have you taken any medications
 9   today?
10        A    Caffeine.
11        Q    Okay.  Coffee.
12             No prescription medications?
13        A    No.  In fact I forgot to take my
14   glucosamine, and that's not prescription anyway.
15   No, actually, I've taken nothing.  No vitamins even.
16        Q    Okay.  So nothing that could affect your
17   ability to give competent testimony?
18        A    If I hadn't had my caffeine...
19        Q    Well, I'm glad you had your caffeine.
20             Okay.  Did you do anything to prepare for
21   this deposition today?
22        A    No.  I slept.  I mean --
23          MS. ECHOLS:
24                 She did meet with counsel.
25
```

DR. MICELLE HAYDEL                     September 19, 2019

Page 11

1   BY MR. SCHMIDT:

2        Q    So you met with counsel?

3        A    Oh, is that what you're saying?  Okay.

4        Q    Yeah.  Don't tell me what you talked about

5   or anything.

6        A    No, no, no.  We did, what, the day before

7   yesterday?  Two days ago.

8        Q    Okay.  Okay.

9        A    Just to be fair.

10       Q    Right.

11       A    I didn't know.  I'm sorry.  I thought that

12   there was something before we were doing this today.

13       Q    No.  You're fine.  You know, that's what I

14   was asking about.  Did you review any documents to

15   prepare for this deposition?

16       A    This -- we didn't review.  I think she

17   showed me an email and said, you know, I mean, it

18   was all the things in here.

19       Q    Okay.

20       A    That I'm aware of.

21       Q    Yeah.

22       A    Anything that had my name on it.  Not

23   anything, but pretty much what had my name on it we

24   talked about.

25            MR. SCHMIDT:

DR. MICELLE HAYDEL                                    September 19, 2019

                                                               Page 12

1              All I would ask is if there is
2        anything that Dr. Haydel reviewed that
3        hasn't been produced that it be produced.
4        I don't need a list of what all y'all --
5        MS. ECHOLS:
6              There were 9800 emails that I have
7        been reviewing and I'm finally finished
8        and now my computer techs are trying to
9        figure out how to produce them and get
10        them Bates stamped from an email pull.
11        MR. SCHMIDT:
12             Okay.
13        MS. ECHOLS:
14             But they were pretty much what we
15        already had.
16        MR. SCHMIDT:
17             Okay.
18        MS. ECHOLS:
19             And duplicates.
20   BY MR. SCHMIDT:
21       Q    Other than meeting with counsel, have you
22   spoken to anybody else about the deposition today?
23       A    Um, I think my husband knows that I'm
24   coming up here.  Uh, I got a call from somebody at
25   your office asking me if I still worked at LSU.

DR. MICELLE HAYDEL                              September 19, 2019

Page 13

1   That was a month or so ago.  And I said "yes".  And

2   they said, "Okay, we can't talk".  I told Jorge

3   Martinez that I was coming up here.

4           MS. ECHOLS:

5               They share an office.

6       A    Yeah, and Jim Aiken.

7   BY MR. SCHMIDT:

8       Q    And what, uh -- when you discussed this

9   with Dr. Aiken and Dr. Martinez, what was the

10  substance of those conversations?

11      A    Well, they're aware of Dr. Greenberg and I

12  said, "I'm getting deposed.  Are y'all?"  And they

13  said they haven't heard anything.

14      Q    Okay.  Was that it?  Did they say anything

15  else?

16      A    I mean, they -- let me see.  It's hard to

17  talk about something Jorge Martinez would say

18  without cursing.  Sorry.

19      Q    If you can remember exactly what he said

20  don't hold back.

21      A    I don't remember exactly what he said, but

22  something to the effect of it's about damn time or

23  something like that.  You know.  I think he thinks

24  that this should be happening.  I think both of them

25  implied that this should be happening.  That we

DR. MICELLE HAYDEL                                    September 19, 2019

Page 14

1   should be going through with this and documenting
2   what happened with Eric.
3        Q    Okay.  Did either one of them make any
4   statements regarding your potential testimony in
5   this deposition?
6        A    No, no.  Oh, Jorge said, "Just tell the
7   truth."  I'm like, you know, this is an awkward
8   situation.  He said, "You tell the truth."
9        Q    Okay.
10            MS. ECHOLS:
11                 Jorge is also a lawyer.  M.D. J.D.
12   BY MR. SCHMIDT:
13        Q    Well, that's good advice.
14        A    Both of them.  Yeah, that's it.  Because, I
15   mean, it was more of:  I'm a little nervous about
16   this.  What do I do and how do I handle it because I
17   work at LSU, and I mentored Greenberg so I don't --
18   you know, straddling that line of --
19            And both were very, like, just tell the
20   truth.
21        Q    Yeah.  Okay.  Good.
22            All right.  Could you please state your
23   name, address and date of birth for the record,
24   please?
25        A    Micelle Haydel, 1328 2nd Street, New

**DR. MICELLE HAYDEL**                          **September 19, 2019**

 1    Orleans, Louisiana 70130-11463.

 2         Q    Okay.  And your name is spelled

 3    M-I-C-E-L-L-E.

 4         A    Correct.

 5         Q    And what is your current occupation?

 6         A    I'm a physician.

 7         Q    And who is your employer?

 8         A    I have several.  I work part-time at UMCNO

 9    LSU through Van Meter and Associates.  So that's an

10    independent contractor, Van Meter and Associates.

11    And I work part-time at Ochsner.  And I recently got

12    credentialed to work a shift a month at Highland

13    Hospital in Mississippi.

14         Q    And in what capacity are you employed by

15    LSU?

16         A    Just a emergency physician.  I don't have a

17    title.

18         Q    Okay.  But you're not full-time there any

19    more, correct?

20         A    Correct.

21         Q    How many hours a month do you work there?

22         A    I believe it ends up being about 80 because

23    I'm being paid for both some academic administrative

24    time as well as clinical time.

25         Q    Okay.

DR. MICELLE HAYDEL                          September 19, 2019

Page 16

 1      A      And it ends up being close to 80 hours a
 2  month.
 3      Q      Do you teach any courses.
 4      A      Yeah.
 5      Q      You do?
 6      A      Yeah.  I mean, I'm not a -- like, I give
 7  lectures.  I teach a cadaver lab.  You know what I
 8  mean?  It's a variety of different things within the
 9  residency that, uh -- but I don't have a title of,
10  like, director of this specific course or anything.
11      Q      Okay.  What is your title at LSU?
12      A      I have no title.
13      Q      You have no title, but you are still
14  actively involved in the residency?  It's fair to
15  say that?
16      A      Yes, at a part-time status.  I'm not -- I'm
17  not considered full-time there.
18      Q      Okay.  Um, how long has it been since you
19  were full-time there?
20      A      Okay.  My dates may be a little bit off.  I
21  was full-time up until about a month before Sal
22  stepped down as program director.  Do you have that
23  on a timeline?  I do not know if you do.  But --
24  let's see what month.  We're in August.  It would be
25  sometime this year.  I guess early this year maybe.

DR. MICELLE HAYDEL                         September 19, 2019

Page 17

1    I really don't know.  It could have been late last
2    year, early this year; but it's been -- it hadn't
3    been.  You know, it's been within the year.  I would
4    say within a year, 12 months or so I was asked to
5    give up half of my academic time and that put me in
6    a part-time status.
7        Q    You were asked to?
8        A    (Indicates affirmative response).
9        Q    By whom?
10       A    By Van Meter.
11       Q    Dr. Van Meter, his first name is?
12       A    Keith.
13       Q    Keith.  Okay.  Um, why did he ask you to do
14   that?
15       A    Because Sal did not want me to be involved
16   in the residency.
17       Q    Okay.  When you say "Sal" you're referring
18   to Dr. Salvador Suau?
19       A    Um-hum.
20       Q    Did he state why Dr. Suau didn't want you
21   to be involved in the residency?
22       A    Well, in the meeting that Sal was at he
23   said that he did not want me to be interacting with
24   the residents.
25       Q    Okay.  He didn't give any reason?

1      A     Um, I mean I can suppose he didn't like me,

2    but he didn't say that that was the word.  He said

3    that he did not want me interacting with the

