## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ERIC GREENBERG

CIVIL ACTION

VERSUS

No. 19-137

BOARD OF SUPERVISORS OF LOUISIANA
UNIVERSITY AND AGRICULTURAL
AND MECHANICAL COLLEGE

SECTION I

### ORDER & REASONS

Before the Court are three motions[1] in limine by defendant, the Board of Supervisors of Louisiana University and Agricultural and Mechanical College ("LSU Board"), to exclude or, in the alternative, limit the testimony of plaintiff Eric Greenberg's ("Greenberg") proposed experts, Julie Sherriff ("Sherriff"), Dr. Stan V. Smith ("Dr. Smith"), and Dr. Karen Jubanyik ("Dr. Jubanyik"). For the following reasons, the motions are granted in part and denied in part.

### I.

Greenberg has filed claims of retaliation and hostile work environment based on religion against the LSU Board, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, in connection with his termination from the Emergency Medicine Residency Program at Louisiana State University Health Sciences Center – New Orleans ("LSUHSC-NO"). In support of his claims, Greenberg has retained three experts—Sherriff, Dr. Smith, and Dr. Jubanyik—each of whom

---

[1] R. Doc. Nos. 50, 51, & 52.

the LSU Board challenges under Federal Rule of Evidence 702 and *Daubert*. The Court will address the admissibility of each proposed expert's testimony in turn.

## II.

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993); *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (discussing witnesses whose expertise is based purely on experience). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th

Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Id.* "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.*; *see also Daubert*, 509 U.S. at 596.

*Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires a trial court to conduct a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire*, 526 U.S. at 147.

"[T]he expert's testimony must be reliable at each and every step or else it is inadmissible." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). All aspects of an expert's testimony are subject to the reliability analysis, including the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion. *Id.* The court may use a number of nonexclusive factors to evaluate the reliability of expert testimony, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the technique's potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Curtis v. M&S*

*Petroleum, Inc.*, 174 F.3d 661, 669 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 593–94). The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see also Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) ("Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702.").

With respect to determining the relevancy of an expert's testimony pursuant to Rule 702 and *Daubert*, the proposed testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Federal Rule of Evidence 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note). In other words, expert testimony is wholly unnecessary where a jury can "adeptly assess this situation using only their common experience and knowledge." *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 449 (5th Cir. 1990).

The Court applies a preponderance of the evidence standard when performing its gatekeeping function under *Daubert. See Daubert*, 509 U.S. at 592 n.10. When expert testimony is challenged under Rule 702 and *Daubert*, the burden of proof rests with the party seeking to present the testimony. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

## III.

### A. Julie Sherriff

Greenberg has retained Sherriff as a proposed expert to testify to Greenberg's ability to become board-certified, his future job prospects including the market demand for emergency medicine physicians, the average age of retirement of emergency medicine physicians, and the salary differences between emergency medicine and urgent care physicians.[2] The LSU Board moves to exclude Sherriff's opinions, arguing that they are unreliable pursuant to Federal Rule of Evidence 702 and *Daubert*.[3]

Sherriff has worked in the physician recruitment and placement industry since 1983.[4] She founded and currently serves as the president of Sherriff & Associates, Inc., a company that specializes in placing physicians and advanced practitioners in positions with medical groups, hospitals, and other healthcare organizations.[5] Sherriff has recruited and placed physicians in a variety of practice settings, such as

---

[2] *See* R. Doc. No. 50-3.
[3] R. Doc. No. 50-1, at 1.
[4] R. Doc. No. 50-3, at 1.
[5] *Id.*

in medical groups, solo practices and partnerships, hospitals, universities, academic centers, and national clinics providing specialty services to the public.[6] Sherriff is also involved with several trade associations in the physician recruitment industry and has served in various leadership roles for those associations.[7]

Sherriff's expert report offers four general conclusions: (1) as a result of Greenberg's dismissal from the residency program at LSUHSC-NO, he is unlikely to be able to obtain a position in another emergency medicine residency program; (2) Greenberg's dismissal from LSUHSC-NO "was career-ending in terms of him becoming an emergency medicine physician in most hospitals" and Greenberg would have been in high demand as a board-certified emergency medicine physician; (3) it is common for emergency medicine physicians to practice beyond the age of sixty;[8] and (4) the average salaries of emergency medicine physicians, who generally must be board-certified, are significantly higher than the average salaries of urgent care physicians, who generally need not be board-certified.[9] Sherriff also provides the average range of salaries of emergency medicine physicians compared to urgent care physicians and a chart detailing the wage growth of emergency medicine and urgent care physicians.[10] The Court will consider the reliability and relevance of each of Sherriff's conclusions in turn.

---

[6] *Id.* at 2.
[7] *Id.*
[8] R. Doc. No. 50-3, at 14.
[9] *Id.* at 9–12.
[10] *Id.*

*i.*

Sherriff, based on her experience in the field of physician recruiting and placement, concludes that because of the competition for specialty emergency medicine residencies and Greenberg's dismissal from LSUHSC-NO's residency program, "it would be unlikely that Dr. Greenberg would be seen as a top contender and able to obtain another Emergency Medicine residency if he chose to apply."[11]

To reach this conclusion, Sherriff relies on her experience in the physician recruitment business, specifically that she has "never worked with a physician who was dismissed from a residency program for cause, and subsequently went on to enter, and successfully complete, residency training in the same or even a different medical specialty."[12] Sherriff notes that although Greenberg could apply to another

---

[11] *Id.* at 19.