4    residents.

5      Q     And that's it?

6      A     I mean, it wasn't a surprise coming -- you

7    know, we did not see eye to eye.

8      Q     Okay.

9      A     It was a surprise that I was being cut

10   back, but.

11     Q     Okay.  Prior to that, what was your

12   position at LSU?

13     A     Well, so, that I was a full-time core

14   academic faculty which meant that I had more

15   academic hours, so I had the full-time compliment of

16   hours that I could use for research and teaching so

17   those hours were cut to part-time, and I did that

18   for -- without a title as well -- for, I guess it

19   was from '17 to '18.  I'm -- you know, I would have

20   to look at the dates of letters and that sort of

21   thing to tell you specifically, but I was -- I had

22   had -- I had been, basically, a core academic

23   faculty without a title for approximately a year

24   prior to that, before I was cut down to part-time.

25     Q     Okay.  What position did you hold during

DR. MICELLE HAYDEL                    September 19, 2019

Page 19

1   Dr. Greenberg's time at LSU?

2        A    Well, I had two positions.

3        Q    Okay.

4        A    I was the program director for the first, I

5   guess, 18 months of his tenure and after that I was

6   the director of resident education.  Resident and

7   faculty education.

8        Q    And so the program director.  Um, were you

9   the director of just the emergency medicine resident

10  program?

11       A    Yes.  I was assistant director of the

12  pediatric EM combined program as well.

13       Q    Okay.  Um, so, the program director, that

14  was the position that Dr. Sual took --

15       A    After I stepped down.

16       Q    -- after you stepped down?

17       A    Yes.

18       Q    Okay.  And what were your duties as program

19  director?

20       A    It's huge.

21       Q    I'm sure.  Maybe I should narrow that down

22  a question.  Narrow that down a little bit.

23       A    Care and upkeep of residents.

24       Q    What, uh, departments are under you -- who

25  did you supervise as program director?

DR. MICELLE HAYDEL                          September 19, 2019

Page 20

1      A     Fifty- -- it was approximately 58 emergency

2    medicine residents plus the combined residents that

3    were PTM and IM/EM residents.  So it ended up being

4    about 60 residents that it was my job to make sure

5    that they met their requirements for graduating and

6    were qualified to sit for the boards to be board

7    certified emergency physicians.

8      Q     Okay.

9      A     And all the metrics that the RRC or

10   ACGME --

11         That were, um, kind of required by the

12   credentialing committee, which is the residency --

13   you know, the RRC, which is Residency Review

14   Committee for ACGME which is American College of.

15         MS. ECHOLS:

16              Graduate.

17     A     Graduate Medical Education which, they have

18   a little division that's emergency medicine.  So,

19   that's who makes the rules.

20     Q     Okay.  So, how long were you the program

21   director?

22     A     About eight years.

23     Q     Eight years.  Okay.

24     A     From 2007 to 2015.

25     Q     Okay.  So, when did you first meet Dr. Eric

DR. MICELLE HAYDEL                          September 19, 2019

Page 21

1    Greenberg?

2        A    When he was interviewing for the residency

3    as part of our interview season.

4        Q    Okay.  So that would have been in 2013?

5        A    When did he start the program?  '14?

6        Q    Right.

7        A    No --

8             MS. ECHOLS:

9                 July.  I'm sorry.  I'm testifying.

10            I've got to shut up.  I can't --

11       A    So, help me with the timeline.  So he would

12   have interviewed, usually, the fall before he

13   started the residency in July.

14   BY MR. SCHMIDT:

15       Q    Okay.

16       A    So, would that be -- whatever the dates for

17   that are.

18       Q    Okay.  Thank you.  And at that time you

19   were the program director?

20       A    Correct.

21       Q    Um, what was your initial impression of Dr.

22   Greenberg?

23       A    I liked him enough to rank him.  I, you

24   know, ranked 100- -- well, we probably ranked about

25   110 people, um, to put on our list of people that we

DR. MICELLE HAYDEL                          September 19, 2019

Page 22

1   would like to see come into the program, and he was

2   on that list.

3       Q    Okay.  How many of those people, actually,

4   started the program?

5       A    There's 12.  We take 12.

6       Q    Twelve.  Okay.

7       A    We take 12 a year, yeah.

8       Q    Okay.  All right.  If you could open to

9   Exhibit Number 1 in this binder here.  Um, so, this

10  is Dr. Greenberg's evaluation for the period from

11  July 1, 2013 to October 1, 2014, correct?

12      A    Yep.

13      Q    Okay.  So, if you turn to page 4 of 5.

14      A    Four of five, is that what you said?

15      Q    Yes, ma'am.

16           So, there's a heading in around the middle

17  of the page that says, "general."

18      A    Yes.

19      Q    And there is some comments below that.

20      A    Okay.

21      Q    And the first paragraph after, "Please note

22  any action plan initiated."

23      A    Yes.

24      Q    The third sentence of that paragraph says,

25  "Is still getting his bearings.  He is a smart

DR. MICELLE HAYDEL                          September 19, 2019

Page 23

1   intern and I expect he will do well once he

2   acclimates to our setting."  Then it parentheses

3   "Haydel".  Does that your mean it's your comment?

4        A    Yes.

5        Q    What did you mean by, "Still getting his

6   bearings"?

7        A    He -- when he first started as a resident

8   he had a couple interactions with nurses and upper

9   level residents where they felt that he was, um, I

10  guess, too verbal, too familiar, um, kind of

11  speaking as if he was an upper level without, you

12  know, having earned that right.

13       Q    Okay.

14       A    So, too, I guess overly confident might be

15  the best way of putting it.

16       Q    Okay.

17       A    And I talked to him about it and he, you

18  know, he responded well.  He responded

19  appropriately.

20       Q    Okay.  So, you heard this from nurses?

21       A    Nurses and upper level residents.

22       Q    Upper level residents?

23       A    Yes.

24       Q    What did you mean by "acclimating to our

25  setting"?

DR. MICELLE HAYDEL                          September 19, 2019

Page 24

1      A     I felt that this was a New York versus New

2    Orleans type of problem.   That I know he had been in

3    New York and he, in my humble opinion, struck me as

4    kind of a New Yorker type of person coming into New

5    Orleans and being more kind of abrupt and less,

6    uh -- less -- sweet.   Less, you know, conversant

7    when he was giving an order or presenting a patient.

8    You know, he was more of a, you know, cut and dry

9    and blunt at times and some people found that

10   offensive.

11     Q     He didn't have that warm southern

12   hospitality?

13     A     Thank you.   He didn't have that warm

14   southern hospitality and that was my read on him.

15     Q     Okay.   Do you feel that he did acclimate to

16   the setting?

17     A     I feel that he improved.   He developed

18   friendships among the residency.   I felt he was

19   comfortable in New Orleans.   He was putting down

20   roots here.   I would say yes.

21     Q     As being program director for eight

22   years --

23     A     Uh-huh.

24     Q     -- did you have multiple residents under

25   your supervision during that time who were from the

DR. MICELLE HAYDEL                                    September 19, 2019

Page 25

1   northern parts of the country?

2       A    Yep.  Yep.

3       Q    Okay.  Is that a common problem that you

4   would have with those residents?

5       A    I've had it with probably two others before

6   and had, kind of, helped to walk them through.

7       Q    Okay.

8       A    Yeah.

9       Q    All right.  If you look at the --

10          THE WITNESS:

11               It's hot in here, y'all --

12          MS. ECHOLS:

13               Let me take a break.

14          MR. SCHMIDT:

15               Of course, yes.

16                    (OFF THE RECORD)

17          MR. SCHMIDT:

18               Back on the record.

19   BY MR. SCHMIDT:

20       Q    Okay.  The paragraph -- still under the

21   heading of General that begins with, "This

22   represents".

23       A    Yes.

24       Q    Okay.  Immediately after selected faculty

25   comments it just says, "doing well".  Haydel.