[12] *Id.* at 18. It is unclear to the Court whether Sherriff's statement means that she has never worked with any physician who was dismissed from a residency program for cause, or that she has worked with such a physician but was unable to place him or her in any medical specialty as a full-time physician. Greenberg argues that the LSU Board's statement that Sherriff "'has never placed a physician that is simply board eligible let alone one that is not board certified' mischaracterizes the testimony and improperly suggests that Ms. Sherriff has never attempted to place a physician that has not yet been board-certified." R. Doc. No. 57, at 9 (quoting R. Doc. No. 50-1, at 7). However, the portion of Sherriff's deposition testimony that Greenberg relies upon is her statement that she would place physicians without board-certification if she could, but that "the problem is finding a hospital that would—whose medical staff bylaws will allow that." *Id.* at 9–10 (quoting R. Doc. No. 57-1, at 22). It thus remains unclear whether Sherriff has worked with physicians who were dismissed from residency programs for cause. However, regardless of whether Sherriff has worked with such a physician and attempted to find him or her employment as a full-time practicing physician, she still does not have any experience placing a physician in a *residency* program after he or she has been dismissed from another residency program for cause. As Sherriff testified in her deposition, she has no experience placing physicians in residencies because all physicians seeking residencies must "go through the [electronic] match . . . process." R. Doc. No. 57-1, at 22.

emergency residency program to complete his residency, "competition is historically keenly fierce for program year one (PGY-1) residency positions if he must start his residency over," because "there are historically not enough first year residency openings for the number of registrants available, and there are a very limited number of slots available at the second to fourth year level, as those openings occur only if the slot has been vacated by another resident."[13] In addition to her experience, Sherriff also relies on the Association of American Medical Colleges's 2019 Match Summary report of April 2019 ("Match Summary report"), which indicates that 44,608 individuals applied for all medical residency specialties, only 32,194 available residency positions were available, and only 2,458 residency positions were available in the specialty of emergency medicine.[14]

The LSU Board argues that Sherriff is not qualified to render her opinion as to whether Greenberg could transfer to another residency program because she has never been involved with the selection and ranking of residency applicants.[15] In Sherriff's deposition, she stated that she has "never been involved in [ranking potential residents]," but that "[her company and employees] are knowledgeable— somewhat knowledgeable of the process[.]"[16] Sherriff also clarified that she has never worked in human resources in either an academic or medical institution.[17]

---

[13] R. Doc. No. 50-3, at 18.
[14] *Id.* at 19.
[15] R. Doc. No. 50-1, at 9–10.
[16] R. Doc. No. 50-4, at 2.
[17] *Id.* at 2–3.

Greenberg does not specifically address the LSU Board's argument that Sherriff is not qualified to testify that Greenberg would likely not be able to secure another residency position in an emergency medicine program, but rather argues that "Sherriff's testimony is reliable because the scope of her expertise is properly aligned with the scope of the opinion she has rendered."[18]

The Court finds that Sherriff is not qualified to testify as an expert on Greenberg's inability to find another position in an emergency medicine residency program. First, Greenberg has not satisfied his burden of proof with respect to his attempt to qualify Sherriff as an expert in emergency medicine *resident* placement or recruitment in emergency medicine residency programs. Greenberg has not demonstrated that Sherriff has sufficient knowledge, training, education, or skill to offer an expert opinion with respect to Greenberg's chances of being accepted into another emergency medicine residency after having been dismissed from a prior emergency medicine residency.[19]

Sherriff's first conclusion that Greenberg will be unable to obtain a position in another emergency medicine program is also unreliable. The only facts that Sherriff relies on to support her conclusion is the Match Summary report, which indicates that an emergency medicine residency position is competitive.[20] Sherriff cannot opine on Greenberg's inability to obtain another emergency medicine residency position,

---

[18] R. Doc. No. 57, at 8.
[19] Further, Greenberg does not provide any cases in which Sherriff has been accepted as an expert in medical residency placement.
[20] R. Doc. No. 50-3, at 18–19.

after being terminated from LSUHSC-NO's residency program, based on the bare fact that emergency medicine residency positions are competitive for medical students seeking residency positions immediately out of medical school. Sherriff has no research, or experience with such research, to support her conclusion that because Greenberg was dismissed from one emergency residency program, it is highly unlikely that he could obtain an emergency medicine residency position in another program.[21]

### ii.

Sherriff next opines that Greenberg's dismissal from LSUHSC-NO "was career-ending in terms of him becoming an emergency medicine physician in most hospitals, due to his lack of residency training completion and his ineligibility to sit for his board exams," and that had he completed his residency **and** become board-certified, he would have been in high demand as an emergency medicine physician.[22]

Greenberg specifically relies on Sherriff's testimony to show that (1) Greenberg will likely be unable to obtain a position as an emergency medicine physician because he will never be board-certified, and (2) there is a high demand for emergency

---

[21] The LSU Board further argues that Sherriff's opinions are unreliable because she did not "review crucial details regarding [Greenberg's] discharge" and did nothing "to actually vet whether [Greenberg] actually applied to the other [thirty-two] residency programs" that he claims rejected him subsequent to his termination from LSUHSC-NO's residency program. R. Doc. No. 50-1, at 10–11. The Court does not exclude Sherriff's opinion on these grounds because they go to the weight of Sherriff's opinion rather than to its admissibility.

[22] R. Doc. No. 50-3, at 12, 18 ("The demand for Emergency Medicine physicians continues to climb annually and for years, abundant positions have been available nationwide for [emergency medicine] physicians to consider.").

medicine physicians, but most, if not all, of these positions require board certification. Absent Sherriff's testimony, Greenberg would allegedly not be able to prove that he fulfilled his duty to mitigate damages by using reasonable diligence to obtain substantially equivalent employment.[23]

The LSU Board does not dispute that the only way Greenberg may become board-eligible or -certified in emergency medicine is by successfully completing an emergency medicine residency.[24] Rather, the LSU Board argues that Sherriff is unqualified to render an expert opinion to the effect that it is impossible for Greenberg to obtain a position as an emergency medicine physician in most hospitals without being board-eligible or -certified and that there is a high demand for board-certified emergency medicine physicians.[25] The LSU Board contends that Sherriff's opinion with respect to the qualifications emergency medicine physicians must

---

[23] Greenberg offers Sherriff's testimony to support his argument that he used reasonable diligence to obtain "substantially equivalent employment" as an urgent care physician, and that he could not have obtained a higher-salaried emergency medicine physician position because he is not board-eligible or -certified. R. Doc. No. 57, at 5–6. Title VII claimants have a duty to mitigate their damages. *See Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990). Employers meet their burden of establishing a failure to mitigate by showing that substantially equivalent work was available and that the claimant did not exercise reasonable diligence to obtain it. *Id.* "Substantially equivalent employment" is "employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position" that the Title VII claimant held before termination. *Id.*

[24] The LSU Board argues that Sherriff erroneously assumes that Greenberg could have successfully completed his residency, passed his boards to become board-certifiied, and progressed long-term as an emergency medicine physician, had he not been terminated from LSUHSC-NO's residency program. R. Doc. No. 50-1, at 3. Such arguments are properly addressed through cross-examination and argument at trial.