```
1      A    Yes.

2      Q    And that is your comment?

3      A    Me.

4      Q    What led you to make that comment?

5      A    Because I thought he was doing well.

6      Q    In comparison to other residents you were

7   seeing?

8      A    He was doing well within what I would

9   expect for an intern at his level of training

10  compared to the other interns I've known over the

11  years.  I felt like he was doing well.

12     Q    Okay.  Um, did that opinion change during

13  Dr. Greenberg's time at LSU?

14     A    While I was program director I felt like he

15  was advancing.

16     Q    Okay.  Did you feel like he wasn't after

17  you were program director?

18     A    I didn't -- I felt that he was improving as

19  he went along.

20     Q    Okay.  Did you have less of an opportunity

21  to form opinions about his progress after you were

22  no longer program director?

23     A    Correct.  I wasn't privy to the -- um, the

24  CCC meetings, his evaluations.  All the information

25  I got was from Eric because he saw me as a mentor
```

DR. MICELLE HAYDEL                              September 19, 2019

Page 27

1  and came to me.

2      Q    Okay.

3      A    We did do daily evaluations during the

4  first -- when I was program director, I had him

5  on --

6                    (SHORT INTERRUPTION)

7      A    So we were talking about daily evaluations?

8  BY MR. SCHMIDT:

9      Q    Right.

10     A    Okay.  So while I was program director,

11 based on further evaluations, I'm not sure of the

12 timeline in here, but it was during the 18 months

13 that I was program director, I recommended that he

14 been placed on daily evaluations for two different

15 episodes, based on his interpersonal skills.  What

16 that means is I took the behaviors that ACGME

17 requires of residents and fit those with the

18 behaviors we expected of Eric, and he would take a

19 sheet of paper and bring it to the faculty he was

20 working with that day and they would check off did

21 he meet those recommendations and place any

22 comments, and he did fine on both of those.  Each

23 time he was able to check off that he was doing

24 well.  The faculty checked off that he had met those

25 criteria.

DR. MICELLE HAYDEL                        September 19, 2019

Page 28

1      Q    Okay.  So, correct me if I'm wrong, I
2   believe you said it was based on two incidents that
3   you decided to do that?
4      A    It was based on the CCC.  So, when we meet,
5   and -- well, when the Competency Committee meets,
6   reviews the whole information about a resident and
7   if they feel that the resident falls off, then we
8   would at that point, I would decide what to do and
9   at that point I decided that he would benefit from
10  daily feedback so that he would realize and see the
11  behavior and how he should be behaving.
12     Q    Okay.  And was that based on his
13  interpersonal interactions that you were talking
14  about a minute ago?
15     A    It was based on the comments that I got
16  from his -- that were -- it seemed to be -- the
17  fallout seemed to be interpersonal.  It was --
18  there's -- it's like a division of the requirements
19  is interpersonal skills and professionalism, and in
20  his case it was more interpersonal skills, which is
21  conversing and giving orders to nurses and how he's
22  perceived by others and how his, um, closed-loop
23  communication, those sort of things that are
24  effective ways of communicating in the emergency
25  department.

DR. MICELLE HAYDEL                          September 19, 2019

Page 29

1      Q    Okay.  So, this was based on the feedback

2  you got from attending physicians?

3      A    Yes.  Yes.

4      Q    And residents, also?

5      A    So, may have been comments from residents.

6  I do get comments from residents about other

7  residents; but, the gist.  You know, when I hear

8  something from one of the residents I try to make

9  sure that there's not an interpersonal issue as

10  opposed to, you know, try to get to the --

11          A resident does not have the same insight

12  about another resident as faculty or the program

13  directors, so.

14      Q    Okay.

15      A    So, we're basing this on the feedback that

16  we're getting from the faculty that are working with

17  him.

18      Q    Okay.  All right.  The same paragraph, the

19  second line, from right after "Murphy".  It says, "A

20  little concerned that he seems very unperturbed

21  about the possible level of illness of his patients.

22  He seems very comfortable with being the intern on

23  the case and not in charge of their care.  He smiles

24  and walks around and visits.  He does not appear

25  flustered or overwhelmed or engaged with his tasks,

DR. MICELLE HAYDEL                          September 19, 2019

Page 30

1   even when behind.  His knowledge is dated to his
2   medical school education and he has no formal
3   reading plan.  I know he is very new, however I need
4   him to be more invested in his responsibilities and
5   not so comfortable with simply being the intern."
6   And that comment was made by Dr. Legros, correct?
7        A    Yes.
8        Q    Should an intern be uncomfortable being the
9   intern on a case?
10       A    No.
11       Q    Okay.  Is it inappropriate for a resident
12  or intern to walk around and visit?
13       A    No.
14       Q    Okay.  Are residents or interns expected to
15  be flustered or overwhelmed?
16       A    No.
17       Q    Okay.  What is a formal reading plan?
18       A    Dr. Legros would have to answer that
19  question.
20       Q    Okay.  So it's -- I'm sorry.  Go ahead.
21       A    That comment is made about many residents
22  by Dr. Legros.
23       Q    Okay.  So, to your knowledge, it's not
24  something that's a requirement of residents or
25  interns?

DR. MICELLE HAYDEL                              September 19, 2019

Page 31

1      A    Correct.

2      Q    Okay.  Do these comments represent typical

3    feedback that a resident would receive or are they

4    indicative of a problem resident?

5      A    They are typical.

6      Q    All right.  So, the next paragraph below

7    that where it says, "attending comments"?

8      A    Yes.

9      Q    It says, "I thought the guy was great and

10   gave him an outstanding.  He was pretty slow but

11   maybe he was trying to do everything right since

12   apparently they're looking at him very closely.

13   Anyway, I'll give him high marks this time around.

14   Sometimes workups to extensive, but receptive to

15   constrictive criticism.  Worked hard.  Picked up

16   patients and peds when no other residents would.  No

17   red flags on this rotation."  Did I read that

18   correctly?

19     A    Yes, you did.

20     Q    Okay.  Um, do you know who the attending

21   was that wrote this feedback?

22     A    Well, I'm not positive, but I think it may

23   have come from West Jefferson Hospital because when

24   it says this about, "picked up patients and peds"

25   they have a little separate pediatric section, so

Page 32

1   this may have come from an off site but I'm not

2   positive.  We don't have --

3          This does not sound like a comment that

4   would have been made at University Hospital or the

5   mother ship.  We don't have a separate peds section

6   there, so I would definitely feel that this was

7   probably West Jefferson Hospital.

8      Q    Okay.  Do you know why this physician would

9   say they're looking at him very closely?

10     A    He probably told them.

11     Q    Okay.  Do you agree that they were looking

12  at him very closely?

13     A    I do not.  I -- I think that that is the

14  perception that a resident gets when they're put on

15  daily evaluation.  Um, I -- I invented daily

16  evaluations.  I thought it was a good way of giving

17  daily feedback to a resident that might have been

18  getting some negative feedback so that faculty are

19  then required to give them feedback, you know, in

20  real time.  It's meant to be a positive process and

21  I always found that it was a very positive process

22  because the resident was able to get feedback that

23  day and not wait for a month or six months to get

24  feedback about something and then not know it.  But,

25  the perception of the resident is:  Oh, my god, I'm

DR. MICELLE HAYDEL                         September 19, 2019

Page 33

1    being singled out.  I must be bad.

2        Q    Is that more often than not what a resident

3    thinks when they're put on --

4        A    Yes, they all think that.

5        Q    -- daily evaluations?

6             Okay.  Do you agree that Dr. Greenberg was

7    receptive to constructive criticism?

8        A    Yes, I do.

9        Q    All right.  The next paragraph below that.

10   "Dr. Greenberg has some challenges with

11   professionalism and interpersonal skills.  His

12   medical knowledge and decision making are adequate

13   but his general demeanor and approach need polish.

14   He seems to lack the insight and self-awareness to

15   understand this.  Problems need to be brought to his

16   attention so that he can make corrective actions."

17   Did I read that correctly?

18       A    Yes, you did.

19       Q    So, I know you might not know the answer to

20   this question, but because you're familiar with the

21   format of these evaluations, do you think that that

22   paragraph was written by the same person as the

23   paragraph before it?

24       A    It doesn't sound like it.

25       Q    The next paragraph after that has Legros in

DR. MICELLE HAYDEL                          September 19, 2019

Page 34

1   parentheses at the end.  Do you think that that is

2   part of Dr. Legros statement?

3        A     This font is like three-point font.

4        Q     It's very small.

5        A     Okay.  This represents a composite --

6              The first is to stop stating -- eating at

7   the doctor's desk.  Um, I don't know if they were

8   the same person or not.

9        Q     Okay.

10       A     I don't know.

11       Q     Um, do you feel that this feedback would be

12  typical feedback that a resident might receive?

13       A     I would estimate that, approximately,

14  20 percent of the residents would get, you know, in

15  each class, so there would be probably one to two in

16  each class, would have this type of feedback for

17  whatever, whether it's being late, or they're

18  medical knowledge.  There's, like, six different

19  kind of realms of things that we assess them on, and

20  Eric's happened to be interpersonal and

21  professionalism.

22       Q     Do most of those residents go on to finish

23  the program?

24       A     They all did -- do -- did.

25       Q     All right.  So the paragraph directly under

Page 35

1   on daily eval "stay focused"?

2       A    Yes.

3       Q    Okay.  It says, "As an attending with

4   several interactions with him on a particular night

5   shift I found his lack of attention to the details

6   to be disappointing.  He only seemed to be

7   interested in the procedure.  He was noted to be

8   asleep while the entire team was working on

9   patients.  I had to remind him that his skills

10  should be learned here on L and D, and that he was

11  not to go to the ER to see his buddies and assess

12  patients there."

13      A    That was an ObGyn rotation.

14      Q    Okay.  Do you know who the physician would

15  have been?

16      A    No.  It was probably a resident, though.

17  Probably one of his upper level ObGyn residents on

18  ObGyn rotation.

19      Q    So comments by upper level residents appear

20  on these evaluations sometime?

21      A    So, if the -- oh, well, this says as an

22  attending, so this must have been an attending.

23  There you go.  I'm sorry.

24      Q    I missed it, too.

25           Okay.  Are residents allowed to sleep at

DR. MICELLE HAYDEL                    September 19, 2019

Page 36

1    work at all?

2         A    On ObGyn they are.

3         Q    They are?

4         A    Yes.

5         Q    Is that because they work long shifts?

6         A    They are on call and they do.

7         Q    Okay.

8         A    And yes, they do.

9         Q    Okay.

10        A    From what I knew of the ObGyn rotation, the

11   room where our emergency medicine residents slept

12   was not in the same area where the ObGyn residents

13   were and sometimes there were communication issues,

14   so he was not the only one who ObGyns said, well,

15   they don't seem engaged.  But there was an issue

16   with -- you know, they were in their own call room

17   studying and didn't know that there was a case

18   coming up.  That sort of thing.  So this was not an

19   unusual comment.

20        Q    Okay.  So that was a -- that type of --

21        A    It was a two week --

22        Q    I'm sorry.  Go ahead.

23        A    It was a two week rotation.  I'm sorry.

24        Q    Two week rotation.  So that type of

25   complaint was common among the staff at that

DR. MICELLE HAYDEL                          September 19, 2019

Page 37

1   rotation?

2       A    I would say -- you know, I hate to say

3   "common" to me is more than 50 percent of the time.

4   It wasn't more than 50 percent of the time, but

5   probably a quarter of the time.

6       Q    Okay.  Let's look at Number 2.

7            So this is Dr. Greenberg's deposition.

8   Part of what I want to ask you about is on pages 57

9   through 59.  So, there's four pages per page.

10      A    Okay.  I got it.  Fifty-seven.

11      Q    Okay.  If you could just read pages 57

12  through 59 to yourself --

13      A    Okay.

14      Q    -- real quick.

15      A    Okay.  Got it.

16      Q    Okay.  So, in this part of the deposition

17  Dr. Greenberg is talking about the -- a meeting he

18  had with you regarding his evaluation for the period

19  from July 2014 to October of 2014, correct?

20      A    Yes.  That's what it sounds like.

21      Q    Okay.  Do you recall this meeting?

22      A    No.

23      Q    Okay.

24      A    I met with all residents.  Sorry.

25      Q    If you don't remember you don't remember.