[25] R. Doc. No. 50-1, at 8–9.

possess to practice emergency medicine is irrelevant and would be confusing to the jury because in her report "she emphasizes that board certification is a *de facto* requirement to obtaining employment as an emergency physician," but concedes in her deposition testimony that certification is not a prerequisite to practicing emergency medicine in all hospitals.[26]

In order to be qualified as an expert, the proponent must demonstrate that the expert possesses a higher degree of knowledge, skill, experience, training, or education than an ordinary person. *See* Fed. R. Evid. 702. "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). "Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony and then leave to the jury the extent of those qualifications." *Jones v. Blue Cross Blue Shield of Louisiana*, No. 16-340, 2018 WL 585543, at *4 (M.D. La. Jan. 29, 2018) (citing *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999), *superseded by statute on other grounds*). "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss*, 571 F.3d at 452.

---

[26] R. Doc. No. 71, at 5–6. The LSU Board also asserts that Sherriff's deposition testimony shows that "she is not knowledgeable about rudimentary job placement requirements in the field of emergency medicine," because she "[does] not even know if the state of Michigan – the state where Greenberg currently resides with his family – requires emergency medicine physicians to be board certified." *Id.* at 9. However, the question actually posed to Sherriff was whether she knew where Greenberg had gotten the information that "to work in . . . any Michigan ER, you had to be board-certified[.]" R. Doc. No. 57-1, at 42.

The record supports a finding that Sherriff is qualified to offer her opinions that most hospitals require emergency medicine physicians to be board-certified and that there is a high demand for emergency medicine physicians. Sherriff has worked in the physician recruiting and placement industry for thirty-six years and owns her own physician recruiting and placement company that places physicians throughout the United States. She offers perspective regarding the physician recruitment and placement process. Sherriff is also involved in her field and connected with other industry members through a number of organizations in which she has served, including the National Association of Physician Recruiters (NAPR) and First Choice, Inc.[27] Sherriff was a founding member of NAPR, the national trade association for the industry, and she has served as the organization's president, vice president, secretary, and on its board of directors, among other positions.[28] *See Sentinel Integrity Solutions, Inc. v. Mistras Group, Inc.*, No. 10-1576, 2011 WL 13258115, at *5 (S.D. Tex. Sept. 1, 2011) (finding it relevant, when determining that the witness was qualified to testify as an expert in his field, that he had worked in the industry for forty-two years and had served on numerous committees for industry trade associations).

These facts are sufficient to show that Sherriff has professional experience and personal knowledge in the physician recruitment and placement field exceeding that of an ordinary person. *See Rideau v. Lafayette Health Ventrues, Inc.*, No. 18-473, 2019

---

[27] R. Doc. No. 50-3, at 2.
[28] *Id.*

WL 1923380, at *3–4 (finding a physician recruiter qualified to testify as an expert in physician job placement who had twenty-five years of experience in the industry and had previously owned his own physician recruitment company); *Crankshaw v. City of Elgin*, No. 1:18-75, 2019 WL 3883564, at *5 (W.D. Tex. May 8, 2019) (holding that working in the recruiting industry for at least thirteen years and owning a boutique recruiting firm were sufficient qualifications to show that the expert witness had experience and knowledge exceeding that of an ordinary person).

The LSU Board's challenges to Sherriff's qualifications and lack of specialization go to the weight and credibility of her opinions rather than their admissibility. *See e.g., United States v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir. 2013), *cert. denied*, 124 S. Ct. 1011 (2014) (holding that "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications"). If the LSU Board believes that Sherriff's opinion is entitled to less weight due to the fact that the majority of her experience has been in major metropolitan areas,[29] she has a lack of experience placing emergency medicine physicians,[30] or she has wavered in her opinion as to whether Greenberg is foreclosed

---

[29] *See* R. Doc. No. 50-1, at 7.

[30] *See id.* Sherriff asserts that she has placed "hundreds of physicians in medical practices located throughout the United States" in practice areas "across the board," but she testified in her deposition that she could not recall how many emergency medicine physicians she had placed. *Id.* at 35. When Sherriff's company has received requests for emergency medicine physicians, they have been for physicians that are board-certified, but Sherriff agreed with counsel for the LSU Board in her deposition that "[t]here may be some [companies]" that are "placing ER physicians who are not board-certified" because "[t]here are not enough [emergency medicine] board certified physicians to fill every [emergency room physician] position." *Id.* The LSU Board can

from practicing emergency medicine because he will never be board eligible,[31] the LSU Board can make that case to the jury at trial. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Sherriff's experience qualifies her to testify to the demand of emergency medicine physicians and the qualifications that hospitals typically require for emergency medicine physicians. *See Sentinel*, 2011 WL 13258115, at *5. Sherriff may also use her internet research to support her conclusions at trial, as explained below, if experts in her field would reasonably rely upon those kinds of facts or data in forming an opinion on the subject. *See* Fed. R. Ev. 703. Sherriff relies on 18,000 emergency medicine job advertisements "on a variety of physician and career job boards" to conclude that most hospitals require emergency medicine physicians to be board-certified.[32]

The LSU Board argues that Sherriff's research is unreliable because she clarified in her deposition that she and her assistant reviewed, at most, only three to five-hundred of the job postings, and most of the postings did not list job requirements.[33] However, when the postings did list job requirements, they included

---

elicit this testimony at trial to rebut Sherriff's conclusion that most hospitals require emergency medicine physicians to be board-certified.