```
 1          MS. ECHOLS:
 2               It's fine.  It's okay to say you
 3          don't know.
 4   BY MR. SCHMIDT:
 5      Q    All right.  Let's go on to Number 3.
 6      A    Oh, that was it?
 7      Q    No, we're going to come back to two a lot.
 8      A    I was like --
 9          MS. ECHOLS:
10               It was a long deposition.
11          MR. SCHMIDT:
12               It was a very long deposition.
13   BY MR. SCHMIDT:
14      Q    All right, now going to 3.  Go to page 7 of
15   8.  Page numbers at the very bottom.
16      A    Got it.  All right.
17                    (OFF THE RECORD)
18   BY MR. SCHMIDT:
19      Q    So, on page 7, under Interpersonal and
20   Communication Skills?
21      A    Yes.
22      Q    The paragraph that begins with "Needs to
23   work"?
24      A    Yes.
25      Q    It says, "Needs to work on documentation
```

DR. MICELLE HAYDEL                    September 19, 2019

Page 39

1    and verbal presentations.  These can generally be

2    viewed as sloppy with poor attention to detail.

3    Should always read notes for accuracy and

4    completeness prior to presenting them to staff."

5            Do you agree that Dr. Greenberg's

6    documentation or verbal presentations were sloppy or

7    demonstrated poor attention to detail?

8       A    These were isolated episodes.  I did not

9    see that when I worked with him.

10      Q    Okay.  What about inaccurate or incomplete

11   notes.  Did you ever see that from him?

12      A    It doesn't -- I don't recall any.

13      Q    Okay.  And, again, are these typical

14   comments that a resident would receive when getting

15   feedback or are they indicative that there's a

16   bigger problem?

17      A    These, again, would occur in,

18   approximately, 20 percent of residents.

19      Q    Okay.  All right.

20           And down below -- um, below the fourth

21   arrow.  It says, "Dr. Greenberg is not viewed on the

22   same level as his peers in this area.  He needs to

23   become more self aware of the image he presents and

24   how this may be perceived by patients colleagues and

25   staff.  Eric had to be woken up during the night

**DR. MICELLE HAYDEL**                              **September 19, 2019**

Page 40

1    float rotation and was not consistent in the

2    following of patients from admission to delivery.

3    He participated in deliveries but seemed a bit

4    uninterested in the overall labor process."

5          A     That was ObGyn rotation.

6          Q     Okay.

7          A     Same thing again?

8          Q     That was going to be my question.

9          A     Yes.

10         Q     Did you ever get the impression that Dr.

11   Greenberg was uninterested in his work?

12         A     No.

13         Q     All right.  Let's look at Number 4.

14               So, in the electronic file these came from

15   Dr. Greenberg's EEOC file and the EEOC put page

16   numbers at the very top.  They did not make it out

17   on the page when they were printed.

18         A     Do we have the same thing, because I have a

19   page number at the bottom.

20         Q     Well, there was at the very top, though,

21   there were pages that said 283 out of whatever.

22         A     Okay.

23         Q     So, this one will be easy because there are

24   page numbers at the bottom but a couple of them,

25   it's going to take a minute to find the page.

DR. MICELLE HAYDEL                           September 19, 2019

Page 41

1      A      Okay.

2      Q      But this is where it says page 2 at the

3  bottom.

4      A      Okay.  Go to page 2 at the bottom.

5      Q      All right.  The very first comment on the

6  page is from you.

7      A      Yes.

8      Q      It says, "Great multi-tasking.  Great job

9  supervising junior off-service residents."  What led

10  you to make those comments?

11      A      I don't recall.

12      Q      Okay.  Fair enough.

13      A      I would say that -- oh --

14              MS. ECHOLS:

15                    No, no.  You can.

16      A      I would say that if a resident is able to

17  manage multiple patients and also be teaching at the

18  same time, which can be a challenge to both teach

19  junior level residents as well as handling sick

20  patients all at one time.

21      Q      Okay.  Then, let's see four comments down

22  from there.  There's another comment from you which

23  just says, "teach more."

24      A      This -- is there dates on that?

25      Q      It look likes March 8, 2017.

**DR. MICELLE HAYDEL**                    **September 19, 2019**

Page 42