[31] R. Doc. No. 71, at 5–6.
[32] R. Doc. No. 50-3, at 12.
[33] R. Doc. No. 50-1, at 8; R. Doc. No. 50-4, at 13.

completion of an emergency medicine residency and board certification or eligibility.[34] The LSU Board also highlights Sherriff's note in her report that "the same job opening may be listed on more than one jobsite, which would result in an additional 'count' of some jobs,"[35] to support the argument that her research is thereby unreliable.[36]

Greenberg contends that "there is no requirement that an expert must review every piece of paper in existence that could conceivably relate to her testimony in order for her testimony to be reliable," and that Sherriff was not required to review all 18,000 job postings "to support [her] opinion that the job market is open and competitive for board-certified Emergency Room physicians."[37]

As a recruiter, Sherriff is familiar with the demand for physicians and the typical requirements that hospitals demand from applicants. Generally, challenges to the sources that inform an expert's opinion affect the weight of an expert's testimony rather than its admissibility. *See Viterbo*, 826 F.2d at 422. Thus, an appropriate way for the LSU Board to challenge Sherriff's opinion and internet research is through cross-examination and the presentation of evidence. *See Crankshaw v. City of Elgin*, No. 1:18-75, 2019 WL 3883564, at *5 (W.D. Tex. May 8, 2019) (permitting an expert witness to rely on his research of the job market which was based on job postings on Indeed.com and Glassdoor.com because "searching for employment is not an exact science"). Further, Sherriff noted the limitations of her

---

[34] R. Doc. No. 50-3, at 12–13.
[35] *Id.* at 12.
[36] R. Doc. No. 50-1, at 8.
[37] R. Doc. No. 57, at 10.

research in her report, but adequately explained how she arrived at her conclusions. *See id.* Sherriff's searches for the availability of emergency medicine physician positions and the qualifications hospitals typically seek when hiring emergency medicine physicians are proper areas of inquiry.

### *iii.*

The Court rejects the attempt by Greenberg to have Sherriff testify as to her third conclusion, that emergency medicine physicians typically retire past the age of sixty.[38] Sherriff states in her report that "[i]n [her company's] experience, it is common for emergency medicine physicians to practice beyond the age of sixty," and that her company "continues to receive job inquiries regarding fulltime, part-time, and locum tenens positions from emergency medicine physicians who are in their [sixties]."[39] Sherriff also relies on a 2018 report from the Association of American Medical Colleges that found that in 2017, 65.4% of practicing emergency medicine physicians were under the age of fifty-five, 34.6% were over the age of fifty-five, and the median age of retirement for all physicians in *all* specialties is sixty-five.[40]

Sherriff provides no indication of how many inquiries she has received for emergency medicine physician placements, much less how many she has received for physicians over the age of sixty. Furthermore, the report Sherriff relies upon does not conclude that it is common for emergency medicine physicians to practice beyond the age of sixty, just that a little over one-third of emergency medicine physicians are

---

[38] R. Doc. No. 50-3, at 14.
[39] *Id.*
[40] *Id.*

above the age of fifty-five. The report found that the median age of retirement for *all* physicians in all specialties is sixty-five, not that the median age of retirement for emergency medicine physicians specifically is sixty-five.[41] Sherriff's anecdotal evidence that some emergency medicine physicians retire past the age of sixty is "of such little weight that the jury should not be permitted to receive [her] opinion." *Fair v. Allen*, 669 F.3d 601, 607 (5th Cir. 2012). Sherriff's opinion, as supported solely by anecdotal evidence, is not only unreliable, but it "would not actually assist the jury in arriving at an intelligent and sound verdict," and it is therefore inadmissible at trial. *Id.*

### iv.

Sherriff next concludes that the average salaries of emergency medicine physicians, who generally must be board-certified, are significantly lower than the average salaries of urgent care physicians, who generally need not be board-certified. Sherriff also provides the average range of salaries of emergency medicine physicians compared to urgent care physicians and a chart detailing the trend for compensation of emergency medicine and urgent care physicians.[42] Sherriff pulls her data from the Medical Group Management Association (MGMA), American Medical Group Association (AMGA), American College of Emergency Physicians (ACEP), and Merrit Hawkins & Associates (MHA).[43]

---

[41] *Id.*

[42] *See id.* at 9–12.

[43] R. Doc. No. 50-3, at 9–11.

The LSU Board argues that the surveys Sherriff relies upon for the salaries of emergency medicine physicians and urgent care physicians are unreliable because she cannot account for the methods used in compiling these surveys.[44] The LSU Board further asserts that Sherriff failed to verify whether the emergency medicine physicians who responded to the surveys were board-certified and her conclusions as to the average salaries for emergency medicine physicians will only serve to confuse the jury by suggesting certain compensation figures are not available to Greenberg when they may well be.[45] Accordingly, the LSU Board argues, if Sherriff's reported salaries for emergency medicine physicians are available to physicians who are not board-certified, like Greenberg, the surveys are unreliable and of no assistance to the trier of fact in demonstrating how Greenberg's inability to complete his residency and become board eligible equated to a financial loss.[46]

The compensation figures for emergency medicine physicians Sherriff cites in her report, such as the ACEP 2018–19 Compensation Report for Emergency Physicians that Dr. Stan V. Smith references in his report, are only relevant if they reflect the compensation of *board-certified* emergency medicine physicians. Otherwise, as the LSU Board points out, they do not reflect Greenberg's potential financial loss because the data could include salaries of emergency medicine physicians who are not board-certified, and Greenberg could obtain these types of positions with similar salaries. Although MGMA reports have been held to be reliable

---

[44] R. Doc. No. 71, at 2.
[45] *Id.* at 4.
[46] *Id.* at 4–6.

under *Daubert* and recognized as the industry standard for physician compensation by at least one federal court, there was no dispute in that case that the salary information available applied to the plaintiff-physician. *Rideau*, 2019 WL 1923380, at \*5. Sherriff's compensation data will not "assist the trier of fact to understand or determine a fact in issue" unless she can establish that the reported salaries are only for board-certified emergency medicine physicians. *Bocanegra*, 320 F.3d at (citing *Daubert*, 509 U.S. at 591-92).

Sherriff testified in her deposition that there is "[n]o way of knowing" whether the reported salaries of emergency medicine physicians in the MGMA data included only board-certified physicians or also non-board-certified physicians.[47] The MGMA data is therefore inadmissible. Sherriff may rely upon the emergency medicine physician salary data from AMGA, ACEP, or MHA, however, if she can establish at trial that such data only includes the reported salaries of board-certified emergency medicine physicians.