```
 1      A     And then the one before that?  It can't
 2  be -- that doesn't make sense.
 3      Q     They all say the exact same time to the
 4  second, actually.
 5      A     So, that doesn't make sense.
 6      Q     Okay.
 7      A     Maybe this was pulled on that date.  God.
 8  I'm sorry.  This is so hard to read that font.  This
 9  is my good eye.  I have bifocals on.  So, every
10  single comment is from that day or everything from
11  me is?
12      Q     Everything from you.
13      A     Uh, areas of improvement.  Don't know.  I
14  don't know.  I don't -- the system that pulls these,
15  um, I don't know if they lumped them together.  But
16  I don't know how that -- I don't know.
17      Q     If you don't know, you don't know.  That's
18  fine.
19      A     Okay.
20      Q     All right.  Now, we're going to skip around
21  a little bit.  I'm going to look at Number 10.
22      A     Yes.
23      Q     All right.  And this is an email exchange
24  between yourself and Dr. Greenberg, correct?
25      A     Yes.
```

DR. MICELLE HAYDEL                    September 19, 2019

Page 43

1     Q    If you could read this to yourself.

2     A    I'm familiar with it.

3     Q    You are?

4     A    Yes.

5     Q    So, you're response to Dr. Greenberg says,

6     "Correct, I was told by Dr. Tuckler about a

7     conversation he had where Dr. Mackey said that you

8     did not match into emergency medicine position.

9     Then you were handpicked to join our program by me

10    because a position opened up and I have been

11    protecting you ever since.  In that conversation Dr.

12    Mackey said you would have been fired by now if I

13    had not been protecting you."

14         Who is Dr. Tuckler?

15    A    He is a core faculty member.

16    Q    Okay.  You used that term earlier and I

17    should have asked you this then, but what does core

18    faculty mean?

19    A    In the eyes of ACGME, it -- there are

20    certain criteria that we must uphold including

21    research and teaching, um, academic responsibilities

22    as opposed to a person who just comes in and does a

23    shift and says, "see ya" but doesn't go to resident

24    conference or have any teaching responsibilities.

25    Q    So, a core faculty would be one who did

1   have the academic responsibilities.

2        A    Yes.  Yes.  Without -- you don't

3   necessarily have to have a title to be a core

4   faculty member.

5        Q    Okay.  Would core faculty members also work

6   shifts at the hospital?

7        A    Yes.  Yes.

8        Q    Okay.  And what about Dr. Mackey?  Who's

9   Dr. Mackey?

10       A    He was, at that time, the assistant program

11  director or one of the assistant program directors.

12       Q    So, he would have been directly under Dr.

13  Suau?

14       A    Yes.

15       Q    And he would have been supervising Dr.

16  Greenberg?

17       A    Yes.

18       Q    Okay.  Um, are your statements in this

19  email accurate?

20       A    Yes.

21       Q    Okay.

22       A    To the best of my knowledge.

23       Q    Okay.  What was the context in which that

24  conversation occurred?  Meaning, did Dr. Tuckler

25  approach you to tell you about it?

**DR. MICELLE HAYDEL**                    **September 19, 2019**

1      A    Yes.

2      Q    He did?

3      A    Yes.

4      Q    Why?  Was it because he was concerned?

5      A    Yes.

6      Q    Okay.  Um, what else did he say, if you

7  remember?

8      A    That's all I recall.

9      Q    Okay.  Is it true that Dr. Greenberg did

10  not match into an emergency medicine position?

11      A    No.

12      Q    Would it have been possible for him to

13  begin the program if he hadn't?

14      A    Yes.

15      Q    Okay.

16      A    Sometimes people go outside of the match.

17      Q    Okay.

18      A    And then are able to be brought into the

19  program which is what happened to one of the people

20  in his class.

21      Q    Okay.

22      A    But it was not him.

23      Q    Okay.  So, it's not accurate then to say

24  that Dr. Greenberg was handpicked by you?

25      A    No.  Not in the sense that this was

DR. MICELLE HAYDEL                    September 19, 2019

Page 46

1    implying.  He was handpicked in that we all -- we
2    chose all these residents, but he went through the
3    match the normal way.
4         Q    The other resident who you said did go
5    outside of match, did you have any involvement in
6    getting that resident hired?
7         A    Absolutely, yeah.  I was program director.
8         Q    You did?
9         A    Yep.  In fact, we -- we -- it wasn't -- too
10   much information.  You probably don't care.  I mean,
11   it doesn't matter.  I mean, yes, I did.
12             MS. ECHOLS:
13                  Sounds like the whole thing is very
14             complicated.
15        A    It is very complicated.  Isn't -- probably
16   impertinent to this.
17   BY MR. SCHMIDT:
18        Q    What I was getting at was this:  Was that
19   student handpicked by you in the sense that Dr.
20   Tuckler is talking about here?
21        A    I handpicked him, yes.  And it didn't go
22   before the committee.  We had a spot open up and I
23   did not want that one handpicked resident.  I didn't
24   want it to be known that they didn't actually match,
25   because that person did not match into emergency

DR. MICELLE HAYDEL                          September 19, 2019

Page 47

1  medicine, and we had a spot that opened up, and I

2  didn't want everybody in his class to know that, oh,

3  you didn't even match anywhere but yet Haydel was

4  able to pull you in because we had a spot open.

5      Q    Okay.

6      A    So I didn't advertise that that's how that

7  person got into the program.

8      Q    So, is your interpretation of that that Dr.

9  Mackey got Dr. Greenberg mixed up with this other

10  student?

11      A    Yep.

12      Q    Okay.  Would you say you were protecting

13  Dr. Greenberg?

14      A    I was supporting Dr. Greenberg.

15      Q    Okay.  In what sense?

16      A    At this point I was no longer the program

17  director.  I didn't have the ability to protect him.

18      Q    Okay.  Now, let's look at Number 5, please.

19           And this is another email exchange between

20  you and Dr. Greenberg, correct?

21      A    Yes.  Yes.

22      Q    Do you recall this exchange?

23      A    I recall that he asked me to confirm that I

24  was aware of these issues and that he wanted it in

25  writing so he wanted it in an email.

1     Q    Okay.  And your response was, "I recall the
2    conversations but I'm not sure about the specific
3    dates."
4     A    Correct.
5     Q    So I'm not going to ask you about specific
6    dates.
7     A    Thank you.
8     Q    But Number 1 here, where Dr. Greenberg says
9    that after a meting with Dr. Suau he discussed that
10   he felt that he felt that he was harassed by Dr.
11   Suau's comments about circumcision.  Do you recall
12   that comment by Dr. Greenberg?
13     A    I recall that it happened.  I recall that
14   he spoke to me about it and I was not the only one
15   in the room.  It was, I believe, Dr. Martinez.
16     Q    Okay.  Do you remember what the comments
17   were that Dr. Suau allegedly made?
18     A    Something about being circumcised.  I don't
19   recall the exact words.
20     Q    Okay.  And was it a comment made to Dr.
21   Greenberg?
22     A    That's what Greenberg said, yes.
23     Q    Um, what was your response to Dr. Greenberg
24   telling you this?
25     A    That he should speak to his faculty adviser

DR. MICELLE HAYDEL                    September 19, 2019

Page 49

1   and that I didn't think it was appropriate.

2       Q    Do you know who his faculty adviser was at

3   that time?

4       A    DeBlieux, D-E-B-L-I-E-U-X.

5       Q    Dr. DeBlieux.  Okay.

6       A    He really likes it when you misspell it,

7   too.

8       Q    Did you ever discuss this complaint with

9   anybody else?

10      A    No.  Not that I'm aware of.

11      Q    Did you ever hear Dr. Suau make any similar

12  comments to anybody?

13      A    No.  No.

14      Q    Did you believe Dr. Greenberg at the time?

15      A    Yes.

16      Q    And do you believe him now?

17      A    About what?

18      Q    About did that conversation occur with Dr.

19  Suau?

20      A    Yeah.  Yes.

21      Q    All right.  What do you recall about your

22  conversation with Dr. Greenberg and Dr. Martinez

23  about harassment by Dr. Suau during the ABEM

24  internist exam?

25      A    I recall that we recommended that he speak

**DR. MICELLE HAYDEL**                    **September 19, 2019**

Page 50

1  to his -- Dr. DeBlieux as well as Dr. Hilton if he
2  felt that he was being singled out.
3       Q    Okay.  What is the ABEM inservice exam?
4       A    Every year the residents take a test that
5  is kind of a smaller version of the qualifying
6  examination to be board certified in emergency
7  medicine.  It's kind of like a practice test.
8       Q    Okay.  Do you remember what Dr. Suau's
9  alleged behavior was that Dr. Greenberg was upset
10 about?
11      A    I remember that Eric said that he was -- it
12 was a computer that he typed on, and that Dr. Suau
13 said, "You're typing too loud."
14      Q    Okay.  Was there anything else?
15      A    That's all I recall.
16      Q    If what Dr. Greenberg said was accurate
17 does that makes sense to you?
18      A    Make sense?
19      Q    Sorry.  Would it be reasonable for a med
20 school teacher to -- I'm sorry.  A resident
21 supervisor to tell a resident that they were typing
22 too loudly during an exam?
23      A    I would find it unusual.
24      Q    Okay.  Have you ever heard somebody type
25 too loudly?

**DR. MICELLE HAYDEL**                    **September 19, 2019**

Page 51

1     A     (Witness points to the court reporter.)

2           MS. ECHOLS:

3                Let the record reflect the witness

4           pointed to the court reporter.

5   BY MR. SCHMIDT:

6     Q     Okay.

7     A     So, no.

8     Q     Okay.  What do you recall about your

9   conversation with Dr. Greenberg about Dr. Suau's

10  comments about his dietary practices?

11    A     Similar to the first question, which is he

12  was discussing that he felt uncomfortable with his

13  relationship with Dr. Suau, and that he did not

14  think it was appropriate for Dr. Suau to talk about

15  his Jewish eating habits.  But I'm using my own

16  words.  I don't think that's a thing, "Jewish eating

17  habits" but to that effect.

18    Q     So, Dr. Greenberg expressed to you that he

19  felt that this was offensive on the basis of his

20  religion?

21    A     He didn't say those words, but he felt it

22  was offensive.

23    Q     Okay.  But the comment, according to Dr.

24  Greenberg, did relate to his religion?

25    A     Yes.

Page 52

1      Q    What about the first conversation about
2  circumcision?
3      A    Same.
4      Q    He tied that to his religion as well?
5      A    Yes.
6      Q    All right.  Um, have you ever witnessed Dr.
7  Suau do or say anything that you would consider
8  racist?
9      A    No.
10      Q    Have you ever witnessed him do or say
11  anything that you would consider antisemitic.
12      A    No.
13      Q    Have you ever witnessed him do or say
14  anything that you would consider sexist?
15           MS. ECHOLS:
16                Off the record.
17                     (OFF THE RECORD)
18  BY MR. SCHMIDT:
19      Q    Okay.
20      A    I did see him occasionally looking at a
21  nurse as they walked by, um, raising his eyebrows in
22  a way that I thought was not professional.
23      Q    Did you ever hear him make any comments?
24      A    I don't recall.
25      Q    Okay.  Have you ever witnessed Dr. Suau do

Page 53

1    or say anything that you would consider

2    discriminatory in any way?

3         A    What do you mean "discriminatory"?