## B. Dr. Stan V. Smith

### i.

Greenberg has retained Dr. Smith as a proposed expert to establish the value of Greenberg's "loss of wages subsequent to his alleged wrongful termination" from the residency program.[48] The LSU Board argues, however, that Dr. Smith's wage loss calculations are based on "unreliable methodologies that lack a proper factual

---

[47] R. Doc. No. 50-4, at 12.
[48] R. Doc. No. 56, at 2.

foundation."[49] Specifically, the LSU Board contends that Dr. Smith's calculations rest on several faulty assumptions—most significantly, that Greenberg would have obtained a job as an emergency medicine physician in Texas after completing his residency program and that he would be employed at a pay rate specified in one of the two sample employment agreements that Greenberg provided.[50]

In support of Dr. Smith's proposed expert testimony, Greenberg asserts that Dr. Smith's expert opinion as to Greenberg's net wage loss is reliable and that the LSU Board's challenges to his conclusions "go to the weight of Dr. Smith's testimony rather than its admissibility."[51]

### ii.

Dr. Smith divides his net wage loss calculation into two scenarios, using figures from two employment agreements that Greenberg alleges he received. He also applies a wage offset based on Greenberg's reported 2018 earnings and projected wage growth using averages for urgent care physicians from the AMGA survey, the MGMA

---

[49] R. Doc. No. 52-1, at 8.

[50] *See* R. Doc. No. 52-1, at 10. In addition, the LSU Board asserts that Dr. Smith's reliance on a report that Sherriff prepared is improper because Dr. Smith did not independently examine the methodologies or underlying data that Sherriff used to develop her report. *See id*. As discussed herein, the LSU Board has also moved to exclude Sherriff's testimony, arguing that it is unreliable and irrelevant, *see* R. Doc. No. 50, and asserting that the alleged unreliability of Sherriff's testimony will thereby "impute" to the testimony of Dr. Smith. R. Doc. No. 72, at 2. Because the Court finds that Sherriff's use of certain compensation rates is improper due to their failure to distinguish between non-board- and board-certified positions, Dr. Smith's use of these compensation rates in his conclusions is also improper.

[51] R. Doc. No. 56, at 9.

survey, and the MHA survey.[52] Scenario one is based on employment at St. David's South Austin Medical Center Facility ("St. David's") in Austin, Texas, which provides for 50% of Greenberg's work time to be spent at St. David's and 50% of his time to be spent at Metroplex Adventist Hospital ("Metroplex"), also in Austin.[53] Under scenario one, Dr. Smith calculated Greenberg's total compensation to be $16,065,495.00 and net wage loss to be $5,667,119.00, assuming that Greenberg would work until age sixty-seven.[54] Scenario two is based on full-time employment at Metroplex.[55] Under scenario two, Dr. Smith calculated Greenberg's total compensation to be $14,413,250.00 and net wage loss to be $4,014,874.00, again assuming that Greenberg would work until age sixty-seven.[56]

The LSU Board argues that Dr. Smith's testimony is inadmissible because it is based on unreliable methodologies and unsupported factual assertions. According

---

[52] *See* R. Doc. No. 52-4, at 6. As discussed in the Court's evaluation of Sherriff's proposed expert testimony, the Court finds that Sherriff's use of the MGMA compensation data was improper because the survey does not distinguish between non-board-certified and board-certified positions. Dr. Smith's use of the MGMA survey data also undermines the reliability of his conclusions to the extent that his calculations did not account for such distinction. The Court also notes that Sherriff and Dr. Smith may rely on the data from the AMGA and MHA surveys if it is established at trial that their use of such data accounted for the distinction between non-board-certified and board-certified physicians.

[53] *Id.* at 3; R. Doc. No. 52-9, at 8.

[54] R. Doc. No. 52-4, at 8. The "Summary of Losses for Eric Greenberg" chart that Dr. Smith provides in his report delineates the projected net wage loss at age sixty-seven. *Id.* However, Greenberg has not asserted that he intends to work as an emergency medicine physician until age sixty-seven, and Dr. Smith has not explained why this conclusory chart only states the estimated net wage loss for the age of sixty-seven, even though Dr. Smith's report includes Greenberg's projected wage loss for ages thirty-eight to seventy-eight. *See id.* at 10–17.

[55] *Id.* at 8.

[56] *Id.*

to an analysis prepared by the LSU Board's "expert economists," Ed Comeaux ("Comeaux") and Charles Theriot ("Theriot"),[57] Dr. Smith incorrectly calculated the projected wages in scenario one because he "exclusively applied the St. David's pay, which is higher than the Metroplex pay" to the contract, even though Greenberg's time would be split evenly between the two institutions.[58] This error results in an overstatement of Greenberg's projected wage loss in scenario one by approximately $500,000.00.[59]

The LSU Board also disputes whether these two agreements represent actual post-residency employment offers made to Greenberg, rather than merely "sample" contracts. Although Greenberg stated in a declaration that he received these offers from St. David's and Metroplex before he was terminated from the residency program,[60] the LSU Board contends that "subpoenas to these hospitals provided no confirming evidence that [Greenberg] ever received an employment offer."[61] The LSU Board also notes that the copies of these agreements that Greenberg provided in discovery bear a "SAMPLE" watermark on each page.[62]

With respect to whether these agreements are actual employment contracts that Greenberg received, the Court finds Greenberg's response to be less than

---

[57] R. Doc. No. 52-1, at 11. The LSU Board has provided the report that Comeaux and Theriot prepared. *See* R. Doc. No. 52-12, at 42–68. Greenberg has not challenged the expertise of Comeaux or Theriot.
[58] R. Doc. No. 52-1, at 11.
[59] R. Doc. No. 52-12, at 8.
[60] R. Doc. No. 58-3, at 11.
[61] R. Doc. No. 52-1, at 4.
[62] *Id.* at 3.

satisfactory, as Greenberg simply states that he "will testify at trial and will have an opportunity to establish at that time that he received the documents from these institutions."[63] Greenberg then asserts that "the parties will have the opportunity to establish the authenticity of all of these documents at trial."[64] Notably, Greenberg has not provided any further evidence to support the legitimacy of these "sample" agreements as post-residency job offers that would have been available to him had he not been terminated from the residency program at LSUHSC-NO.

Greenberg's position with respect to the authenticity of these agreements as legitimate job offers is troubling because the agreements provide foundational figures for Dr. Smith's wage loss calculations. As Greenberg acknowledges, Dr. Smith based his projections on the assumption that if Greenberg had been able to complete his residency, Greenberg would have worked at either St. David's or Metroplex in accordance with the terms set forth in either one of these two agreements, including compensation at the wage rates set forth therein.[65] If these "sample" agreements do not reflect true employment offers made to Greenberg, they do not serve as relevant bases for Dr. Smith's calculations. Dr. Smith has also not explained why his exclusive use of the wage rates provided for in these agreements—rather than regionally- or

---

[63] R. Doc. No. 56, at 13. At a pretrial conference with both parties, Greenberg's counsel was unable to provide additional evidence that the agreements were, in fact, employment contracts that Greenberg received as offers of employment.