4         Q    Whatever your definition of discriminatory

5    is?

6              MS. ECHOLS:

7                   I think you need to define it for

8              her.  You're asking the question.

9    BY MR. SCHMIDT:

10        Q    Okay.  Um, did he ever exhibit any type of

11   prejudice against anybody, whether on the basis of

12   national origin, race, sex?

13        A    I didn't see that.

14        Q    You never saw that.  Okay.

15             And Dr. Suau's no longer employed at LSU,

16   correct?

17        A    Correct.

18        Q    Do you have knowledge of the reason why he

19   is no longer employed there?

20        A    I do not.

21        Q    Okay.

22        A    No.

23        Q    When -- do you know when it was?

24        A    Within the last year I believe, so maybe 12

25   months ago or so.

DR. MICELLE HAYDEL                              September 19, 2019

Page 54

1     Q     Do you know whether he was terminated or
2  resigned?
3     A     I think he stepped down.
4     Q     Voluntarily?
5     A     I do not know that.
6     Q     So you don't -- you don't have any idea
7  what the reason for that might have been?
8           MS. ECHOLS:
9                 Objection, asked and answered, but
10          you can say it again.
11    A     I don't have -- no one ever told me why.
12 BY MR. SCHMIDT:
13    Q     Okay.  Have you ever known Dr. Suau to be
14 dishonest?
15    A     Yes.
16    Q     Okay.  When and how?
17    A     I was on a shift with him and he lied about
18 where he was.
19    Q     About where?  What do you mean?
20    A     In the emergency department.
21    Q     Okay.  Why would he lie about that?
22    A     I have no earthly idea.
23    Q     Okay.
24    A     I was not his boss.
25    Q     How do you know that he lied?

**DR. MICELLE HAYDEL**                                **September 19, 2019**

Page 55

1    A    Because he told me he was somewhere and I

2    had needed to go to that same area and I said, "I

3    thought doctor -- I thought Sal was here."  And they

4    said, "We haven't seen him all morning."

5    Q    Um, okay.

6         Any other instances in which you've known

7    Dr. Suau to be dishonest?

8    A    Yes.  But there's one that -- it's

9    protected.  One of the -- through a peer review at

10   the hospital.

11   Q    Through a peer review at the hospital?

12   A    Uh-huh.

13   Q    What do you mean by that?

14        MS. ECHOLS:

15             What are those called?

16        THE WITNESS:

17             The peer review?

18        MS. ECHOLS:

19             They are --

20   A    It's -- we have peer review among --

21        It's kind of faculty-to-faculty review and

22   if a case comes up then I'm on the peer-review

23   committee, so I'm part of that.

24        MS. ECHOLS:

25             And usually general counsel is there.

DR. MICELLE HAYDEL                    September 19, 2019

Page 56

1   BY MR. SCHMIDT:

2       Q    Okay.

3       A    And it was investigated and dealt with.

4       Q    I'm not going to ask you any identifying

5   information about anybody else in the review or

6   anything like that, but I am going to ask you about

7   what he was dishonest about and if there is an issue

8   of whether or not this is admissible we can deal

9   with that at a later date?

10      A    In general it was about his documentation

11  about patient care.

12      Q    Dr. Suau's documentation?

13      A    Yes.

14      Q    And he was dishonest in that documentation?

15      A    That was the impression I got.

16      Q    What was he dishonest about?

17      A    It concerned the transfer of the care of

18  the patient to another faculty member.

19      Q    Okay.

20           MS. ECHOLS:

21               And, again, I'd object to that line

22           of questioning.  I'm just objecting for

23           the record --

24           THE WITNESS:

25               Okay.

DR. MICELLE HAYDEL                          September 19, 2019

Page 57

1          MS. ECHOLS:

2                  -- to the line of questioning.  I

3          believe general counsel was there, so.

4     BY MR. SCHMIDT:

5          Q    Okay.  Was Dr. Suau disciplined for that?

6          A    There was no discipline.  I guess it was --

7          Q    Okay.

8          A    It was a discussion.

9          Q    A discussion.

10         A    And watching.

11         Q    Was he reprimanded?

12         A    No.  He was watched.

13         Q    By whom?

14         A    The peer-review committee to look for a

15    trend.  There was no trend.

16         Q    Um, other than Dr. Greenberg have any other

17    residents, interns, students or faculty ever made

18    any complaints to you regarding Dr. Suau?

19         A    Aisha Parker did.

20         Q    Aisha Parker?

21         A    Um-hum.

22         Q    And who was that?

23         A    She was a co-resident of Greenberg's.  I

24    believe they were the same year.

25              MS. ECHOLS:

DR. MICELLE HAYDEL                    September 19, 2019

Page 58

1            She's on your witness list.

2      A    She's on your witness list.

3  BY MR. SCHMIDT:

4      Q    She is.  Um, what was her complaint?

5      A    That she was unclear about the feedback

6  that she received and how to improve to meet his

7  expectations, and that's why she came to me.

8      Q    Feedback she received from Dr. Suau?

9      A    Yes.

10     Q    Was this in connection with the probation?

11     A    The super secret probation?

12     Q    I'm gonna -- we're gonna have to ask you to

13 explain what you mean by that?

14     A    Again, I was not in any of these meetings.

15 Greenberg and Parker came to me on two -- not at the

16 same time and told me they were put on probation

17 along with two other residents by Suau and I

18 assisted in navigating in terms of their

19 documentation.  Kind of a reply of, you know, asking

20 for the specific behaviors that they needed to do in

21 order to meet his expectations and then within a

22 week or two they were told that they were never on

23 probation.  That they're not on probation.  That

24 this probation didn't count, and would not be in

25 their records.  I do not know the specific dates --

DR. MICELLE HAYDEL                          September 19, 2019

Page 59

1     Q     Okay.

2     A     -- before you ask.

3     Q     So -- so Dr. Greenberg, Aisha Parker and

4    two others?

5     A     But I don't know who they were.

6     Q     You don't know who they were.  Okay.

7           Had you ever heard of this being done at

8    any point in time prior to this?

9     A     Sal had -- he was new.  He was new to the

10   position so he hadn't done it to anyone else before.

11    Q     Okay.  Had you ever done that in your

12   tenure as program director?

13    A     I hadn't felt the need.  I put residents on

14   daily evaluations and they did well, fixed their

15   behavior, whatever it may be, and then we didn't get

16   to a point where we needed it.

17    Q     Okay.  Well, did you -- so you never put

18   anybody --

19    A     I actually did put someone on probation

20   before.

21    Q     Okay.

22    A     And they also had to be on, like, a 3-month

23   period of time where there were consecutive months

24   of daily probation.  So, yes, I'm sorry.

25    Q     But was this secret probation or a regular

Page 60

1   probation?

2        A    Regular.

3        Q    What was your response to Dr. Greenberg and

4   Dr. Parker when they came to you about this?

5        A    Again, I -- my recommendation to them was

6   to ascertain what specific behaviors that they

7   needed to do in order to meet his expectations

8   because the comments -- the comments they had been

9   given were very -- I found that they were vague and

10  it's difficult to improve your behavior if you don't

11  know what your behavior is that's wrong.

12       Q    Did you think it was strange that Dr. Suau

13  had allegedly told each of them that they were on

14  probation and, also, told them that they were not on

15  probation?

16       A    Well, it didn't happen the exact same day.

17  It first started with being on probation and then

18  later became not probation.

19       Q    Okay.

20       A    But it was a span of a week or so, I guess.

21       Q    Okay.  Did you think that was strange,

22  though?

23       A    I thought it was unusual.

24       Q    Okay.  All right.

25            All right.  Let's look at Number 6.  And

DR. MICELLE HAYDEL                    September 19, 2019

Page 61

 1  this is the one of the documents I was telling about
 2  where the page number at the top is cropped off.  So
 3  the page I want to ask you about is the third to
 4  last page of the document.
 5      A    So, the last word is "education"?
 6      Q    The last word is "education".  The first is
 7  "during shift."
 8      A    Got it.
 9      Q    Okay.  So, the very last paragraph on here?
10      A    Got it.
11      Q    States -- is dated March 8, 2017.  It says,
12  "Email from Dr. Salvador Suau.  Apologizes for not
13  getting expectations and written probation notice to
14  me.  States we will have a meeting in the upcoming
15  weeks to go over written expectations, a neutral
16  supervisor other than Dr. Salvador Suau, the long
17  awaited evaluation forms as per my due process
18  rights.  At this point I'm notified that the CCC is
19  to have an emergency meeting to discuss my
20  graduation date.  By Dr. Micelle Haydel, residency
21  program director, professor of emergency medicine,
22  director of education."  Did I read that correctly?
23      A    You did read it correctly.
24      Q    Um, what do you recall about the
25  allegations that Dr. Greenberg is making in this

DR. MICELLE HAYDEL                                    September 19, 2019

Page 62

1    paragraph?

2              MS. ECHOLS:

3                   Do you have the original email?

4                   I mean, this is -- this is a summary

5              of what -- I mean I know it went to the

6              EEOC but it would be better if -- you

7              understand?

8              MR. SCHMIDT:

9                   I do, and I can make my question a

10             little bit more clear.

11   BY MR. SCHMIDT:

12        Q    The last sentence of this, it's worded

13   somewhat strangely, but I interpret it as meaning

14   that you notified --

15        A    I don't recall it that I --

16        Q    You don't recall that happening?

17        A    Well, not in that fashion.

18        Q    Okay.

19        A    What I recall is that he contacted me to

20   say that, good news, we're having a meeting to talk

21   about how I'm going to get, you know, a plan for

22   graduation.  I said, yes, I also was invited to the

23   CCC emergency meeting.  So I'm assuming that's what

24   it's about, you know.

25        Q    Did you know anything about the emergency

DR. MICELLE HAYDEL                          September 19, 2019

Page 63

1   meeting?

2       A    No, I was -- I was -- in fact I applauded

3   Sal for including me as his mentor thinking this

4   would bring us all to the same page.  I said to Sal

5   I think this is a great idea because if we want to

6   move forward with this, it helps to have all parties

7   involved.

8       Q    And did the emergency meeting take place?

9       A    Yes.

10      Q    What was discussed at the meeting?

11      A    Eric's file, and a vote to fire him,

12  terminate him.

13      Q    Okay.  And who was present?

14      A    Oh, good Lord.  A lot of people.

15      Q    A lot of people?

16      A    I don't -- you have the letter, right?

17      Q    Right, I do have the letter?

18          MS. ECHOLS:

19               I don't have it.

20  BY MR. SCHMIDT:

21      Q    The people on the letter were at the

22  meeting?

23      A    Yeah, I think there was maybe -- like,

24  maybe, Van Meter wasn't there.

25          MS. ECHOLS:

Page 64