[64] *Id.*

[65] *See id.* at 3–4. As Dr. Smith stated in his deposition, "I only assumed and I will inform the jury that my work is based on him working under these two contracts." R. Doc. No. 52-5, at 58–59. Dr. Smith also candidly stated, "I have no idea nor do I care" whether the two agreements that Greenberg provided to him "were legally executed" as employment contracts. *Id.* at 58.

nationally-representative figures—is a reliable method to determine Greenberg's projected wage loss.

Notably, neither Dr. Smith nor Greenberg has established whether the terms of these agreements are representative of the wages that an emergency medicine physician would receive and whether they would depend on board certification.[66] Moreover, in his report, Dr. Smith notes his review of the average annual compensation rates for emergency physicians in the Southeast and Southwest regions, which include Louisiana and Texas, respectively, but he nevertheless uses the wage rates set forth in the St. David's and Metroplex agreements.[67] It is evident to the Court that Greenberg's annual compensation under the St. David's agreement, as calculated by Dr. Smith, is higher than the average annual compensation for both regions.[68] However, Dr. Smith has not explained why the wage rates he used in his

---

[66] The LSU Board raised a similar objection to Sherriff's expert testimony.

[67] Dr. Smith indicates that he obtained the average compensation rates for both regions from Sherriff's report, which in turn relied on the "2018–2019 Compensation Report for Emergency Physicians." *See* R. Doc. No. 52-4, at 3–4. As stated previously, the LSU Board argues that Dr. Smith's reliance on Sherriff's report is improper. The Court includes this portion of Dr. Smith's analysis to demonstrate its overall unreliability; the Court does not express an opinion as to the reliability of the 2018–2019 Compensation Report for Emergency Physicians.

[68] Dr. Smith states that the average annual compensation for emergency medicine physicians in the Southeast and Southwest regions are $416,000.00 and $389,000.00, respectively. *Id.* at 3–4. Dr. Smith calculated Greenberg's annual compensation under the St. David's agreement to be $422,329.00. *Id.* at 4. Dr. Smith's calculation for Greenberg's annual compensation under the Metroplex agreement—$378,000.00—is closer to the reported averages for the Southeast and Southwest regions. *Id.*

As an additional matter, and as stated previously, Dr. Smith appears to have incorrectly applied the wage rates provided for in the St. David's agreement by exclusively using the higher St. David's pay, rather than considering the split-time provision with Metroplex.

calculations should be relied upon in lieu of the regional averages he cited in his report. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Because Greenberg has not yet established whether these two agreements constitute actual employment offers that he received, Dr. Smith may not be able to testify as to Greenberg's projected earnings based on the compensation rates set forth in these agreements. However, if Greenberg is able to close the "analytical gap" and properly establish at trial the validity of these agreements as employment offers made to him, Dr. Smith may be able to offer his expert testimony with respect to the compensation that Greenberg would have earned under the Metroplex agreement.[69]

The LSU Board also objects to Dr. Smith's reliance on salary figures for physicians in Texas, rather than other regions such as Michigan. According to the LSU Board, because physician salaries are comparatively higher in Texas than in Michigan, the use of Texas figures may overestimate Greenberg's projected wage loss.[70] Greenberg has not directly explained why Dr. Smith's wage loss projections

---

[69] Dr. Smith's calculation of the projected compensation under scenario one, which he asserts is based on the St. David's agreement, is unreliable and inadmissible because it fails to account for the division of time between St. David's and Metroplex and the differing wage rates of each institution.

[70] *See* R. Doc. No. 52-1, at 13. According to a survey cited by Sherriff, the compensation for an emergency room physician is 24% higher in Texas than Michigan. *Id.*

are based on Texas compensation rates although, presumably, Dr. Smith's calculations use Texas figures because the "sample" employment agreements are from Texas medical institutions. However, neither Greenberg nor Dr. Smith has provided the Court with a specific reason for wage projections based on Texas compensation rates rather than Michigan, where Greenberg currently works, or any other geographic region. In fact, Dr. Smith testified in his deposition that he did not make any effort to investigate "where [Greenberg] was qualified to work" because it would be a "waste of time and client money."[71]

The LSU Board further disputes the methodology that Dr. Smith used to calculate Greenberg's projected wage loss and wage offset, and it highlights Dr. Smith's failure to validate the data he used. According to the LSU Board, Dr. Smith "ignores surveys by [Greenberg's] physician recruiter that show the earnings of urgent care physicians as being higher, both regionally and nationally, than the wage base he uses."[72] In addition, by calculating Greenberg's wage offset projection based on compensation trends for someone who works as an "employee of another," rather than a person in Greenberg's current employment situation, i.e., working as a physician who owns his own business, Dr. Smith allegedly understates Greenberg's offset earnings and overstates Greenberg's net wage loss.[73] Greenberg has not

---

[71] *Id.* at 14.

[72] *Id.* at 12.

[73] *Id.* at 13. Dr. Smith explains that he used Greenberg's 2018 earnings as the base for his wage offset projections, which are calculated according to data from the MGMA, AMGA, and MHA surveys for urgent care physicians. *See* R. Doc. No. 52-4, at 6.

explained why Dr. Smith's calculation of the wage offset, which is not based on the nature of Greenberg's current occupation as the provider and owner of an urgent care clinic in Michigan, is relevant and reliable.

Furthermore, according to the LSU Board, Dr. Smith "admitted that he had no idea how many hours [Greenberg] worked in his first year of urgent care practice, or even if [Greenberg] worked full time during his first year."[74] In Dr. Smith's deposition, when asked whether the wage base he used was "representative of a full-time urgent care provider," Dr. Smith responded, "I don't know who else earns that," and "what other people in this profession, how many hours they work, I don't know."[75] Dr. Smith's failure to provide factual support for the assumptions underlying his wage loss calculations undermine the reliability of his conclusions.[76] *See Hathaway v. Bazany*, 507 F.3d 312, 318–19 (5th Cir. 2007) (affirming district court's decision to

---

The LSU Board further argues that in calculating the wage offset, Dr. Smith failed to account for Greenberg's future plan to pursue a position as a medical director or administrator, which, as Dr. Smith acknowledges, "could have a very, very significant increase in pay over that of a—of a—of the career that—for which the contracts represent his earnings." R. Doc. No. 52-5, at 65. However, because Greenberg's future career plan appears speculative at this stage of the proceedings, the Court will not assess whether Dr. Smith should have accounted for Greenberg's intention to pursue a different career path after working as an emergency medicine physician.