```
 1              There was a girl on maternity leave.
 2         Was she at the meeting?
 3         THE WITNESS:
 4              I don't know.
 5  BY MR. SCHMIDT:
 6     Q    Okay.  All right.
 7         All right.  Now, let's go back to Number 2
 8  for a minute?
 9     A    Should I dog ear this, you know, so that we
10  can get back to it?
11         MR. SCHMIDT:
12              No.
13         THE WITNESS:
14              No, we don't need that?
15  BY MR. SCHMIDT:
16     Q    So, pages 90 through 92 are the ones I want
17  to talk about.
18     A    Got it.
19     Q    All right.  Now, if you could just read
20  those to yourself, please.
21     A    Okay, got it.
22     Q    All right.  Um, did Dr. Greenberg report to
23  you that Dr. Luke LeBas -- am I pronouncing that
24  correctly?
25     A    LeBas.
```

DR. MICELLE HAYDEL                          September 19, 2019

Page 65

1      Q      Threatened him with a knife?

2      A      I believe it was a fair time afterwards.

3    He didn't come to me immediately.

4      Q      But he did discuss it with you?

5      A      Yes.

6      Q      What did he tell you?

7      A      That LeBas pulled a hunting knife out and

8    said I can cut you and nobody would do anything

9    about it.

10     Q      Do you remember, um, the context in which

11   this allegedly happened?

12     A      My impression was that it was in the ER on

13   a shift.

14     Q      During work?

15     A      Yes.

16     Q      And what was your response when Dr.

17   Greenberg tells you about that?

18     A      I was horrified.

19     Q      Did you give him any advice?

20     A      Yes.  I told him he needed to talk to

21   DeBlieux and Hilton and he said he had talked to

22   DeBlieux about it.

23     Q      Okay.  Do you know what actions, if any,

24   LSU took in response to the report?

25     A      I don't have they access to any of that.

1      Q     Okay.  Um, did Dr. Greenberg ever report
2   any other incidents to you regarding Dr. LeBas?
3      A     Not that I recall.
4      Q     Okay.  Did any other residents or students
5   make any complaints to you regarding Dr. LeBas?
6      A     Not to me to do something about, but -- too
7   much information.
8            MS. ECHOLS:
9                  No, no.  You go ahead.
10  BY MR. SCHMIDT:
11     Q     I mean, if there's a distinction there,
12  explain it.  I mean, did students complain to you
13  about him?
14     A     Yes, there's talking.  Residents complained
15  about him.
16     Q     Like about?
17     A     His professionalism.
18     Q     That he was unprofessional?
19     A     Yes.
20     Q     Did anybody report to you that they felt
21  threatened or intimidated by him?
22     A     I believe a nurse had a complaint about
23  him.
24     Q     Do you remember who that was?
25     A     No.  Just kind of they didn't feel like

DR. MICELLE HAYDEL                    September 19, 2019

Page 67

1   they wanted to work with him because he was

2   intimidating.

3        Q    Okay.  Do you agree with Dr. Greenberg's

4   conclusion that nothing was ever done in response to

5   his complaint?

6        A    From what I know, yes.

7        Q    Okay.  Do you know of anything being done?

8        A    I was on the peer-review committee.  It

9   never came up.

10       Q    Okay.  All right.  Now, I want to go back

11  to Number 6.  Um, so I wanted to ask you about the

12  fifth page of the document.  At the very top it's

13  Question 5.  Those are the words at the very top?

14       A    No.  Are we --

15            Oh, questions for the --

16       Q    Yes, counting the actual --

17       A    Okay.  Got it.

18       Q    Okay.  Sorry.  All right.  Directly under

19  PGY2.

20       A    Yes.

21       Q    The paragraph that's dated July 23, 2014.

22  Um, it says, "Complaint to Dr. Micelle Haydel,

23  residency program director, professor of emergency

24  medicine, director of education, and Dr. Peter

25  DeBlieux, CMO director, ED, Re: harassment by Dr.

DR. MICELLE HAYDEL                    September 19, 2019

Page 68

1   Tracy Legros, ER staff physician.  No resolution to

2   problem.  In addition to my complaint PGY3 resident

3   confirmed the targeting and harassing by Dr. Tracy

4   Legros, ER staff physician."

5          Um, do you recall Dr. Greenberg making a

6   complaint to you around this time about Dr. Legros?

7      A    I don't know the timing but I do know that

8   he complained to me that Dr. Legros -- he felt that

9   he was being harassed by Dr. Legros.

10     Q    Okay.  Harassing in what way?

11     A    Um, asking him to do more than was required

12  of other residents.

13     Q    Okay.

14     A    In terms of coming in when he shouldn't

15  have had to come in to see something.  Coming in

16  from home.

17     Q    Okay.  Do you have any personal knowledge

18  of whether that is true?

19     A    I got emails about it from him and the

20  other residents involved.  I don't know -- I think

21  y'all had 'em.  Didn't -- I think that was in the

22  evidence, though, wasn't it?  It was the whole

23  toxicology, come in and see a patient.  I'm sorry.

24  She took my phone and texted this.

25     Q    Yes.  I believe you're talking about an

DR. MICELLE HAYDEL                    September 19, 2019

Page 69

1    instance in which Dr. Greenberg was texting with

2    another resident who was informing him that Dr.

3    Legros had asked him to come in.  Then Dr. Legros

4    called Dr. Greenberg from that resident's phone.

5    Correct?

6        A    Yes.  Correct.

7        Q    Is it abnormal for an attending to ask a

8    resident to come in when they're off?

9        A    In that situation it was abnormal.  It was

10   not abnormal for Legros.  She's a bit harsh with

11   residents.

12       Q    Okay.  When you say in that situation it

13   was abnormal.  What do you mean by that?

14       A    There was no indication for him to come in.

15       Q    Okay.  You didn't feel it was necessary?

16       A    No.

17       Q    Did a resident or student named Beca

18   complain to you about Dr. Legros' treatment of Dr.

19   Greenberg?

20            MS. ECHOLS:

21                 Where are you reading?

22       A    Yeah.

23   BY MR. SCHMIDT:

24       Q    I'm actually not reading.  I was asking a

25   question.

DR. MICELLE HAYDEL                    September 19, 2019

Page 70

 1      A    I think that was part of that whole
 2  situation.  I think this was --
 3           Was she not involved in that situation?
 4      Q    Well, okay.  Let's --
 5      A    I do believe so, but I don't recall if it
 6  was that specific situation or not.  I think it may
 7  have been all related during that time.
 8      Q    Okay.  That's fine.  Yeah, let's go back to
 9  Number 2 the deposition, on Page 76.
10           MS. ECHOLS:
11               Page 76.  It's his deposition.
12      A    Okay.  Got it.
13  BY MR. SCHMIDT:
14      Q    Okay.  Would you just read that page to
15  yourself.
16      A    Okay.
17      Q    And then if you flip over to Page 78 and
18  read that page to yourself, please.
19      A    The whole page or?
20      Q    Yeah.
21      A    Okay.  Got it.
22      Q    Okay.  So, do you have any recollection of
23  either Beca Link or Joseph Framin complaining to you
24  about Dr. Legros' treatment of Dr. Greenberg?
25      A    I believe they corroborated what Greenberg

DR. MICELLE HAYDEL                          September 19, 2019

Page 71

 1    said happened, yes.

 2         Q     Okay.  Did they approach you?

 3         A     I don't recall.

 4         Q     Okay.

 5         A     I don't recall whether it started with

 6    Greenberg versus them; you know, how they got

 7    involved.

 8         Q     So, they also felt that Dr. Legros was

 9    treating Dr. Greenberg differently from other

10    residents?

11         A     At that time, yes.

12         Q     All right.  Let's go to Number 7.

13               All right.  So, this is Dr. Suau's

14    March 14, 2017 request for Dr. Greenberg's

15    termination, correct?

16         A     That's what it looks like, yes.

17         Q     Then, so in this document the first part,

18    the actual letter on the bottom right, there are

19    page numbers that are 1 out of 5 --

20         A     Yes.

21         Q     -- 2 of 5, 3 of 5.  After that, there are

22    attachments with handwritten numbers in the bottom

23    right?

24         A     Okie dokie.

25         Q     So when I refer to those pages I'll explain

Page 72

1  to you which ones I'm referring to, so --

2       A    Got it. got it.

3       Q    First, if you would just look at page 5 of

4  5 of the actual letter.

5       A    Okay.

6       Q    Okay.  And then I would -- I would hold

7  that spot but I'll ask you to look at Number 8.

8  You'll see why I'm doing this.

9       A    Okay.  Hold that spot, and go to 8 of

10 written --

11      Q    No, no.  Exhibit 8.

12      A    Okay.

13      Q    So, it appears that Number 8 is essentially