[74] R. Doc. No. 72, at 9.

[75] R. Doc. No. 72-1, at 21.

[76] As an additional matter, the LSU Board highlights Dr. Smith 's failure to account for the possibility that Greenberg "suffered no loss whatsoever," since Greenberg has decided to open an urgent care facility in Michigan and has not demonstrated that he would not be able to obtain employment in emergency medicine. R. Doc. No. 52, at 13. The evidence as to Greenberg's alternative employment prospects are discussed herein in the Court's analysis of Sherriff's proposed expert testimony. If Dr. Smith does testify at trial, pending the establishment of a proper foundation, the LSU Board will have the opportunity to cross-examine Dr. Smith on this alleged deficiency in his conclusions.

exclude testimony of expert who did not "offer any specific factual support for the reliability of his initial assumptions").

### *iii.*

"Expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible." *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (quoting *Hathaway*, 507 F.3d at 318); *see Mac Sales, Inc. v. E.I. du Pont de Nemours & Co.*, 24 F.3d 747, 752 (5th Cir. 1994) ("In the exercise of its discretion a district court may exclude expert testimony that lacks an adequate foundation."). Greenberg has not provided the Court with sufficient supporting evidence that would permit a finding that Dr. Smith's calculations were based on substantiated wage and hour figures for Greenberg's projected wage loss as a result of his termination from the residency program at LSUHSC-NO, or that Dr. Smith used appropriate compensation and offset rates in his overall calculations. Accordingly, absent the establishment of a proper evidentiary foundation at trial, Dr. Smith may not testify as to Greenberg's net loss of wages because his testimony "has neither the sufficient facts nor the reliable methodology that would warrant its inclusion as evidence." *Hathaway*, 507 F.3d at 319.[77]

---

[77] As stated previously, if Greenberg is able to establish at trial that the Metroplex agreement was a valid employment offer made to him pending his completion of the LSUHSC-NO residency program, then Dr. Smith may testify as to the compensation that Greenberg would have received under the Metroplex agreement in scenario two. However, he may not testify as to his calculation of the projected compensation under scenario one because Dr. Smith incorrectly applied the wage rates set forth in the St. David's agreement. In addition, Dr. Smith may not testify with respect to Greenberg's wage offset or Greenberg's overall net loss of wages because his conclusions as to those matters are unreliable and lack adequate factual support.

## C. Dr. Karen Jubanyik

Greenberg has retained Dr. Jubanyik as a proposed expert to testify to the adequacy of the feedback and documentation provided by LSUHSC-NO, the appropriate standard of care for placing a central line in a crashing patient, and the professionalism of communications between Greenberg and a supervising physician.[78] The LSU Board moves to exclude Sherriff's opinions, arguing they are unreliable pursuant to Federal Rule of Evidence 702 and *Daubert*.[79]

Dr. Jubanyik is a board-certified emergency medicine physician and practices emergency medicine in an academic hospital setting.[80] Dr. Jubanyik has been an associate residency program director, an interim residency program director, and a medical student clerkship director, and she is currently an academic advisor for students at Yale Medical School.[81] Dr. Jubanyik also teaches professionalism and communication skills to medical students, works and teaches during clinical shifts with the Yale-New Haven Hospital emergency medicine residents, and serves on the Yale Emergency Medicine Residency Education Committee.[82]

---

The Court notes that Dr. Smith has been rejected as an expert on lost wages in a previous case that also involved a plaintiff in the medical profession. *See Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc.*, No. 1:11-CV-430-WTL-DML, 2015 WL 3448947 (S.D. Ind. May 29, 2015). In that case, the district court found that his assumption with respect to the plaintiff's current earning capacity was "demonstrably incorrect" and that there was "no evidentiary basis for his assumption" that the plaintiff "would have had a career in critical care medicine rather than internal medicine." *Id.* at *3.

[78] *See* R. Doc. No. 51-3.
[79] R. Doc. No. 51-1, at 1.
[80] R. Doc. No. 51-3, at 1.
[81] *Id.*
[82] *Id.*

Although not always expressly stated, Dr. Jubanyik's expert report appears to offer four general conclusions: (1) there was "an overall lack of documentation of Dr. Greenberg's performance in his first year (PGY1) of residency" and LSUHSC-NO did not provide Greenberg with proper feedback;[83] (2) Greenberg complied with the standard of care when he did not administer local anesthesia to a crashing patient before he placed a central line;[84] (3) Dr. Suau's emails and texts to Greenberg were "unprofessional in tone and content for communications from a residency program director with a resident";[85] and (4) "it does not seem that [LSUHSC-NO] provided" an environment "free of . . . religious bias[.]"[86] The Court will consider the reliability and relevance of each of Dr. Jubanyik's conclusions in turn.

### i.

Dr. Jubanyik first concludes that there was "an overall lack of documentation of Dr. Greenberg's performance in his first year (PGY1) of residency" and that LSUHSC-NO did not provide Greenberg with "[d]etailed, summative feedback" that was "focused on specific observed behaviors and not interpretations of motives or behaviors."[87] In her report, Dr. Jubanyik analyzes the documented feedback Greenberg was given during his time at LSUHSC-NO, and she explains why such feedback would not have been helpful to Greenberg and was otherwise improper and inadequate.

---

[83] *Id.* at 1–2.
[84] *Id.* at 2.
[85] *Id.* at 3.
[86] *Id.*
[87] *Id.* at 1.