14 the last page of Dr. Suau's letter but with multiple

15 signatures at the bottom, correct?

16      A    It looks very similar.

17      Q    Okay.  And if you'd look at the second

18 page.

19          MS. ECHOLS:

20              I don't have -- we got it now.

21          MR. SCHMIDT:

22              Sorry.  Sorry.

23          MS. ECHOLS:

24              Okay.  I got it now.

25

DR. MICELLE HAYDEL                         September 19, 2019

Page 73

1    BY MR. SCHMIDT:

2        Q     All right.  And then if you'd look at the

3    second page of Exhibit 8.

4        A     Yes.

5        Q     There is a -- it looks like there is a spot

6    for your signature but you did not sign it, correct?

7        A     Correct.

8        Q     Why did you not sign it?

9        A     I went into the meeting thinking that we

10   were planning on setting up a plan for graduation.

11   When I found that the meeting was for his

12   termination, I did not feel that I had enough data

13   to discuss any -- or to make a decision.

14       Q     Okay.  Why -- do you know why they included

15   you in that meeting?

16       A     I don't know.  I found it odd.

17             At first I thought we were moving forward

18   so I thought it was a good thing, but then --

19                    (OFF THE RECORD)

20   BY MR. SCHMIDT:

21       Q     All right.  So, back on the record.

22       A     Yes.

23       Q     So, the reason that you didn't sign this

24   letter was because you felt that you didn't have

25   enough information to form an opinion about whether

DR. MICELLE HAYDEL                          September 19, 2019

Page 74

1   Dr. Greenberg should be terminated?

2        A     Correct.

3        Q     Okay.  All right.  Um, all right.  Let's

4   look at Exhibit 6, again.   The very last page of it.

5   The very first paragraph on that page says that on

6   "April 19, 2017 HR interview.  Give list of

7   witnesses including Aisha Parker, Micelle Haydel,

8   Francois Ancelet.  They have not been interviewed by

9   HR."  Did anybody from HR ever interview you --

10       A     No.

11       Q     -- in connection --

12       A     No.

13       Q     I'm sorry.

14             MS. ECHOLS:

15                   Let him finish the question.

16   BY MR. SCHMIDT:

17       Q     -- in connection with Dr. Greenberg's

18   termination?

19       A     No.

20       Q     The seventh paragraph on that page which is

21   the last one with the date 5/22/17?

22       A     Okay.

23       Q     "Received call from Dr. Micelle Haydel,

24   residency program director, professor of emergency

25   medicine, director of education, states that she was

Page 75

1    approached by Dr. Keith Van Meter.  He told her that

2    the medical school was unhappy that she was

3    supporting me.  She stated that she felt like this

4    was intimidation.  States that she has not been

5    contacted by HR as my witness."  Is Dr. Greenberg's

6    statement regarding what you told him accurate?

7         A    Um, I don't recall calling him.

8         Q    Okay.

9         A    Um, I did -- I do recall telling him that I

10   was told to back down.

11        Q    Okay.

12        A    And that I wasn't happy about it.

13        Q    Okay.  And was it Dr. Van Meter that told

14   you --

15        A    Yes.

16        Q    -- to back down.

17        A    Yes.

18        Q    What exactly did he say?  Do you remember?

19   To the best of your recollection, what did he say to

20   you?

21                     (OFF THE RECORD)

22        A    I've been talking --

23             I've been talking to the medical school,

24   and it's not a good idea if you keep supporting

25   Eric.  Something to that effect.

DR. MICELLE HAYDEL                           September 19, 2019

Page 76

1    BY MR. SCHMIDT:

2        Q    Okay.  UM, and this was after his

3    termination had been requested?

4        A    I don't know.  It looks like it.  It says

5    5/22/17, so.

6        Q    Okay.  What did you say to Dr. Van Meter

7    after he said that?

8        A    I said I have to do what's right.

9        Q    Okay.  Um, did you agree to speak or

10   testify at the hearing, the ad hoc committee hearing

11   for Dr. Greenberg's termination?

12       A    Yes.

13       Q    You did?  Okay.  And is it testimony?  Was

14   it sworn?  Did you take an oath at the beginning?

15       A    I don't remember.  I don't think so.

16       Q    Okay.  Did anyone else other than Dr. Van

17   Meter do anything that you interpreted as an attempt

18   to persuade you not to testify or speak on Dr.

19   Greenberg's behalf at that meeting?

20       A    I don't -- I didn't think that Van Meter

21   asked me not to speak at the meeting.

22            MS. ECHOLS:

23                 Are you talking about the ad hoc

24            meeting?

25

**DR. MICELLE HAYDEL**                    **September 19, 2019**

Page 77

1   BY MR. SCHMIDT:

2        Q    Okay.

3        A    Yeah.  That was not part of the --

4        Q    So, when you had that discussion it was not

5   concerning --

6        A    The ad hoc meeting?  No.

7        Q    Okay.

8        A    It was --

9        Q    Okay.  Um, did anyone else other than Dr.

10  Van Meter say or do anything that you interpreted as

11  them trying to persuade you to stop supporting Dr.

12  Greenberg?

13       A    I don't -- there was a general tone from

14  the residency leadership, but I don't recall any

15  specific conversations.

16       Q    The residency leadership; that would

17  include Dr. Sual?

18       A    Sal, Avegno.

19       Q    Okay.  Anyone else?

20       A    Well, there was other people on it, but I

21  don't think that -- I didn't feel that from them,

22  no.

23       Q    Okay.  Um, do you know -- does LSU Med

24  School policy require that complaints of harassment

25  or discrimination be forwarded to the dean?

DR. MICELLE HAYDEL                          September 19, 2019

Page 78

1       A      I'm not aware of that.

2       Q      You're not aware.  Okay.

3              Do you know if, uh, any reports of alleged

4    harassment or discrimination made by Dr. Greenberg

5    ever were forwarded to the dean?

6       A      I think they went to Hilton.  He's the head

7    of the GME, which I think he has a deanship.

8              MS. ECHOLS:

9                  He is dean of the medical school now.

10             THE WITNESS:

11                 Oh, he is?

12   BY MR. SCHMIDT:

13      Q      Okay.

14      A      But, I mean, he wasn't dean of the med

15   school then, but he was dean of -- I mean, there's

16   lot of deanships.

17             MS. ECHOLS:

18                 Yeah.

19      A      I think he carried the position of dean.

20   Yeah, some kind of dean title.

21   BY MR. SCHMIDT:

22      Q      And I believe you testified you're unaware

23   whether or not LSU took any action as to these

24   complaints?

25      A      I do not recall.  Have any knowledge.

DR. MICELLE HAYDEL                         September 19, 2019

Page 79

1        Q      All right.  So, let's look back to the
2    Exhibit 7.  So, um, item Number 4 on the letter.
3        A      So, we're on page --
4        Q      It's on page 2 of 5.
5        A      Yes.  Okay.
6        Q      All right.  If you would just read that to
7    yourself for me, please.
8        A      Okay.  I read it.
9        Q      Okay.  And then if you look at handwritten
10   page 4.
11       A      Okay.  You mean --
12       Q      Page number is handwritten, yeah.
13       A      Yes.
14       Q      So, does this appear to be the complaint by
15   the PTY1 resident that is referenced in item Number
16   4?
17       A      I don't think I've ever seen this 4 here,
18   so I need to read it.
19       Q      Go ahead.
20       A      Okay.  I read it.  It does sound like it.
21       Q      They have the same date, correct,
22   September 7, 2016?
23       A      It said September 2016.  Yeah.
24       Q      Then if you look at handwritten Number 5.
25       A      Yes, I think it's the same.

**DR. MICELLE HAYDEL**                    **September 19, 2019**

Page 80

1      Q     Okay.  So, this would be an email from Dr.
2   Mackey describing the September 7th incident --
3      A     Yes.
4      Q     -- correct?
5            Okay.  And then if you look at handwritten
6   Page 6.  And if you read that to yourself for me,
7   please.
8      A     Okay.
9      Q     Okay.  So, this appears to be the complaint
10  by the nurse that is referenced in Number 4,
11  correct?
12     A     It seems to be documentation of what
13  happened, yes.
14     Q     Okay.  Do you have any knowledge of this
15  incident?
16     A     Vague knowledge of it.
17     Q     From?
18     A     Greenberg.
19     Q     Just from Greenberg.  Okay.
20     A     Yeah.
21     Q     What do you recall him telling you about
22  it?
23     A     That he felt detached from the patient's
24  situation and he didn't feel that he handled it
25  well.  And that he had reached out to Sal about it.