The LSU Board argues that Dr. Jubanyik's opinion as to the sufficiency of LSUHSC-NO's documentation is unreliable because "she merely assesses the program speaking from her anecdotal career experience within emergency medicine (a career entirely limited to one university in the state of Connecticut)," which is "not falsifiable" or based on any actual research.[88] The LSU Board further asserts that Dr. Jubanyik's opinion as to the adequacy of Greenberg's feedback is merely a "[c]onclusory opinion[] . . . [that] lack[s] the evidentiary reliability mandated by Rule 702 because [it] fail[s] to set forth a discernable methodology."[89] The LSU Board points out that Dr. Jubanyik failed to review materials readily available to her on LSU Medical School's website regarding its residency program and resources, and that she did not refer to any national materials such as documents from the Counsel of Residency Directors or the Residency Review Committee.[90]

Greenberg argues in response that "[t]here is no 'scientific' testing that could have been performed to determine whether [Dr. Greenberg's] alleged deficiencies [are] . . . shortcomings experienced by typical, competent residents or are indicative of a problem resident,"[91] and that Dr. Jubanyik "possesses the practical experience necessary to opine on whether alleged deficiencies on the part of a resident are typical or would justify termination[.]"[92]

---

[88] R. Doc. No. 51-1, at 7–8.

[89] *Id.* at 8–9 (quoting *General Star Indem., Co. v. Sherry Brooke Revocable Trust*, No. SA-99-CA-105-HG, 2001 WL 34063890, at *10 (W.D. Tex. Mar. 16, 2001).

[90] R. Doc. No. 51-1, at 9.

[91] R. Doc. No. 55, at 10.

[92] R. Doc. No. 55, at 7. Even if LSUHSC-NO unjustifiably terminated Greenberg's residency, it would only be actionable under Title VII if his residency was terminated

Dr. Jubanyik is intimately familiar with Yale's Emergency Residency Program ("Yale's Program") and the feedback and documentation she would expect to be generated in connection with a resident in Yale's Program. However, her experience working for a single residency program does not provide her with the requisite expertise to opine as to a national standard for documentation and feedback by *all* emergency medicine residency programs. Dr. Jubanyik does not reference a national standard for emergency medicine residency programs in her report, or provide any other information or data which suggests that she has surveyed or extensively researched various emergency medicine residency programs to determine best practices. If Greenberg argues at trial that the proffered reasons for his termination were pretextual, the jury will be capable of evaluating the evidence and determining, on its own, whether the reasons given were valid. *See Shawler v. Ergon Asphalt & Emulsions, Inc.*, No. 15-2500, 2016 WL 1019121, at *11 (E.D. La. Mar. 15, 2016) (Africk, J.) (citation omitted) (holding that "expert testimony on matters in which a jury is capable of understanding and deciding without an expert's help" should be excluded).

### ii.

Dr. Jubanyik next concludes that Greenberg complied with the standard of care when he did not administer local anesthesia to a crashing patient before placing

---

for an *unlawful* reason. *See Bryant v. Compass Group USA, Inc.,* 413 F.3d 471, 478 (5th Cir. 2005) ("[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision. Management does not have to make proper decisions, only non-discriminatory ones.") (citations omitted).

a central line.[93] One reason LSUHSC-NO provided for Greenberg's dismissal was that Greenberg placed a central line in a mentally challenged patient without any form of analgesia.[94]

The LSU Board argues that Dr. Jubanyik's opinion should be excluded because she was provided with inaccurate information to reach her conclusion, and her opinion is analogous to the testimony that was excluded in *Viterbo*.[95] According to the LSU Board and another witness, the patient was not crashing when Greenberg placed a central line without anesthesia, which is confirmed by the patient's medical chart.[96]

The Fifth Circuit recognizes that "as a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned to the opinion rather than its *admissibility*." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004) (internal quotations and citation omitted); *Pipitone,* 288 F.3d at 250 ("The fact-finder is entitled to hear [the expert witness's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert witness] relied are accurate."); *In re M&M Wireline & Offshore Servs., LLC*, No. 15-4999, 2017 WL 480603, at *6 (E.D. La. Feb. 3, 2017) (Brown, J.) (denying a motion to

---

[93] R. Doc. No. 51-3, at 2.
[94] R. Doc. No. 51-7, at 2.
[95] R. Doc. No. 51-1, at 10–11.
[96] *Id.* at 10.

exclude expert testimony in which the movant argued that the expert's conclusions were unfounded).

The LSU Board may present evidence through other witnesses that nothing in the patient's records indicated that he or she was crashing at the time Greenberg placed the central line. It may also cross-examine Dr. Jubanyik with respect to whether her opinion would change if the patient had not been crashing. This case is distinguishable from *Viterbo* because Dr. Jubanyik did not provide a completely unsupported opinion—Dr. Jubanyik's opinion as to whether Greenberg complied with the proper standard of care is based upon the medical information provided to her, and the LSU Board can contest the factual accuracy and completeness of such information at trial.

### iii.

Dr. Jubanyik opines that Dr. Suau's emails and texts to Greenberg were "unprofessional in tone and content for communications from a residency program director with a resident."[97]

Expert testimony is wholly unnecessary where a jury can "adeptly assess [the] situation using only their common experience and knowledge." *Peters*, 898 F.2d at 449; *see also Shawler*, 2016 WL 1019121, at *11. The jury will be capable of determining, on its own, whether Dr. Suau's communications to Greenberg were unprofessional or inappropriate. Dr. Jubanyik will not be permitted to testify as to the professionalism of Dr. Suau's emails and texts at trial.

---

[97] R. Doc. No. 51-3, at 3.

*iv.*

Finally, Dr. Jubanyik broadly concludes, that "from the records provided to [her], it does not seem that [LSUHSC-NO] provided" an environment "free of . . . religious bias[.]"[98] Counsel for Greenberg indicated to the Court at the pretrial conference on November 14, 2019 that such testimony would not be elicited from Dr. Jubanyik at trial. The proposed testimony would be otherwise inadmissible because it offers a legal opinion and it would not assist the trier of fact. *Shawler v. Ergon Asphalt & Emulsions, Inc*, No. 15-2599, 2016 WL 1019121, at *10 (E.D. La. Mar. 15, 2016) (Africk, J.) (citing *Estate of Sowell v. United States of America*, 198 F.3d 169, 171 (5th Cir. 1999) and *Askanase v. Fatjo*, 130 F.3d 657, 669 (5th Cir. 1997)); *see also Bocanegra*, 320 F.3d at 584.

## III.

Accordingly,

**IT IS ORDERED** that the LSU Board's motions *in limine* are **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

New Orleans, Louisiana, November 26, 2019.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[98] *Id.*